**SUMMONS IN A CIVIL ACTION - COURT OF COMMON PLEAS, CUYAHOGA COUNTY JUSTICE CENTER**
CLEVELAND, OHIO 44H3

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV08676856 | D4 CM | 12908429 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

| | |
|---|---|
| HARTFORD MEZZANINE INVESTORS I LLC. | **PLAINTIFF** |
| VS | |
| SCOTT A CHAPPELLE  ET AL | **DEFENDANT** |

## SUMMONS

ROSALIND KRAMER
1427 WEST SAGINAW STE 200
EAST LANSING MI 48823-0000

You have been named defendant in a complaint (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

You are hereby summoned and required to answer the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

Said answer is required to be served on:



Said answer is required to be served on Plaintiff's Attorney (Address denoted by arrow at left.)

Your answer must also be filed with the court within 3 days after service of said answer on plaintiff's attorney.

Plaintiff's Attorney

KIRK W ROESSLER
2020 HUNTINGTON BLDG.

925 EUCLID AVENUE
CLEVELAND, OH 44115-0000

If you fail to do so, judgment by default will be rendered against you for the relief demanded in the complaint.

Case has been assigned to Judge:

RONALD SUSTER
Do not contact judge. Judge's name is given for attorney's reference only.



GERALD E. FUERST
Clerk of the Court of Common Pleas

| DATE |
|---|
| Nov 21, 2008 |

By _____
Deputy

COMPLAINT FILED   11/19/2008

CMSN130

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| HARTFORD MEZZANINE | ) | |
| INVESTORS I, LLC, | ) | CASE NO. |
| a Delaware limited liability company, | ) | |
| | ) | JUDGE |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SCOTT A. CHAPPELLE | ) | |
| 1427 West Saginaw, Ste. 200 | ) | |
| East Lansing, MI 48823, | ) | |
| | ) | |
| LAURA A. CHAPPELLE | ) | |
| 1427 West Saginaw, Ste. 200 | ) | |
| East Lansing, MI 48823, | ) | **COMPLAINT** |
| | ) | |
| EVERT KRAMER, JR. | ) | |
| 1427 West Saginaw, Ste. 200 | ) | |
| East Lansing, MI 48823, | ) | |
| | ) | |
| ROSALIND KRAMER | ) | |
| 1427 West Saginaw, Ste. 200 | ) | |
| East Lansing, MI 48823, | ) | |
| | ) | |
| KEVIN T. MCGRAW | ) | |
| 4520 N. Grand River Ave. | ) | |
| Lansing, MI 48906, | ) | |
| | ) | |
| SHARON D. MCGRAW | ) | |
| 4520 N. Grand River Ave. | ) | |
| Lansing, MI 48906, | ) | |
| | ) | |
| Defendants. | ) | |

1712361.3

Plaintiff Hartford Mezzanine Investors I, LLC, a Delaware limited liability company ("**Lender**" or "**Plaintiff**"), by and through its undersigned counsel, hereby files its Complaint against Defendants Scott A. Chappelle, Laura A. Chappelle, Evert Kramer, Jr., Rosalind Kramer, Kevin T. McGraw, and Sharon D. McGraw ("**Defendants**" or "**Guarantors**") and states and alleges as follows:

*The Parties*

1.    Plaintiff is a limited liability company organized and existing under the laws of the State of Delaware.

2.    Guarantors Scott A. Chappelle, Laura A. Chappelle (the "**Chappelles**"), Evert Kramer, Jr., Rosalind Kramer (the "**Kramers**"), Kevin T. McGraw, and Sharon D. McGraw (the "**McGraws**") are adult individuals who are members or former members of Woodland Lakes Investment Group, L.L.C., a Michigan limited liability company ("**Woodland**" or "**Borrower**") and who conduct or have conducted business at, and who may be found at 1427 West Saginaw, Ste. 200, East Lansing, Michigan 48823.  In addition, the McGraws may be found at 4520 North Grand River Avenue, Lansing, MI 48906.

*Facts Common to All Counts*

3.    On or about January 4, 2006, Woodland signed and delivered to Lender that certain Term Note dated January 4, 2006, in the original principal amount of $3,340,000.00 (the "**Note**").  A true and correct copy of the Note is attached hereto as **Exhibit A**.

4.    In order to secure the amounts owed under the Note, Borrower signed and delivered that certain Loan Agreement dated January 4, 2006 (the "**Loan Agreement**"), a true and correct copy of which is attached hereto as **Exhibit B**.

5.      In connection with the indebtedness and obligations owed by Borrower to Lender, Guarantors executed that certain Guaranty dated January 4, 2006 (the "**January 2006 Guaranty**"), pursuant to which Guarantors guaranteed to Lender the payment and performance of certain obligations owed to Lender, as specifically set for the in the January 2006 Guaranty. A true and accurate copy of the January 2006 Guaranty is attached hereto as **Exhibit C**.

6.      Borrower committed multiple Events of Default under the Note and Loan Agreement, including its failure to make certain required payments owed to Lender, thereunder.

7.      On or about January 8, 2008, Lender, through its legal counsel, provided notice to Borrower and Guarantors of such defaults and made written demand upon Borrower and Guarantors for cure of the defaults under the Note and Loan Agreement (the "**January 2008 Default Notice**").  A true and accurate copy of the January 2008 Default Notice is attached hereto as **Exhibit D**.

8.      Borrower did not cure said defaults and continued to be in default under the Note and Loan Agreement.

9.      On or about February 14, 2008, Lender, through its legal counsel, provided written notice to Borrower and Guarantors that the indebtedness owed under the Note and other loan documents was accelerated (the "**Acceleration Letter**").  A true and accurate copy of the Acceleration Letter is attached hereto as **Exhibit E**.

10.      On or about June 3, 2008, Borrower, Guarantors and Lender entered into that certain Forbearance and Modification Agreement (the "**Forbearance Agreement**").  A true and accurate copy of the Forbearance Agreement is attached hereto as **Exhibit F**.

11.      In connection with the Forbearance Agreement, the Chappelles and Kramers executed that certain Guaranty dated June 3, 2008 (the "**June 2008 Guaranty**"), pursuant to

1712361.3                                   **3**

which they absolutely and unconditionally guaranteed to Lender the payment and performance of certain obligations owed to Lender, as set forth in the Forbearance Agreement. A true and accurate copy of the June 2008 Guaranty is attached hereto as **Exhibit G**.

12. On or about October 14, 2008, Lender, through its legal counsel, provided notice to Guarantors that certain defaults have occurred with respect to obligations owed under the January 2006 Guaranty and June 2008 Guaranty, and made demand that Guarantors cure said defaults (the "**October 14, 2008 Letter**"). A true and accurate copy of the October 14, 2008 Letter is attached hereto as **Exhibit H**.

13. On or about October 22, 2008, Lender, through its legal counsel, provided a second formal notice to Guarantors that the defaults detailed in the October 14, 2008 Default Notice had not been cured and again demanded that Guarantors cure said defaults (the "**October 22, 2008 Letter**"). A true and accurate copy of the October 22, 2008 Letter is attached hereto as **Exhibit I**.

14. The Note, the Loan Agreement, the January 2006 Guaranty, the Forbearance Agreement, the June 2008 Guaranty and all other documents further evidencing, securing and/or executed in connection with the indebtedness owed under the Note, as each may have been subsequently modified from time to time, are sometimes referred to herein collectively as the "**Loan Documents**."

15. Lender is the current owner and holder of all the Loan Documents.

### COUNT I – SUIT ON THE JANUARY 2006 GUARANTY
(Against Guarantors—Scott A. Chappelle, Laura A. Chappelle, Evert Kramer, Jr., Rosalind Kramer, Kevin T. McGraw, and Sharon D. McGraw)

16. Lender incorporates by reference all of the allegations of paragraphs 1 through 15 of the Complaint as if fully set forth herein.

17.     Under the January 2006 Guaranty, Guarantors absolutely and unconditionally guaranteed specific obligations of Borrower.  First, under sections 1(a) through (d) of the January 2006 Guaranty, Guarantors guaranteed the repayment of all principal, interest, late charges, costs, fees (including attorneys fees) and other amounts owed under the Loan Documents.  The guaranty of these amounts was made on a nonrecourse basis generally, provided, however, that such guaranty would become recourse to the Guarantors under specific circumstances set out in section 2 of the January 2006 Guaranty, which circumstances include the insolvency of Borrower or any Guarantor.  Second, under Section 1(e) of the January 2006 Guaranty, Guarantors guaranteed the payment of certain amounts, on a recourse basis, including (i) claims of third parties which claims, if unpaid, might become liens or charges against the Property, (ii) damages resulting from Borrower failing to timely pay any lienable impositions with respect to the Property, and (iii) any damage as a result of waste suffered or permitted to occur with respect to the Property.

18.     Guarantors are liable to Lender for the entire indebtedness owed under the Loan Documents, pursuant to sections 1(a) through (d), for the reason that Borrower and one or more of the Guarantors is insolvent.  In addition, Guarantors are liable to Lender under section 1(e) of the Guaranty as a result of Borrower breaching its obligations to Lender by failing to pay certain vendors for the months of February through July 2008 when there was sufficient cash flow generated by the Property to pay the invoices submitted by such vendors.

19.     The following amounts are due and owing by Guarantors to Lender under section 1(a) through (d) of the Guaranty: principal in the amount of $3,340,000.00; interest through November 6, 2008 in the amount of $724,746.63; interest thereafter at the per diem rate of $2250.69; late charges in the amount of $35,562.12; prepayment consideration in the amount of

$132,836.91; and fees, costs and expenses in the amount of $427,884.29.  In addition, the following amounts are due and owing by Guarantors under section 1(e) of the Guaranty: (a) unpaid invoices for the month of February 2008 in the amount of $28,221.00; (b) unpaid invoices for the month of March 2008 in the amount of $910.00; (c) unpaid invoices for the month of April 2008 in the amount of $1707.00; (d) unpaid invoices for the month of May 2008 in the amount of $1436.00; (e) unpaid invoices for the month of June 2008 in the amount of $2306.00; and (f) unpaid invoices for the month of July 2008 in the amount of $7772.00.

20.     In connection with its enforcement of its rights under the Loan Documents, Lender has incurred fees and costs, including attorneys fees, for which Guarantors are personally liable pursuant to section 1(d) of the January 2006 Guaranty.

WHEREFORE, Plaintiff prays for the entry of Judgment on Count I of this Complaint against Defendants Scott A. Chappelle, Laura A. Chappelle, Evert Kramer, Jr., Rosalind Kramer, Kevin T. McGraw, and Sharon D. McGraw in the following amounts owed under sections 1(a) through (d) of the January 2006 Guaranty: principal in the amount of $3,340,000.00; interest through November 6, 2008 in the amount of $724,746.63; interest thereafter at the per diem rate of $2250.69; late charges in the amount of $35,562.12; prepayment consideration in the amount of $132,836.91; and fees, costs and expenses in the amount of $427,884.29.  In addition, Plaintiff further prays for the entry of Judgment on Count I of this Complaint for the following amounts, which are owed under section 1(e) of the January 2006 Guaranty:  (a) unpaid invoices for the month of February 2008 in the amount of $28,221.00; (b) unpaid invoices for the month of March 2008 in the amount of $910.00; (c) unpaid invoices for the month of April 2008 in the amount of $1707.00; (d) unpaid invoices for the month of May 2008 in the amount of $1436.00;

(e) unpaid invoices for the month of June 2008 in the amount of $2306.00; and (f) unpaid invoices for the month of July 2008 in the amount of $7772.00.

## COUNT II – SUIT ON THE JUNE 2008 GUARANTY
(Against Scott A. Chappelle, Laura A. Chappelle,
Evert Kramer, Jr. and Rosalind Kramer)

21.     Lender incorporates by reference all of the allegations of paragraphs 1 through 20 of the Complaint as if fully set forth herein.

22.     Under the June 2008 Guaranty, the Chappelles and Kramers guaranteed the payment of base interest on the unpaid principal amount of the Note at a rate of 12 percent per annum (the "**Base Interest Payments**") for the period commencing June 3, 2008 and ending December 1, 2009.

23.     Additionally, under the June 2008 Guaranty, the Chappells and Kramers guaranteed the complete payment and performance of all payments to all suppliers of goods and services having claims against the Borrower ("**Borrower Liabilities**").  The Base Interest Payments and Borrower Liabilities are collectively referred to hereafter as the "**Guaranteed Obligations**."

24.     The Chappelles and Kramers are in default under the June 2008 Guaranty for failing to make the complete payment of the Guaranteed Obligations, as required by the June 2008 Guaranty.

25.     The following amounts are due and owing under the June 2008 Guaranty as of November 6, 2008: (a) the Base Interest Payment for June 2008 in the amount of $33,400.00; (b) the Base Interest Payment for July 2008 in the amount of $34,513.33; (c) the Base Interest Payment for August 2008 in the amount of $34,513.33; (d) the Base Interest Payment for September 2008 in the amount of $33,400.00; (e) the Base Interest Payment for October 2008 in

the amount of $34,513.33; (f) the Base Interest Payment for November 2008 in the amount of

$33,400.00; (g) unpaid invoices for the month of June 2008 in the amount of $2306.00; (h)

unpaid invoices for the month of July 2008 in the amount of $7772.00; and (i) all reasonable

legal expenses and other reasonable Loan related expenses necessarily incurred by Lender in

collecting any amount payable under the June 2008 Guaranty or enforcing or protecting its rights

under the June 2008 Guaranty, not to exceed the amount of $50,000.00.

26.     The Chappelles and Kramers are also liable for Guaranteed Obligations accruing

after November 6, 2008, including (a) future Borrower Liabilities and (b) future Base Interest

Payments on the unpaid principal amount of the Note at a rate of 12 percent per annum.  The

future Borrower Liabilities shall accrue after November 6, 2008 as follows: in December 2008 in

the amount of $34,513.33, in January 2009 in the amount of $34,513.00, in February 2009 in the

amount of $31,173.33, in March 2009 in the amount of $34,513.33, in April 2009 in the amount

of $33,400.00, in May 2009 in the amount of $34,513.33, in June 2009 in the amount of

$33,400.00, in July 2009 in the amount of $34,513.33, in August 2009 in the amount of

$34,513.33, in September 2009 in the amount of $33,400.00, in October 2009 in the amount of

$34,513.33, in November 2009 in the amount of $33,400.00, and in December 2009 in the

amount of $34,513.33.

WHEREFORE, Plaintiff prays for the entry of Judgment on Count II of this Complaint

against Defendants Scott A. Chappelle, Laura A. Chappelle, Evert Kramer, Jr., and Rosalind

Kramer in the following amounts:  (a) the Base Interest Payment for June 2008 in the amount of

$33,400.00; (b) the Base Interest Payment for July 2008 in the amount of $34,513.33; (c) the

Base Interest Payment for August 2008 in the amount of $34,513.33; (d) the Base Interest

Payment for September 2008 in the amount of $33,400.00; (e) the Base Interest Payment for

October 2008 in the amount of $34,513.33; (f) the Base Interest Payment for November 2008 in the amount of $33,400.00; (g) unpaid invoices for the month of June 2008 in the amount of $2306.00; (h) unpaid invoices for the month of July 2008 in the amount of $7772.00; (i) Base Interest Payments accruing hereafter, if not paid, in the following amounts: in December 2008 in the amount of $34,513.33, in January 2009 in the amount of $34,513.00, in February 2009 in the amount of $31,173.33, in March 2009 in the amount of $34,513.33, in April 2009 in the amount of $33,400.00, in May 2009 in the amount of $34,513.33; in June 2009 in the amount of $33,400.00, in July 2009 in the amount of $34,513.33, in August 2009 in the amount of $34,513.33, in September 2009 in the amount of $33,400.00, in October 2009 in the amount of $34,513.33, in November 2009 in the amount of $33,400.00, and in December 2009 in the amount of $34,513.33; (j) Borrower Liabilities that accrue, but which are not paid, hereafter; and (k) all reasonable legal expenses and other reasonable Loan related expenses necessarily incurred by Lender in collecting any amount payable under the June 2008 Guaranty or enforcing or protecting its rights under the June 2008 Guaranty.

Respectfully submitted,

ZIEGLER, METZGER & MILLER LLP

By: _____
Kirk W. Roessler (OH#0060931)
2020 Huntington Building
925 Euclid Avenue
Cleveland, Ohio 44115
(216) 781-5470
Fax:  216-781-0714

-and-

1712361.3                                                                                                 9

OF COUNSEL:

POLSINELLI SHALTON FLANIGAN SUELTHAUS PC

BRETT D. ANDERS  (#35516)
MATTHEW R. MORIARITY  (#57871)
700 West 47th Street, Suite 1000
Kansas City, Missouri  64112
(816) 753-1000
Fax No. (816) 753-1536

ATTORNEYS FOR PLAINTIFF



## TERM NOTE

US $3,340,000.00                                                Cleveland, Ohio

January 4, 2006

**FOR VALUE RECEIVED**, the undersigned **WOODLAND LAKES INVESTMENT GROUP, L.L.C.**, a Michigan limited liability company and together, with its successors and assigns, is referred to herein as the *"Borrower,"* hereby promises to pay to the order of **HARTFORD MEZZANINE INVESTORS I, LLC** (the *"Lender"*), in lawful money of the United States of America and in immediately available funds, at the Lending Office of the Lender, on the Maturity Date, Three Million Three Hundred Forty Thousand and 00/100 Dollars ($3,340,000.00), or the aggregate principal amount then outstanding pursuant to the Loan Agreement referred to below. Capitalized terms used herein without definition shall have the respective meanings ascribed thereto in the Loan Agreement referred to below.

The Initial Maturity Date under the Loan Agreement is September 1, 2015, *provided, however,* the Maturity Date may be accelerated as provided in the Loan Agreement.

The Borrower also promises to pay interest in like currency and funds on the unpaid principal amount of the Loan made by the Lender, at said office, from the date hereof until paid at the rates and at the times provided in section 2.3 of the Loan Agreement.

This Note is the Note referred to in the Loan Agreement, dated as of even date herewith, between the Borrower and the Lender (as from time to time in effect, the *"Loan Agreement"*) and is entitled to the benefits thereof and of the other Loan Documents.

If an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Loan Agreement.

The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note. No failure to exercise, or delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of any such rights.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF OHIO, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

*(Signature page follows.)*

B-1

**IN WITNESS WHEREOF,** the Borrower has executed this Note as of the date first above written.

**BORROWER:**

**WOODLAND LAKES INVESTMENT GROUP,**
**L.L.C.,** a Michigan limited liability company

By:    WLA Management, Inc., a Michigan corporation

Its:    Manager

By: _____

Name: Scott A. Chappelle

Its:    President

B-2

**EXHIBIT B**

# LOAN AGREEMENT

by and between

## WOODLAND LAKES INVESTMENT GROUP, L.L.C.

*as the Borrower,*

and

## HARTFORD MEZZANINE INVESTORS I, LLC,

*as the Lender,*

dated as of

January 4, 2006

$3,340,000 Loan

Jones Day Cleveland
601755-IIMI001
CLI-1362430v3

Woodland Lakes Apartments
Mezzanine Loa

# TABLE OF CONTENTS

Page

SECTION 1    DEFINITIONS AND TERMS.................................................................1
   1.1    Certain Defined Terms....................................................................1
   1.2    Computation of Time Periods.......................................................12
SECTION 2    AMOUNT AND TERMS OF THE LOAN ...................................12
   2.1    Commitment for Loan....................................................................12
   2.2    Note; Loan Accounts .....................................................................12
   2.3    Interest Rates and Payment...........................................................13
   2.4    Illegality, Increased Costs, etc .....................................................14
   2.5    Term of the Loan ...........................................................................14
SECTION 3    PAYMENTS AND PREPAYMENTS .........................................14
   3.1    Voluntary Prepayments..................................................................14
   3.2    Mandatory Prepayments ................................................................14
   3.3    No Reborrowing.............................................................................15
   3.4    Application of Prepayments...........................................................15
   3.5    Method and Place of Payment .......................................................15
SECTION 4    FEES .............................................................................................16
   4.1    Underwriting Fee ..........................................................................16
SECTION 5    CONDITIONS PRECEDENT .....................................................16
   5.1    Conditions Precedent to Closing...................................................16
SECTION 6    REPRESENTATIONS AND WARRANTIES..............................18
   6.1    Organizational Status, etc .............................................................18
   6.2    Organizational Power and Authority, etc......................................18
   6.3    No Violation...................................................................................19
   6.4    Governmental Approvals ..............................................................19
   6.5    Litigation.......................................................................................19
   6.6    Use of Proceeds; Margin Regulations...........................................19
   6.7    Indebtedness...................................................................................20
   6.8    Consideration and Solvency ..........................................................20
   6.9    No Material Adverse Change.........................................................20
   6.10   Tax Returns and Payments.............................................................20
   6.11   Title to Properties, etc ...................................................................20

-i-

**TABLE OF CONTENTS**
(continued)

Page

| 6.12 | Lawful Operations, etc | 21 |
| 6.13 | Compliance with ERISA | 21 |
| 6.14 | Intellectual Property, etc | 21 |
| 6.15 | Investment Company Act, etc | 21 |
| 6.16 | Office of Foreign Asset Control and the USA Patriot Act | 22 |
| 6.17 | True and Complete Disclosure | 22 |
| 6.18 | No Brokers | 22 |
| 6.19 | Senior Loan Documents | 22 |
| 6.20 | Insurance | 22 |
| 6.21 | Reimbursement Agreement | 23 |
| SECTION 7 | AFFIRMATIVE COVENANTS | 23 |
| 7.1 | Reporting Requirements | 23 |
| 7.2 | Books, Records and Inspections | 26 |
| 7.3 | Insurance | 26 |
| 7.4 | Lockbox Arrangements | 26 |
| 7.5 | Payment of Taxes and Claims | 27 |
| 7.6 | Organizational and Other Franchises | 27 |
| 7.7 | Good Repair | 27 |
| 7.8 | Compliance with Statutes, etc | 27 |
| 7.9 | Fiscal Years, Fiscal Quarters | 27 |
| 7.10 | Intentionally omitted | 27 |
| 7.11 | Management of the Project | 28 |
| 7.12 | Publicity | 28 |
| 7.13 | Reimbursement Agreement | 28 |
| 7.14 | Additional Funding Loan Agreement | 28 |
| 7.15 | UCC Financing Statements/Insurance | 28 |
| 7.16 | Further Assurances | 28 |
| SECTION 8 | NEGATIVE COVENANTS | 29 |
| 8.1 | Changes in Business | 29 |
| 8.2 | Consolidation, Merger or Sale of Assets | 29 |
| 8.3 | Liens | 29 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 8.4 | Distributions to Equity Holders | 29 |
| 8.5 | Transactions with Affiliates | 29 |
| 8.6 | Plan Terminations, Minimum Funding, etc | 29 |
| 8.7 | Amendment of Organizational Documents | 30 |
| 8.8 | Intentionally omitted | 30 |
| 8.9 | Amendment of Senior Loan Documents | 30 |
| 8.10 | Amendment of Reimbursement Agreement | 30 |
| 8.11 | Indebtedness | 30 |
| SECTION 9 | EVENTS OF DEFAULT | 30 |
| 9.1 | Events of Default | 30 |
| 9.2 | Acceleration, etc | 33 |
| 9.3 | Application of Liquidation Proceeds | 33 |
| SECTION 10 | MISCELLANEOUS | 34 |
| 10.1 | Payment of Expenses, etc | 34 |
| 10.2 | Right of Setoff | 35 |
| 10.3 | Notices | 35 |
| 10.4 | Successors and Assigns | 37 |
| 10.5 | No Waiver; Remedies Cumulative | 38 |
| 10.6 | Financial Calculations | 38 |
| 10.7 | Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial | 38 |
| 10.8 | Counterparts | 39 |
| 10.9 | Headings Descriptive | 39 |
| 10.10 | Amendment or Waiver | 39 |
| 10.11 | Survival of Indemnities | 39 |
| 10.12 | Domicile of the Loan | 40 |
| 10.13 | General Limitation of Liability | 40 |
| 10.14 | No Duty | 40 |
| 10.15 | Lender Not Fiduciary to the Loan Parties | 40 |
| 10.16 | Survival of Representations and Warranties | 40 |
| 10.17 | Interest Rate Limitation | 40 |
| 10.18 | Sharing of Information | 41 |

ANNEX I    -    INFORMATION AS TO THE LENDER

EXHIBIT A  -    FORM OF NOTE

## LOAN AGREEMENT

THIS LOAN AGREEMENT, dated as of January 4, 2006, among the following:

(i)     **WOODLAND LAKES INVESTMENT GROUP, L.L.C.**, a Michigan limited liability company (herein, together with its successors and assigns, the "*Borrower*"); and

(ii)    **HARTFORD MEZZANINE INVESTORS I, LLC**, a Delaware limited liability company (herein, together with its successors and assigns, the "*Lender*"):

**PRELIMINARY STATEMENTS:**

(1)     Unless otherwise defined herein, all capitalized terms used herein and defined in section 1 are used herein as so defined.

(2)     The Borrower is the owner of approximately 60.33 acres of real property at 4200 Dell Road in the Township of Delhi, County of Ingham, State of Michigan (the "*Land*") and a 344-unit Class A apartment community consisting of 21 two-story apartment buildings plus a 3,200 square foot clubhouse with locker rooms, exercise facility and in-ground swimming pool, situated on such Land, all known as the Woodland Lakes Apartments (the "*Project*").

(3)     The Borrower has applied to the Lender for mezzanine financing in the amount of $3,340,000 in order to provide funds for lawful business purposes, namely, to refinance existing mezzanine financing of the Borrower secured by pledges of all of the equity interests in the Borrower.

(4)     Subject to and upon the terms and conditions set forth herein, the Lender is willing to make available to the Borrower the loan provided for herein.

**NOW, THEREFORE,** it is agreed:

## SECTION 1
## DEFINITIONS AND TERMS.

**1.1     Certain Defined Terms.**  As used herein, the following terms shall have the meanings herein specified unless the context otherwise requires.  Defined terms in this Agreement shall include in the singular number the plural and in the plural the singular:

"*Additional Funding*" shall have the meaning ascribed to such term in the Additional Funding Loan Agreement.

"*Additional Funding Loan Agreement*" shall mean the Additional Funding Loan Agreement dated as of August 1, 2005 pursuant to which the Senior Lender shall disburse an Additional Funding in the original principal amount of $1,500,000.

Jones Day Cleveland
601755-HM1001
CLI-1362430v3

Woodland Lakes Apartments
Mezzanine Loan

"*Adjusted Debt Service*" shall mean the aggregate of debt service payments for a twelve (12) month period on a deemed principal amount equal to the sum of the then outstanding principal balance of the Senior Loan plus the then outstanding principal balance of the Loan, *assuming* (i) a per annum interest rate equal to the greater of (a) seven percent (7.00%) per annum, and (b) the yield on ten-year United States Treasury notes as of the close of business on the day preceding the date of calculation, as announced on Bloomberg.com or another reliable source selected by the Lender plus 150 basis points, and (ii) monthly payments of principal and interest based on an amortization period of thirty (30) years.

"*Adjusted DSCR*" shall mean, for the Project, with respect to the twelve month period preceding the date of measurement, the ratio of (a) Deemed Cash Flow, to (b) the Adjusted Debt Service.

"*Affiliate*" shall mean, with respect to any person, any other person directly or indirectly controlling, controlled by, or under direct or indirect common control with such person. A person shall be deemed to control a second person if such first person possesses, directly or indirectly, the power (i) to vote 10% or more of the securities having ordinary voting power in the election of directors or managers of such second person or (ii) to direct or cause the direction of the management and policies of such second person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, (x) a director, officer or employee of a person shall not, solely by reason of such status, be considered an Affiliate of such person and (y) the Lender shall not in any event be considered an Affiliate of any Loan Party.

"*Agreement*" shall mean this Loan Agreement, as the same may be from time to time modified, amended and/or supplemented.

"*Approved Management Fee*" shall mean monthly fees in an amount not to exceed 3% of Gross Revenues for such month.

"*Authorized Officer*" shall mean any officer or employee of any Loan Party designated by it in writing to the Lender as being authorized to execute and deliver any Loan Documents or take any actions in connection with the Loan Documents on behalf of such Loan Party.

"*Bankruptcy Code*" shall have the meaning provided in section 9.1(i)(i).

"*Base Interest*" shall have the meaning provided in section 2.3(a).

"*Borrower*" shall have the meaning provided in the first paragraph of this Agreement.

"*Business Day*" shall mean any day excluding Saturdays, Sundays and any day that is, in the city in which the Lending Office is located, a legal holiday or a day on which banking institutions are authorized by Law or other governmental actions to close.

"*Capital Event*" shall mean (i) title to a substantial portion of the Project is transferred pursuant to any condemnation or eminent domain proceeding or (ii) the Senior Lender and/or the Lender and/or Borrower collect insurance proceeds resulting from a casualty pursuant to which the Project was substantially destroyed.

"*Capital Lease*" as applied to any person shall mean any lease of any property (whether real, personal or mixed) by that person as lessee that, in conformity with sound accounting principles consistently applied, is accounted for as a capital lease on the balance sheet of that person.

"*Capitalized Lease Obligations*" shall mean all obligations under Capital Leases of the Borrower in each case taken at the amount thereof accounted for as liabilities in accordance with sound accounting principles consistently applied.

"*CERCLA*" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same may be amended from time to time, 42 U.S.C. § 9601 *et seq.*

"*Charges*" shall have the meaning provided in section 10.17.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"*Cost Reimbursement for Eligible Activities*" shall be used as provided in Section 8(a) of the Reimbursement Agreement.

"*Deemed Cash Flow*" shall mean for any period, the Gross Revenues less Operating Expenses.

"*Default*" shall mean any event, act or condition that, with notice or lapse of time or both, would constitute an Event of Default.

"*Dollars*," "*U.S. dollars*," "*U.S. Dollars*" and the sign "*$*" each shall mean lawful money of the United States.

"*DTBRA*" shall mean the Delhi Township Brownfield Redevelopment Authority.

"*Environmental Claims*" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of non-compliance or violation, investigations or proceedings arising under any Environmental Law or any permit issued under any such law (hereafter "*Claims*"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the storage, treatment or Release (as defined in CERCLA) of any Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

"*Environmental Indemnity*" shall mean the Environmental and Hazardous Substances Indemnity Agreement, dated as of the date hereof, by the Borrower and the Guarantors in favor of the Lender, as modified, amended or supplemented from time to time in accordance with the terms thereof and hereof.

"*Environmental Law*" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy and rule of common law now or hereafter in effect and in each case as amended, and any binding and enforceable judicial or administrative interpretation thereof, including, without limitation, any judicial or administrative order, consent, decree or judgment issued to or rendered against any Loan Party relating to the environment, employee health and safety or Hazardous Materials, including, without limitation, the CERCLA; the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601(20)(D); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*; the Federal Water Pollution Control Act, as amended by the Clean Water Act, 33 U.S.C. § 1251 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the Hazardous Materials Transportation Act; 49 U.S.C. § 7401 *et seq.*; the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, as any such acts and laws may be amended, modified or supplemented from time to time.

"*Environmental Proceedings*" shall mean environmental proceedings, whether civil (including actions by private parties), criminal, or administrative proceedings, relating to the Project.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect on the date hereof, and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"*ERISA Affiliate*" shall mean each person (as defined in section 3(9) of ERISA) that together with the Borrower would be deemed to be a "single employer" within the meaning of section 414(b),(c), (m) or (o) of the Code.

"*Event of Default*" shall have the meaning provided in section 9.1.

"*Fees*" shall mean, collectively, the Underwriting Fee and all other fees payable to the Lender by any Loan Party in connection with this Agreement or any of the other Loan Documents.

"*GAAP*" shall mean generally accepted accounting principles in the United States of America as in effect from time to time.

"*Governmental Authority*" shall mean any government or political subdivision, whether federal, state, local or foreign, or any agency or instrumentality of any such government or political subdivision, or any federal, state, local or foreign court or arbitrator.

"*Gross Revenues*" shall mean, for the twelve calendar month period immediately preceding the date of measurement, all revenues of the Borrower, determined in accordance with sound cash basis accounting practices, consistently applied, derived from the ownership, operation, use, leasing and occupancy of the Project during such period, limited however to such revenues from not more than 95% occupancy of the Project; *provided* that in no event shall Gross Revenues include any (i) loan proceeds, (ii) proceeds or payments under insurance policies (except proceeds of business interruption insurance); (iii) condemnation proceeds; (iv) security deposits received from tenants in the Project, unless and until the same are applied to rent or

other obligations in accordance with the tenant's lease; (v) capital contributions made to Borrower, and (vi) any reimbursements from any replacement reserve accounts.

"*Guarantors*" shall mean each of the Principals, individually or collectively, as the context shall imply.

"*Guaranty*" shall mean the Guaranty, dated as of the date hereof, by the Guarantors in favor of the Lender, as modified, amended or supplemented from time to time in accordance with the terms thereof and hereof.

"*Guaranty Obligations*" shall mean as to any person (without duplication) any obligation of such person guaranteeing any Indebtedness ("*primary Indebtedness*") of any other person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of such person, whether or not contingent, (a) to purchase any such primary Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary Indebtedness of the ability of the primary obligor to make payment of such primary Indebtedness, or (d) otherwise to assure or hold harmless the owner of such primary Indebtedness against loss in respect thereof, *provided* that the term Guaranty Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guaranty Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary Indebtedness in respect of which such Guaranty Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"*Hazardous Materials*" shall mean (i) any petrochemical or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, toxic mold, and radon gas and (ii) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous materials," "extremely hazardous wastes," "restrictive hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law.

"*Hedge Agreement*" shall mean (i) any interest rate swap agreement, any interest rate cap agreement, any interest rate collar agreement or other similar agreement or arrangement designed to protect against fluctuations in interest rates or (ii) any currency swap agreement, forward currency purchase agreement or similar agreement or arrangement designed to protect against fluctuations in currency exchange rates.

"*Indebtedness*" of any person shall mean, without duplication:

      (i)    all indebtedness of such person for borrowed money;

(ii)     all bonds, notes, debentures and similar debt securities of such person;

(iii)    the deferred purchase price of capital assets or services that in accordance with sound accounting principles consistently applied would be shown on the liability side of the balance sheet of such person;

(iv)    the face amount of all letters of credit issued for the account of such person and, without duplication, all drafts drawn thereunder;

(v)     all obligations, contingent or otherwise, of such person in respect of bankers' acceptances;

(vi)    all Indebtedness of a second person secured by any Lien on any property owned by such first person, whether or not such indebtedness has been assumed;

(vii)   all Capitalized Lease Obligations of such person and all Indebtedness of such Person secured by Purchase Money Security Interests;

(viii)  the present value, determined on the basis of the implicit interest rate, of all basic rental obligations under all "synthetic" leases (*i.e.*, leases accounted for by the lessee as operating leases under which the lessee is the "owner" of the leased property for Federal income tax purposes);

(ix)    all obligations of such person to pay a specified purchase price for goods or services whether or not delivered or accepted, *i.e.*, take-or-pay and similar obligations;

(x)     all net obligations of such person under Hedge Agreements;

(xi)    the full outstanding balance of trade receivables, notes or other instruments sold with full recourse (and the portion thereof subject to potential recourse, if sold with limited recourse), other than in any such case any thereof sold solely for purposes of collection of delinquent accounts;

(xii)   the stated value, or liquidation value if higher, of all Redeemable Stock of such person; and

(xiii)  all Guaranty Obligations of such person;

*provided* that (x) neither trade payables nor other similar accrued expenses, in each case arising in the ordinary course of business, nor obligations in respect of insurance policies or performance or surety bonds that themselves are not guarantees of Indebtedness (nor drafts, acceptances or similar instruments evidencing the same nor obligations in respect of letters of credit supporting the payment of the same), shall constitute Indebtedness and (y) the Indebtedness of any person shall in any event include (without duplication) the Indebtedness of any other entity (including any general partnership in which such person is a general partner) to the extent such person is liable thereon as a result of such person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide expressly that such person is not liable thereon.

"*Indemnitees*" shall have the meaning provided in section 10.1(d).

"*Initial Maturity Date*" shall mean September 1, 2015.

"*Intercreditor Agreement*" shall mean an intercreditor agreement, in form and substance satisfactory to the Lender, between the Lender and the Senior Lender and entered into as of the date hereof, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"*Land*" shall have the meaning provided in the preliminary statements to this Agreement.

"*Laws*" shall mean collectively, all federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations, including, without limitation, judicial opinions or precedential authority in the applicable jurisdiction.

"*Leaseholds*" of any person shall mean all the right, title and interest of such person as lessee or licensee in, to and under leases or licenses of land, improvements, fixtures or personalty.

"*Lender*" shall have the meaning provided in the first paragraph of this Agreement.

"*Lending Office*" shall mean, with respect to the Lender, the office of the Lender specified as its Lending Office in **Annex I** or such other office of the Lender as the Lender may from time to time specify to the Borrower.

"*Lien*" shall mean any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof).

"*Loan*" shall have the meaning provided in section 2.1.

"*Loan Documents*" shall mean this Agreement, the Note, the Pledge Agreement, the Guaranty, and the Environmental Indemnity, and all other documents and agreements entered into among the Borrower and/or the Guarantors and/or the Members and the Lender in connection with the Loan, as the same may be modified, amended or supplemented from time to time in accordance with the terms hereof and thereof.

"*Loan Opening Date*" shall mean the date of Lender's initial disbursement hereunder.

"*Loan Party*" shall mean (i) the Borrower, (ii) the Guarantors, (iii) the Pledgors, and (iv) each other person (other than the Lender) that is or becomes a party to any Loan Document.

"*Manager*" shall mean WLA Management, Inc., a Michigan corporation.

"*Margin Stock*" shall have the meaning provided in Regulation U.

"*Material Adverse Effect*" shall mean (i) when used with reference to any Loan Party, a material adverse effect on the business, operations, prospects, property, assets, liabilities or

financial condition of, such person and its Subsidiaries, taken as a whole, or a material adverse effect on the ability of any Loan Party to perform its obligations under the Loan Documents or (ii) when used with reference to any other person, a material adverse effect on the business, operations, prospects, property, assets, liabilities or financial condition of such person and its Subsidiaries, taken as a whole, as the case may be.

"*Maturity Date*" shall mean the earliest of (i) the Initial Maturity Date; (ii) the maturity date of the Borrower's obligations under the Senior Loan Agreement; and (iii) the date on which the indebtedness of the Borrower hereunder becomes due and payable, whether by acceleration or otherwise.

"*Members*" shall mean (i) Harrison Investment Group, L.L.C., a Michigan limited liability company, (ii) Covenant Investment Group, Inc., a Michigan corporation, (iii) KTM Development Corporation, a Michigan corporation, (iv) TMC Investment Group, L.L.C., a Michigan limited liability company, (v) Shawn O'Brien, an individual, (vi) Frank Vargas, Jr., an individual, (vii) Alliance Investment Group, L.L.C., a Michigan limited liability company, (viii) Charles W. Crouch, an individual, (ix) Brent Chappelle, an individual, (x) Masonic Investment Group, L.L.C., a Michigan limited liability company, (xi) Abbott Road Commons, L.L.C., a Michigan limited liability company, (xii) Chasco Investment Properties, L.L.C., a Michigan limited liability company, (xiii) Evergreen Investment Group, L.L.C., a Michigan limited liability company, (xiv) Grand Ledge Investment Group, L.L.C., a Michigan limited liability company, (xv) SLHA Investment Group, L.L.C., a Michigan limited liability company, (xvi) Score Properties, Inc., a Michigan corporation, (xvii) Petoskey Investment Group, L.L.C., a Michigan limited liability company, (xviii) Terra Management Company, a Michigan corporation, and (ixx) WLA Management Company, Inc., a Michigan corporation, individually or collectively, as the context shall imply.

"*Monthly Excess Available Cash*" shall mean, for any calendar month, the amount by which Gross Revenues exceed the sum of, without duplication, (i) Operating Expenses; and (ii) scheduled principal and interest payments to the Senior Lender required by the Senior Loan Documents and (iii) scheduled payments of Base Interest hereunder.

"*Multiemployer Plan*" shall mean a multiemployer plan, as defined in section 4001(a)(3) of ERISA to which the Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions or has within any of the preceding three plan years made or accrued an obligation to make contributions.

"*Multiple Employer Plan*" shall mean an employee benefit plan, other than a Multiemployer Plan, to which the Borrower or any ERISA Affiliate, and one or more employers other than the Borrower or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Borrower or an ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

"*Note*" shall have the meaning provided in section 2.2(a).

"*Obligations*" shall mean all amounts, direct or indirect, contingent or absolute, of every type or description, and at any time existing, owing by the Borrower or any other Loan Party to the Lender pursuant to the terms of this Agreement or any other Loan Document.

"*OFAC*" shall have the meaning provided in section 6.16.

"*Operating Expenses*" shall mean, for the twelve calendar month period immediately preceding the date of measurement, the actual costs and expenses of owning, operating, managing and maintaining the Project during such period incurred by Borrower, determined in accordance with sound cash basis accounting practices, consistently applied (except for real and personal property taxes and insurance premiums, which shall be determined on an accrual basis, consistently applied), including, without limitation, a $200 per unit replacement reserve and, provided that no Event of Default has occurred, the Approved Management Fee.  Operating Expenses shall not include (i) scheduled interest payments to the Senior Lender required by the Senior Loan Documents; (ii) scheduled interest payments or Fees to the Lender for this Loan; (iii) expenditures funded from the permitted replacement reserve described above; (vi) leasing commissions, and (v) all other capital expenditures except those approved in writing by the Lender.

"*Organizational Documents*" shall mean, with respect to any person (other than an individual), such person's articles of incorporation, articles of organization, certificate of limited partnership or other equivalent formation documents, and regulations, bylaws, operating agreement, limited partnership agreement or equivalent governing documents, and any amendments to any of the foregoing permitted hereunder.

"*PBGC*" shall mean the Pension Benefit Guaranty Corporation established pursuant to section 4002 of ERISA, or any successor thereto.

"*person*" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"*Plan*" shall mean any multiemployer or single-employer plan as defined in section 4001 of ERISA that is maintained or contributed to by (or to which there is an obligation to contribute by) the Borrower or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Borrower or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan.

"*Pledge Agreement*" shall mean the Pledge Agreement (Pledge of Membership Interests by Members), dated as of the date hereof, made by all of the Members as Pledgors to the Lender pledging all of the membership interests in the Borrower, as it may be modified, amended or supplemented from time to time in accordance with the terms thereof and hereof.

"*Pledgor*" shall mean each Member pledging an interest to the Lender under the Pledge Agreement.

"*Prepayment Premium*" shall mean an amount equal to two percent (2%) of the principal balance of the Loan prepaid *plus* Yield Maintenance, if any.

"*Principal Party*" shall have the meaning provided in section 9.1(i)(i).

"*Principals*" shall mean (i) Scott A. Chappelle, an individual, (ii) Laura A. Chappelle, an individual, (iii) Kevin T. McGraw, an individual, (iv) Sharon D. McGraw, an individual, (v) Evert Kramer, Jr., an individual, and (vi) Rosalind Kramer, an individual, individually or collectively, as the context shall imply.

"*Prohibited Transaction*" shall mean a transaction with respect to a Plan that is prohibited under section 4975 of the Code or section 406 of ERISA and not exempt under section 4975 of the Code or section 408 of ERISA.

"*Project*" shall have the meaning provided in the preliminary statements to this Agreement.

"*Property Management Agreement*" shall have the meaning provided in section 5.1(r).

"*Property Manager*" shall mean Terra Management Company, a Michigan corporation, unless replaced as permitted by section 7.11.

"*Purchase Money Security Interest*" shall mean any mortgage, security interest or other lien that is created or assumed in purchasing, constructing or improving any real or personal property in the ordinary course of business.

"*Real Property*" of any person shall mean all of the right, title and interest of such person in and to land, improvements and fixtures, including Leaseholds.

"*Redeemable Stock*" shall mean with respect to any person any capital stock or similar equity interests of such person that (i) is by its terms subject to mandatory redemption, in whole or in part, pursuant to a sinking fund, scheduled redemption or similar provisions, at any time prior to the Maturity Date or (ii) otherwise is required to be repurchased or retired on a scheduled date or dates, upon the occurrence of any event or circumstance, at the option of the holder or holders thereof, or otherwise, at any time prior to the Maturity Date, other than any such repurchase or retirement occasioned by a "change of control" or similar event.

"*Reimbursement Agreement*" shall mean the Brownfield Reimbursement Agreement, dated March 26, 2002, executed by and between the Borrower and the DTBRA, as amended by First Amendment to Brownfield Reimbursement Agreement, dated June 13, 2003 by and among Borrower, DTBRA and the Senior Lender, as further amended by Second Amendment to Brownfield Reimbursement Agreement, dated on or about August 1, 2005 by and among Borrower, DTBRA and the Lender, and consented to by the Senior Lender.

"*Regulation U*" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"*Rent Roll*" shall have the meaning provided in section 7.1(d).

"*Reportable Event*" shall mean an event described in section 4043 of ERISA or the regulations thereunder with respect to a Plan, other than those events as to which the notice requirement is waived under subsections .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, .35, .62, .63, .64, .65 or .67 of PBGC Regulation section 4043.

"*Senior Lender*" shall mean John Hancock Life Insurance Company, and its successors and assigns.

"*Senior Loan*" shall mean the loan in the maximum principal amount of $24,000,000 made by the Senior Lender to the Borrower pursuant to, and evidenced by the Senior Loan Documents.

"*Senior Loan Documents*" shall mean (i) the promissory note issued by the Borrower in favor of the Senior Lender in the original principal amount not in excess of $24,000,000; (ii) the Senior Mortgage; and (iii) all other documents and agreements entered into between the Borrower and/or the Principals and the Senior Lender in connection with the Senior Loan, as the same may be modified, amended or supplemented from time to time in accordance with the terms hereof and thereof.

"*Senior Mortgage*" shall mean the Mortgage dated as of August 1, 2005 made by the Borrower in favor of the Senior Lender, as the same may be further modified, amended or supplemented from time to time in accordance with the terms hereof and thereof. encumbering the Project securing the Borrower's obligations to the Senior Lender under the Senior Loan Documents.

"*Standard Lease*" shall mean the Borrower's standard form of apartment lease as approved by the Lender hereunder.

"*Subsidiary*" of any person shall mean and include (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such person directly or indirectly through Subsidiaries and (ii) any partnership, limited liability company, association, joint venture or other entity in which such person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time.

"*Transfer Date*" shall mean the date on which the Project or any interest therein is transferred or otherwise conveyed from the Borrower to any other person or, in the case of a Capital Event, on the date on which such Capital Event occurs.

"*UCC*" shall mean the Uniform Commercial Code.

"*Underwriting Fee*" shall have the meaning provided in section 4.

"*Unfunded Current Liability*" of any Plan shall mean the amount, if any, by which the actuarial present value of the accumulated plan benefits under the Plan as of the close of its most recent plan year exceeds the fair market value of the assets allocable thereto, each determined in

11

accordance with Statement of Financial Accounting Standards No. 87, based upon the actuarial assumptions used by the Plan's actuary in the most recent annual valuation of the Plan.

"*United States*" and "*U.S.*" each shall mean the United States of America.

"*written*" or "*in writing*" shall mean any form of written communication or a communication by means of telex, facsimile transmission, telegraph or cable.

"*Yield Maintenance*" shall mean an amount equal to the amount of interest, calculated at a per annum rate equal to 12% compounded on the first day of every month, that would have been due and payable had the full principal balance of the Loan been outstanding until the third anniversary of the Loan Opening Date *less* the actual amount of Base Interest paid by the Borrower to the Lender prior to such date of prepayment (but without giving effect to any interest that may have been paid at the default rate pursuant to section 2.3(c)).

**1.2    Computation of Time Periods.** In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."

## SECTION 2
## AMOUNT AND TERMS OF THE LOAN.

**2.1    Commitment for Loan.** Subject to and upon the terms and conditions herein set forth, the Lender agrees to make a loan in the original principal amount of Three Million Three Hundred Forty Thousand Dollars ($3,340,000.00) (the "*Loan*") to the Borrower on the date of this Agreement, which shall be repaid in full on or before the Maturity Date.  The full disbursement of the Loan proceeds shall be made on the Loan Opening Date, upon the satisfaction of the terms and conditions contained herein, including, without limitation, section 5.1.

**2.2    Note; Loan Accounts.**

**(a)    Form of Note.** The Borrower's obligation to pay the principal of, and interest on, the Loan shall be evidenced by a promissory note of the Borrower substantially in the form of **Exhibit A** (the "*Note*," such term to include all notes and other securities issued in exchange therefor or replacement thereof).

**(b)    Form of Note.** The Note issued by the Borrower to the Lender shall be: (i) executed by the Borrower; (ii) payable to the order of the Lender and dated on the date of this Agreement; (iii) payable in the original principal amount of the Loan; (iv) due and payable on the Maturity Date; (v) bear interest as provided in section 2.3; and (vi) entitled to the benefits of this Agreement and the other Loan Documents.

**(c)    Loan Accounts of Lender.** The Lender shall maintain accounts in which it shall record (i) the amount of the Loan made hereunder and (ii) the amount of any sum received by the Lender hereunder.  Upon reasonable prior written notice from the Borrower to the Lender, the Borrower shall have the right to review such accounts during normal business hours at the usual location where the Lender maintains such records.

(d)     **Effect of Loan Accounts.** The entries made in the accounts maintained pursuant to section 2.2(c) shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay or prepay the Loan in accordance with the terms of this Agreement.

2.3     **Interest Rates and Payment.**

(a)     **Base Interest.**   The unpaid principal amount of the Loan shall bear interest from the Loan Opening Date until indefeasibly paid in full at a per annum rate equal to 12%, which interest shall be compounded on the first day of each calendar month if not paid within the ten day grace period permitted by section 9.1(a)(iii) (the *"Base Interest"*).

(b)     **Intentionally omitted.**

(c)     **Default Interest.**   Notwithstanding anything to the contrary in section 2.3(a), if a Default or an Event of Default is in existence, all outstanding amounts of principal and, to the extent permitted by Law, all overdue interest in respect of the Loan shall bear interest, payable on demand, at a rate of 20% per annum, compounded monthly on the first day of each calendar month. If any amount (other than the principal of and interest on the Loan) payable by the Borrower under the Loan Documents is not paid when due, such amount shall bear interest, payable on demand, at a rate of 20% per annum compounded monthly on the first day of each calendar month.

(d)     **Accrual and Payment of Interest.**

(i)     Prior to maturity, whether by acceleration or otherwise, Base Interest on the Loan shall be due and payable in arrears for the prior calendar month on the first day of each month, beginning with the first day of February 2006.

(ii)     Intentionally omitted.

(iii)     After the Maturity Date, all Base Interest and all other interest on the Loan shall be due and payable on demand.

(e)     **Late Charge.**   If the Borrower shall fail to pay any portion of the Obligations within ten (10) days of its due date (provided that such Obligation is not otherwise accrued as permitted hereunder), the Borrower shall also pay the Lender a late charge calculated at the rate of 5% of such portion of the Obligations for the purpose of defraying the expenses incident to handling such delinquent payment; *provided* that in no event shall the Borrower be required to pay a late fee greater than the maximum amount permitted under applicable Law. Such late charge shall be in addition to, and not in lieu of, any other remedy the Lender may have and is in addition to any reasonable fees and charges of any agents or attorneys that the Lender is entitled to employ upon any Default or Event of Default by the Borrower hereunder or under any other Loan Document, whether authorized herein or by Law.

(f)  **Computations of Interest and Fees.** All computations of interest on the Loan hereunder and of other fees hereunder shall be made on the actual number of days elapsed over a year of 360 days.

2.4  **Illegality, Increased Costs, etc.** If the Lender shall have determined that, after the date hereof, the adoption of any applicable Law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged by Law with the interpretation or administration thereof, or compliance by the Lender or its parent corporation with any request or directive regarding capital adequacy (whether or not having the force of Law) of any such authority, central bank or comparable agency, in each case made subsequent to the date hereof, has or would have the effect of reducing by an amount reasonably deemed by the Lender to be material the rate of return on the Lender's or its parent corporation's capital or assets as a consequence of the Lender's commitments or obligations hereunder to a level below that which the Lender or its parent corporation could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration the Lender's or its parent corporation's policies with respect to capital adequacy), *then* from time to time, within 15 days after demand by the Lender, the Borrower shall pay to the Lender such additional amount or amounts as will compensate the Lender or its parent corporation for such reduction. The Lender, upon determining in good faith that any additional amounts will be payable pursuant to this section 2.4, will give prompt written notice thereof to the Borrower, which notice shall set forth, in reasonable detail, the basis of the calculation of such additional amounts, which basis must be reasonable, although the failure to give any such notice shall not release or diminish the Borrower's obligations to pay additional amounts pursuant to this section 2.4 upon the subsequent receipt of such notice.

2.5  **Term of the Loan.** All principal, interest and other sums due under the Loan Documents, including, without limitation, the Prepayment Premium if any, shall be due and payable in full on the Maturity Date.

## SECTION 3
## PAYMENTS AND PREPAYMENTS.

3.1  **Voluntary Prepayments.** The Borrower shall have the right to prepay the Loan in full together with the Prepayment Premium at any time, *provided* that the Borrower shall give the Lender at the Lending Office written or telephonic notice (in the case of telephonic notice, promptly confirmed in writing if so requested by the Lender) of its intent to prepay the Loan, which notice shall be received by the Lender by 12:00 noon (local time at the Lending Office) on the date of such prepayment, provided, further however that any voluntary prepayment of the Loan shall be in full (and not in part) and shall include the interest provided for in section 2.3(a) and (c) and the Prepayment Premium.

3.2  **Mandatory Prepayments.**

(a)  Intentionally omitted.

(b)     The Borrower shall prepay the Loan in full (i) on or before the date of prepayment, or other payment, in full of the Borrower's obligations under the Senior Loan Documents to the Senior Lender, (ii) on or before the date on which the Borrower sells, assigns, conveys or transfers or refinances all or any part of the Obligations or of the Borrower's obligations under the Senior Loan Documents, and (iii) on the Transfer Date, which prepayments shall include the interest provided for in section 2.3(a) and(c) and the Prepayment Premium.

(c)     Following the occurrence of any Event of Default, on a quarterly basis and otherwise as and when received from the DTBRA, the Borrower shall prepay the Loan in part to the extent of the Cost Reimbursement for Eligible Activities as provided in section 7.13 hereof.  Any payments received directly by the Lender from the DTBRA or from the Borrower shall be applied as provided herein.

(d)     In connection with any Additional Funding, the Borrower shall prepay the Loan in part as required by section 7.14.  Any payments received by the Lender related to any Additional Funding shall be applied as provided herein.

3.3     **No Reborrowing.**  The Borrower shall not be entitled to reborrow any amounts that are prepaid.

3.4     **Application of Prepayments.**

(a)     Any voluntary prepayments made pursuant to section 3.1 or mandatory prepayments made pursuant to section 3.2(b) will be applied (i) *first,* to the payment of accrued but unpaid Base Interest on the Loan for the immediately preceding calendar month; (ii) *second,* to the payment of any accrued but unpaid Fee or other costs and expenses then accrued and payable to the Lender under this Agreement or any other Loan Document; (iii) *third,* to the payment of any accrued but unpaid, outstanding past due Base Interest on the Loan (which may have been added to the principal balance of the Loan); (iv) *fourth,* to the payment of the Prepayment Premium, and (v) *fifth,* to the payment of the principal balance then owing on the Loan.

(b)     **Intentionally omitted.**

(c)     Any mandatory prepayments of Cost Reimbursement for Eligible Activities pursuant to section 3.2(c) will be applied to the payment of Prepayment Premium and then to the principal balance then owing on the Loan.

(d)     Any mandatory prepayments of Additional Funding pursuant to section 3.2(d) will be applied to the payment of Prepayment Premium and then to the principal balance then owing on the Loan..

3.5     **Method and Place of Payment.**  Except as otherwise specifically provided herein, all payments under this Agreement shall be made to the Lender not later than 1:00 p.m. (local time at the Lending Office) on the date when due and shall be made at the Lending Office in immediately available funds and in lawful money of the United States of America, it being understood that telephonic notice (confirmed in writing) by the Borrower to the Lender to make

a payment from the funds in the Borrower's account at the Lending Office shall constitute the making of such payment to the extent of such funds held in such account. Any payments under this Agreement that are made later than 1:00 p.m. (local time at the Lending Office) shall be deemed to have been made on the next succeeding Business Day. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day. All payments made by the Borrower hereunder, under the Note or any other Loan Document will be made without setoff, counterclaim or other defense.

## SECTION 4
### FEES.

**4.1    Underwriting Fee.** On or prior to the Loan Opening Date, the Borrower shall pay to the Lender an underwriting fee in an amount equal to Twenty-Five Thousand Dollars ($25,000) (the "*Underwriting Fee*") less the amount of any deposit previously paid by or on behalf of the Borrower to the Lender in connection with the Loan.

## SECTION 5
### CONDITIONS PRECEDENT.

**5.1    Conditions Precedent to Closing.** The obligation of the Lender to make the Loan is subject to the satisfaction of each of the following conditions:

(a)    **Note.** The Borrower shall have delivered to the Lender the Note, executed by the Borrower in the amount, maturity and as otherwise provided herein.

(b)    **Fees.** The Borrower shall have paid or caused to be paid the Underwriting Fee to the Lender and all reasonable fees and expenses of the Lender and of special counsel to the Lender that have been invoiced on or prior to the date hereof in connection with the preparation, execution and delivery of this Agreement and the other Loan Documents and the structuring and the consummation of the transactions contemplated hereby and thereby.

(c)    **Equity Investment.** The Lender shall have received evidence satisfactory to it that the Members shall have made, and shall maintain, an equity investment in the Borrower in an aggregate amount not less than $4,885,000.

(d)    **Other Loan Documents.** The Loan Parties named therein shall have duly executed and delivered and there shall be in full force and effect, and original counterparts shall have been delivered to the Lender of, (i) the Pledge Agreement, (ii) the Guaranty, and (iii) the Environmental Indemnity.

(e)    **Real Estate Due Diligence.** The Borrower shall have provided the Lender with copies of the appraisal, ALTA/ACSM survey, title commitment together with copies of all exception items identified therein, site plan, phase I environmental report (and, if necessary, phase II environmental report), evidence of utilities serving the Project, property conditions report, all permits and approvals issued by any Governmental Authority related to the operation of the Project, certificates of insurance,

and the initial annual operating budget for the Project, all of which shall be in form and substance satisfactory to the Lender.

(f)     **Resolutions and Approvals.** The Lender shall have received certified copies of the resolutions of the members, partners or board of directors of each Loan Party, approving the Loan Documents to which such Loan Party is or may become a party, and of all documents evidencing other necessary corporate or other organizational action and governmental approvals, if any, with respect to the execution, delivery and performance by such Loan Party of the Loan Documents to which it is or may become a party.

(g)     **Incumbency Certificates.** The Lender shall have received a certificate of the Secretary or an Assistant Secretary (or other Authorized Officer) of each Loan Party, certifying the names and true signatures of the officers of such Loan Party authorized to sign the Loan Documents to which such Loan Party is a party and any other documents to which such Loan Party is a party that may be executed and delivered in connection herewith.

(h)     **Certificates Representing the Pledged Interests.** The Lender shall have received certificates, if any, representing the equity interests pledged to the Lender pursuant to the Pledge Agreement.

(i)     **UCC, Tax and Judgment Lien Search Results.** The Lender shall have received such UCC, tax and judgment lien search results on each of the Loan Parties, as debtors, from such jurisdictions and filing offices as the Lender may reasonably request.

(j)     **Opinion of Counsel.** The Lender shall have received an opinion, addressed to the Lender and dated the date hereof, from counsel for the Loan Parties, substantially in the form previously provided by the Lender to the Borrower and covering such other matters incident to the transactions contemplated hereby as the Lender may reasonably request, such opinion letter to be in form and substance satisfactory to the Lender.

(k)     **Proceedings and Documents.** All corporate (or other organizational), and other proceedings, and all documents incidental to the transactions contemplated hereby, including, without limitation, the Organizational Documents of the Loan Parties, shall be satisfactory in substance and form to the Lender and its special counsel and the Lender shall have received all such counterpart originals or certified or other copies of such documents as the Lender or its special counsel may reasonably request.

(l)     **No Defaults.** None of the Loan Parties shall be in default under the terms of any promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement or any other material agreement or other instrument to which it is a party or by which it or any of its property or assets are bound or to which it may be subject.

(m)     **No Material Adverse Effect.** None of the Loan Parties shall have experienced a Material Adverse Effect.

(n)     **Senior Loan Documents.**  The Lender shall have received copies of, reviewed and approved the Senior Loan Documents.  The closing and full funding of the Senior Loan shall have occurred on or prior to the Loan Opening Date.

(o)     **Intercreditor Agreement.**  The Lender and Senior Lender shall have executed and delivered and there shall be in full force and effect an Intercreditor Agreement in form and substance satisfactory to the Lender.

(p)     **Reimbursement Agreement.**  The Lender shall have received copies of, reviewed and approved the Reimbursement Agreement, including, without limitation, an amendment providing that Cost Reimbursement for Eligible Activities shall be paid directly by the DTBRA to the Borrower.

(q)     **Rent Roll.**  The Lender shall have received copies of, reviewed and approved the Standard Lease and a rent roll, and received copies each lease upon request.

(r)     **Property Management Agreement.**  The Borrower shall have provided to the Lender a management agreement in form and substance reasonably satisfactory to Lender (the "*Property Management Agreement*") with the Property Manager to fully lease the Project to qualified tenants and to professionally operate and manage the Project.  The Property Management Agreement must be terminable upon 30 days notice from Borrower or Lender to the Property Manager.  The compensation to the Property Manager shall not exceed the Approved Management Fee.

(s)     **Due Diligence.**  The Lender shall have completed all investigations, appraisals, reviews and audits with respect to any Loan Party, the Project and the Loan as the Lender deems appropriate, including any items set forth on the closing checklist provided by the Lender to the Borrower prior to the date hereof.

## SECTION 6
## REPRESENTATIONS AND WARRANTIES.

In order to induce the Lender to enter into this Agreement and to make the Loan, the Borrower makes the following representations and warranties to, and agreements with, the Lender, all of which shall survive the execution and delivery of this Agreement:

6.1     **Organizational Status, etc.**  Each Loan Party (i) is a duly organized or formed and validly existing partnership, limited liability company or corporation, as the case may be, in good standing under the laws of the jurisdiction of its formation and has the partnership or limited liability company or corporate power and authority, as applicable, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (ii) has duly qualified and is authorized to do business in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified would not have a Material Adverse Effect.  The Manager is the sole manager of the Borrower.  The Members hold all of the membership interests in the Borrower and there are no other equity interests in the Borrower.

6.2     **Organizational Power and Authority, etc.**  Each Loan Party has the corporate, partnership or other organizational power and authority to execute, deliver and carry out the

terms and provisions of the Loan Documents to which it is party and has taken all necessary corporate, partnership or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is party. Each Loan Party has duly executed and delivered each Loan Document to which it is party and each Loan Document to which it is party constitutes the legal, valid and binding agreement or obligation of such Loan Party enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

6.3    **No Violation.** Neither the execution, delivery and performance by any Loan Party of the Loan Documents to which it is party nor compliance with the terms and provisions thereof, nor the consummation of the loan transactions contemplated therein (i) will contravene any provision of any law, statute, rule, regulation, order, writ, injunction or decree of any court or governmental instrumentality applicable to such Loan Party or its properties and assets; (ii) will conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (other than the Liens created under the Pledge Agreement and the Senior Mortgage) upon any of the property or assets of such Loan Party pursuant to the terms of any promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement or any other material agreement or other instrument to which such Loan Party is a party or by which it or any of its property or assets are bound or to which it may be subject; (iii) will violate any provision of the articles or certificate of incorporation or formation, code of regulations, by-laws, partnership agreement or other organizational document of such Loan Party; or (iv) will conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, any of the Senior Loan Documents.

6.4    **Governmental Approvals.** No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any foreign or domestic governmental or public body or authority, or any subdivision thereof, is required to authorize or is required as a condition to (i) the execution, delivery and performance by any Loan Party of any Loan Document to which it is a party or (ii) the legality, validity, binding effect or enforceability of any Loan Document to which any Loan Party is a party, except for any filings or recordings necessary to perfect the Liens provided for under the Pledge Agreement.

6.5    **Litigation.** There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened with respect to any Loan Party that (i) has had, or could reasonably be expected to have, a Material Adverse Effect or (ii) question the validity or enforceability of any of the Loan Documents or of any action to be taken by such Loan Party pursuant to any of the Loan Documents.

6.6    **Use of Proceeds; Margin Regulations.**

(a)    The proceeds of the Loan shall be utilized for lawful purposes consistent with the requirements of this Agreement.

(b)     No part of the proceeds of the Loan will be used directly or indirectly to purchase or carry Margin Stock, or to extend credit to others for the purpose of purchasing or carrying any Margin Stock, in violation of any of the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System. No Borrower is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. At no time would more than 25% of the value of the assets of the Borrower that are subject to any "arrangement" (as such term is used in section 221.2(g) of such Regulation U) hereunder be represented by Margin Stock.

6.7     **Indebtedness.** The Borrower is not liable for any Indebtedness other than, the Obligations and the obligations under the Senior Loan Documents.

6.8     **Consideration and Solvency.** Each Loan Party has received consideration that is the reasonable equivalent value of the obligations and liabilities that it has incurred to the Lender. Each Loan Party has capital sufficient to carry on its business and transactions and all business and transactions in which it is about to engage, is solvent and able to pay its debts as they mature and owns property having a value, both at fair valuation and at present fair salable value, greater than the amount required to pay its debts, and no Loan Party is entering into the Loan Documents with the intent to hinder, delay or defraud its creditors. For purposes of this section 6.8, "***debt***" means any liability on a claim, and "***claim***" means (i) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (ii) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

6.9     **No Material Adverse Change.** Since the date of the most recent financial statements provided to the Lender by any Loan Party, there has been no change in the condition, business or affairs of such Loan Party or their properties and assets considered as an entirety, except for changes that, individually or in the aggregate, have not had or could not reasonably be expected to have a Material Adverse Effect or except as otherwise disclosed to the Lender in writing prior to the date hereof.

6.10    **Tax Returns and Payments.** Each Loan Party has filed all federal income tax returns and all other material tax returns, domestic and foreign, required to be filed by it and has paid all material taxes and assessments payable by it that have become due, other than those not yet delinquent and except for those being contested in good faith. Each Loan Party has established on its books such charges, accruals and reserves in respect of taxes, assessments, fees and other governmental charges for all fiscal periods as are required by sound accounting principles consistently applied. No Loan Party knows of any proposed assessment for additional federal, foreign or state taxes for any period, or of any basis therefor, that, individually or in the aggregate, taking into account such charges, accruals and reserves in respect thereof as such Loan Party has made, could reasonably be expected to have a Material Adverse Effect.

6.11    **Title to Properties, etc.** From and after the date hereof, the Borrower will have good and marketable title to the Land, subject only to the Senior Mortgage, and the exceptions

set forth in the title commitment provided to the Lender pursuant to section 5.1(c). As of and after the date hereof, the Borrower owns no Real Property other than the Land.

**6.12 Lawful Operations, etc.** Except for known situations or incidents that are reserved for on the most recent consolidated balance sheet referred to in section 6.9 or that, if not so reserved, could not reasonably be expected to have a Material Adverse Effect, each of the Loan Parties is in full compliance with all material requirements imposed by Law that are applicable to them, their operations or their properties, whether federal or state or local, including, without limitation, all Environmental Laws, the Americans with Disabilities Act of 1990, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities and zoning ordinances.

**6.13 Compliance with ERISA.** Compliance by the Borrower and each Loan Party with the provisions hereof will not involve any Prohibited Transaction. Each of the Borrower and each Loan Party (i) has fulfilled all obligations under minimum funding standards of ERISA and the Code with respect to each Plan that is not a Multiemployer Plan or a Multiple Employer Plan; (ii) has satisfied all respective contribution obligations in respect of each Multiemployer Plan and each Multiple Employer Plan; (iii) is in compliance in all material respects with all other applicable provisions of ERISA and the Code with respect to each Plan, each Multiemployer Plan and each Multiple Employer Plan; and (iv) has not incurred any liability under the Title IV of ERISA to the PBGC with respect to any Plan, any Multiemployer Plan, any Multiple Employer Plan or any trust established thereunder. No Plan or trust created thereunder has been terminated, and there have been no Reportable Events with respect to any Plan or trust created thereunder or with respect to any Multiemployer Plan or Multiple Employer Plan, which termination or Reportable Event will or could result in the termination of such Plan, Multiemployer Plan or Multiple Employer Plan and give rise to a material liability of the Borrower or any ERISA Affiliate in respect thereof. No Borrower, other Loan Party or ERISA Affiliate is at the date hereof, or has been at any time within the two years preceding the date hereof, an employer required to contribute to any Multiemployer Plan or Multiple Employer Plan, or a "contributing sponsor" (as such term is defined in section 4001 of ERISA) in any Multiemployer Plan or Multiple Employer Plan. No Loan Party nor any ERISA Affiliate has any contingent liability with respect to any post-retirement "welfare benefit plan" (as such term is defined in ERISA) except as disclosed to the Lender in writing.

**6.14 Intellectual Property, etc.** Each Loan Party has obtained or has the right to use all material patents, trademarks, service marks, trade names, copyrights, licenses and other rights with respect to the foregoing necessary for the present and planned future conduct of its business, without any known conflict with the rights of others, *except for such* patents, trademarks, service marks, trade names, copyrights, licenses and rights the loss of which, and such conflicts, that in any such case individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

**6.15 Investment Company Act, etc.** None of the Loan Parties is subject to regulation with respect to the creation or incurrence of Indebtedness under the Investment Act of 1940, as amended, the Interstate Commerce Act, as amended, the Federal Power Act, as amended, the Public Utility Holding Company Act of 1935, as amended, or any applicable state public utility Law.

6.16    **Office of Foreign Asset Control and the USA Patriot Act.** No Loan Party is (or will be) a person with whom Lender is restricted from doing business under regulations of the Office of Foreign Asset Control ("*OFAC*") of the Department of the Treasury of the United States of America (including those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 #13224 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons. In addition, to help the US Government fight the funding of terrorism and money laundering activities, the USA Patriot Act ("*Patriot Act*") requires Lender to obtain, verify and record information that identifies its customers. Borrower shall provide the Lender with any information that the Lender deems necessary from time to time in order to ensure compliance with the Patriot Act and any other applicable Laws concerning money laundering and similar activities.

6.17    **True and Complete Disclosure.** All factual information (taken as a whole) heretofore or contemporaneously furnished by or on behalf of any Loan Party to the Lender for purposes of or in connection with this Agreement or any transaction contemplated herein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of such persons in writing to the Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any material fact necessary to make such information (taken as a whole) not misleading at such time in light of the circumstances under which such information was provided, except that any such future information consisting of financial projections prepared by management of the Borrower is only represented herein as being based on good faith estimates and assumptions believed by such persons to be reasonable at the time made. The Lender recognizes that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ materially from the projected results. As of the date hereof, there is no fact known to any Loan Party that has, or could reasonably be expected to have, a Material Adverse Effect that has not theretofore been disclosed in writing to the Lender.

6.18    **No Brokers.** No person acting on behalf of the Borrower or any other Loan Party is or will be entitled to any commission or broker's or finder's fees in connection with the transactions contemplated by this Agreement.

6.19    **Senior Loan Documents.** The Senior Loan Documents received by Lender pursuant to section 5.1(n) are true, correct and complete and no Event of Default (as defined therein) exists thereunder. The performance by the Borrower and the Guarantors of their respective obligations thereunder will not conflict with or cause a breach or violation of the Loan Documents.

6.20    **Insurance.** The Project is insured with financially sound and reputable insurance companies that are not Affiliates of any Loan Party, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower operates and in conformance with the requirements of the Senior Loan Documents.

**6.21   Reimbursement Agreement.**   The Reimbursement Agreement received by Lender pursuant to section 5.1 is true, correct and complete and no covenant or other default exists thereunder. The performance by the Borrower and any Affiliates of their respective obligations thereunder will not conflict with or cause a breach or violation of the Loan Documents.

**SECTION 7**
**AFFIRMATIVE COVENANTS.**

The Borrower hereby covenants and agrees that so long as this Agreement is in effect and until such time as the Loan, together with interest, fees and all other Obligations hereunder, have been paid in full:

**7.1   Reporting Requirements.**   The Borrower will furnish to the Lender:

**(a)   Quarterly Financial Statements.**   As soon as available and in any event within 45 days after the close of each of the quarterly accounting periods in each fiscal year of the Borrower, the unaudited balance sheet of the Borrower as of the end of such quarterly period and the related unaudited statements of income and of cash flows for such quarterly period and/or for the fiscal year to date and setting forth, in the case of such unaudited consolidated statements of income and of cash flows, comparative figures for the related periods in the prior fiscal year, and which consolidated financial statements shall be certified on behalf of the Borrower by its chief financial or accounting officer or other Authorized Officer of the Borrower, subject to changes resulting from normal year-end audit adjustments.

**(b)   Tax Returns.**   Within 120 days after the end of each calendar year and in any event within 10 days after filing, a copy of each federal or state tax return (or request for extension for the filing thereof) filed by the Borrower with the Internal Revenue Service or similar state taxing authority.

**(c)   Operating Statements/Budget.**

(i)   Within 30 days after the end of each calendar month, the Borrower shall provide the Lender with monthly operating statements for the Project, signed and certified by the chief financial or accounting officer or other Authorized Officer of the Borrower in the form required by the Lender, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) and major capital improvements for the month and containing appropriate year-to-date information.

(ii)   Within 30 days after the end of each calendar year, the Borrower shall provide the Lender with an annual operating budget for the Project, in form and substance satisfactory to the Lender.

**(d)   Rent Rolls.**   Within 15 days after the end of each calendar month, the Borrower shall provide the Lender a rent roll (**"Rent Roll"**) for each calendar month, detailing the names of all tenants of the Project, the unit occupied by each tenant, the base

rent and any other charges payable under each lease and the term of each lease, including the expiration date, the extent to which any tenant is in default under any lease and any other information as is reasonably required by Lender.

(e)     **Monthly Conference Call.**  Reasonably promptly after the end of each calendar month, the Borrower will participate in a telephonic conference call with the Lender's asset manager, as reasonably scheduled by the Lender in its discretion during normal business hours, to discuss the results of operations of the Project and any other matters reasonably requested by the Lender or its asset manager. Borrower shall cause the Property Manager to participate in such telephonic conference if requested by Lender.

(f)     **Senior Loan Correspondence.**  Promptly after delivery thereof to the Senior Lender, copies of all compliance certificates and other notices and documents delivered pursuant to the Senior Loan Documents. Promptly upon receipt from the Senior Lender, copies of all notices and documents other than ordinary course notices related to interest rate elections.

(g)     **Budget.**  The Borrower shall provide to the Lender information related to any anticipated changes to the annual operating budget for the Project for its review and approval.

(h)     **Officer's Compliance Certificates.**  At the time of the delivery of the financial statements provided for in section 7.1(a), a certificate on behalf of the Borrower by its chief financial or accounting officer or other Authorized Officer of the Borrower to the effect that, to the best knowledge of the Borrower, no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof and the actions the Borrower proposes to take with respect thereto.

(i)     **Notice of Default and Certain Other Matters.**  Promptly, and in any event within three Business Days, in the case of clause (i) below, or five Business Days, in the case of clauses (ii) or (iii) below, after any Loan Party obtains knowledge thereof, notice of:

(i)     the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(ii)     any litigation or governmental or regulatory proceeding pending against any Loan Party that involves any reasonable possibility of having a Material Adverse Effect; and

(iii)     any other event or circumstance involving or affecting any Loan Party that involves any reasonable possibility of having a Material Adverse Effect.

(j)     **ERISA.**  Promptly, and in any event within 10 days after any Loan Party or any ERISA Affiliate knows of the occurrence of any of the following, the Borrower shall deliver to the Lender a certificate of an Authorized Officer of the Borrower setting

forth the full details as to such occurrence and the action, if any, that such Loan Party or ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given to or filed with or by such Loan Party, the ERISA Affiliate, the PBGC, a Plan participant or the Plan administrator with respect thereto:

        (i)     that a Reportable Event that reasonably could have a Material Adverse Effect has occurred with respect to any Plan;

        (ii)    the institution of any steps by such Loan Party, any ERISA Affiliate, the PBGC or any other person to terminate any Plan;

        (iii)   the institution of any steps by such Loan Party or any ERISA Affiliate to withdraw from any Plan;

        (iv)   the institution of any steps by such Loan Party to withdraw from any Multiemployer Plan or Multiple Employer Plan, if such withdrawal could result in withdrawal liability (as described in Part 1 of Subtitle E of Title IV of ERISA) in excess of $250,000;

        (v)    a non-exempt "prohibited transaction" within the meaning of section 406 of ERISA in connection with any Plan;

        (vi)   that a Plan (other than a Multiemployer Plan or a Multiple Employer Plan) has an Unfunded Current Liability exceeding $250,000;

        (vii)   any increase in the contingent liability of any Loan Party or ERISA Affiliate with respect to any post-retirement welfare liability that reasonably could have a Material Adverse Effect; or

        (viii)  the taking of any action by, or the threatening of the taking of any imminent action by, the Internal Revenue Service, the Department of Labor or the PBGC with respect to any of the foregoing.

        **(k)**    **Environmental Matters.**  Promptly upon, and in any event within 10 Business Days after, an officer of any Loan Party obtains actual knowledge thereof, notice of one or more of the following environmental matters: (i) any pending or threatened material Environmental Claim against any Loan Party or any Real Property owned or operated by any Loan Party; (ii) any condition or occurrence on or arising from any Real Property owned or operated by any Loan Party that (A) results in material noncompliance by the any Loan Party with any applicable Environmental Law or (B) would reasonably be expected to form the basis of an Environmental Claim against any Loan Party or any such Real Property that, after giving effect to any rights of indemnification, reimbursement or similar claim in favor of any Loan Party, could reasonably be expected to have a Material Adverse Effect; (iii) any condition or occurrence on any Real Property owned, leased or operated by any Loan Party that could reasonably be expected to cause such Real Property to be subject to any material restrictions on the ownership, occupancy, use or transferability by any Loan Party of such Real Property under any Environmental Law; and (iv) the taking of any material removal

or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by any Loan Party as required by any Environmental Law or any governmental or other administrative agency. All such notices shall describe in reasonable detail the nature of the Environmental Claim and any Loan Party's response thereto.

(l) **Other Information.** With reasonable promptness, such other information or documents (financial or otherwise) relating to any Loan Party as the Lender may reasonably request from time to time.

(m) **Other Correspondence.** Promptly after delivery thereof to any party to the Reimbursement Agreement, copies of all certificates and other notices and documents delivered by the Borrower or any Affiliate pursuant to such Agreements or any related documents. Promptly upon receipt by the Borrower or any Affiliate from any party to the Reimbursement Agreement, copies of all certificates and other notices and documents.

**7.2    Books, Records and Inspections.** The Borrower will (i) keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrower in accordance with sound accounting principles consistently applied and (ii) permit, upon at least three Business Days' notice to the chief financial officer of the Borrower, officers and designated representatives of the Lender to visit and inspect any of the properties or assets of the Borrower in whomsoever's possession (but only to the extent the Borrower has the right to do so to the extent in the possession of another person), to examine the books of account of the Borrower, and make copies thereof and take extracts therefrom, and to discuss the affairs, finances and accounts of the Borrower with, and be advised as to the same by, its and their officers and independent accountants and independent actuaries, if any, all at such reasonable times and intervals and to such reasonable extent as the Lender may request.

**7.3    Insurance.** The Borrower will (i) maintain insurance coverage by such insurers and in such forms and amounts and against such risks, with such deductibles and covering such risks, as are generally consistent with the insurance coverages that are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower operates; (ii) maintain such insurance with financially sound and reputable insurance companies that are not Affiliates of any Loan Party; (iii) forthwith upon the Lender's written request, furnish to the Lender such information about such insurance as the Lender may from time to time reasonably request, which information shall be prepared in form and detail satisfactory to the Lender and certified by an Authorized Officer of the Borrower; and (iv) comply with all reasonable requirements of the Lender and the Senior Lender regarding insurance of the Project. The Lender shall be named as an additional insured or loss payee as designated by the Lender on all insurance policies maintained by the Borrower, and such policies shall provide that the Lender shall receive 30 day prior written notice of any termination. In no event shall the Lender be required to make insurance proceeds available to the Borrower following a casualty.

**7.4    Lockbox Arrangements.** The Borrower will, upon request by the Lender following the occurrence of an Event of Default, cooperate with the Senior Lender and the

Lender to establish a lockbox account for collection of operating revenues from the Project and the disbursement of such revenues.

7.5 **Payment of Taxes and Claims.** The Borrower will pay and discharge all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims that, if unpaid, might become a Lien or charge upon any properties of the Borrower *provided* that the Borrower shall not be required to pay any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with sound accounting principles consistently applied; and *provided further* that the Borrower will not be considered to be in default of any of the provisions of this sentence if the Borrower fails to pay any such amount, individually or in the aggregate, that is immaterial.

7.6 **Organizational and Other Franchises.** Each Loan Party will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate, partnership, limited liability company or trust existence, rights and authority, and its rights and franchises.

7.7 **Good Repair.** The Borrower will ensure that its material properties and equipment used or useful in its business, in whomsoever's possession they may be, are kept in good repair, working order and condition, normal wear and tear excepted, and that from time to time there are made in such properties and equipment all needful and proper repairs, renewals, replacements, extensions, additions, betterments and improvements thereto, to the extent and in the manner customary for companies in similar businesses.

7.8 **Compliance with Statutes, etc.** The Borrower will comply, in all material respects, with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, including, without limitation, all Environmental Laws, the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities, other than those the noncompliance with which would not have, and that would not be reasonably expected to have, a Material Adverse Effect.

7.9 **Fiscal Years, Fiscal Quarters.** If the Borrower shall change its fiscal year or fiscal quarter, the Borrower will promptly, and in any event within 30 days following any such change, deliver a notice to the Lender describing such change and any material accounting entries made in connection therewith and stating whether such change will have any impact upon any financial computations to be made hereunder, and if any such impact is foreseen, describing in reasonable detail the nature and extent of such impact. If the Lender determines that any such change will have any impact upon any financial computations to be made hereunder that is adverse to the Lender, the Borrower will, if so requested by the Lender, enter into an amendment to this Agreement, in form and substance satisfactory to the Lender, modifying any of the financial covenants or related provisions hereof in such manner as the Lender determines is necessary to eliminate such adverse effect.

7.10 **Intentionally omitted.**

**7.11 Management of the Project.** The Borrower shall not amend, modify or terminate the Property Management Agreement, or enter into any other agreement providing for the management or operation of the Project, or replace the Property Manager of the Project, without the Lender's prior written consent which consent shall not be unreasonably withheld or delayed. The Property Management Agreement must be terminable upon 30 days notice from Borrower to the Property Manager, and upon Lender's request and with the consent of the Senior Lender, the Borrower shall give such termination notice to the Property Manager. The compensation to the Property Manager shall not exceed the Approved Management Fee. Promptly upon receipt from the Property Manager, the Borrower shall provide to the Lender, copies of all notices and documents other than ordinary course notices related to leasing or tenant matters.

**7.12 Publicity.** The Lender reserves the right to publicize the making of the Loan.

**7.13 Reimbursement Agreement.** The Borrower shall diligently and continuously pursue completion of the Eligible Activities (as defined in the Reimbursement Agreement). The Borrower shall submit to the DTBRA, on a quarterly basis or otherwise at the soonest time permitted under the Reimbursement Agreement, a request for Cost Reimbursement for Eligible Activities. Following the occurrence of any Event of Default, the Borrower shall pay to the Lender, as a mandatory prepayment of principal hereunder, all reimbursements received from the DTBRA under the Reimbursement Agreement promptly upon its receipt of same.

**7.14 Additional Funding Loan Agreement.** The Borrower may pursue qualification for the Additional Funding, ***provided, however,*** if, at the time of Borrower's request for all or any part of the Additional Funding, the Adjusted DSCR is not equal to or greater than 1.15:1.00, then the Borrower shall pay to the Lender, as a mandatory prepayment of principal hereunder, all Senior Loan proceeds received from the Senior Lender under the Additional Funding Loan Agreement promptly upon its receipt of same but only until the application of such prepayment as provided herein causes the foregoing Adjusted DSCR to be satisfied.

**7.15 UCC Financing Statements/Insurance.** (i) Within 10 days of the Loan Opening Date, the Lender shall have received the following: (i) evidence of the filing of the UCC financing statements required by the Lender hereunder to perfect its security interests under the Pledge Agreement, (ii) the original so-called "Eagle 9" UCC policy, and (iii) a copy of the Borrower's owner's policy of title insurance with the original Mezzanine Endorsement, if available and requested by the Lender, all as required by the Lender hereunder.

**7.16 Further Assurances.** Promptly upon the request of the Lender, each Loan Party shall take such additional actions as the Lender may reasonably require from time to time in order to (i) carry out more effectively the purposes of this Agreement or any other Loan Document; (ii) subject to the Liens created by the Pledge Agreement, any property, right or interest covered thereby; (iii) perfect and maintain the validity, effectiveness and priority of the Pledge Agreement and the Liens intended to be created thereby; and (iv) better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Lender the rights granted or hereafter intended to be granted to the Lender under any Loan Document.

## SECTION 8
## NEGATIVE COVENANTS.

The Borrower hereby covenants and agrees that on the date hereof and thereafter for so long as this Agreement is in effect and until such time as the Loan, together with interest, fees and all other Obligations incurred hereunder, are paid in full:

**8.1  Changes in Business.** The Borrower will not engage in any business other than the ownership and operation of the Project.

**8.2  Consolidation, Merger or Sale of Assets.** The Borrower will not (i) wind up, liquidate or dissolve its affairs; (ii) enter into any transaction of merger or consolidation; or (iii) transfer, convey, sell, assign or otherwise hypothecate all or substantially all of its assets; or (iv) agree to do any of the foregoing at any time. The Borrower will not assign or attempt to assign its rights under this Agreement to any person and any purported assignment will be void.

**8.3  Liens.** The Borrower will not create, incur, assume or suffer to exist any Lien upon or with respect to any of the Project (except for the Senior Mortgage), or sell such property or any portion thereof or assign any right to receive income therefrom, or file or permit the filing of any financing statement under the UCC or any other similar notice of Lien upon such property under any similar recording or notice statute, *except* for such filings necessary to perfect the Senior Mortgage. Further, without the Lender's prior written consent, the Borrower will not create, incur, assume or suffer to exist any other encumbrance upon or with respect to any of the Project (except as shown in the title commitment referenced in section 5.1(e) and reviewed by the Lender prior to the Loan Opening Date), and any agreement containing covenants, conditions and/or restrictions governing the Project. The Borrower will not seek any change in the zoning designation or requirements applicable to the Land as of the Loan Opening Date without the Lender's prior written consent, including, without limitation, any change to a condominium regime.

**8.4  Distributions to Equity Holders.** The Borrower will not make any distribution to any of its partners, members, shareholders or other equity holders other than Monthly Excess Available Cash.

**8.5  Transactions with Affiliates.** The Borrower will not enter into any transaction or series of transactions (other than those contemplated by the Property Management Agreement) with any Affiliate other than in the ordinary course of business of and pursuant to the reasonable requirements of the Borrower's business and upon fair and reasonable terms no less favorable to the Borrower than would be obtained in a comparable arms' length transaction with a person other than an Affiliate.

**8.6  Plan Terminations, Minimum Funding, etc.** Except for actions taken by persons who are not Affiliates of any Loan Party in respect of any Multiemployer Plan or Multiple Employer Plan, no Loan Party will permit any ERISA Affiliate to, (i) terminate any Plan or Plans so as to result in liability of such Loan Party or any ERISA Affiliate to the PBGC in excess of, in the aggregate, $250,000, (ii) permit to exist one or more events or conditions that reasonably present a material risk of the termination by the PBGC of any Plan or Plans with

respect to which such Loan Party or any ERISA Affiliate could, in the event of such termination, incur liability to the PBGC in excess of such amount in the aggregate or (iii) fail to comply with the minimum funding standards of ERISA and the Code with respect to any Plan.

**8.7   Amendment of Organizational Documents.** The Borrower shall not amend its Organizational Documents without the Lender's prior written consent, and no other Loan Party shall amend its Organization Documents unless (i) such amendment does not affect such Loan Party's ability to perform its obligations under the Loan Documents to which it is a party, (ii) such amendment does not affect the control or management of such Loan Party, and (iii) such Loan Party provides prior written notice of such amendment to the Lender.

**8.8   Intentionally omitted.**

**8.9   Amendment of Senior Loan Documents.** In no event shall the Borrower amend, modify or terminate, any of the Senior Loan Documents without the Lender's prior written consent.

**8.10   Amendment of Reimbursement Agreement.** In no event shall the Borrower amend, modify or terminate, the Reimbursement Agreement without the Lender's prior written consent.

**8.11   Indebtedness.** In no event shall the Borrower incur any Indebtedness without the Lender's prior written consent other than the Obligations, the obligations under the Senior Loan Documents and customary trade payables incurred in the ordinary course of business. In no event shall the Borrower acquire the promissory note of the Senior Loan Documents. In no event shall the Borrower refinance the obligations evidenced by the Senior Loan Documents without the Lender's prior written consent unless the Loan is indefeasibly paid in full in connection with, or on or prior to, the consummation of such refinance. In no event shall the Borrower enter into any transaction or confirmation under any Hedge Agreement without the Lender's prior written consent.

## SECTION 9
## EVENTS OF DEFAULT

**9.1   Events of Default.** Any of the following specified events shall constitute an Event of Default (each an "*Event of Default*"):

    **(a)   Payments.** The Borrower shall (i) default in the payment when due of any principal of the Loan; (ii) default in the payment of any Fee when due; or (iii) default in the payment within ten (10) days of its due date of any interest on the Loan, or (iv) default, and such default under this subsection (iv) shall continue for ten or more Business Days after the Lender's written request therefor, in the payment when due of any fees or any other amounts owing hereunder or under any other Loan Document.

    **(b)   Representations.** Any representation, warranty or statement made by the Borrower or any other Loan Party herein or in any other Loan Document or in any statement or certificate delivered or required to be delivered pursuant hereto or thereto

shall prove to be untrue in any material respect on the date as of which made or deemed made.

(c) **Certain Negative Covenants.** The Borrower shall default in the due performance or observance by them of any term, covenant or agreement contained in sections 8.1 through 8.11, inclusive, of this Agreement.

(d) **Other Covenants.** Any Loan Party shall default in the due performance or observance by it of any term, covenant or agreement contained in this Agreement, other than those referred to in sections 9.1(a), 9.1(b), or 9.1(c) above, and such default is not remedied within 30 days after the earlier of (i) an officer of the Borrower obtaining actual knowledge of such default and (ii) the Borrower receiving written notice of such default from the Lender (any such notice to be identified as a "notice of default" and to refer specifically to this paragraph), *provided, however,* no cure period shall be afforded for the breach of any covenant of any Pledgor contained in section 3(b)(ii), (iii) or (vii) or the Pledge Agreement.

(e) **Cross Default under the Senior Loan Documents.** Any Default or Event of Default (as such terms are defined in the Senior Loan Agreement) shall occur and shall be continuing beyond any applicable grace periods under such Senior Loan Documents.

(f) **Change of Control.** Any Guarantor, that is an individual, shall die and his/her legal representatives shall fail to affirm the obligations under the Loan Documents to which such deceased Guarantor is a party within thirty days of such death. The Manager shall cease to be the sole manager of the Borrower, or Scott A. Chappelle shall cease to control the Manager.

(g) **Other Loan Documents.** Any of the Loan Documents shall cease for any reason to be in full force and effect; or any Loan Party shall default in any payment obligation thereunder beyond any grace period provided in respect thereof (taking into account any notice required to be given in connection therewith); or any Loan Party shall default in any material respect in the due performance and observance of any other obligation thereunder and such default shall continue unremedied for a period of at least 30 days after notice by the Lender; or any Loan Party shall (or seek to) disaffirm or otherwise limit its obligations thereunder otherwise than in strict compliance with the terms thereof.

(h) **Judgments.** One or more judgments or decrees shall be entered against any Loan Party involving a liability (other than a liability covered by insurance, as to which the carrier has adequate claims paying ability and has not denied coverage or reserved its rights) of $100,000 or more in the aggregate for all such judgments and decrees for all Loan Parties, and any such judgments or decrees shall not have been vacated, discharged or stayed or bonded pending appeal within 30 days (or such longer period, not in excess of 60 days, during which enforcement thereof, and the filing of any judgment lien, is effectively stayed or prohibited) from the entry thereof.

(i)     **Bankruptcy, etc.** Any of the following shall occur:

(i)     Any Loan Party (each such person, a "***Principal Party***") shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the "***Bankruptcy Code***");

(ii)    an involuntary case is commenced under the Bankruptcy Code against any Principal Party and the petition is not controverted within 10 days, or is not dismissed within 90 days, after commencement of the case;

(iii)   a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of any Principal Party;

(iv)    any Principal Party commences (including by way of applying for or consenting to the appointment of, or the taking of possession by, a rehabilitator, receiver, custodian, trustee, conservator or liquidator (collectively, a "***conservator***") of itself or all or any substantial portion of its property) any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, liquidation, rehabilitation, conservatorship or similar law of any jurisdiction whether now or hereafter in effect relating to such Principal Party;

(v)     any such proceeding is commenced against any Principal Party to the extent such proceeding is consented by such person or remains undismissed for a period of 90 days;

(vi)    any Principal Party is adjudicated insolvent or bankrupt;

(vii)   any order of relief or other order approving any such case or proceeding is entered;

(viii)  any Principal Party suffers any appointment of any conservator or the like for it or any substantial part of its property that continues undischarged or unstayed for a period of 90 days;

(ix)    any Principal Party makes a general assignment for the benefit of creditors; or

(x)     any corporate (or similar organizational) action is taken by any Principal Party for the purpose of effecting any of the foregoing.

(j)     **ERISA.** Any of the events described in section 7.1(j) shall have occurred, or there shall result from any such event or events the imposition of a lien, the granting of a security interest or a liability or a material risk of incurring a liability, and any such event or events or any such lien, security interest or liability, individually and/or in the aggregate, in the reasonable opinion of the Lender, has had, or could reasonably be expected to have, a Material Adverse Effect.

(k)    **Material Adverse Effect.**  Any event or circumstance shall occur or exist that has a Material Adverse Effect upon any Loan Party or the Project.

**9.2    Acceleration, etc.**  Upon the occurrence of any Event of Default, and at any time thereafter, if any Event of Default shall then be continuing, the Lender may, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Lender to enforce its claims against the Borrower or any other Loan Party in any manner permitted under applicable Law:

(a)    declare the principal of and any accrued interest in respect of the Loan and all other Obligations, including, without limitation, the Prepayment Premium, owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and/or

(b)    exercise any other right or remedy available under any of the Loan Documents or applicable Law;

*provided* that, if an Event of Default specified in section 9.1(i) shall occur with respect to any Principal Party, the result that would occur upon the giving of written notice by the Lender as specified in clauses (a) and/or (b) above shall occur automatically without the giving of any such notice.

**9.3    Application of Liquidation Proceeds.**  All monies received by the Lender from the exercise of remedies hereunder or under the other Loan Documents or under any other documents relating to this Agreement shall, unless otherwise required by the terms of the other Loan Documents or by applicable Law, be applied as follows:

(a)    *first*, to the payment of all expenses (to the extent not paid by the Borrower) incurred by the Lender in connection with the exercise of such remedies, including, without limitation, all reasonable costs and expenses of collection, attorneys' fees, court costs and any foreclosure expenses;

(b)    *second*, to the payment of interest then accrued on the Loan;

(c)    *third*, to the payment of any Fees then accrued and payable to the Lender under this Agreement or any other Loan Document;

(d)    *fourth*, to the payment of the Prepayment Premium;

(e)    *fifth*, to the payment of the principal balance then owing on the Loan;

(f)    *sixth*, to the payment of all other amounts owed by the Borrower to the Lender under this Agreement or any other Loan Document; and

(g)    *finally*, any remaining surplus after all of the Obligations have been paid in full, to the Borrower or to whomsoever shall be lawfully entitled thereto.

## SECTION 10
## MISCELLANEOUS.

### 10.1   Payment of Expenses, etc.

**(a)**     Whether or not the transactions contemplated hereby are consummated, the Borrower shall pay (or reimburse the Lender for) all reasonable out-of-pocket costs and expenses of the Lender in connection with (i) the negotiation, preparation, execution and delivery of the Loan Documents and the documents and instruments referred to therein, (ii) any amendment, waiver or consent relating to any of the Loan Documents that is requested by any Loan Party and (iii) the enforcement of any of the Loan Documents or the other documents and instruments referred to therein, including, without limitation, in each such case the fees and disbursements of Jones Day or other special counsel to the Lender.

**(b)**     Without limitation of the preceding section 10.1(a), in the event of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of any Loan Party, the Borrower shall pay all costs of collection and defense, including reasonable attorneys' fees in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, that shall be due and payable together with all required service or use taxes.

**(c)**     The Borrower shall pay and hold the Lender harmless from and against any and all present and future stamp and other similar taxes with respect to the foregoing matters and hold the Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to the Lender) to pay such taxes.

**(d)**     The Borrower shall indemnify the Lender and its officers, directors, employees, representatives and agents (collectively, the *"Indemnitees"*) from and hold each of them harmless against any and all losses, liabilities, claims, damages or expenses reasonably incurred by any of them as a result of, or arising out of, or in any way related to, or by reason of

**(i)**     any investigation, litigation or other proceeding (whether or not the Lender is a party thereto) related to the entering into and/or performance of any Loan Document or the use of the proceeds of the Loan hereunder or the consummation of any transactions contemplated in any Loan Document, other than any such investigation, litigation or proceeding or arising solely out of any examination of the Lender by any regulatory or other governmental authority having jurisdiction over it; or

**(ii)**     the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property owned, leased or at any time operated by any Loan Party, the release, generation, storage, transportation, handling or disposal of Hazardous Materials at any location, whether or not owned or operated by any Loan Party, if any Loan Party

could have or is alleged to have any responsibility in respect thereof, the non-compliance of any such Real Property with foreign, federal, state and local Laws, regulations and ordinances (including applicable permits thereunder) applicable thereto, or any Environmental Claim asserted against any Loan Party, in respect of any such Real Property, or

(iii)    all claims, liabilities, costs and expenses (including attorneys' fees and expenses) incurred in relation to any claim by broker, finder or similar person related to any brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby or by the Senior Loan Documents;

including, in each case, without limitation, the fees and disbursements of counsel incurred in connection with any such investigation, litigation or other proceeding, provided, however, that Borrower shall not be liable for indemnification to the extent that Lender is found to be responsible for gross negligence of willful misconduct. To the extent that the undertaking to indemnify, pay or hold harmless any person set forth in the preceding sentence may be unenforceable because it is violative of any Law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities that is permissible under applicable Law.

10.2    **Right of Setoff.**  In addition to any rights now or hereafter granted under applicable Law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to the Borrower or to any other person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Lender (including, without limitation, by branches and agencies of the Lender wherever located) to or for the credit or the account of the Borrower against and on account of the Obligations and liabilities of the Borrower to the Lender under this Agreement or under any of the other Loan Documents, including, without limitation, all other claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not the Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

10.3    **Notices.**  All notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto or any other person shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by prepaid courier and shall be deemed to be given for purpose of this Agreement (i) in regard to registered or certified mail, three Business Days after mailing and (ii) in regard to personal delivery or prepaid courier, on the day that such writing is delivered. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this section 10.3, notices, demands, instructions and other communications in writing shall be given to or made upon the following persons at its addresses indicated below:

To the Borrower or any Loan Party:

> WOODLAND LAKES INVESTMENT GROUP, L.L.C.
> 1427 West Saginaw, Suite 200
> East Lansing, MI 48823
> Attention: Scott A. Chappelle
> Telephone: (517) 336-4400
> Facsimile: (517) 336-4499

> With a courtesy copy to:

> McGraw & Eckhardt, PC
> 1427 West Saginaw, Suite 200
> East Lansing, MI 48823
> Attention: Thomas R. Eckhardt, Esq.
> Telephone: (517) 336-4400
> Facsimile: (517) 336-4499

To the Lender:

> HARTFORD MEZZANINE INVESTORS I, LLC
> 127 Public Square, 7th Floor
> Cleveland, Ohio 44114
> Attention: Asset Manager - James MacQueen
> Facsimile: (216) 689-4700
> Telephone: (216) 689-4504

with a courtesy copy to:

> Jones Day
> North Point
> 901 Lakeside Avenue
> Cleveland, Ohio 44114
> Attention: Bernadette M. Mast, Esq.
> Facsimile: (216) 579-0212
> Telephone: (216) 586-7088

or at such other address as any of the persons identified above may from time to time designate by written notice given as herein required. Rejection or refusal to accept or inability to deliver because of changed addresses or because notice of changed address was given shall be deemed a receipt of such notice. The effectiveness of such notice will not be affected by the giving or lack thereof of courtesy copies of such notice.

If any day on which any notice, demand, instruction or other communication is given or sent by any party hereto is not a Business Day, such notice, demand, instruction or other communication shall be deemed to have been given or sent on the Business Day next succeeding such non-Business Day.

**10.4    Successors and Assigns.**

(a)    **General.**  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns, *provided* that the Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of the Lender.

(b)    The Lender may at any time sell to one or more persons (each a "*Participant*") participating interests in the Loan, all on such terms as the Lender may deem acceptable. In the event of any such sale of a participating interest to a Participant, the Lender's obligations under this Agreement shall remain unchanged, the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, the Lender shall remain the holder of the Note issued hereunder for all purposes under this Agreement, and the Borrower shall continue to deal solely and directly with the Lender in connection with the rights and obligations derived through the Lender under this Agreement.

(c)    The Lender and any assignee thereof (each an "*Assignor*") may at any time assign to one or more banks, financial institutions or other persons (each an "Assignee") all or any of its rights and obligations under this Agreement, the Note and the other Loan Documents, and such Assignee shall assume all such rights and obligations, pursuant to an assignment and assumption agreement executed by such Assignee, all on such terms as Lender may deem acceptable.  Upon the execution, delivery and acceptance of such assignment and assumption agreement in accordance with this Agreement, from and after the effective date of the assignment effected thereby, (i) the Assignee thereunder shall be a party hereto and, to the extent of that portion of the Loan covered by such assignment and assumption agreement, have the same rights and obligations as the Assignor, (ii) all references to the Lender contained in this Agreement or any other Loan Document shall be deemed to be a referenced to the Lender and any Assignee, and (iii) the Assignor shall, to the extent provided in such assignment and assumption agreement, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an assignment and assumption agreement covering all or the remaining portion of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto).  Such assignment and assumption agreement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Assignee as a party to this Agreement and the resulting adjustment arising from the purchase by such Assignee of all or a portion of the rights and obligations of the Assignor under this Agreement, the Note and the other Loan Documents.  On or prior to the effective date of the assignment effected by such assignment and assumption agreement, the Borrower, if so requested by the Lender, shall execute and deliver to the Assignee in exchange for the Assignor's Note or Notes a new Note or Notes to the order of the Assignee in an amount equal to the amount of the Loan assumed by it pursuant to such assignment and assumption agreement and to the Assignor a new Note or Notes to the order of such Assignor in an amount equal to the amount of the Loan retained by it hereunder.  Such new Note or Notes shall be dated as of the date hereof and shall otherwise be in the form of the Note or Notes replaced thereby.  The Note or Notes surrendered by the Assignor shall be marked "canceled."

(d)     The Borrower authorizes any Assignor to disclose to any Participant, Assignee or other transferee (each, a "Transferee") and any prospective Transferee any and all financial information in such Assignor's possession concerning the Borrower that has been delivered to such Assignor by the Borrower pursuant to this Agreement or that has been delivered to such Assignor by the Borrower in connection with the Lender's credit evaluation prior to entering into this Agreement.

(e)     Anything in this section 10.4 to the contrary notwithstanding, any Assignor may assign and pledge all or any portion of the Loan and/or obligations owing to it to any Federal Reserve Bank or the United States Treasury as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any Operating Circular issued by such Federal Reserve Bank, provided that any payment in respect of such assigned portion of the Loan and/or obligations made by the Borrower to the assigning and/or pledging Assignor in accordance with the terms of this Agreement shall satisfy the Borrower's obligations hereunder in respect of such assigned Loan and/or obligations to the extent of such payment. No such assignment shall release the assigning and/or pledging Assignor from its obligations hereunder.

(f)     The Lender agrees to furnish to the Borrower upon its written request a copy of any assignment and assumption agreement executed pursuant to section 10.4(a).

10.5     **No Waiver; Remedies Cumulative.** No failure or delay on the part of the Lender in exercising any right, power or privilege hereunder or under any other Loan Document and no course of dealing between the Borrower and the Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies that the Lender would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Lender to any other or further action in any circumstances without notice or demand.

10.6     **Financial Calculations.** The financial statements to be furnished to the Lender pursuant hereto shall be made and prepared in accordance with sound accounting principles consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lender).

10.7     **Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial.**

(a)     THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF OHIO, TO THE FULLEST EXTENT PERMITTED BY LAW, AND THE BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF OHIO GOVERNS THIS

AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (EXCEPT AS OTHERWISE PROVIDED FOR THEREIN). Any legal action or proceeding with respect to this Agreement or any other Loan Document may be brought in the United States District Court for the Northern District of Ohio or in any Ohio court sitting in the City of Cleveland, and, by execution and delivery of this Agreement, the Borrower hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. The Borrower hereby further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the Borrower at its address for notices pursuant to section 10.3, such service to become effective 30 days after such mailing or at such earlier time as may be provided under applicable Law. Nothing herein shall affect the right of the Lender to serve process in any other manner permitted by Law or to commence legal proceedings or otherwise proceed against the Borrower in any other jurisdiction.

(b)     The Borrower hereby irrevocably waives any objection that it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other Loan Document brought in the courts referred to in section 10.7(a) above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

(c)     EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**10.8     Counterparts.** This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same agreement. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Lender.

**10.9     Headings Descriptive.** The headings of the several sections and other portions of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

**10.10     Amendment or Waiver.** Neither this Agreement, any of the other Loan Documents, nor any terms hereof or thereof, may be amended, changed, waived, discharged or terminated *unless* such amendment, change, waiver, discharge or termination is in writing signed by the Borrower (or other appropriate Loan Party) and the Lender.

**10.11     Survival of Indemnities.** All indemnities set forth herein including, without limitation, in section 10.1, shall survive the execution and delivery of this Agreement and the making and prepayment or repayment of the Loan.

**10.12  Domicile of the Loan.**  The Lender may transfer and carry the Loan at, to or for the account of any branch office, subsidiary or Affiliate of the Lender.

**10.13  General Limitation of Liability.**  No claim may be made by the Borrower or any other person against the Lender or its Affiliates, directors, officers, employees, attorneys or agents for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any of the other Loan Documents, or any act, omission or event occurring in connection therewith; and the Borrower hereby, to the fullest extent permitted under applicable Law, waives, releases and agrees not to sue or counterclaim upon any such claim for any special, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**10.14  No Duty.**  All attorneys, accountants, appraisers, consultants and other professional persons (including the firms or other entities on behalf of which any such person may act) retained by the Lender with respect to the transactions contemplated by the Loan Documents shall have the right to act exclusively in the interest of the Lender and shall have no duty of disclosure, duty of loyalty, duty of care or other duty or obligation of any type or nature whatsoever to any Loan Party or to any other person with respect to any matters within the scope of such representation or related to their activities in connection with such representation.

**10.15  Lender Not Fiduciary to the Loan Parties.**  The relationship among the Loan Parties and the Lender is solely that of debtor and creditor, and the Lender has no fiduciary or other special relationship with any Loan Party, and no term or provision of any Loan Document, no course of dealing, no written or oral communication or other action shall be construed so as to deem such relationship to be other than that of debtor and creditor.

**10.16  Survival of Representations and Warranties.**  All representations and warranties herein shall survive the making of the Loan hereunder, the execution and delivery of this Agreement, the Note and the other Loan Documents, the issue and delivery of the Note, any disposition thereof by the holder thereof and any investigation made by the Lender or on its behalf.  All statements contained in any certificate or other document delivered to the Lender by or on behalf of any Loan Party pursuant hereto or otherwise specifically for use in connection with the transactions contemplated hereby shall constitute representations and warranties by the Borrower hereunder, made as of the respective dates specified therein or, if no date is specified, and if the context does not require otherwise, as of the date delivered.

**10.17  Interest Rate Limitation.**  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts that are treated as interest on the Loan under applicable Law (collectively the "*Charges*"), shall exceed the maximum lawful rate that may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable Law, the rate of interest payable in respect of the Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the maximum lawful rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Loan but were not payable as a result of the operation of this section 10.17 shall be cumulated and the interest and Charges payable to the Lender in respect of other periods shall be increased (but not above the maximum lawful rate

therefor) until such cumulated amount, together with interest thereon to the date of repayment, shall have been received by the Lender. Any amount collected by the Lender in excess of that which can be spread over the life of the Loan in accordance with this section 10.17 shall be promptly refunded to the Borrower and shall be deemed by the parties to never have been charged at all.

**10.18 Sharing of Information.** Borrower acknowledges and agrees that the Lender and the Senior Lender may share information that each may acquire with respect to Borrower, the other Loan Parties or the Project and consents to the transfer of such information, whether financial or otherwise, between them, without having to obtain the Borrower's consent.

*(Signatures are on the following page.)*

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:

WOODLAND LAKES INVESTMENT GROUP, L.L.C., a Michigan limited liability company

By: WLA Management, Inc., a Michigan corporation

Its: Manager

   By: _____
   Name: Scott A. Chappelle
   Its: President

LENDER:

HARTFORD MEZZANINE INVESTORS I, LLC, a Delaware limited liability company

By: Key Real Estate Equity Capital, Inc., an Ohio corporation, its Managing Member

   By: _____
   Name: _____
   Title: Vice President

And By: Hartford Investment Management Company, a Delaware corporation, its Managing Member

   By: _____
   Name: _____
   Title: Vice President

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed and delivered as of the date first above written.

**BORROWER:**

**WOODLAND LAKES INVESTMENT GROUP, L.L.C.**, a Michigan limited liability company

By:    WLA Management, Inc., a Michigan corporation

Its:    Manager

       By: _____
       Name: Scott A. Chappelle
       Its:    President

**LENDER:**

**HARTFORD MEZZANINE INVESTORS I, LLC,** a Delaware limited liability company

By:    Key Real Estate Equity Capital, Inc., an Ohio corporation, its Managing Member

       By: _____
       Name: _____
       Title: Vice President

And By: Hartford Investment Management Company, a Delaware corporation, its Managing Member

       By: _____
       Name: _____
       Title: Vice President

Signature Page
to
Loan Agreement

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:

**WOODLAND LAKES INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company

By:    WLA Management, Inc., a Michigan corporation
Its:    Manager

        By: _____
        Name: Scott A. Chappelle
        Its:    President

LENDER:

**HARTFORD MEZZANINE INVESTORS I, LLC,** a Delaware limited liability company

By:    Key Real Estate Equity Capital, Inc., an Ohio corporation, its Managing Member

        By: _____
        Name: _____
        Title:  Vice President

And By: Hartford Investment Management Company, a Delaware corporation, its Managing Member

        By: _____
        Name: William P. Bowman
        Title:  Vice President

Signature Page
to
Loan Agreement