**ANNEX I**

**INFORMATION AS TO LENDER**

**HARTFORD MEZZANINE INVESTORS I, LLC**

**Lending Office**

Hartford Mezzanine Investors I, LLC
127 Public Square, 7th Floor
Cleveland, Ohio  44114

**Primary Contact:**
Mr. James MacQueen
Telephone:  (216) 689-4504
Facsimile:  (216) 689-4700

**Contact for Rates, Payments, etc.:**
Mr. James MacQueen
Telephone:  (216) 689-4504
Facsimile:  (216) 689-4700

**Wiring Information:**
Hartford Mezzanine Investors I, LLC
Cleveland, OH 44114
ABA No. 041001039
Credit Account No. 114010
Please notify:  Paula Struchen. (216) 689-0878 upon
arrival

## EXHIBIT A

*[See next page.]*

# TERM NOTE

US $3,340,000.00

Cleveland, Ohio

January 4, 2006

FOR VALUE RECEIVED, the undersigned **WOODLAND LAKES INVESTMENT GROUP, L.L.C.**, a Michigan limited liability company and together, with its successors and assigns, is referred to herein as the "*Borrower*," hereby promises to pay to the order of **HARTFORD MEZZANINE INVESTORS I, LLC** (the "*Lender*"), in lawful money of the United States of America and in immediately available funds, at the Lending Office of the Lender, on the Maturity Date, Three Million Three Hundred Forty Thousand and 00/100 Dollars ($3,340,000.00), or the aggregate principal amount then outstanding pursuant to the Loan Agreement referred to below. Capitalized terms used herein without definition shall have the respective meanings ascribed thereto in the Loan Agreement referred to below.

The Initial Maturity Date under the Loan Agreement is September 1, 2015, *provided, however,* the Maturity Date may be accelerated as provided in the Loan Agreement.

The Borrower also promises to pay interest in like currency and funds on the unpaid principal amount of the Loan made by the Lender, at said office, from the date hereof until paid at the rates and at the times provided in section 2.3 of the Loan Agreement.

This Note is the Note referred to in the Loan Agreement, dated as of even date herewith, between the Borrower and the Lender (as from time to time in effect, the "*Loan Agreement*") and is entitled to the benefits thereof and of the other Loan Documents.

If an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Loan Agreement.

The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note. No failure to exercise, or delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of any such rights.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF OHIO, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

*(Signature page follows.)*

B-1

IN WITNESS WHEREOF, the Borrower has executed this Note as of the date first above written.

BORROWER:

**WOODLAND LAKES INVESTMENT GROUP, L.L.C.**, a Michigan limited liability company

By:   WLA Management, Inc., a Michigan corporation

Its:   Manager

By: _____

Name: Scott A. Chappelle

Its:    President

B-2

# EXHIBIT
# C

# GUARANTY

dated as of
January 4, 2006

by

## SCOTT A. CHAPPELLE,

## LAURA A. CHAPPELLE,

## KEVIN T. MCGRAW,

## SHARON D. MCGRAW,

## EVERT KRAMER, JR.,

and

## ROSALIND KRAMER,

*as Guarantors*

for the benefit of

## HARTFORD MEZZANINE INVESTORS I, LLC,

*as the Lender*

Jones Day Cleveland
601755-HMI001
CLI-1364709v2

Woodland Lakes Apartments
Mezzanine Loan

## GUARANTY

This **GUARANTY** (this "*Guaranty*"), dated as of January 4, 2006, is made jointly and severally by (i) **SCOTT A. CHAPPELLE**, (ii) **LAURA A. CHAPPELLE**, (iii) **KEVIN T. MCGRAW**, (iv) **SHARON D. MCGRAW**, (v) **EVERT KRAMER, JR.** and (vi) **ROSALIND KRAMER**, each an individual (herein, together with each of their respective successors, assigns, heirs and personal representatives, collectively, the "*Guarantors*" and each a "*Guarantor*") in favor of **HARTFORD MEZZANINE INVESTORS I, LLC**, a Delaware limited liability company (herein, together with its successors and assigns, the "*Lender*").

All capitalized terms appearing and not defined herein shall have the same meanings ascribed to them in the Loan Agreement, dated as of the date hereof (as hereafter amended or otherwise modified, the "*Loan Agreement*"), between Woodland Lakes Investment Group, L.L.C., a Michigan limited liability company (herein, together with its successors and assigns, the "*Borrower*") and the Lender.

### W I T N E S E T H:

**WHEREAS**, the Borrower is a single asset entity whose sole asset is approximately 60.33 acres of real property at 4200 Dell Road in the Township of Delhi, County of Ingham, State of Michigan (the "*Land*") and a 344-unit Class A apartment community consisting of 21 two-story apartment buildings plus a 3,200 square foot clubhouse with locker rooms, exercise facility and in-ground swimming pool situated on the Land, all known as the Woodland Lakes Apartments (the "*Project*");

**WHEREAS**, pursuant to the terms and conditions of the Loan Agreement, the Lender agreed to make a secured loan (the "*Loan*") available to Borrower in the original principal amount of $3,340,000.00 to provide funds for lawful business purposes, namely, to refinance existing mezzanine financing of Borrower;

**WHEREAS**, the Loan is secured by, among other things, pledges of one hundred percent of the membership interest in the Borrower (the "*Pledge Agreement*");

**WHEREAS**, the Loan will be advanced by the Lender to the Borrower upon the Borrower's compliance with, and subject to, the terms, conditions and limitations of the Loan Agreement;

**WHEREAS**, the Guarantors will benefit from the making of the Loan;

**WHEREAS**, to induce the Lender to make the Loan pursuant to the Loan Agreement, and to accept the Note and the Pledge Agreement, the Guarantors have agreed to execute and deliver this Guaranty to be binding upon the Guarantors and their respective successors, assigns, heirs and personal representatives;

**WHEREAS**, the Lender is unwilling to extend credit to the Borrower unless this Guaranty is executed by the Guarantors and delivered to the Lender; and

**WHEREAS**, it is a condition to the obligations of the Lender to make the Loan to the Borrower pursuant to the Loan Agreement that this Guaranty is executed by the Guarantors and delivered to the Lender.

**NOW, THEREFORE**, in consideration of the Loan to the Borrower, in order to induce the Lender to execute and deliver the Loan Agreement and to accept the Note and the Pledge Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantors, for themselves, their successors, assigns, heirs and personal representatives hereby covenant and agree with the Lender, for the benefit of the Lender and its successors and assigns, as follows:

    1.    **Guaranty Obligations.**    For purposes of this Guaranty only, "*Guaranty Obligations*" shall mean the prompt, absolute and unconditional payment in full of the following:

        (a)    the aggregate outstanding principal amount of the Loan;

        (b)    all Fees due under the Loan Agreement;

        (c)    all interest on the aggregate outstanding principal amount of the Loan, whether such interest accrues at the regular interest rate applicable thereto, at the default rate specified in section 2.3(c) of the Loan Agreement, and whether such interest accrues prior to or after the Maturity Date;

        (d)    late charges, prepayment fees and premiums, including, without limitation, the Prepayment Premium, if any, including the Yield Maintenance, if any, whether before or after any petition under the Bankruptcy Code, as the same shall become due and payable under the Loan Agreement and the Note, and all fees, charges and expenses and other sums now or hereafter due to the Lender under the Loan Agreement, the Note or any other Loan Document, including, without limitation, any and all reasonable costs and expenses incurred by the Lender in connection with the collection and enforcement of the Note, the Pledge Agreement or any other Loan Document, all attorneys' fees and expenses, investigative costs and all court costs, whether or not suit is filed thereon, or whether at maturity, by acceleration otherwise; and

        (e)    damages incurred by the Lender as a result of any Loan Party (or their respective agents, employees, heirs, personal representatives, successors or assigns) (i) committing fraud in connection with the Loan Agreement, the Senior Loan Documents and/or the transactions contemplated thereby or making any material misrepresentation in any Loan Document, any Senior Loan Document or any other instrument, agreement or document delivered in connection with the Loan Agreement or the Senior Loan Documents, (ii) failing timely to pay any accrued and due and payable property taxes, assessments or other lienable impositions or any insurance premiums with respect to the Project, (iii) failing to apply tenant security deposits, insurance proceeds or condemnation proceeds in connection with the Project in accordance with the Loan Documents and the Senior Loan Documents, (iv) damaging the Project (or any portion thereof) as a result of waste suffered or permitted to occur with respect to the Project (or any portion thereof), (v) violating applicable law as a result of its willful acts or omissions or its gross

negligence, (vi) incurring any material environmental liability with respect to the Project, and (vii) with respect to the Borrower, except as otherwise permitted by the express terms of the Loan Agreement, (A) engaging in any business or activity other than the ownership, leasing and operation of the Project, (B) incurring any Indebtedness other than the Loan, the Senior Loan, and trade payables incurred in the ordinary course of business, (C) granting any Lien on its interest in the Project other than the Senior Mortgage, (D) selling, leasing or otherwise disposing of all or substantially all of its assets, and (E) merging, combining or otherwise consolidating with any other person, and (viii) selling, conveying, assigning, pledging or otherwise transferring, directly or indirectly, any interest in the Borrower or the Project except as permitted by the express terms of the Pledge Agreement and/or the Loan Agreement.

2.      **Guaranty.** The Guarantors unconditionally and irrevocably guarantee, on a joint and several basis, the Guaranty Obligations to the Lender. The Guarantors shall, within five Business Days following written notice from the Lender to the Guarantors demanding payment hereunder, pay to the Lender, in immediately available funds, at the office of the Lender set forth in the introductory paragraph to this Guaranty, such amount of the Guaranty Obligations as the Lender shall specify in such notice and that are owed hereunder. Notwithstanding anything contained in the foregoing to the contrary, Lender shall not demand payment for the Guaranty Obligations identified in Sections 1(a) through (d) above unless any one of the following events shall occur:

        (a)     if any Loan Party shall (i) make an assignment for the benefit of creditors; (ii) admit in writing such person's inability to pay its debts as they become due; (iii) file a voluntary petition in bankruptcy; (iv) become insolvent as defined in the Bankruptcy Code; (v) file any petition or answer seeking for such person any reorganization, arrangement, composition, readjustment of debt or similar relief under any present or future statute, law or regulation of any jurisdiction; (vi) petition or apply to any tribunal for any receiver, custodian or any trustee for any substantial part of such person's property; (vii) be the subject of any proceeding described in Sections 2(a) (iii), (v) or (vi) commenced against such person by a person other than the Lender that remains undismissed for a period of 60 days; (viii) file any answer admitting or not contesting the material allegations of any such petition filed against such person or of any order, judgment or decree approving such petition in any such proceeding; or (ix) seek, approve, consent to, or acquiesce in any such proceeding, or in the appointment of any trustee, receiver, custodian, liquidator, or fiscal agent for such person or any substantial part of such person's property or if an order is entered appointing any such trustee, receiver, custodian, liquidator or fiscal agent and such order remains in effect for 60 days; or

        (b)     if an order for relief is entered under the Bankruptcy Code or any other decree or order is entered by a court of competent jurisdiction (i) adjudicating any Loan Party bankrupt or insolvent; (ii) approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of any Loan Party; or (iii) appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any Loan Party of any substantial part of such person's property; and

(c)     if any Loan Party commences or seeks to sell, convey, assign, pledge or otherwise transfer, directly or indirectly, any interest in the Borrower or the Project except as permitted by the express terms of the Pledge Agreement and/or the Loan Agreement.

**3.      Representations, Warranties and Covenants of Guarantors.**  Each Guarantor hereby represents, warrants and covenants to the Lender as follows:

(a)     If such Guarantor is a natural person, such Guarantor has the legal and mental capacity to enter into this Guaranty and to consummate the transactions contemplated hereby.  If such Guarantor is not a natural person, such Guarantor (i) is a duly organized or formed and validly existing corporation, partnership, limited liability company or irrevocable trust, as the case may be, in good standing under the laws of the jurisdiction of its formation and has the corporate, partnership, limited liability company or trust power and authority, as applicable, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage, and (ii) has duly qualified and is authorized to do business in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified would not have a Material Adverse Effect.

(b)     If such Guarantor is not a natural person, such Guarantor has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of this Guaranty and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Guaranty.  Such Guarantor has duly executed and delivered this Guaranty and this Guaranty constitutes the legal, valid and binding agreement or obligation of such Guarantor enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

(c)     Neither the execution, delivery and performance by such Guarantor of this Guaranty nor compliance with the terms and provisions hereof, nor the consummation of the loan transactions contemplated in the Loan Documents (i) to the best of such person's knowledge, will contravene any provision of any Law, statute, rule, regulation, order, writ, injunction or decree of any court or governmental instrumentality applicable to such Guarantor or their properties and assets; (ii) will conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (other than the Liens created under the Pledge Agreement and the Senior Deed of Trust) upon any of the property or assets of such Guarantor pursuant to the terms of any promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement or any other material agreement or other instrument to which such Guarantor is a party or by which it or any of its property or assets are bound or to which it may be subject; (iii) will violate any provision of the articles or certificate of incorporation, code of regulations, by-laws or other Organizational Document, if applicable, of such Guarantor; or (iv) will conflict with or result in any breach of, any of the terms,

4

covenants, conditions or provisions of, or constitute a default under, any of the Senior Loan Documents.

(d)     To the best of such Guarantor's knowledge, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any foreign or domestic governmental or public body or authority, or any subdivision thereof, is required to authorize or is required as a condition to (i) the execution, delivery and performance by such Guarantor of this Guaranty or (ii) the legality, validity, binding effect or enforceability of this Guaranty.

(e)     Such Guarantor is not insolvent (as such term is defined in the Bankruptcy Code), and such Guarantor will not be rendered insolvent by execution of this Guaranty or any other Loan Document to which such Guarantor is a party or by the consummation of the transactions contemplated hereby or thereby.

(f)     The consummation of the transactions contemplated hereby and the performance by such Guarantor of the Guarantor's obligations under this Guaranty or any other Loan Document to which such Guarantor is a party will not result in any breach of, give rise to a lien under, or constitute a default under, any mortgage, deed of trust, lease, bank loan or credit agreement, including, without limitation the Senior Loan Documents, any operating agreement, partnership agreement, corporate charter, by-laws, shareholder agreement or other agreement or instrument to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's properties may be bound or affected.

(g)     The financial statements, tax returns and other information regarding the net worth of such Guarantor delivered by such Guarantor to the Lender at or prior to the date hereof fairly and accurately present the financial condition of such Guarantor as of the date thereof, and no adverse change has occurred in the financial condition or net worth reflected therein since the date thereof. Such financial statements have been prepared in accordance with sound accounting methods, principles and standards, consistently applied, and do not omit facts, the omission of which would make such financial statements materially misleading. All of the assets reflected on the financial statements provided to the Lender by such Guarantor are available (on an unsecured basis) to satisfy such Guarantor's obligations hereunder.

(h)     Except as disclosed in writing to the Lender, there are no actions, suits or proceedings pending, or to the knowledge of such Guarantor threatened, against or affecting such Guarantor or the Project, or involving the validity or enforceability of the Pledge Agreement, or the priority of the liens created thereby, at law or in equity, before or by any Governmental Authority, and such Guarantor is not subject to, in default of or in violation with respect to any order, writ, injunction, decree or demand of any court or any Governmental Authority that could affect such Guarantor's obligations hereunder.

(i)     Such Guarantor shall promptly provide the Lender with written notice of any pending or threatened litigation against such Guarantor or the Project involving claims in excess of $250,000 not fully covered by insurance or any such claims in excess of $1,000,000, regardless of insurance coverage, or the commencement against such

Guarantor or the Project of any proceedings or investigations by a Governmental Authority.

(j)     There is no default on the part of such Guarantor under or with respect to this Guaranty or any other Loan Document to which such Guarantor is a party, and no event has occurred and is continuing that, with the giving of notice or the passage of time, or both, would constitute a default under any of the aforesaid documents.

(k)     Such Guarantor has no counterclaims, offsets or defenses with respect to the Loan or with respect to this Guaranty, the Note or any other Loan Document to which such Guarantor is a party.

(l)     Such Guarantor will not join in any action, or consent to amend, terminate or modify the Organizational Documents of the Borrower, or any Pledgor (except as expressly permitted by the terms of the Loan Agreement) or such Guarantor, if any, without the prior written consent of the Lender.

(m)     Such Guarantor will promptly comply with all conditions of this Guaranty and the other Loan Documents with which such Guarantor is required to comply. Such Guarantor will promptly and fully respond to any inquiry of the Lender made with respect to the Loan, the Project or any of the matters covered by this Guaranty.

(n)     Such Guarantor will not modify or amend or terminate (other than by full performance thereof) or cancel any Loan Document or any Senior Loan Document without the prior written consent of the Lender.

(o)     Such Guarantor is deriving or expects to derive a financial or other advantage from each and every obligation incurred by the Borrower to the Lender.

(p)     Such Guarantor hereby acknowledges receipt of copies of, and hereby approves, the Loan Agreement and the other Loan Documents and the Senior Loan Documents.

(q)     Such Guarantor shall execute and deliver to the Lender, from time to time, such other documents as shall be reasonably necessary to give full effect to the rights and remedies granted or provided to the Lender by this Guaranty.

(r)     Such Guarantor acknowledges and agrees that the Lender may apply any payments or recoveries received after a default under any of the Loan Documents to principal, interest, fees, expenses and other sums due with respect to the Loan in such order as may be provided in the Loan Agreement or the other Loan Documents or, to the extent not so provided, in such order as the Lender, in its sole discretion, may elect.

(s)     Such Guarantor acknowledges and agrees that the Lender and the Senior Lender may share information that each may acquire with respect to any Loan Party and the Project and consents to the transfer of such information, whether financial or otherwise, between them, without having to obtain such Guarantor's consent.

4.     **Transfer of Property, Sales, Mergers, etc.** The Guarantors hereby covenant and agree, that until this Guaranty is terminated in accordance with its terms, (a) no Guarantor shall, without the Lender's prior written consent, directly or indirectly, convey, transfer or assign any property or asset of any nature, or any interest therein, having a fair market value of more than $250,000, whether such property is real property, personal property or mixed, tangible or intangible, for less than fair market value; (b) no Guarantor shall permit the Borrower to sell, assign, mortgage (other than the Senior Mortgage), pledge or encumber or otherwise dispose of its interests in the Project; (c) no Guarantor shall permit any Pledgor to sell, assign, mortgage, pledge or encumber or otherwise dispose of its ownership interests in the Borrower; (d) the Guarantors shall cause the Borrower and each Pledgor and each Guarantor to take all actions necessary to maintain its limited liability company/partnership/corporate, as applicable, existence; (e) no Guarantor shall permit any Loan Party to consolidate or merge with, or to sell all or substantially all of its assets to, any other person, (f) no Guarantor shall permit the Borrower to enter into, modify, amend, terminate or cancel any of the Senior Loan Documents without the Lender's prior written consent, and (g) no Guarantor shall permit the Borrower to use the proceeds from the Senior Loan for any purpose other than as contemplated by the Loan Agreement.

5.     **Financial Covenants.** The Guarantors shall submit to the Lender the following reports and other information:

(a)     As soon as available and in any event within 60 days after the end of each calendar quarter, the unaudited balance sheet of each of the Guarantors as of such date and the related unaudited statements of income and cash flows for such year and setting forth the comparative figures for the prior year, certified by the respective Guarantor.

(b)     Within thirty (30) days after timely filing, a copy of each federal or state tax return (or request for extension for the filing thereof) filed by the respective Guarantor with the Internal Revenue Service or similar state taxing authority.

(c)     Promptly upon request therefor, any other information reasonably requested by the Lender.

6.     **Defaults.** The following shall constitute a default hereunder (each, an *"Event of Default"*):

(a)     the Guarantors shall fail to make any payment required to be made under section 2 in accordance with the terms thereof; or

(b)     the Guarantors shall fail to perform, observe, or comply with any covenant under this Guaranty (other than the covenants in section 2), within ten (10) days after notice from the Lender demanding such performance, observance, or compliance; or

(c)     any Guarantor that is a natural person shall die and his personal representatives shall fail to ratify and confirm the Guaranty Obligations in writing within ninety (90) days after his death.

7. **Remedies.** Upon the occurrence of an Event of Default hereunder, in addition to any other remedy provided for under this Guaranty or at law or in equity, the Guarantors hereby authorize the Lender, in the Lender's sole discretion, at any time, to foreclose nonjudicially or judicially against any real or personal property security it holds for the Guaranty Obligations or any part thereof or exercise any other remedy against the Guarantors, or any of them, or any security.

8. **Waiver of Election of Remedies.** Each Guarantor waives (to the extent permitted by law) any right to require or compel the Lender to (a) proceed against the Borrower or any other guarantor; (b) proceed against or exhaust any security for the Loan or the Guaranty Obligations; or (c) pursue any other remedy in the Lender's power whatsoever; and failure of the Lender to do any of the foregoing shall not exonerate, release or discharge the Guarantors from their absolute, unconditional and independent liabilities to the Lender hereunder. Each Guarantor hereby waives (to the extent permitted by law) any and all legal requirements that the Lender shall institute any action or proceedings at law or in equity against the Borrower or anyone else in respect of the Loan or the Loan Agreement or any other Loan Document or resort to or seek to realize upon any security held by the Lender, as a condition precedent to bringing an action against any Guarantor upon this Guaranty.

9. **Right of Separate Actions.** The Lender may bring and prosecute a separate action against any Guarantor to enforce the Guarantor's liabilities hereunder, whether or not any action is brought against any other Guarantor or any other person and whether or not any other Guarantor or any other person is joined in any such action or actions. Nothing shall prohibit the Lender from exercising its rights against any Guarantor, the Borrower, any security for the Guaranty Obligations or the Note, or any other person, simultaneously, jointly and/or severally. The Guarantors shall be bound by each and every ruling, order and judgment obtained by the Lender against the Borrower in respect of the Loan and the Loan Documents, whether or not any Guarantor is a party to the action or proceeding in which such ruling, order or judgment is issued or rendered.

10. **Waiver of Rights of Subrogation.** Each Guarantor hereby irrevocably waives any rights to be subrogated to the rights of the Lender with respect to the Guaranty Obligations and the Note or any other Loan Document. Each Guarantor hereby agrees that such Guarantor will not institute or take any action seeking reimbursement against the Borrower or any other Guarantor until such time as the Lender shall have received payment in full in cash in satisfaction of all the obligations of the Borrower under the Note and the other Loan Documents. No failure on the part of the Lender to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Lender of any right, remedy or power hereunder preclude any other or future exercise of any other right, remedy or power.

11. **Waiver of Notice, Consent, etc.**

(a) This Guaranty shall be construed as a continuing, absolute and unconditional guaranty of payment except as limited by section 2 of this Guaranty.

(b)     Each Guarantor hereby waives acceptance and notice of acceptance of this Guaranty by the Lender and notice of presentment, demand, protest, notice of protest and of dishonor, notices of default and all other notices relative to this Guaranty of every kind and description now or hereafter provided by any agreement between the Borrower and the Lender or any statute or rule of law, except those specifically required by this Guaranty.

(c)     Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the obligations of the Borrower under any of the Loan Documents. The obligations of the Borrower under any of the Loan Documents, and each of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guaranty and all dealings between the Borrower and the Lender shall likewise be conclusively presumed to have been made or consummated in reliance upon this Guaranty.

(d)     The Guarantors hereby agree that the terms, covenants and provisions contained in the Loan Agreement, the Note or in any other Loan Document may be altered, extended, modified, waived, released or cancelled by the Lender, and the Guarantors agree that this Guaranty and the Guarantors' liability hereunder shall be in no way affected, diminished or released by any such alteration, extension, modification, release, waiver or cancellation.

12.     **Waiver of Priority of Collateral.** Each Guarantor hereby agrees that, in the event that any of the Guarantor's property is or may be hypothecated with property of the Borrower, as security for any obligations of the Borrower under any other Loan Document, any right of such Guarantor to have such other property of the Borrower first applied to the discharge of such obligations is hereby irrevocably waived by such Guarantor. Each Guarantor hereby expressly recognizes that any of its property that is or may be hereafter hypothecated pursuant to the Pledge Agreement is security for such obligations and is not security for this Guaranty.

13.     **No Discharge; Remedies Cumulative.** No Guarantor shall be discharged, released or exonerated, in any way, from such Guarantor's absolute, unconditional and independent liabilities hereunder, even though any rights or defenses that such Guarantor may have against the Lender or others may be destroyed, diminished or otherwise affected by:

(a)     any declaration by the Lender of a default in respect of any of the obligations of the Borrower under any of the Loan Documents;

(b)     the exercise by the Lender of any rights or remedies against the Borrower, any Loan Party or any other person;

(c)     the failure of the Lender to exercise any rights or remedies against the Borrower, any Loan Party or any other person;

(d)     the sale or enforcement of, or realization upon (through judicial foreclosure, power of sale or any other means) any security for any of the obligations of the Borrower under any of the Loan Documents or any security for any of the Guaranty Obligations, even though (i) recourse may not thereafter be had against the Borrower or any other person for any deficiency or (ii) the Lender fails to pursue any such recourse that might otherwise be available, whether by way of deficiency judgment following judicial foreclosure or otherwise;

(e)    any bankruptcy or reorganization of the Borrower or the voluntary or involuntary participation by the Borrower in any settlement or composition for the benefit of such Borrower's creditors either in liquidation, readjustment, receivership, bankruptcy or otherwise;

(f)    the release of any other guarantor by agreement, operation of law or otherwise; or

(g)    any such action by the Lender that would release or limit the liability of any guarantor to the Lender even if the effect of that action is to deprive the Guarantor of the right to collect reimbursement from the Borrower or any other guarantor for any sums paid to the Lender.

All rights and remedies of the Lender hereunder or under any of the Loan Documents shall be cumulative and may be exercised singularly or concurrently. The rights of the Lender under this Guaranty are in addition to and not in diminution of the rights of the Lender under any other Loan Document.

**14.    Continuing Guaranty.** Until all obligations of the Borrower to the Lender under the Loan Documents are fulfilled and each and every of the terms, covenants and conditions of this Guaranty are fully performed and the Loan is fully repaid, no Guarantor shall be released by any act or thing that might, but for this provision, be deemed a legal or equitable discharge of a surety, or by reason of any waiver, extension, modification, forbearance or delay or other act or omission of the Lender or its failure to proceed promptly or otherwise, or by reason of any action taken or omitted or circumstance that may or might vary the risk or affect the rights or remedies of such Guarantor or by reason of any further dealings between the Borrower and the Lender, whether relating to the Loan or otherwise, and each Guarantor hereby expressly waives and surrenders any defenses to such Guarantor's liability hereunder based upon any of the foregoing acts, omissions, things or agreements or waivers of the Lender; it being the purpose and intent of this Guaranty that the obligations of the Guarantors hereunder are absolute and unconditional under any and all circumstances. The Guarantors have also executed and delivered the Environmental Indemnity in favor of the Lender and (a) performance by the Guarantors of their obligations under this Guaranty shall not decrease the Guarantor's liability under the Environmental Indemnity, and (b) performance by the Guarantors under the Environmental Indemnity shall not decrease or diminish the Guarantor's liability under this Guaranty.

**15.    Notices.** All notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto or any other person shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by prepaid courier and shall be deemed to be given for purpose of this Guaranty (i) in regard to registered or certified mail, 3 Business Days after mailing, and (ii) in regard to personal delivery or prepaid courier, on the day that such writing is delivered. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this section 15, notices, demands, instructions and other communications in writing shall be given to or made upon the following persons at the addresses indicated below:

To the Guarantors:

c/o 1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attention: Scott A. Chappelle
Telephone: (517) 336-4400
Facsimile: (517) 336-4499

With a courtesy copy to:

McGraw & Eckhardt, PC
1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attention: Thomas R. Eckhardt, Esq.
Telephone: (517) 336-4400
Facsimile: (517) 336-4499

To the Lender:

Hartford Mezzanine Investors I, LLC
127 Public Square, 7th Floor
Cleveland, Ohio 44114
Attention: Asset Manager - James MacQueen
Facsimile: (216) 689-4700
Telephone: (216) 689-4504

With a courtesy copy to:

Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Attention:     Bernadette M. Mast, Esq.
Facsimile:     (216) 579-0212
Telephone:     (216) 586-7088

or at such other address as any of the persons identified above may from time to time designate by written notice given as herein required. Rejection or refusal to accept or inability to deliver because of changed addresses shall be deemed a receipt of such notice. The effectiveness of such notice will not be affected by the giving or lack thereof of courtesy copies of such notice.

If any day on which any notice, demand, instruction or other communication is given or sent by any party hereto is not a Business Day, such notice, demand, instruction or other communication shall be deemed to have been given or sent on the Business Day next succeeding such non-Business Day.

16.     **Submission to Jurisdiction.** (a) Each Guarantor irrevocably submits to the non-exclusive jurisdiction of the courts of the State of Ohio, the courts of the United States for the Northern District of the State of Ohio, and appellate courts from any of such courts, as the Lender in its sole discretion may elect, over any suit, action or proceeding arising out of or relating to this Guaranty. Each Guarantor hereby irrevocably waives, to the fullest extent permitted by law, any objection that the Guarantor may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Each Guarantor agrees that a final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon such Guarantor.

(b)     Each Guarantor hereby further irrevocably consents, to the extent permitted by Law, to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Guarantor at its address for notices pursuant to section 15, such service to become effective 30 days after such mailing or at such earlier time as may be provided under applicable law. Nothing herein shall affect the right of the Lender to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against any Guarantor in any other jurisdiction.

17.     **Entire Agreement; Modification and Waiver.** This Guaranty, together with the other Loan Documents to which the Guarantors are a party (the "*Guarantor Documents*"), represents the entire agreement between the Guarantors and the Lender with respect to the matters referred to herein and therein together with the Loan Documents to the extent referenced herein or therein, and no waiver or modification hereof or thereof shall be effective unless in writing and signed by the party against whom enforcement of the same is sought. Each of the Guarantor Documents is an independent agreement and shall be so construed in accordance with its respective terms. The other Guarantor Documents are additional security and benefit to the Lender and are not in lieu of and do not in any way diminish the Guaranty Obligations of any Guarantor hereunder. The Guarantors shall be fully liable to the Lender hereunder whether or not the Lender has or shall obtain any other or further guaranties, security or agreements, and irrespective of whether the other Guarantor Documents or other or further guaranties, security or agreements are effective or enforceable or are released or assigned in whole or in part, voluntarily or involuntarily or by operation of law or otherwise. The Lender shall not have any obligation to pursue or attempt to pursue any remedies under the other Guarantor Documents or any other or further guaranties, security or agreement and may enforce all rights and obligations hereunder, irrespective of the existence or nonexistence of other or further guaranties, security or agreements.

18.     **Governing Law. THIS GUARANTY AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES AND OTHER PERSONS BENEFITTED HEREUNDER SHALL BE CONSTRUED, ENFORCED, AND INTERPRETED ACCORDING TO THE LAWS OF THE STATE OF OHIO, APPLICABLE TO CONTRACTS MADE IN AND PERFORMED IN THE STATE OF OHIO, WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICT OF LAWS.**

**19.** **Heirs and Assigns.** This Guaranty shall be binding upon the Guarantors and upon their respective successors, assigns, heirs and personal representatives and shall inure to the benefit of the Lender and its successors and assigns.

**20.** **Time of the Essence.** Time shall be of the essence with regard to the performance by the Guarantors of their obligations under this Guaranty.

**21.** **Singular and Plural.** As used in this Guaranty, the singular shall include the plural as the context requires, and the masculine, feminine and neuter pronouns shall each include the other as the context requires.

**23.** **Waiver of Trial by Jury. EACH OF THE GUARANTORS AND THE LENDER BY ITS ACCEPTANCE OF THE BENEFITS HEREOF, HEREBY IRREVOCABLY WAIVES, TO THE EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM AMONG ANY OF THEM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR IN ANY WAY CONNECTED TO THE LOAN, THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS.**

**24.** **Severability.** If any term or provision of this Guaranty or any application thereof shall be held to be invalid, illegal or unenforceable, the remainder of this Guaranty and any other application of such term or provision shall not be affected thereby.

**25.** **Enforcement Expenses.** The Guarantors shall pay, on a joint and several basis, all costs and expenses of the Lender in connection with the enforcement of this Guaranty and any amendment, waiver or consent relating hereto (including, without limitation, the fees and disbursements of counsel employed by the Lender).

**26.** **Counterparts.** This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

**27.** **Headings.** The headings in this Guaranty are for purposes of reference only and shall not limit or define the meaning hereof.

**28.** **Joint and Several.** The warranties, covenants and other obligations of the Guarantors hereunder are made and undertaken jointly and severally by each of the Guarantors.

*(Signature page follows.)*

**IN WITNESS WHEREOF**, this Guaranty has been executed by the undersigned as of the date first above written.

Guarantors:

_____

**SCOTT A. CHAPPELLE**, individually

_____

**LAURA A. CHAPPELLE**, individually

_____

**KEVIN T. MCGRAW**, individually

_____

**SHARON D. MCGRAW**, individually

_____

**EVERT KRAMER, JR.**, individually

_____

**ROSALIND KRAMER**, individually

Signature Page
to
Guaranty

# EXHIBIT
# D

Hartford Mezzanine Investors I - CRE CDO 2007-1, LTD.
127 Public Square
Cleveland, Ohio 44114

January 8, 2008

**VIA FAX AND OVERNIGHT COURIER**

Woodland Lakes Investment Group, L.L.C.
1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attention: Scott A. Chappelle
Facsimile: (517) 336-4499

Re: $3,340,000 Loan to Woodland Lakes Investment Group, L.L.C.,
from Hartford Mezzanine Investors I – CRE CDO 2007-1, LTD.,
as successor in interest to Hartford Mezzanine Investors I, LLC,
related to a 344 unit apartment community
commonly known at the Woodland Lakes Apartments
in the Township of Delhi, County of Ingham, State of Michigan

Gentlemen:

Reference is hereby made to the Loan Agreement, dated as of January 4, 2006 (the "*Loan Agreement*"), by and between Woodland Lakes Investment Group, L.L.C. ("*Borrower*") and Hartford Mezzanine Investors I, LLC ("*HMI*") as assigned by HMI to Hartford Mezzanine Investors I – CRE CDO 2007-1, LTD. by agreement dated on or about August 8, 2007 ("*Lender*"), pursuant to which Lender agreed to make the Loan upon the terms and conditions set forth in the Loan Agreement. Unless otherwise defined herein, all capitalized terms contained in this letter shall have the same meaning given to them in the Loan Agreement.

This letter shall serve to inform you that the Lender has received a Notice of Default dated January 3, 2008 issued by the Senior Lender to the Borrower regarding certain monetary defaults including the Borrower's failure to pay monthly debt service on the Senior Loan for the month of December. As you know, a Default or Event of Default under the Senior Loan Documents constitutes an Event of Default under the Mezzanine Loan Documents.

Pursuant to Section 2.3(c) of the Loan Agreement, the Loan shall bear interest at the default rate set forth therein commencing as of December 1, 2007.

CLI-1550696v1

Other than the foregoing, Lender has not yet elected to exercise any remedies against the Borrower pursuant to Section 9.2 of the Loan Agreement or otherwise, however, in no event shall such forbearance or omission be construed (i) as any waiver of any default under the Loan Agreement or any other related loan document or (ii) as any agreement to continue to forbear or otherwise refrain from exercising any remedies at any time hereafter.

Very truly yours,

HARTFORD MEZZANINE INVESTORS I -
CRE CDO 2007-1, LTD.

By: Hartford Investment Management
Company, its Co-Collateral Manager

By:
Name:
Title: **WILLIAM P. BOWMAN**
**SENIOR VICE PRESIDENT**

By: Key Real Estate Equity Capital, Inc., as
Co-Collateral Manager
By:
Name: JAMES H. MacQUEEN
Title: VICE PRESIDENT

cc: McGraw & Eckhardt, PC
142" West Saginaw, Suite 200
East Lansing, MI 48823
Attention: Thomas R. Eckhardt, Esq
Facsimile: (517) 336-4409

Harrison Investment Group, L.L.C
c o Brent Tims
313 S. Washington Square
Lansing, MI 48933
Facsimile: (517) 367-7323

Shawn O'Brien
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Frank R. Vargas, Jr.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Covenant Investment Group, Inc.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

KTM Development Corporation
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Charles W. Crouch
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Brent Chappelle
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

TMC Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

CLI-1550009v3

Alliance Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Masonic Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Abbott Road Commons, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Chasco Investment Properties, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Evergreen Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Grand Ledge Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

SLHA Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Petoskey Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Score Properties, Inc.
c/o Scott Chappelle
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Terra Management Company
c/o Scott Chappelle
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

WLA Management, Inc.
c/o Julia L. Skinner
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

John Hancock Life Insurance Company
Real Estate Investment Group
John Hancock Tower, T-56
200 Clarendon Street
Boston, MA 02116
Re: Loan No. 6518352
Attention: Real Estate Investment Group / Loan 6518352
Facsimile: (617) 572-0266

Quarles & Brady LLP
500 West Madison Street
Suite 3700
Chicago, IL 60661
Attention Peter A. Sarasek, Esq.
Facsimile: (312) 715-5155

Mr. James MacQueen
Mr. Matthew Shmelter
Bernadette M. Mast, Esq.

CLI-1550909v3

# EXHIBIT E

# Polsinelli

### Shalton | Flanigan | Suelthaus ℡

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

Daniel J. Flanigan
(816) 360-4260
dflanigan@polsinelli.com

February 14, 2008

**BY FEDERAL EXPRESS**

Woodland Lakes Investment Group, L.L.C.
1427 West Saginaw, Suite 200
East Lansing, Michigan 48823
Attention: Scott A. Chappelle

> Re:  **Term Note Dated January 4, 2006**
> **In The Original Principal Amount of $3,340,000.00**

### NOTICE OF DEFAULT AND ACCELERATION

Ladies and Gentlemen:

This firm is counsel to Hartford Mezzanine Investors I, LLC, a Delaware limited liability company ("**Mezzanine Lender**"). Woodland Lakes Investment Group, L.L.C., a Michigan limited liability company ("**Borrower**") signed and delivered to Mezzanine Lender that certain Term Note dated January 4, 2006 in the original principal amount of $3,340,000.00 (the "**Mezzanine Note**"). In addition, in connection with its execution of the Mezzanine Note, Borrower signed and delivered to Mezzanine Lender that certain Loan Agreement dated as of January 4, 2006 (the "**Mezzanine Loan Agreement**"). Mezzanine Lender is the current holder and owner of the Mezzanine Note, the Mezzanine Loan Agreement, and all other documents further evidencing and/or securing the indebtedness owed under the Mezzanine Note, as each may have been subsequently modified from time to time (collectively, together with the Mezzanine Note and Mezzanine Loan Agreement, the "**Mezzanine Loan Documents**").

John Hancock Life Insurance Company, a Massachusetts corporation ("**Senior Lender**") made a loan to Borrower (the "**Senior Loan**") on or about August 1, 2005, pursuant to that certain Note in the original principal amount of $24,000,000.00 (the "**Senior Note**") (the Senior Note and all other documents further evidencing and/or securing the indebtedness owed under the Senior Note are collectively referred to herein as the "**Senior Loan Documents**").

On or about January 8, 2008, you were provided notice of Borrower's default under the Mezzanine Loan Documents for its failure to pay monthly debt service on the Senior Loan, which constitutes a Default or Event of Default under the Senior Loan Documents. A copy of this notice is attached hereto for your ease of reference.

1639148.1        Kansas City        St. Louis        Chicago        New York        Washington, D.C.
Overland Park        Topeka        Edwardsville



**Polsinelli**
Shallon | Flonigan | Suelihaus

Woodland Lakes Investment Group, L.L.C.
February 14, 2008
Page 2

As you are aware, Borrower has failed to cure the Senior Loan Default and, consequently, Borrower remains in default under the Mezzanine Loan Documents. This letter constitutes formal notice to you of Mezzanine Lender's **acceleration** of the indebtedness owed under the Mezzanine Note and other Mezzanine Loan Documents.

Please note that any partial payment made by Borrower, or acceptance of any partial payment by Mezzanine Lender or any of its representatives or loan servicing agents, of any amount that is not sufficient to cure as required herein or that is not sufficient to satisfy any future obligation under the Mezzanine Loan Documents is not intended, and shall not be deemed, to constitute a waiver of Mezzanine Lender's rights, remedies or recourse under the Mezzanine Loan Documents or at law or in equity. Any application of any such payment is not intended, and shall not be deemed, to be a modification, rearrangement, reinstatement or extension of the existing Mezzanine Loan Documents. Any such payment shall be applied in such order as Mezzanine Lender may elect in its sole discretion, without any waiver by Mezzanine Lender of its right to pursue any of its rights and remedies under the Mezzanine Loan Documents or at law or in equity.

You are hereby further notified that any past or future negotiation between you or your representatives or agents on the one hand and Mezzanine Lender and its representatives or agents on the other do not and shall not constitute a waiver of Mezzanine Lender's rights to exercise its rights and remedies under the Mezzanine Loan Documents or at law or in equity. Any alleged waiver of any of Mezzanine Lender's rights shall not be effective unless in writing duly executed by an authorized representative of Mezzanine Lender. Neither Borrower nor any other obligor for the indebtedness owed under the Mezzanine Loan Documents shall be entitled to rely upon any oral statements made or purported to be made by or on behalf of Mezzanine Lender or its agents in connection with any alleged agreement by or on behalf of Mezzanine Lender to refrain from exercising any of Mezzanine Lender's rights under the Mezzanine Loan Documents or otherwise at law or in equity.

Nothing set forth herein is intended, nor shall it be deemed, to modify, limit, release, reduce or waive any of Mezzanine Lender's rights, remedies, and/or privileges under the Mezzanine Loan Documents, or at law or in equity, all of which are hereby specifically reserved. Furthermore, the enumeration of any specific default herein is not intended, nor shall it be deemed, to waive other defaults that may currently exist under the Mezzanine Loan Documents.



**Polsinelli**
Shalton | Flanigan | Suelthaus.

Woodland Lakes Investment Group, L.L.C.
February 14, 2008
Page 3

Your immediate attention to the matters addressed in this letter is appreciated.  Thank you.

Sincerely,

Dan Flanigan (slr)

Daniel J. Flanigan


DJF:slr
Enclosure
cc:    McGraw & Eckhardt, PC (via Federal Express, Overnight)
       1427 West Saginaw, Suite 200
       East Lansing, Michigan 48823
       Attention: Thomas R. Eckhardt, Esq.

       John Hancock Life Insurance Company (via Federal Express, Overnight)
       Real Estate Investment Group
       John Hancock Tower, T-56
       200 Clarendon Street
       Boston, Massachusetts 02116
       Re: Loan No. 6518352
       Attention: Real Estate Investment Group/Loan 6518352

       Dykema Gossett PLLC (via Federal Express, Overnight)
       400 Renaissance Center
       Detroit, Michigan 48243
       Attention: Cameron H. Piggott, Esq.

       Quarles & Brady LLP (via Federal Express, Overnight)
       500 West Madison Street
       Suite 3700
       Chicago, Illinois 60661
       Attention: Peter A. Sarasek, Esq.

       Scott A. Chappelle (via Federal Express, Overnight)
       c/o 1427 West Saginaw, Suite 200
       East Lansing, MI  48823

       Laura A.Chappelle (via Federal Express, Overnight)
       c/o 1427 West Saginaw, Suite 200
       East Lansing, MI  48823
       Attn:  Laura A. Chappelle



**Polsinelli**
Shulton | Flanigan | Snelthaes.

Woodland Lakes Investment Group, L.L.C.
February 14, 2008
Page 4

Kevin T. McGraw (via Federal Express, Overnight)
c/o 1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attn: Kevin T. McGraw

Sharon D. McGraw (via Federal Express, Overnight)
c/o 1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attn: Sharon D. McGraw

Evert Kramer, Jr. (via Federal Express, Overnight)
c/o 1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attn: Evert Kramer, Jr.

Rosalind Kramer (via Federal Express, Overnight)
c/o 1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attn: Rosalind Kramer

Harrison Investment Group, L.L.C. (via Federal Express, Overnight)
c/o Brent Titus
313 S. Washington Square
Lansing, MI 48933

Shawn O'Brien (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Frank R. Vargas, Jr. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Covenant Investment Group, Inc. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823


**Polsinelli**
Shalton | Flanigan | Suelthaus

Woodland Lakes Investment Group, L.L.C.
February 14, 2008
Page 5

KTM Development Corporation (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Charles W. Crouch (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Brent Chappelle (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

TMC Investment Group, L.L.C. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Alliance Investment Group, L.L.C. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Masonic Investment Group, L.L.C. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Abbott Road Commons, L.L.C. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Chasco Investment Properties, L.L.C. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823



**Polsinelli**
Shalton | Flanigan | Suelthaus

Woodland Lakes Investment Group, L.L.C.
February 14, 2008
Page 6


Evergreen Investment Group, L.L.C. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Grand Ledge Investment Group, L.L.C. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

SLHA Investment Group, L.L.C. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Petoskey Investment Group, L.L.C. (via Federal Express, Overnight)
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Score Properties, Inc. (via Federal Express, Overnight)
c/o Scott Chappelle
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

Terra Management Company (via Federal Express, Overnight)
c/o Scott Chappelle
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

WLA Management, Inc. (via Federal Express, Overnight)
c/o Julia L. Skinner
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

James A. MacQueen
Matthew Shmelter

Hartford Mezzanine Investors I - CRE CDO 2007-1, LTD.
127 Public Square
Cleveland. Ohio 44114

January 8, 2008

**VIA FAX AND OVERNIGHT COURIER**

Woodland Lakes Investment Group, L.L.C.
1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attention: Scott A. Chappelle
Facsimile: (517) 336-4499

> Re: $3,340,000 Loan to Woodland Lakes Investment Group, L.L.C.,
> from Hartford Mezzanine Investors I – CRE CDO 2007-1, LTD.,
> as successor in interest to Hartford Mezzanine Investors I, LLC,
> related to a 344 unit apartment community
> commonly known at the Woodland Lakes Apartments
> in the Township of Delhi, County of Ingham, State of Michigan

Gentlemen:

Reference is hereby made to the Loan Agreement, dated as of January 4, 2006 (the "*Loan Agreement*"), by and between Woodland Lakes Investment Group, L.L.C. ("*Borrower*") and Hartford Mezzanine Investors I, LLC ("*HMI*") as assigned by HMI to Hartford Mezzanine Investors I – CRE CDO 2007-1, LTD. by agreement dated on or about August 8, 2007 ("*Lender*"), pursuant to which Lender agreed to make the Loan upon the terms and conditions set forth in the Loan Agreement. Unless otherwise defined herein, all capitalized terms contained in this letter shall have the same meaning given to them in the Loan Agreement.

This letter shall serve to inform you that the Lender has received a Notice of Default dated January 3, 2008 issued by the Senior Lender to the Borrower regarding certain monetary defaults including the Borrower's failure to pay monthly debt service on the Senior Loan for the month of December. As you know, a Default or Event of Default under the Senior Loan Documents constitutes an Event of Default under the Mezzanine Loan Documents.

Pursuant to Section 2.3(c) of the Loan Agreement, the Loan shall bear interest at the default rate set forth therein commencing as of December 1, 2007.

CLE-1550998v3

Other than the foregoing, Lender has not yet elected to exercise any remedies against the Borrower pursuant to Section 9.2 of the Loan Agreement or otherwise, however, in no event shall such forbearance or omission be construed (i) as any waiver of any default under the Loan Agreement or any other related loan document or (ii) as any agreement to continue to forbear or otherwise refrain from exercising any remedies at any time hereafter.

Very truly yours,

HARTFORD MEZZANINE INVESTORS I - CRI CDO 2007-1, LTD.

By: Hartford Investment Management Company, its Co-Collateral Manager

By: _____
Name:
Title: **WILLIAM P. BOWMAN**
**SENIOR VICE PRESIDENT**

By Key Real Estate Equity Capital, Inc., its Co-Collateral Manager
By: _____
Name: JAMES H. MacQUEEN
Title: VICE PRESIDENT

cc: McGraw & Eckhardt, PC
    142" West Saginaw, Suite 200
    East Lansing, MI 48823
    Attention: Thomas R. Eckhardt, Esq.
    Facsimile: (517) 336-4499

    Harrison Investment Group, L.L.C
    c/o Brent Finis
    313 S. Washington Square
    Lansing, MI 48933
    Facsimile: (517) 367-7321

Shawn O'Brien
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Frank R. Vargas, Jr.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Covenant Investment Group, Inc.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

KTM Development Corporation
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Charles W. Crouch
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Brent Chappelle
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

TMC Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

CLI-1550909v3

Alliance Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Masonic Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Abbott Road Commons, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Chasco Investment Properties, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Evergreen Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Grand Ledge Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

SLHA Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Petoskey Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Score Properties, Inc.
c/o Scott Chappelle
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

Terra Management Company
c/o Scott Chappelle
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

WLA Management, Inc.
c/o Julia L. Skinner
1427 W. Saginaw, Suite 200
East Lansing, MI 48823
Facsimile: (517) 336-4499

John Hancock Life Insurance Company
Real Estate Investment Group
John Hancock Tower, T-56
200 Clarendon Street
Boston, MA 02116
Re: Loan No. 6518352
Attention: Real Estate Investment Group / Loan 6518352
Facsimile: (617) 572-0266

Quarles & Brady LLP
500 West Madison Street
Suite 3700
Chicago, IL 60661
Attention Peter A. Sarasek, Esq.
Facsimile: (312) 715-5155

Mr. James MacQueen
Mr. Matthew Shmelter
Bernadette M. Mast, Esq.

CLI-1550900v3

# EXHIBIT
# F

## Forbearance and Modification Agreement
(Woodland Lakes Apartments)

This Forbearance and Modification Agreement ("**Agreement**") is made this 3rd day of June, 2008, by and among HARTFORD MEZZANINE INVESTORS I, LLC, a Delaware limited liability company ("**Lender**"), WOODLAND LAKES INVESTMENT GROUP, L.L.C., a Michigan limited liability company ("**Borrower**"), SCOTT A. CHAPPELLE, an adult individual ("**S. Chappelle**"), LAURA A. CHAPPELLE, an adult individual ("**L. Chappelle**"), KEVIN T. MCGRAW, an adult individual ("**K. McGraw**"), SHARON D. MCGRAW, an adult individual ("**S. McGraw**"), EVERT KRAMER, JR., an adult individual ("**E. Kramer**"), and ROSALIND KRAMER, an adult individual ("**R. Kramer**") (S. Chappelle, L. Chappelle, K. McGraw, S. McGraw, E. Kramer, and R. Kramer sometimes being referred to in this Agreement collectively as the "**Guarantors**"), and each of the entities and individuals set forth on Exhibit A attached hereto ("**Pledgors**"). Borrower, Guarantors and the Pledgors are sometimes referred to as the "**Borrower Parties**," and Lender and the Borrower Parties are sometimes referred to collectively herein as the "**Parties**."

The following recitals are a material part of this Agreement:

A.     Lender is the owner and holder of the loan ("**Loan**") evidenced by that certain Term Note (the "**Note**") in the original principal amount of $3,340,000.00 executed by Borrower in favor of Lender.

B.     The Loan was made pursuant to that certain Loan Agreement dated as of January 4, 2006, between Borrower and Lender ("**Loan Agreement**"). Borrower is the sole owner of the Project (as defined below), and in addition to the Note and Loan Agreement, the Loan is further evidenced or secured by various documents, including the following:

(i)     Pledge Agreement dated January 4, 2006, executed by the Pledgors for the benefit of Lender (the "**Pledge Agreement**"), which grants a security interest in the Pledged Collateral (as defined in the Pledge Agreement). Each Pledgor has remained a member of Borrower and Pledgor, other than Masonic Investment Group, L.L.C., which conveyed its interests in Borrower to another member. In addition, KTM Development Corporation and Harrison Investment Group, LLC may, subject to the Pledge Agreement, sell some or all of their membership interests in Borrower to Covenant Investment Group, Inc., a Pledgor, or other Pledgors.

(ii)     Guaranty dated January 4, 2006, executed by the Guarantors in favor of Lender, as amended by that certain Amendment to Guaranty dated December 19, 2007 (collectively, the "**Guaranty**"), pursuant to which the Guarantors have guaranteed and are jointly and severally liable to Lender for full payment and performance of all obligations relating to the Loan upon the occurrence of certain events and the limited obligations (under certain exceptions to the non-recourse provisions of the Loan Documents) for which Borrower is personally liable in connection with the Loan.

1650758.19

     (iii)    Financing Statements under the Uniform Commercial Code ("UCCs").

     (iv)    Environmental and Hazardous Substances Indemnity Agreement ("**Environmental Indemnity**") dated January 4, 2006, executed by Guarantors and Borrower for the benefit of Lender.

    C.    Contemporaneously herewith, Scott A. Chappelle, Laura A. Chappelle, Evert Kramer, Jr. and Rosalind Kramer have delivered to Lender a Guaranty ("**Supplemental Guaranty**").

    D.    Contemporaneously herewith, (i) Borrower, Lender, Senior Lender (as defined below) and KeyBank National Association have executed that certain Lockbox-Deposit Account Control Agreement ("**Lockbox Agreement**"), (ii) Borrower, Lender, Senior Lender, and Terra Management Company have executed that certain Cash Management Agreement ("**Cash Management Agreement**"). The Lockbox Agreement and Cash Management Agreement supersede and replace any prior document in connection with the collection of rents at the Project and the application of such rents.

    E.    On May 16, 2008, Borrower sent to each tenant at the Project a letter ("**Tenant Direction Letter**") substantially similar to the Tenant Direction Letter attached to the Lockbox Agreement as <u>Exhibit B</u>.

    F.    Borrower and Delhi Township Brownfield Redevelopment Authority ("**DTBRA**") executed that certain Brownfield Reimbursement Agreement dated March 26, 2002 ("**Initial Reimbursement Agreement**"), amended by that certain First Amendment to Brownfield Reimbursement Agreement ("**First Amendment**"), further amended by the Second Amendment to Brownfield Reimbursement Agreement dated August 1, 2005 ("**Second Amendment**"), and further amended by the Third Amendment to Brownfield Reimbursement Agreement dated January 24, 2006 ("**Third Amendment**") (the Initial Reimbursement Agreement, together with the First Amendment, the Second Amendment, the Third Amendment and any further amendments or modifications thereto, the "**Reimbursement Agreement**"). Pursuant to the terms of the Reimbursement Agreement, Borrower is the recipient of certain payments from the DTBRA for reimbursement of certain costs ("**Reimbursements**"). On May 19, 2008, Borrower sent to the DTBRA a notice substantially similar to the letter attached hereto as <u>Exhibit C</u>.

    G.    The Note, Loan Agreement, Pledge Agreement, Guaranty, the Environmental Indemnity, UCCs, this Agreement, the Lockbox Agreement, Cash Management Agreement, Supplemental Guaranty, and all other existing or future documents evidencing, securing or executed in connection with the Loan, and all documents that hereafter modify, amend, extend, restate, replace, or otherwise affect the Loan or any of the foregoing documents are referred to collectively herein as the "**Loan Documents**." All covenants, agreements, and obligations of Borrower Parties in this Agreement shall be included within the definition of "Obligations" under the Loan Documents.

1650758.19

H.       Borrower obtained a loan (the "**Senior Loan**") from John Hancock Life Insurance Company (the "**Senior Lender**") evidenced by that certain Promissory Note dated August 1, 2005 in the amount of $24,000,000.00 (the "**Senior Loan Note**") and that certain Additional Funding Loan Agreement dated as of August 1, 2005, between Borrower and Senior Lender and is further evidenced or secured by various documents, including (i) that certain Mortgage dated as of August 1, 2005, executed by Borrower in favor of Senior Lender ("**Security Instrument**") that encumbers with first-priority liens and security interests certain real property, improvements, appurtenances and related personal property owned by Borrower, located at 4200 Dell Road in the Township of Delhi, County of Ingham, State of Michigan and commonly known as the Woodland Lakes Apartments (collectively, the "**Project**"), (ii) an Assignment of Leases and Rents dated as of August 1, 2005, executed by Borrower in favor of Senior Lender ("**Assignment of Leases and Rents**"), (iii) that certain Indemnification Agreement dated as of August 1, 2005 executed by Borrower, Scott A. Chappelle, Laura A. Chappelle, Kevin T. McGraw, and Sharon D. McGraw (collectively, "**Senior Loan Guarantors**"), and (iv) that certain Guaranty Agreement dated as of August 1, 2005 executed by the Senior Loan Guarantors (the Senior Loan Note, Security Instrument, and all other documents and agreements entered into between the Borrower and/or the Senior Loan Guarantors and the Senior Lender in connection with the Senior Loan (including the Senior Loan Forbearance Agreement), as may be modified, amended or supplemented, are collectively referred to herein as the "**Senior Loan Documents**"). On or about the same date herewith, Senior Lender and Borrower have signed and delivered a Forbearance Agreement (collectively, "**Senior Loan Forbearance Agreement**").

I.       An event of default occurred under the Senior Loan Documents, which caused an Event of Default (as defined in the Loan Agreement) under the Loan Agreement, and Borrower failed to make certain payments under the Loan, which also caused an Event of Default. Such Events of Default have remained uncured (such Events of Default, collectively with any other Event of Default that remains outstanding as of the date hereof, "**Existing Defaults**"). On January 8, 2008, Lender notified Borrower and Pledgors of an Event of Default ("**Default Notice**"). On February 14, 2008, Lender notified Borrower and Pledgors that such Event of Default remained uncured and that the Loan had been accelerated ("**Acceleration Notice**"). On February 14, 2008, Lender notified Borrower and Pledgors of Lender's intended disposition of collateral securing the Loan ("**UCC Sale Notice**") through a public sale ("**UCC Sale**") to have occurred on March 21, 2008. Pursuant to a letter ("**UCC Sale Extension Notice**") dated March 20, 2008, the UCC Sale was continued to April 4, 2008. Pursuant to a letter dated April 3, 2008, the UCC Sale was continued to April 18, 2008 ("**UCC Sale Second Extension Notice**"), pursuant to a letter dated April 17, 2008, the UCC Sale was continued to April 30, 2008 ("**UCC Sale Third Extension Notice**"), pursuant to a letter dated April 29, 2008, the UCC Sale was continued to May 9, 2008 ("**UCC Sale Fourth Extension Notice**"), pursuant to a letter dated May 8, 2008, the UCC Sale was continued to May 30, 2008 ("**UCC Sale Fifth Extension Notice**"), on May 30, 2008, Lender verbally extended the UCC Sale to June 2, 2008 ("**UCC Sale Sixth Extension Notice**"), and pursuant to a letter dated June 2, 2008, the UCC Sale was continued to June 16, 2008 ("**UCC Sale Seventh Extension Notice**") (the UCC Sale Notice, the UCC Sale Extension Notice, the UCC Sale Second Extension Notice, the UCC Sale Third Extension Notice, the UCC Sale Fourth Extension Notice, the UCC Sale Fifth Extension Notice, the UCC Sale Sixth Extension Notice, and the UCC Sale Seventh Extension Notice are sometimes collectively referred to herein as the "**UCC Notices**").

1650758.19

J.      The following sums (collectively, "**June 2008 Outstanding Amounts**") are due and owing under the Loan Documents, prior to payment of any sums required under this Agreement:

      (i)      The outstanding principal balance of $3,340,000.00.

      (ii)      Default Interest payments from October and November, 2007 in the aggregate amount of $7,422.23, plus monthly payments from December 1, 2007, through and including July 10, 2008, for a total amount of $405,587.72 ("**Accrued Default Interest Payments**") calculated at the default rate specified in the Loan Agreement of 20% per annum.

      (iii)      Late charges in accordance with Section 2.3(e) of the Loan Agreement in the aggregate amount of $11,877.01 ("**Late Charges**"), and other administrative expenses in the aggregate amount of $800.00 ("**Administrative Expenses**").

      (iv)      Loan-related expenses (including an appraisal, publishing costs and other third party fees and costs) incurred by Lender and collection and enforcement-related expenses including all attorneys' fees (which shall be in the amount of $85,000.00) and costs incurred by Lender through the Closing Date, collectively, "**Loan Related Expenses**".

K.      Interest continues to accrue on the outstanding balance of the Loan at the default rate and late charges, expenses (including Loan Related Expenses) and other amounts continue to accrue, and Lender has the right to conduct the UCC Sale, to collect the Loan and enforce the Loan Documents, and the right to immediately commence and pursue any or all of the other rights and remedies available to Lender under the Loan Documents or applicable law.

L.      On July 25, 2008 ("**Closing Date**"), Borrower shall deposit with Lender a payment in the amount of (i) all outstanding Base Interest payments through and including the payment due for July, 2008, in the amount of $237,139.99 ("**Accrued Base Interest Payments**"), (ii) all Administrative Expenses (not to exceed $800.00), (iii) all Loan Related Expenses, and (iv) the amount of $34,613.33, which is the amount of Base Interest payable for one month under the Loan (the "**Interest Reserve Deposit**"). On the Closing Date, Borrower shall also deposit with Senior Lender the amounts then due under the Senior Loan Forbearance Agreement.

M.      Borrower and Pledgors have requested that Lender forbear in the pursuit of Lender's remedies, and Lender is willing to do so, but only on the terms and conditions specified in this Agreement, in reliance upon the agreements of Borrower Parties herein, and subject to full performance by Borrower Parties of all acts required of them hereunder or that are necessary to give effect to the provisions of this Agreement.

1650758.19

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Defined Terms.   All capitalized terms used in this Agreement that are not otherwise defined herein shall have the meanings defined for them in the Loan Agreement.

2.    Recitals; Status of and Effect of Loan Documents.  Each of the Borrower Parties acknowledges, confirms, and agrees that the matters stated in the Recitals set forth above are true and accurate in all respects, are a material part of this Agreement, are hereby incorporated by reference, and may be relied upon for all purposes by the parties and that:

(a)    The Loan Documents (including this Agreement) have been duly authorized, executed, and delivered to Lender, remain in full force and effect as originally written or as modified herein or as previously modified by mutual written agreement of the parties, and are valid, binding and enforceable against each respective party in accordance with their respective terms.   Each Borrower Party hereby ratifies and reaffirms the terms and provisions of the Loan Documents, including Section 9.1 of the Loan Agreement.

(b)    All liens and security interests created in favor of Lender under the Loan Documents have been validly created and duly perfected as encumbrances upon all property and collateral of the Pledgors in first priority as represented by the Pledgors or other persons or entities in the Pledge Agreements or any other Loan Documents.

(c)    All indebtedness created under the Loan Documents (including the June 2008 Outstanding Amounts) is validly and unconditionally owing in full to Lender, in accordance with the terms thereof, as modified hereby, without any defense or offset whatsoever, and Borrower Parties have no defenses, claims, counterclaims, or other rights that could be asserted to impair, delay, or adversely affect Lender's receipt of full payment and performance of all obligations owed to Lender by such parties with respect to the Loan.

(d)    Lender has given and Borrower Parties have received all notices to which they are respectively entitled under the Loan Documents (including the Default Notice, Acceleration Notice, and UCC Notices) with respect to the Existing Defaults, and the Borrower Parties hereby unconditionally and irrevocably waive any and all such notices that Lender might have neglected to give. All notice, grace, or cure periods provided for in the Loan Documents that applied to the Existing Defaults were duly provided to the Borrower Parties and have now expired by their terms.

(e)    The continued existence of uncured Existing Defaults has given Lender the unconditional right, at Lender's election in Lender's discretion and without further notice to Borrower Parties or any other person, to commence and pursue the UCC Sale and any or all of the other remedies for collection of the Loan and enforcement of the

5

Loan Documents that are available to Lender under the Loan Documents or applicable law, in such order and manner as Lender may elect from time to time.

3. <u>Warranties and Representations.</u> Borrower Parties unconditionally and irrevocably ratify, remake and confirm all warranties and representations previously made by them in the respective Loan Documents to which they are parties (except to the extent, if any, that the provisions of this Agreement reflect variances from such existing warranties and representations with respect to facts and circumstances existing on the date hereof), and the respective parties, each as to itself, further warrant and represent the following:

(a)     Each Borrower Party, other than any individual Guarantor or Pledgor, is duly organized, validly existing, and in good standing under the laws of its state of organization and is duly qualified as a foreign entity and is currently in good standing in each state in which such qualification is required for the conduct of its business as it is currently being conducted (including, as applicable, the state where the Project is located).

(b)     Each Borrower Party has full authority and due capacity to execute, deliver, and perform this Agreement and all documents, instruments and agreements executed in connection herewith. Such execution, delivery, and performance has been duly authorized as required under their organizational documents (if any) or under applicable law, and the individuals and entities executing this Agreement on their behalf have been duly authorized and empowered to bind the Borrower Parties by such execution.

(c)     This Agreement has been duly executed and delivered to Lender by each Borrower Party, and is valid, binding, and enforceable against each of them in accordance with its terms.

(d)     Each Borrower Party agrees that neither the execution and delivery of this Agreement nor the performance of its terms and compliance with its conditions will conflict with or result in a breach of any of the terms, conditions or provisions of or constitute a violation or default under any organizational document of such Borrower Party or any contract, agreement, or to the knowledge of each Borrower Party, applicable law, regulation, judgment, writ, order or decree to which such Borrower Party or any property of such Borrower Party is subject.

(e)     All documents and information furnished by any Borrower Party to Lender with respect to the Loan or this Agreement are complete and accurate in all material respects, and none contains any misrepresentation or misstatement of a material fact or omits to state a material fact.

(f)     To their knowledge, Borrower Parties are in compliance in all material respects with all federal, state and local laws, rules, and regulations applicable to their respective properties, operations, businesses, and finances.

6

1650758.19

(g)     To the knowledge of Borrower, no Default or Event of Default exists under any Loan Document except for the Existing Defaults.

(h)     The Borrower Parties hereby acknowledge that the Borrower Parties gain a substantial opportunity to receive significant economic benefit or avoid significant economic detriment from the Lender's forbearance herein, which constitutes reasonably equivalent value for the Borrower Parties' agreements herein.

(i)     Borrower represents and warrants that the revised 2008 Budget (as defined below) attached hereto as <u>Exhibit B</u> is materially complete and correct.

(j)     Borrower represents and warrants that (i) the list of Pledgors on <u>Exhibit A</u> is true, complete and correct, (ii) there are no owners of membership interests in Borrower that are not set forth on such list, (iii) no certificates have been issued evidencing the membership interests in Borrower, and (iv) the organizational chart set forth on <u>Exhibit E</u> is accurate and complete.

(k)     Each Pledgor represents and warrants that its membership interest in Borrower is not evidenced by a certificate.

(l)     Borrower represents and warrants that the Schedule of Reimbursements attached hereto as <u>Exhibit D</u> is a complete and correct schedule of dates of receipt of Reimbursements.

4.     <u>Acceptance of Collateral in Satisfaction of Indebtedness.</u>

(a)     Pursuant to Section 1309.620 of the Uniform Commercial Code of the State of Ohio ("**UCC**") and in reliance on the covenants and agreements and warranties and representations made in this Agreement, Lender hereby proposes ("**Proposal**") to accept, under and subject to the terms and conditions set forth in this Agreement, the Pledged Collateral (as defined in the Pledge Agreement) in satisfaction of $100,000.00 of the Obligations ("**Collateral Acceptance**"). Borrower Parties hereby consent to and accept the terms of the Proposal, and this Agreement shall be deemed to be "a record authenticated after default" pursuant to Section 1309.620(C)(1) of the UCC. The Collateral Acceptance shall be effective upon (i) the occurrence of a Forbearance Termination Event followed by (ii) Lender's written notice, which it may send or not in it its discretion, to the Borrower and Pledgors that the Collateral Acceptance is effective, complete, and final and designating the Lender or its designee as the recipient of the Collateral Acceptance. Until and unless the Collateral Acceptance is effective, complete, and final, all provisions of the Mezzanine Loan Documents shall remain in full force and effect and Lender may pursue any or all of its other remedies under the Loan Documents and applicable law.

(b)     The Pledgors agree to continue to be subject to the terms of the Pledge Agreement. The Pledgors and Guarantors acknowledge and agree that (i) they are not "secondary obligors" under Section 1309.621(B) of the UCC, (ii) Lender is not required

to send the Proposal to the Pledgors and Guarantors under Section 1309.621 of the UCC, (iii) the Pledgors have no right to object to the Proposal under Section 1309.620 of the UCC, (iv) to the extent Pledgors are deemed to be secondary obligors under Section 1309.621(B) of the UCC, they hereby waive all rights to notice and objections to the Proposal under Sections 1309.620 and 1309.621 of the UCC, and (v) to the extent Pledgors are deemed to be secondary obligors under Section 1309.621(B) of the UCC and if the rights of secondary obligors under Sections 1309.620 and 1309.621 of the UCC may not be waived, this Agreement constitutes the sending to the Pledgors of the Lender's "proposal to accept collateral in full or partial satisfaction of the obligation it secures" required under Section 1309.621 of the UCC, and the period within which the Pledgors may object to the Proposal under Sections 1309.620 and 1309.621 shall begin on the date of this Agreement and end on the date that is twenty (20) days after the date of this Agreement.

5.    Forbearance by Lender on Conditions; Effects of Forbearance.

(a)    Subject to and in consideration of the full performance by the Borrower Parties of all of their covenants and agreements in this Agreement and in the other Loan Documents as modified by this Agreement, and only until the occurrence of a Forbearance Termination Event (as defined below), Lender agrees that Lender shall:

(i)    Forbear from commencement or further active pursuit of (A) the UCC Sale, (B) the Collateral Acceptance, and (C) the other remedies available to Lender under this Agreement or the other Loan Documents or applicable law for collection of the Loan and enforcement of the Loan Documents.

(ii)    So long as a Forbearance Termination Event does not occur, waive the payment of the Late Charges and Accrued Default Interest Payments (through the Closing Date). Notwithstanding the foregoing, upon the occurrence of a Forbearance Termination Event, all June 2008 Outstanding Amounts, together with all other amounts then due (including any additional applicable late charges or default interest), shall immediately become due.

(b)    Lender's agreement herein to forego immediate pursuit of its rights and remedies constitutes a postponement and forbearance only, and does not in any event constitute a waiver of any such rights or remedies. Nothing herein shall be deemed to (i) waive any condition or requirement contained in any of the Loan Documents, as modified by this Agreement, unless expressly stated herein, or (ii) constitute or establish a course of conduct or course of dealing with respect to the Borrower Parties' compliance with any such condition or requirement or that varies any provision of any Loan Document relating to any waiver, approval or consent by Lender (other than the modifications specified in Section 6 below or other provisions of this Agreement).

6.    Modifications to Loan Documents; Covenants. The parties agree that the Loan Documents are hereby modified in accordance with the following:

(a)    Payment Due Dates.  Section 2.3(d)(i) of the Loan Agreement is hereby replaced with the following: "Prior to maturity, whether by acceleration or otherwise, Base Interest on the Loan shall be due and payable in arrears for the prior calendar month on the tenth day of each month."

(b)    Budget.  In accordance with Section 7.1(g) of the Loan Agreement, Borrower has delivered to Lender an annual operating budget for the Project ("**Budget**") showing anticipated income and expenses for Borrower's current fiscal year.  Lender has approved the Budget attached hereto.  Not later than sixty (60) days before the end of each fiscal year of Borrower, Borrower shall deliver to Lender the Project's updated annual operating Budget for the following fiscal year, which shall require the written approval of Lender, which shall not be unreasonably withheld, conditioned or delayed, and shall include, among other expenses, the amount of $10,000.00 for payment of expenses to be incurred in accordance with Section 7.2 of the Loan Agreement (as modified below).  If Lender does not approve the Budget for the following fiscal year prior to the commencement thereof, the then current Budget shall remain in effect until Lender's approval is granted, with an increase in any non-discretionary expense item to the lesser of the following: (i) the prior budgeted expense amount with a 5% increase or (ii) the actual expense incurred as evidenced by the applicable bill or invoice.  Borrower shall comply with the Budget unless otherwise approved by Lender.

(c)    Books, Records and Inspections.  Section 7.2 of the Loan Agreement is modified to further provide that Borrower shall, and shall cause the Property Manager to, comply with all reasonable requests from Lender and officers and designated representatives of Lender for information and documents in connection with a review of the accounting practices, finances and accounts of Borrower and collection of rents by the Borrower and Property Manager to confirm, among other things, compliance with the requirements under the Lockbox Agreement and Cash Management Agreement.  Borrower shall be responsible for all of Lender's fees and costs incurred in connection with the provisions of Section 7.2 as amended hereby; provided however, Borrower's obligation to pay all such fees and costs shall not exceed the aggregate amount of $10,000.00 within any twelve month period.  Upon Borrower's request, Lender shall deliver to Borrower and to Senior Lender the results of any of the inspections set forth in this Section.

(d)    Reserve Accounts Generally.  Lender has required that the Interest Reserve Account, the Excess Cash Flow Reserve Account, and the DTBRA Reserve Account (each defined below) (sometimes referred to herein collectively as "**Reserve Accounts**") be established with KeyBank National Association and that the following shall apply with respect to such Reserve Accounts:

(i)    Borrower hereby confirms and grants to Lender a security interest in, and assigns and transfers to Lender, as security for the Obligations, all of its right, title, and interest in and to the Reserve Accounts, and all proceeds thereof.  Each Reserve Account shall be a custodial account (and not a trust account) established by Lender or its designee, and, at Lender's option, funds deposited

9

into a Reserve Account may be commingled with other money held by or on behalf of Lender. Each Reserve Account shall be under the sole dominion and control of Lender, and Borrower shall not have any right to withdraw funds from a Reserve Account other than in accordance with the terms hereof. The Reserve Accounts shall bear interest at commercially reasonable rates, and all interest earned shall be deposited directly into the respective Reserve Accounts (and therefore available for disbursement in accordance with the provisions hereof or available as an offset to deposits or fees in connection with the respective Reserve Account into which the interest is deposited). Each Reserve Account shall be additional collateral for the Loan.

(ii) Upon payment in full of the Loan, pursuant to Borrower's request, Lender shall at Borrower's option either disburse to Borrower or credit against the final payment all unapplied funds held by Lender in the Reserve Accounts.

(iii) No disbursements made from a Reserve Account at the time when a Default or Event of Default has occurred and is then continuing shall be deemed a waiver or cure by Lender of that Default or Event of Default, and Lender's rights and remedies shall not be prejudiced in any manner thereby.

(e) <u>Interest Reserve Account</u>. On the Closing Date, Borrower shall deposit with Lender the Interest Reserve Deposit to be deposited into an account held by Lender or its designee (the "**Interest Reserve Account**"). Amounts in the Interest Reserve Account are to be used for the purpose of paying the accrued interest due from Borrower under the Loan Agreement. So long as no Event of Default shall be continuing, Lender shall, upon receiving written request from Borrower (which shall include evidence indicating that the cash flow from the Project is insufficient for Borrower to pay the accrued interest then due), disburse the amounts from the Interest Reserve Account requested by Borrower to pay, in full, all amounts due in accordance with the Loan Agreement. The amounts disbursed shall not exceed the actual shortfall in the revenues generated by the Project. Borrower acknowledges that Lender has no obligation to disburse more than the remaining balance of the Interest Reserve Account if such amount is less than the full payment requested. Thereafter, Borrower shall, prior to the next succeeding payment due date (and in addition to any payment due on such payment due date), deposit sufficient funds with Lender so that the balance of the Interest Reserve Account is again in the amount of the Interest Reserve Deposit.

(f) <u>Excess Cash Flow Reserve Account</u>. In accordance with the terms of the Cash Management Agreement, all Monthly Excess Available Cash shall be deposited into an account (the "**Excess Cash Flow Reserve Account**") to be held by Lender or its designee as additional collateral for the Loan. Lender shall, so long as no Event of Default shall be continuing, upon receiving written request from Borrower, disburse the deposits as follows: (i) upon receipt of evidence indicating that the cash flow from the Project is insufficient for Borrower to pay the accrued interest then due but not yet paid, disburse the amounts from the Excess Cash Flow Reserve Account requested by Borrower to pay such all amounts due in accordance with the Loan Agreement (the

10

amount to be disbursed shall not exceed the actual shortfall in the revenues generated by the Project); (ii) to be reimbursed to Borrower for payment of operating expenses for the Project to the extent that (A) such operating expenses are consistent with the then applicable approved Budget or otherwise approved by Lender upon receipt of receipts, paid invoices, or other evidence indicating such payment and describing the items or services purchased, and (B) insufficient funds exist from the cash flow of the Project to pay such operating expenses; or (iii) to be applied to any other use requested by Borrower in connection with the Project that Lender determines in its reasonable discretion to be necessary in order to operate a multi-family project of the size and nature of the Project.

(g)    DTBRA; DTBRA Reserve Account.  Borrower hereby confirms and grants to Lender a first priority security interest in, and assigns and transfers to Lender, as security for the Obligations, all of its right, title, and interest in and to, and all rights, Reimbursements and other payments, accounts and general intangibles arising under or related to the Reimbursement Agreement and all products and proceeds thereof, whether now owned or hereafter acquired. Lender shall have no obligations or liabilities under the Reimbursement Agreement. Borrower hereby appoints Lender its attorney-in-fact with full power of substitution (and which shall be deemed to be coupled with an interest and irrevocable until the Loan is paid in full, with Borrower hereby ratifying all that its said attorney shall do by virtue thereof) to complete and undertake all steps necessary to request and receive the Reimbursements from the DTBRA.  Borrower acknowledges that under Section 7.13 of the Loan Agreement, following the occurrence of an Event of Default, Borrower is required to deposit with Lender each Reimbursement from the DTBRA as a mandatory prepayment of principal under the Loan; notwithstanding the foregoing, Borrower hereby further agrees that, (i) pursuant to the letter sent to the DTBRA on May 19, 2008 (substantially similar to the letter attached hereto as <u>Exhibit C</u>), Borrower has requested DTBRA's acknowledgment of the security interest granted to Lender, and Borrower shall use its best efforts to obtain DTBRA's agreement to the provisions of such letter and (ii) if, following the date of this Agreement, Borrower receives a Reimbursement, it shall hold such Reimbursement in trust for Lender and promptly deliver such Reimbursement to Lender whether or not an Event of Default or Forbearance Termination Event then exists.  Lender shall, so long as no Forbearance Termination Event or Event of Default Default shall have occurred and be continuing, deposit all Reimbursements received into an account (the **"DTBRA Reserve Account"**) to be held by Lender as additional collateral for the Loan.   So long as no Event of Default shall be continuing, Lender shall disburse the first $50,000 (in the aggregate) of the DTBRA Reserve Account for reimbursements of costs and expenses for Capital Expenditures (as defined below), and thereafter, so long as no Event of Default shall have occurred and be continuing, following Borrower's request, the deposits shall be disbursed as follows: (i) upon receipt of evidence indicating that the cash flow from the Project is insufficient for Borrower to pay the accrued interest then due but not yet paid, disburse the amounts from the DTBRA Reserve Account requested by Borrower to pay such all amounts due in accordance with the Loan Agreement (the amount to be disbursed shall not exceed the actual shortfall in the revenues generated by the Project); (ii) to be reimbursed to Borrower for payment of operating expenses for the Project to the extent that (A) such operating expenses are consistent with the then applicable approved Budget

11

or otherwise approved by Lender upon receipt of receipts, paid invoices, or other evidence indicating such payment and describing the items or services purchased, and (B) insufficient funds exist from the cash flow of the Project to pay such operating expenses; or (iii) to be applied to any other use requested by Borrower in connection with the Project that Lender determines in its reasonable discretion to be necessary in order to operate a multi-family project of the size and nature of the Project. With respect to each disbursement from the DTBRA Reserve Account for Capital Expenditures, Borrower shall satisfy each of the following disbursement requirements:

(i)     Borrower shall deliver to Lender a request for disbursement, together with a reasonably detailed description and cost breakdown of the Capital Expenditures covered by the request and Borrower's certification that all such Capital Expenditures have been paid (unless a joint check is issued) for work completed lien-free and in a workmanlike manner; and

(ii)    copies of valid and verifiable invoices supporting the request for such disbursement.

For purposes herein, the term **"Capital Expenditures"** shall mean major repairs and replacements (including but limited to carpeting, windows, doors, appliances, furniture and equipment) to maintain or improve the Project.

(h)     Additional Covenant. On the Closing Date, Borrower shall deposit with Lender the payment of (i) all Accrued Base Interest Payments, (ii) all Administrative Expenses, (iii) all Loan Related Expenses, and (iv) the Interest Reserve Deposit.

7.      Ratification by Pledgors; Guarantors.

(a)     Each Pledgor hereby (i) ratifies the Pledge Agreement previously executed by it and confirms that the Pledge Agreement and all waivers, covenants and agreements therein remain in full force and effect for the benefit of Lender, (ii) confirms that the Pledge Agreement has not been modified or amended, and that no Pledgor has assigned, conveyed or encumbered the Pledged Collateral (other than to Lender under the Pledge Agreement or pursuant to conveyances to other Pledgors following notice to Lender), (iii) agrees that its execution of this Agreement is not required under the Pledge Agreement or under any other Loan Document, (iv) agrees that the fact that Lender requested Pledgors' execution of this Agreement does not constitute or establish any course of conduct or course of dealing that modifies any provision of the Pledge Agreement or affect Pledgors' liability thereunder in any manner, (v) Lender shall have the full benefit of this Agreement and the Pledge Agreements without any obligation to obtain any future ratification, reaffirmation, consent, waiver or other agreement from Pledgors (vi) acknowledges receipt of the UCC Notices, and that all such notices were commercially reasonable and duly delivered in accordance with all applicable requirements of law, and waives any defense to notice and objection to such notices, and (vi) acknowledges that Lender's agreements herein concerning forbearance set forth in Section 5 below provide

12

Pledgors an opportunity to protect the value of their ownership interest in Borrower constituting reasonably equivalent value to the Pledgors.

(b)     Guarantors hereby (i) ratify the Guaranty previously executed by them and confirm that the Guaranty and all waivers, covenants and agreements therein remain in full force and effect for the benefit of Lender, (ii) reaffirm their continuing liability under the Guaranty, without any defense or offset whatsoever, (iii) confirm that Guarantors' liabilities under the Guaranty have not been limited, impaired or affected in any manner by any existing or previous event, fact or circumstance. Guarantors further acknowledge and agree that (i) their execution of this Agreement is not required under the Guaranty or under any other Loan Document, (ii) Guarantors would remain fully liable to Lender for all obligations owed under the Guaranty with respect to the Loan as modified by this Agreement whether or not Guarantors executed this Agreement or entered into any of the agreements herein, (iii) Lender has and shall continue to have the right, but shall not be obligated to, further modify any or all of the terms of the Loan or the Loan Documents, extend the maturity of the Loan, obtain or release collateral or security for the Loan, pursue or forbear in the pursuit of remedies, and take any or all other actions Lender is authorized to take under the Guaranty, this Agreement or any other Loan Document without giving notice to, obtaining any consent, approval or agreement from, or obtaining execution of any document by any Guarantor, (iv) the fact that Lender requested Guarantors' execution of this Agreement does not constitute or establish any course of conduct or course of dealing that modifies any provision of the Guaranty or affect Guarantors' liability thereunder in any manner, (v) Lender shall have the full benefit of this Agreement and the Guaranty without any obligation to obtain any future ratification, reaffirmation, consent, waiver or other agreement from Guarantor, (vi) the UCC Notices, and that all such UCC Notices were commercially reasonable and duly delivered in accordance with all applicable requirements of law, and each Guarantor waives any defense to, and all rights to notice and objection of, such notices, and (vii) Lender's agreements herein concerning forbearance set forth in Section 5 below provide Guarantors an opportunity to protect the value of their ownership interest in Pledgors constituting reasonably equivalent value to the Guarantors.

8.     Discussions and Sharing of Information.  To the extent reasonably necessary to carry out or enforce the terms of this Agreement or the other Loan Documents or to facilitate the sale of the Loan or the sale of the Pledged Collateral or to protect the value of the Pledged Collateral, Lender may choose to communicate with one or more Third Parties (as defined below) about (a) the Loan, (b) the Project, (c) the Senior Loan, (d) the action or inaction of the Borrower Parties (collectively, the **"Authorized Subject Matter"**).  The Borrower Parties hereby irrevocably agree that Lender may, and authorize Lender to, (X) impart, receive, and otherwise share with Third Parties from time to time documents and information specifically related to the Project or the Loan that Lender may now or hereafter obtain from any source with respect to any of the Authorized Subject Matter (collectively, the **"Authorized Information"**), and (Y) conduct discussions and communications with Third Parties (collectively, **"Authorized Communications"**) with respect to any of the Authorized Subject Matter or Authorized Information, without notice to or consent by any of the Borrower Parties.  For purposes herein, the term **"Third Parties"** means (i) advisors or consultants to Lender (or as receivers, trustees,

appraisers, consultants, or managers for the Project or in similar capacities), any contractor, subcontractor, vendor, material supplier, service provider, or other party having any contractual or other relationship with a Borrower Party, (ii) the Senior Lender, (iii) the Borrower Parties, (iv) any potential bona fide participant in or bona fide purchaser of the Loan or the Senior Loan, (v) any potential bona fide purchaser of any portion of or interest in the Project, and (vi) any potential bona fide investor or acquirer of an interest in Borrower or any Pledgor. The Borrower Parties agree to furnish to Lender or any Third Party within five days of request any Authorized Information such parties may reasonably request. Prior to an Event of Default, Lender will use commercially reasonable efforts to obtain from each Third Party an agreement to maintain the confidentiality of the information provided. Notwithstanding the foregoing, Lender shall not release any personal information of Guarantors without receipt of a commercially reasonable confidentiality agreement.

9.    Releases and Indemnifications.    As a material part of the consideration for Lender's execution of this Agreement, the Borrower Parties hereby unconditionally, irrevocably and unequivocally:

(a)    acknowledge, agree and affirm that none of them possesses any claims, defenses, offsets, rights of recoupment or counterclaims of any kind or nature against or with respect to the enforcement or administration of the Loan or the Loan Documents (including any aspect of the origination, administration or enforcement thereof) or any knowledge of any facts or circumstances that might give rise to or be the basis of any such claims, defenses, offsets, rights of recoupment or counterclaims.

(b)    release and forever discharge Lender, and its predecessors in interest, affiliates, subsidiaries, participants or assigns, and all of their respective past, present, and future shareholders, members, directors, managers, officers, employees, attorneys, advisers, consultants, servicers, representatives or agents (collectively, the "**Released Parties**") from any and all existing, or potential liabilities, obligations, actions, claims, causes of action, suits, proceedings, demands, damages, costs and expenses of every kind whatsoever, whether known or unknown, arising from or relating to any alleged or actual act, omission, occurrence, or transaction prior to or the date of this Agreement including any of the foregoing relating to the making, administration, servicing, enforcement, or collection of the Loan (collectively, the "**Claims and Liabilities**").

(c)    acknowledge that, subsequent to the execution of this Agreement, they may discover Claims and Liabilities that are now unknown to or unanticipated by them, including unknown or unanticipated Claims and Liabilities that arise from, are based upon, or relate to one or more of the statements (in the recitals or other provisions of this Agreement) concerning the subject matter of this Agreement that the parties have agreed upon or acknowledged as accurate herein, the existence of which Claims and Liabilities, if known to a Borrower Party at the execution of this Agreement, may have materially affected its decision to execute this Agreement. Borrower Parties acknowledge that they are assuming the risk that such unknown or unanticipated Claims and Liabilities exist, and agree that the releases granted by Borrower Parties and the agreements concerning indemnification of the Released Parties made by Borrower Parties in this Agreement shall

14

apply to and are effective with respect to all such Claims and Liabilities. Borrower Parties expressly waive the benefits of any state, federal, or other law providing that a general release does not extend to claims that a releasing party does not know or suspect to exist in its favor when the releasing party executes the release, and that if known by the releasing party must or may have materially affected the releasing party's settlement with the released party.

     (d)    intentionally deleted.

     (e)    acknowledge that Lender is specifically relying upon the Borrower Parties' acknowledgments and agreements in this Section 9 in executing this Agreement, and that in the absence of such agreements Lender would be unwilling to agree to the advances provided for in this Agreement.

     (f)    agree that all releases and discharges by any of the Borrower Parties in this Agreement shall have the same effect as if each released or discharged matter had been the subject of a legal proceeding, adjudicated to final judgment from which no appeal could be taken and therein dismissed with prejudice.

10.    Forbearance Termination Events. Borrower Parties agree that the occurrence of any of the following events shall constitute a **"Forbearance Termination Event"** under this Agreement, regardless of the reason or reasons for the occurrence of any such event, whether or not such occurrence is voluntary or involuntary, and whether or not such event occurs by operation of law or from some other cause that is not within the control of the Borrower Parties:

     (a)    Borrower's failure to timely pay each of the following on or before the Closing Date: (i) all Accrued Base Interest Payments, (ii) required Administrative Expenses, (iii) all Loan Related Expenses, and (iv) the Interest Reserve Deposit.

     (b)    Other than item 10(a) above, failure by any of the Borrower Parties to timely perform any of the covenants, agreements or obligations to be performed under this Agreement following notice of such failure and five days to cure such failure.

     (c)    The failure of Borrower or Guarantors under any Senior Loan Document (including the Senior Loan Forbearance Agreement) to timely cure a default or event of default thereunder.

     (d)    The occurrence of an Event of Default under any Loan Document that remains uncured following notice of such Event of Default and a five day cure period; provided however, if the Event of Default is solely due to a Pledgor's (such Pledgor, the **"Debtor Pledgor"**) actions (and not the actions of Borrower or any Guarantor):

          (i) that cause a breach under Section 9.1(i) of the Loan Agreement, such Event of Default shall not cause a Forbearance Termination Event and shall be deemed cured if each of the following is satisfied, so long as no other Event of Default shall have then occurred: (A) within 180 days of

15

the occurrence of such event, any other Pledgor or Guarantor acquires the Pledged Collateral of the Debtor Pledgor; (B) the Debtor Pledgor is no longer a member of Borrower; (C) by virtue of such acquisition, the Pledged Collateral does not become property of any bankruptcy estate and does not become subject to any lien, pledge or encumbrance other than the pledge to Mezzanine Lender; and (D) no other Default or Event of Default shall have occurred and be continuing; or

(ii) that violate a provision of the Loan Documents (other than 9.1(i) of the Loan Agreement), so long as no other Event of Default shall have occurred and each of the following is satisfied, such Event of Default shall not cause a Forbearance Termination Event: (A) the action that caused the Event of Default is caused directly or indirectly by a Pledgor that is not controlled directly or indirectly by any Guarantor; (B) no other Event of Default or Forbearance Termination Event shall have occurred and be continuing; (C) neither Borrower nor any Guarantor, nor any person directly or indirectly owned or controlled by Borrower or any Guarantor directly or indirectly participated, colluded, assisted, or acted in concert with Pledgor to cause the action creating the Event of Default; and (D) the action of such Pledgor does not affect the Pledged Collateral or impede, alter or interfere with Lender's ability to exercise its rights to foreclose upon all of its Pledged Collateral.

(e) The interference by any Borrower Party (or any person acting or claiming by, through, under, or in concert with or for the benefit of any of them) in any manner with Lender's exercise of its rights and remedies hereunder, under the Loan Documents, or under applicable law.

Any Forbearance Termination Event shall also constitute an Event of Default under each of the Loan Documents, for which no notice shall be required and with respect to which no grace or cure period shall apply, other than as provided for herein.

11. <u>Lender's Rights Upon Occurrence of a Forbearance Termination Event</u>. Upon and at any time after the occurrence of any Forbearance Termination Event, Lender may take any or all of the following actions without notice of any kind to Borrower Parties or any other person:

(a) Lender may immediately cease the forbearance to which Lender agreed pursuant to Section 5 of this Agreement and commence and pursue any or all rights and remedies Lender may have pursuant to this Agreement (including the UCC Sale or other sale under the UCC or the Proposal or Collateral Acceptance) or under the other Loan Documents or applicable law, all in such order and manner as Lender may elect from time to time in its discretion, and without notice of any kind to Borrower Parties or any other person, as if Section 5 had never been agreed to by Lender.

16

(b)     Lender may charge and collect interest on the outstanding balance of the Loan at the default rate of 20% per annum effective from and after the date of the earliest Existing Default that previously occurred under the Loan Documents and until the Loan is paid in full, notwithstanding the provisions of Section 5 of this Agreement.

(c)     Borrower Parties agree to the appointment of a receiver of and for the Borrower, the membership interests in Borrower, or any of Borrower's property on an ex parte basis and without regard to the adequacy of the security for the Loan.

12.     Intentionally Deleted.

13.     Waiver of Automatic Stay; Supplemental Stay.  The Borrower Parties unconditionally and irrevocably acknowledge and agree that:

(a)     due to the Existing Defaults, (i) Borrower Parties are currently in default under the Loan Documents and Lender has an immediate, noncontingent right to exercise its rights and remedies with respect to the Pledged Collateral and Reimbursements, and (ii) Lenders' liens and security interests on the Pledged Collateral and Reimbursements are senior, enforceable, duly perfected and non-avoidable.

(b)     if any bankruptcy proceeding is commenced by or against any Borrower Party and not dismissed within 45 days of filing, "cause" for termination of the automatic stay exists and Lender shall be entitled, subject to the approval of a court of competent jurisdiction, to the immediate entry of an order granting Lender relief from the automatic stay imposed by Section 362 of the United States Bankruptcy Code (the "Code"). Borrower Parties consent to the entry of such order and Borrower Parties agree that in no event will they object to or oppose Lender's motion seeking relief from the automatic stay.  Borrower Parties further agree that upon Lender's reasonable request from time to time they shall execute and file all documents and take all other actions Lender may deem reasonably necessary or appropriate to enable Lender to obtain stay relief and exercise all of its rights and remedies for collection and enforcement of the Loan.

(c)     Borrower Parties shall not seek or request any other party to seek a supplemental stay or any other relief, whether injunctive or otherwise, under Section 105 or any other provision of the Code, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights it has, under the Loan Documents or otherwise, against any Borrower Party or against the Pledged Collateral.

(d)     Lender, as a material inducement to enter into this Agreement, has specifically bargained for the concessions set forth herein, and that this Agreement may be deemed conclusive evidence as to such negotiated ongoing intention of the Parties and that it is intended to be the primary element in determining if cause exists for granting such concessions.

14.     Future Negotiations.  Borrower Parties acknowledge and agree that:

17

(a)     Lender has no obligation whatsoever to discuss, negotiate or to agree to any restructuring of the Loan or to any modification, amendment, restructuring or reinstatement of the Loan Documents or to forbear from exercising its rights and remedies under the Loan Documents.

(b)     If there are any future discussions among Lender and any Borrower Party concerning any restructuring, modification, amendment or reinstatement with respect to the Loan, then no restructuring, modification, amendment, reinstatement, compromise, settlement, agreement or understanding with respect to the Loan, the Loan Documents, the Pledged Collateral, Project, or any aspect of any of them, shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by authorized representatives of the parties.

15.     Additional Documents / Further Assurances. Borrower Parties shall at any time, and from time to time, upon the written request of Lender, sign and deliver such further documents and do such further acts and things as Lender may reasonably request to effect the purposes of this Agreement.

16.     Time is of the Essence. Time is of the essence with respect to all agreements and obligations of Borrower Parties contained herein.

17.     Entire Agreement; Written Modifications Only. This Agreement, the exhibits attached hereto, and the documents referred to, contemplated, or required herein, constitute the sole and entire agreement between the parties with respect to the subject matter hereof, and there are no other covenants, promises, agreements or understandings regarding the same. This Agreement, including the provisions of this Section, may not be modified except by written amendment to this Agreement signed by the Parties affected by the same, and the parties hereby: a) expressly agree that it shall not be reasonable for any of them to rely on any alleged, non-written amendment to this Agreement; b) irrevocably waive any and all right to enforce any alleged, non-written amendment to this Agreement; and c) expressly agree that it shall be beyond the scope of authority (apparent or otherwise) for any of their respective agents to agree to any non-written modification of this Agreement.

18.     No Third-Party Beneficiaries. This Agreement is solely for the benefit of the parties hereto and no persons other than the undersigned and the Released Parties shall be entitled to claim or receive any benefit by reason of this Agreement.

19.     Due Diligence Performed; Parties Fully Informed; No Right to Rely. Each Borrower Party hereby warrants, represents and agrees that it has, by itself and with the assistance of counsel (or, if without the assistance of counsel, such party having of its own volition chosen not to seek such assistance), performed any and all due diligence and investigation it deems necessary or desirable in connection with making a fully informed decision to enter into and sign this Agreement. Borrower Parties are relying on their own investigations and their own decision-making processes in determining to sign this Agreement, are not relying on the representations or omissions of each other or of Lender in so doing, and

18

fully understand the terms and provisions of this Agreement and of the documents contemplated hereby.

20.  Severability. If any one or more of the provisions of this Agreement are deemed unenforceable, the remainder of this Agreement shall, at the sole option of Lender, remain enforceable in accordance with its original terms to the fullest extent possible.

21.  Delay Not a Waiver. Neither the failure nor any delay on the part of Lender to exercise any right, power or privilege under this Agreement or under any document executed in connection herewith shall operate as a waiver of such right, power or privilege and any single or partial exercise of any such right, power or privilege shall not preclude any other or further exercise thereof.

22.  Successors and Assigns. This Agreement shall be binding on and shall inure to the benefit of each party's permitted successors and assigns.

23.  Construction of Provisions. The following rules of construction are applicable for the purposes of this Agreement and all documents and instruments supplemental hereto unless the context clearly requires otherwise:

(a)  All references herein to numbered sections or to lettered exhibits are references to the sections hereof and the exhibits annexed hereto.

(b)  The terms "include," "including," and similar terms shall be construed as if followed by the phrase "without being limited to" or the phrase "without limitation," as the context may require.

(c)  Words of masculine, feminine or neutral gender shall mean and include the correlative words of the other genders, and words importing the singular number shall mean and include the plural, and vice versa.

(d)  No inference in favor of or against any party hereto shall be drawn from the fact that such party has drafted any portion of this Agreement or any other Loan Document.

(e)  All provisions of this Agreement and each of the Loan Documents relating to consents or approvals by Lender, elections Lender has a right to make, or decisions or exercises of discretion by Lender are hereby modified as necessary to give effect to the following provision, which shall control in any event over all contrary or inconsistent provisions of the Loan Documents with respect to all of the foregoing matters and all other issues relating to the Loan from and after the execution and delivery of this Agreement: "Whenever under this Agreement or any other Loan Document Lender has any right, option, election or power ("**Decision Power**") to (a) approve or disapprove, or consent or withhold consent to, any matter, (b) determine whether or not any arrangement or term is satisfactory or acceptable to Lender, (c) determine whether any condition has been satisfied or any requirement has been met, or (d) make any other determination,

19

judgment or decision whatsoever, Lender may do so in each instance in Lender's sole and absolute discretion, unless a provision of this Agreement or another Loan Document executed after this Agreement that directly relates to the applicable approval, consent, determination, judgment or decision states that Lender's discretion must be exercised reasonably or in some other specified manner in a particular instance."

(f)     All references to the Loan shall be deemed to include all existing or future modifications, amendments, extensions, restatements, or replacements of the Loan made by mutual written agreement of the parties.

(g)     The terms "person" and "party" shall mean any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, entity or government (whether federal, state, county, city, municipal or otherwise, including an instrumentality, division, agency, body or department thereof).

(h)     The Loan Documents are hereby modified in all respects necessary to give effect to the provisions of this Agreement, which shall control over any contrary or inconsistent provisions of any of the other Loan Documents. In all other respects, all Loan Documents shall remain in full force and effect as originally written or previously modified by mutual written agreement of the parties. All of Lender's liens, security interests, priorities, rights, and remedies under the Loan Documents shall continue in full force and effect as security for the Loan following the modification thereof by this Agreement. All references in any Loan Document to any other Loan Document shall hereafter be construed to refer to such other Loan Document as modified by this Agreement.

24.     Counterparts. This Agreement may be executed in more than one counterpart, each of which shall be deemed an original and all of which together shall constitute one and the same document, binding upon all the parties hereto notwithstanding that all such parties are not signatories to the same counterpart. This Agreement shall become effective when all parties hereto have executed a counterpart hereof. A signature of a party by facsimile or other electronic transmission shall be deemed to constitute an original and fully effective signature of such party.

25.     Costs and Expenses. Without limiting any other provision of this Agreement or any other Loan Document relating to payment of expenses, Borrower shall, upon execution of this Agreement pay or reimburse Lender for all actual out-of-pocket costs and expenses, including attorneys fees, incurred by Lender in connection with the negotiation, drafting, implementation, or enforcement of this Agreement.     .

26.     Governing Law. This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Ohio.

27.     Waiver of Jury Trial.     THE PARTIES HERETO EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY CONTROVERSY OR CLAIM,

1650758.19

WHETHER ARISING IN TORT OR CONTRACT, BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONJUNCTION WITH, THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS (INCLUDING THE VALIDITY, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR THEREOF), OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH OR THEREWITH.  EACH PARTY ACKNOWLEDGES AND AGREES THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY AN PERSON TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER'S ENTERING INTO THIS AGREEMENT AND  LENDER WOULD NOT HAVE ENTERED INTO THIS AGREEMENT WITHOUT THIS WAIVER.   LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.  SIGNATURES APPEAR ON THE FOLLOWING PAGES.]

1650758.19

LENDER:

**HARTFORD MEZZANINE INVESTORS I, LLC,**
a Delaware limited liability company

By:    Hartford Investment Management Company,
       a Delaware corporation, a Managing Member

       By: _____
       Name: ~~WILLIAM P. BOWMAN~~
       Title: ~~SENIOR VICE PRESIDENT~~

By:    Key Real Estate Equity Capital, Inc.,
       an Ohio corporation, a Managing Member

       By: _____
       Name: ~~JAMES H.~~ MacQUEEN
       Title: ~~Vice President~~ SR. VICE PRESIDENT

STATE OF _Connecticut_ )
                     ) ss. _Hartford_
COUNTY OF _Hartford_ )

_William P. Bowman_         On this _3rd_ day of _June_ , 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared ~~_Debra B. Shanker_~~ , to me personally known, who being by me duly sworn, did state that he is a Hartford Investment Management Company, a Delaware corporation, a Managing Member of **HARTFORD MEZZANINE INVESTORS I, LLC,** a Delaware limited liability company, known to me to be the person who executed the foregoing instrument on behalf of Lender and acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in _Hartford Connecticut_ , the day and year last above written.

                               _Debra B. Shanker_
                               Notary Public
                               Debra B. Shanker

My commission expires: _9-30-2010_

STATE OF _Ohio_ )
)
COUNTY OF _Cuyahoga_ )

On this _11_ day of _June_, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared _James MacQueen_, to me personally known, who being by me duly sworn, did state that he is a Vice President for Key Real Estate Equity Capital, Inc., an Ohio corporation, a Managing Member of **HARTFORD MEZZANINE INVESTORS I, LLC**, a Delaware limited liability company, known to me to be the person who executed the foregoing instrument on behalf of Lender and acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in _Cleveland, Ohio_, the day and year last above written.

_Karen Simpson-Conn_
Notary Public

My commission expires:

_6-23-2008_

