**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

Hartford Mezzanine Investors I, LLC.,  :
                                          :

      Plaintiff,  :   Case No. CV 08676856

      v.  :   Judge Ronald Suster

Scott A. Chappelle, *et al.*,  :

      Defendants.  :   JURY DEMAND
                              :   ENDORSED HEREON

## ANSWER AND COUNTERLAIM OF DEFENDANTS SCOTT CHAPPELLE, LAURA CHAPPELLE, EVERT KRAMER, JR., AND ROSALIND KRAMER

Now come Defendants Scott Chappelle and Laura Chappelle (hereby collectively referred to as the "Chappelle Defendants"), as well as Defendants Evert Kramer, Jr., and Rosalind Kramer (hereby collectively referred to as the "Kramer Defendants"), and for their Answer to Plaintiff's Complaint hereby state as follows:

## FIRST DEFENSE

1.     Answering paragraph 1, the Chappelle Defendants and the Kramer Defendants deny for lack of information the allegations contained therein.

2.     Answering paragraph 2, the Chappelle Defendants and the Kramer Defendants admit that they are adult individuals and that Evert Kramer is a former member of Woodland, but deny that Scott Chappelle, Laura Chappelle, and Rosalind Kramer are or were members of Woodland. By way of further answering, the Chappelle Defendants and the Kramer Defendants admit that they may be found at 1427 W. Saginaw, Suite 200, East Lansing, MI 48823, but deny each and every allegation not specifically admitted herein.

3.      Answering paragraph 3, the Chappelle Defendants and the Kramer Defendants admit that a Term Note was executed on or about January 4, 2006, and that a true and correct copy of the Term Note appears to be attached to the Complaint, but deny each and every allegation not specifically admitted herein. By way of further answering, the Chappelle Defendants and the Kramer Defendants state that the Term Note speaks for itself.

4.      Answering paragraph 4, the Chappelle Defendants and the Kramer Defendants admit that a Loan Agreement was executed on or about January 4, 2006, and that a true and correct copy of the Loan Agreement appears to be attached to the Complaint, but deny each and every allegation not specifically admitted herein. By way of further answering, the Chappelle Defendants and the Kramer Defendants state that the Loan Agreement speaks for itself.

5.      Answering paragraph 5, the Chappelle Defendants and the Kramer Defendants admit that a Guaranty was executed on or about January 4, 2006, and that a true and correct copy of the January 2006 Guaranty appears to be attached to the Complaint, but deny each and every allegation not specifically admitted herein. By way of further answering, the Chappelle Defendants and the Kramer Defendants state that the January 2006 Guaranty speaks for itself.

6.      Answering paragraph 6, the Chappelle Defendants and the Kramer Defendants admit that certain payments were made in an untimely manner, but deny each and every allegation not specifically admitted herein.

2

7.       Answering paragraph 7, the Chappelle Defendants and the Kramer Defendants admit that a January 8, 2008 letter was delivered to them and that a true and correct copy of the January 8, 2008 letter appears to be attached to the Complaint, but deny each and every allegation not specifically admitted herein. By way of further answering, the Chappelle Defendants and the Kramer Defendants state that the January 8, 2008 letter speaks for itself.

8.       Answering paragraph 8, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

9.       Answering paragraph 9, the Chappelle Defendants and the Kramer Defendants admit that a February 14, 2008 letter was delivered to them and that a true and correct copy of the February 14, 2008 letter appears to be attached to the Complaint, but deny each and every allegation not specifically admitted herein. By way of further answering, the Chappelle Defendants and the Kramer Defendants state that the February 14, 2008 letter speaks for itself.

10.     Answering paragraph 10, the Chappelle Defendants and the Kramer Defendants admit that a Forebearance Agreement was executed on or about June 3, 2008 and that a true and correct copy of the Forebearance Agreement appears to be attached to the Complaint, but deny each and every allegation not specifically admitted herein. By way of further answering, the Chappelle Defendants and the Kramer Defendants state that the Forebearance Agreement speaks for itself.

11.     Answering paragraph 11, the Chappelle Defendants and the Kramer Defendants admit that a Guaranty was executed on or about June 3, 2008, and that a true and correct copy of the June 2008 Guaranty appears to be attached to the

3

Complaint, but deny each and every allegation not specifically admitted herein. By way of further answering, the Chappelle Defendants and the Kramer Defendants state that the June 2008 Guaranty speaks for itself.

12.     Answering paragraph 12, the Chappelle Defendants and the Kramer Defendants admit that an October 14, 2008 letter was delivered to them, and that a true and correct copy of the October 14, 2008 letter appears to be attached to the Complaint, but deny each and every remaining allegation not specifically admitted herein. By way of further answering, the Chappelle Defendants and the Kramer Defendants state that the October 14, 2008 letter speaks for itself.

13.     Answering paragraph 13, the Chappelle Defendants and the Kramer Defendants admit that an October 22, 2008 letter was delivered and that a true and correct copy of the October 22, 2008 appears to be attached to the Complaint, but deny each and every allegation not specifically admitted herein. By way of further answering, the Chappelle Defendants and the Kramer Defendants state that the October 22, 2008 letter speaks for itself.

14.     Answering paragraph 14, the Chappelle Defendants and the Kramer Defendants state that no answer is required in response. By way of further answering, however, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

15.     Answering paragraph 15, the Chappelle Defendants and the Kramer Defendants, are without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation contained therein. By the way of further answering,

4

however, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

## COUNT I – SUIT ON THE JANUARY 2006 GUARANTY

16.    The Chappelle Defendants and Kramer Defendants incorporate by reference their responses to paragraphs 1 through 15 of this Answer as if fully restated herein.

17.    Answering paragraph 17, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

18.    Answering paragraph 18, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

19.    Answering paragraph 19, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

20.    Answering paragraph 20, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

## COUNT II – SUIT ON THE JUNE 2008 GUARANTY

21.    The Chappelle Defendants and Kramer Defendants incorporate by reference their responses to paragraphs 1 through 20 of this Answer as if fully restated herein.

22.    Answering paragraph 22, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

23.    Answering paragraph 23, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

24.     Answering paragraph 24, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

25.     Answering paragraph 25, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

26.     Answering paragraph 26, the Chappelle Defendants and the Kramer Defendants deny each and every allegation contained therein.

27.     The Chappelle Defendants and the Kramer Defendants deny each and every allegation not specifically admitted herein.

## SECOND DEFENSE

28.     Each of Plaintiff's claims fails to state a claim upon which relief can be granted.

## THIRD DEFENSE

29.     Each of Plaintiff's claims are barred by the equitable doctrines of laches, estoppel, waiver and/or unclean hands.

## FOURTH DEFENSE

30.     Each of Plaintiff's claims are barred by Plaintiff's and/or its agents' management of Woodland Lakes Apartments in a negligent and commercially unreasonable manner, causing a decline in revenues from which to pay any guaranteed obligations.

## FIFTH DEFENSE

31.     Count I of Plaintiff's Complaint is barred because the January 2006 Guaranty was replaced and superseded by the June 2008 Guaranty.

6

**SIXTH DEFENSE**

32.     Each of Plaintiff's claims are barred because the Borrower is responsible for all unpaid amounts.

**SEVENTH DEFENSE**

33.     Each of Plaintiff's claims are barred because Plaintiff has caused the Borrower to not pay the unpaid amounts at issue.

**EIGHTH DEFENSE**

34.     Each of Plaintiff's claims are barred, in whole or in part, because the amounts Plaintiff seeks have been paid in full or in part.

**NINTH DEFENSE**

35.     Count II of Plaintiff's Complaint is barred because Defendants are not liable for any base rent, expenses or any other amounts accruing before the date applicable to the June 2008 Guaranty.

**TENTH DEFENSE**

36.     Each of Plaintiff's claims are reduced, in whole or in part, by any applicable set-off or offset.

**ELEVENTH DEFENSE**

37.     Each of Plaintiff's claims are barred by Plaintiff's own material breach(es) of the agreements between the parties.

**TWELFTH DEFENSE**

38.     Each of Plaintiff's claims are barred by Plaintiff's bad faith.

## THIRTEENTH DEFENSE

39.    Each of Plaintiff's claims are barred because the January 2006 Guaranty and the June 2008 Guaranty are too uncertain and ambiguous to be legally binding or enforceable.

## FOURTEENTH DEFENSE

40.    Each of Plaintiff's claims are barred because Defendants are not liable for obligations accruing after the membership interests in Borrower were conveyed to Lender's designee.

## FIFTEENTH DEFENSE

41.    Each of Plaintiff's claims are barred, in part, because Defendants are not liable for any costs or fees in excess of $50,000.

## SIXTEENTH DEFENSE

42.    Each of Plaintiff's claims are barred by the lack of insolvency at Woodland.

## SEVENTEENTH DEFENSE

43.    Each of Plaintiff's claims are barred because Plaintiff and/or its agents have negligently or intentionally failed to apply available project revenues to the guaranteed obligations.

## EIGHTEENTH DEFENSE

44.    Each of Plaintiff's claims are barred because the primary debtor has been released from its obligation to pay the debt, thereby releasing Defendants' obligation to pay as a guarantor.

8

## NINETEENTH DEFENSE

45.     Each of Plaintiff's claims are barred by the affirmative defense of duress.

## TWENTIETH DEFENSE

46.     The Chappelle Defendants and the Kramer Defendants reserve the right to add any additional affirmative defenses that become known during discovery.


WHEREFORE, Defendants Scott Chappelle, Laura Chappelle, Evert Kramer, Jr., and Rosalind Kramer, having answered Plaintiff's Complaint, demand that Plaintiff's Complaint be dismissed in its entirety, that they be awarded their attorneys' fees and expenses incurred in defense thereof, and for any and all other relief, legal or equitable which this Court deems appropriate.

9

## COUNTERCLAIM OF DEFENDANTS SCOTT CHAPPELLE, LAURA CHAPPELLE, EVERT KRAMER, JR., AND ROSALIND KRAMER

Now come Defendants/Counterclaim Plaintiffs Scott Chappelle, Laura Chappelle, Evert Kramer, Jr., and Rosalind Kramer, and for their Counterclaim against Plaintiff/Counterclaim Defendant Hartford Mezzanine Investors I, LLC, state as follows:

## FACTS COMMON TO ALL CLAIMS

1.      Defendant/Counterclaim Plaintiff Scott A. Chappelle ("SAC") has his principal residence in Ingham County, Michigan and is a citizen of the State of Michigan.

2.      Defendant/Counterclaim Plaintiff Laura A. Chappelle ("LAC") has her principal residence in Ingham County, Michigan and is a citizen of the State of Michigan.

3.      Defendant/Counterclaim Plaintiff Evert Kramer, Jr. ("EK") has his principal residence in Clinton County, Michigan and is a citizen of the State of Michigan.

4.      Defendant/Counterclaim Plaintiff Rosalind Kramer ("RK") has her principal residence in Clinton County, Michigan and is a citizen of the State of Michigan.

5.      Plaintiff/Counterclaim Defendant Hartford Mezzanine Investors I, LLC ("Hartford") is a limited liability company incorporated in the state of Delaware.

6.      Woodland Lakes Investment Group, L.L.C. ("Woodland") is a limited liability company that owns a 344-unit residential apartment project on Dell Road in Delhi Township, Ingham County, Michigan known as Woodland Lakes Apartments (the "Project").

7.      Terra Management Company managed the Project for Woodland until July 2008 under a management contract with Woodland.  A true and correct copy of the

10

Management Agreement is attached hereto as Exhibit A and incorporated herein by reference.

8. On or about January 4, 2006, Hartford, as the lender, provided a $3,340,000 mezzanine loan to Woodland, as the borrower (the "Loan"). A true and correct copy of the Loan Agreement is attached hereto as Exhibit B and incorporated herein by reference.

9. As security for the Loan, the members of Woodland pledged 100% of their membership interests to Hartford. A true and correct copy of the Pledge Agreement evidencing the security for the loan is attached hereto as Exhibit C and incorporated herein by reference.

10. As further security for the Loan, SAC, LAC, EK and RK and Kevin T. McGraw and Sharon D. McGraw ("Original Guarantors") provided a guaranty of payment, a guaranty which was non-recourse except under certain limited, specified conditions. A true and correct copy of this Original Guaranty is attached hereto as Exhibit D and incorporated herein by reference.

11. In 2008, Hartford declared a default of the Loan. Subsequently, a Forbearance Agreement was executed, providing that Hartford would forbear from pursuing any potential remedies pursuant to its terms. A true and correct copy of the Forbearance Agreement is attached hereto as Exhibit E and incorporated herein by reference.

12. Pursuant to the Forbearance Agreement, Defendants/Counterclaim Plaintiffs SAC, LAC, EK, and RK executed a replacement guaranty on or about June 3,

11

2008. A true and correct copy of the Replacement Guaranty is attached hereto as Exhibit F and incorporated herein by reference.

13.     Pursuant to the terms of the Replacement Guaranty, Defendants/ Counterclaim Plaintiffs SAC, LAC, EK, and RK could become liable for the payment of base interest payments from June 3, 2008 through December 1, 2009, as well as certain operating expenses for the same period.  But there would be no liability for such base interest and operating expenses after a conveyance of the membership interests in Woodland, as set forth at Exhibit F, § 2.1(i).

14.     The Replacement Guaranty further provides at § 6.2 as follows:

Entire Agreement; Modification.

This Guaranty is the *entire agreement between the parties hereto with respect to the subject matter hereof*, and **supersedes and replaces all prior** discussions, representations, communications and **agreements (oral or written)**. This guaranty shall not be modified, supplemented, or terminated, nor any provision hereof waived, except by a written instrument signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing.

(emphasis added).

15.     On or about July 26, 2008, Hartford declared a default under the Forbearance Agreement, and stated that Hartford and an entity related to Hartford, HMI I Woodland Lakes Holdings, LLC, had accepted the Pledged Collateral, which included taking over the membership interests and ownership of Woodland.  According to Hartford's, after July 26, 2008, HMI therefore held 100% of the Pledged Collateral as the designee of Hartford.  A true and correct copy of a July 26, 2008 letter authored by

12

counsel for Hartford setting forth the foregoing is attached hereto as Exhibit G and incorporated herein by reference.

16.    On or about July 28, 2008, Hartford and HMI, with the assistance of their property manager and agent Sterling Management, took possession and control of Woodland and the Project.   A true and correct copy of a July 28, 2008 letter authored by counsel for Hartford setting forth the foregoing is attached hereto as Exhibit H and incorporated herein by reference.

17.    Sterling moved in and took over the Project offices in late July 2008, advising the Terra Management employees that they would be terminated and requiring that they submit to drug tests, among other things, even though Terra Management was the lawful property manager under the Management Agreement (attached hereto as Exhibit A).

18.    Thereafter, Hartford demanded payment for certain operating expenses from the Original Guarantors pursuant to the Original Guaranty and payment for base interest and operating expenses from Defendants/ Counterclaim Plaintiffs SAC, LAC, EK, and RK pursuant to the Replacement Guaranty.   True and correct copies of October 14, 2008 and October 22, 2008 letters authored by counsel for Hartford setting forth the foregoing are attached hereto as Exhibits I and J, respectively, and incorporated herein by reference.

19.    Hartford then repeated its prior demands for payment and vaguely asserted a further default under the Original Guaranty, purportedly requiring reimbursement by Original Guarantors for, among other things, the entire principal balance of the Loan.  A true and correct copy of a November 11, 2008 letter authored

by counsel for Hartford setting forth the foregoing is attached hereto as Exhibit K and incorporated herein by reference.

## Count I - Accounting

20. Defendants/Counterclaim Plaintiffs restate and incorporate by reference paragraphs 1 through 19 as if fully set forth herein.

21. Hartford, and/or its agents HMI and Sterling, are in possession and/or control of the Project and the books and records related thereto.

22. Hartford has unique knowledge of and access to information concerning revenues and expenses of the Project and Woodland that are unavailable to Defendants/Counterclaim Plaintiffs.

23. Hartford's demands for payment under the Original Guaranty and the Replacement Guaranty involve alleged deficiencies in payments to Hartford from the revenues of the Project.

24. Determining the financial status of the Project and Woodland and any deficiencies in payment to Hartford is complex, and within the exclusive control of Hartford and/or Hartford's agents.

25. To the extent no adequate remedy at law exists to adequately determine any liability of Defendants/Counterclaim Plaintiffs, the equitable remedy of accounting should be afforded.

26. Defendants/Counterclaim Plaintiffs therefore respectfully request that this Court order a full and complete accounting of the books, records, revenues and expenses of the Project and Woodland from July 26, 2008 through the date deemed

14

appropriate by the Court, and award counter-plaintiffs costs, attorney fees and interest and other relief that this Court determines to be just and equitable.

## Count II – Declaratory Judgment

27.    Defendants/Counterclaim Plaintiffs restate and incorporate by reference paragraphs 1 through 26 as if fully set forth herein.

28.    As set forth at Exhibit K, Hartford has demanded that the Original Guarantors pay the entire principal amount of the Loan along with interest and various costs, despite the fact that the Replacement Guaranty replaces and supersedes the Original Guaranty.

29.    As set forth in Exhibits I and J, Hartford has also demanded that Defendants/Counterclaim Plaintiffs pay base interest and operating expenses through December 2009, despite the fact that the membership interests and ownership of Woodland has already been conveyed to Hartford.

30.    In contrast to Hartford's assertions, Defendants/Counterclaim Plaintiffs assert, among other things, the following:

> a.    That they are not liable under the Original Guaranty because it was replaced and superseded by the express terms of the Replacement Guaranty as set forth in section 6.2 thereof;
>
> b.    That they are not liable under the Original Guaranty because no default or circumstance has occurred that would give rise to the recourse obligations described therein; and

15

      c. That they are not liable under the Replacement Guaranty for any operating expenses incurred by Woodland after the conveyance of membership interests on July 26, 2008.

31.     There has therefore arisen between the parties a justiciable controversy capable of judicial resolution in accordance with R. C. 2721.01 *et. seq.* and Ohio R. Civ. P. 57.

32.     Defendants/Counterclaim Plaintiffs therefore respectfully request that this Court enter a judgment declaring that:

      a. The Original Guaranty is null and void and/or that Defendants/ Counterclaim Plaintiffs have no liability arising thereunder;

      b. Hartford cannot recover from Defendants/Counterclaim Plaintiffs any operating expenses or base rent incurred after the conveyance of the Woodland membership interests on July 26, 2008;

      c. Hartford cannot recover any payments under the Original Guaranty or Replacement Guaranty until a full accounting has been provided;

      d. Hartford cannot recover from Defendants/Counterclaim Plaintiffs under the Original Guaranty or under the Replacement Guaranty any base rent or operating expenses incurred before the date of the Replacement Guaranty;

33.     Defendants/Counterclaim Plaintiffs further seek an order awarding them their costs, attorney fees and interest and order such other relief that the Court deems just and equitable.

WHEREFORE, Defendants/Counterclaim Plaintiffs Scott Chappelle, Laura Chappelle, Evert Kramer, Jr., and Rosalind Kramer, seek relief from Plaintiff/Counterclaim Defendant Hartford Mezzanine Investors I, LLC, as follows:

a. as to Count I, that the Court order a full and complete accounting of the books, records, revenues and expenses of the Project and Woodland from July 26, 2008 through the date deemed appropriate by the Court;

b. as to Count II, that the Court enter a judgment declaring that:

    i. The Original Guaranty is null and void and/or that Defendants/ Counterclaim Plaintiffs have no liability arising thereunder;

    ii. Hartford cannot recover from counter-plaintiffs any operating expenses or base rent incurred after the conveyance of membership interests on July 26, 2008;

    iii. Hartford cannot recover any payments under the Original Guaranty or Replacement Guaranty until a full accounting has been provided;

    iv. Hartford cannot recover from Defendants/Counterclaim Plaintiffs under the Original Guaranty or from Defendants/Counterclaim Plaintiffs under the Replacement Guaranty any base rent or operating expenses incurred before the date of the Replacement Guaranty;

c. As to all Counts, that the Court award Defendants/Counterclaim Plaintiffs their costs, attorney fees and pre- and post-judgment interest

17

and any and all other relief that this Court determines to be just and equitable.

Respectfully submitted,

James E. Arnold (0037712)
Scott J. Stitt (0073943)

JAMES E. ARNOLD & ASSOCIATES, LPA
471 E. Broad St., Ste. 1400
Columbus, Ohio 43215
Telephone: (614) 460-1600
Facsimile: (614) 469-1066
Email: jarnold@arnlaw.com
sstitt@arnlaw.com

*Attorneys for Defendants/Counterclaim Plaintiffs*
*Scott A. Chappelle, Laura A. Chappelle,*
*Evert Kramer, Jr. and Rosalind Kramer*

## JURY DEMAND

Defendants/Counterclaim Plaintiffs Scott Chappelle, Laura Chappelle, Evert Kramer, Jr., and Rosalind Kramer hereby demand a trial by jury on all counts so triable.

Scott J. Stitt (0073943)

## CERTIFICATE OF SERVICE

This is to certify that a true copy of the foregoing Answer and Counterclaim was served upon the following by ordinary U.S. mail, postage-prepaid, this 26th day of December, 2008:

Kirk W. Roessler
ZIEGLER, METZGER, & MILLER LLP
2020 Huntington Building
925 Euclid Avenue
Cleveland, OH 44115

Brett D. Anders
Matthew R. Moriarity
POLSINELLI SHALTON FLANIGAN SUELTHAUS, PC
700 W. 47th St., Ste. 1000
Kansas City, MO 64112

*Attorneys for Plaintiff*

Kevin T. McGraw
Sharon D. McGraw
4520 N. Grand River Ave.
Lansing, MI 48906

*Defendants*

Scott J. Stitt (0073943)

19

# TERRA MANAGEMENT COMPANY
# MANAGEMENT AGREEMENT

This Management Agreement has been entered into as of August _31_, 2001 between Woodland Lakes Investment Group, L.L.C., with offices at 314 M.A.C. Avenue, Suite 100, East Lansing, Michigan 48823 (hereinafter referred to as "Owner"), and Terra Management Company, of 314 M.A.C. Avenue, Suite 100 East Lansing, Michigan 48823 (hereinafter referred to as "Manager").

For and in consideration of the mutual covenants and promises contained herein, the parties agree as follows:

1. Hiring of Manager. Owner hereby agrees to hire Manager, and Manager hereby agrees to serve, as the exclusive agent and representative of Owner, for the management, custody, legal responsibility, and operation of any properties owned by Owner (hereinafter referred to as the "Properties"). Manager agrees to maintain a valid Michigan real estate brokers license at all times during the term of this agreement.

2. Duties of Manager. Manager shall be responsible for the management custody, and operation of the Properties and shall undertake, with its best efforts, the usual and ordinary duties with respect to such management, so as to assure the continuing operation and maintenance of the Properties in compliance with all applicable laws, ordinances and regulations including, but not limited to, the following:

(a) The leasing of any rental dwellings and buildings, and supervision of tenant move-ins to and move-outs from the Properties;

(b) The development of policies with respect to publicity and rental programs for the purpose of attempting to obtain the greatest possible net revenue from the Properties;

(c) The collection of all rents, deposits, fees and/or assessments and other items due or to become due from the tenants and the giving of receipts therefor and depositing all funds collected hereunder in the Owner's account;

(d) The processing of tenants' security deposits and compliance, on the Owner's behalf, with applicable state or local laws concerning the Manager's responsibility for security deposits and interest thereon, if any;

(e) Undertaking the orderly day to day management of the Properties and their general operations, all with proper economy, including exercising superintending control of all managed properties to ensure compliance

**EXHIBIT**
**A**

with all local government ordinances and housing codes, including, but not limited to, any and all ordinances pertaining to overoccupancy and/or overcrowding and to maintain any rental licenses on the Properties;

(f) The enforcement of all warranties given in connection with the construction of the Properties, and manufactured items included therein;

(g) The investigating, hiring, directing, controlling and discharging of all personnel necessary to be employed by Manager in order to properly maintain and operate the Properties;

(h) The maintenance, at Owner's expense, of comprehensive general liability, casualty and other insurance for the Properties, with such coverage's and limits as Owner may require in accordance with the provisions of Paragraph 9 below.

(i) The facilitation and supervision of all necessary replacements, improvements, supplies and changes in and to the Properties and in the furnishings, fixtures and other equipment therein.

(j) The preparation of rent rolls, profit and loss statements, and other financial statements together with additional information as Manager deems helpful, or Owner reasonably requests;

(k) The preparation, execution and filing of forms, reports and returns required by law in connection with unemployment insurance, wage-hour laws, worker's compensation insurance, disability benefits, Social Security, and other similar taxes now in effect or hereafter imposed, and compliance with all other requirements relating to the employment of personnel. The Manager shall not, however, be required to perform duties that would constitute the practice of law;

(l) The service of notices to vacate upon tenants and prosecution in a lawful manner of legal actions to evict tenants and recover rents, employing for those purposes an attorney to represent Manager. The parties agree that while this management agreement is in effect, Manager may execute leases for the Properties identifying Manager as the landlord of the Properties, unless otherwise agreed, with the right to possession, subject to the rights of tenants, for summary proceedings, collection of rents or otherwise, and Owner assigns and transfers to Manager its right, title, and interest to assert Owner's right to possession and collect rents, deposits, fees, and charges now due or that become due during the term of this Agreement;

(m) Overseeing and supervising any reconstruction of any portion or portions of the Properties which are damaged and are to be rebuilt or any substantial alterations to the Properties;

(n) The solicitation and evaluation of and leasing to qualified ready, willing and able tenants for the Properties; and

(o) The performance of any such other acts and deeds as are reasonable, necessary and proper in the discharge of its duties under this Agreement.

3. Expenses. From the rental proceeds and additional funds, if any, contributed by Owner, Manager is authorized and required to undertake the following:

(a) To purchase, on behalf of Owner, necessary supplies and materials;

(b) To pay for casualty, liability, and other insurance premiums, electricity, gas, water, telephone service, refuse removal, window cleaning, pest extermination, and any and all other utilities, services and ordinary expenses which may reasonably be required for the Properties;

(c) To pay for all personnel hired to operate the Properties;

(d) To cause to be made and to pay for such repairs, decorations and alterations as may be required for the proper operation of the Properties;

(e) To use Owner's funds to obtain independent counsel as appropriate to commence legal actions to enforce the collection of rent or other income from the Properties, to dispossess tenants or other persons from the Properties, or to undertake other necessary legal proceedings involving the Properties. It is understood that Manager will engage its own counsel (billed accordingly to the hourly rates set forth in attached Exhibit B) to represent Manager's interests under paragraph 2(l), above, other provisions of this contract, or otherwise; and

(f) To service all loans and mortgages on the Properties, pay real estate and personal property taxes thereon, and to obtain and pay for licenses and authorizations which may be required from governmental authorities.

Manager shall not be authorized to enter into any agreement, contract, or to obligate the Owner for any expenditures, costs, or obligations of any kind in excess of Fifty Thousand Dollars ($50,000.00) or for a term of more than one year, without having obtained the prior consent of the Owner, except in the case of an emergency, if Manager in good faith determines that an expenditure in excess of this amount is necessary to protect the Properties from damages, to prevent injury to persons or property, or to maintain essential services to tenants in the Properties.

3

4. Furnishing of Personnel. Manager shall not be authorized to engage the employment of any person on behalf of Owner, under any circumstances. Manager shall furnish at its expense such personnel, who shall be deemed to be employees of Manager, as in its discretion shall be necessary to carry out its duties hereunder. Manager shall also provide, employ, and supervise other individuals or contractors to furnish specific services, including maintenance, nonroutine management, and custodial work, which shall be reimbursed by Owner as provided for herein. The above personnel shall be hired for the periods of time agreed upon by Manager.

Manager shall be solely responsible for compliance with payroll and trust taxes, workers' compensation laws, employee benefit and similar laws and Manager shall indemnify and hold harmless Owner for any and all employee claims which may be made against Owner.

5. Accounting Statement. Manager shall maintain books of account of all receipts, disbursements, and any and all activity, incurred in the management of the property, which records shall be open to inspection by Owner or its designees at all reasonable times. Manager shall also maintain proper tenant records indicating the degree of occupancy of the Properties' Buildings.

6. Management Account. Manager shall establish and maintain, in a bank to be named by Manager, a separate zero balance account or accounts for the deposit of moneys collected from the Properties. Interest shall be paid or charged on positive and negative balances respectively on all accounts within Manager's control at a uniform rate of ten (10) percent per annum. Manager shall have the authority to draw on these accounts for any payments that Manager deems reasonably necessary to discharge any liabilities or obligations incurred pursuant to this Agreement, and for the payment of the compensation of Manager. All such payments shall be subject to the limitations of this Agreement. Security deposits shall be deposited into Owner's operating account in accordance with all applicable laws and ordinances and bonded under Manager's security deposit surety bond, at Manager's expense.

7. Compensation to Manager. Manager shall receive a management fee of three percent (3%) of the base rental revenues (i.e., excludes common area maintenance, taxes, assessments, insurance, and utility payments and reimbursements by tenants) actually received from the rental of the Properties (or in the event licensed reputable third-party managers will provide similar management services for lesser consideration, for such lesser consideration) during the period this Agreement remains in full force and effect. The management fees shall be paid to Manager monthly, and shall be based upon said revenue amounts actually received during such month.

4



8. Complaints. All complaints or requests for repair received by Manager shall be recorded in a systematic fashion showing the action taken with respect to each. Complaints deemed by Manager to be extraordinary shall be reported to Owner with appropriate recommendations.

9. Insurance. (a) Liability Insurance. Owner shall pay the cost of such comprehensive general liability insurance as Owner deems reasonably necessary to protect it and Manager and Manager's employees from claims for bodily injury and death, and property damage. The insurance shall be in the amount Owner determines, following Manager's recommendation. The insurance policies shall name Manager and Manager's employees as additional insured parties and provide for Manager to receive notice prior to cancellation. (b) Property Insurance. Owner shall also pay the cost of, but Manager shall bid for and maintain, at its expense, during the term of this Agreement, property damage insurance covering the Properties and all improvements to their full insurable value, less reasonable deductibles. The insurance shall protect against loss by fire, vandalism and other perils ordinarily included in extended coverage. Manager and Manager's employees shall be named as additional insured parties under such insurance, as their interests may appear. (c) Other insurance. Manager shall be responsible for maintaining worker's compensation insurance in amounts not less than that required by law, and maintain automobile liability insurance covering all Manager's vehicles in an amount not less than three hundred thousand dollars ($300,000.00) per occurrence. (d) Reports. Manager shall promptly investigate and make a full report as to all accidents or claims for damage relating to the management, operation and maintenance of the Properties, or occurring on the grounds of the Properties, together with the estimated damage or cost of repair. Manager shall cooperate fully with Owner's insurance company in connection with any such occurrence.

10. Indemnification. (a) Owner shall indemnify and hold harmless Manager against any failure by Owner to pay any expenses required for the proper operation of the Properties, if necessary funds are not made available to Manager by Owner from revenues received from the Properties or from advancements that may be required by Manager. Only Manager can rely on the indemnification's contained herein whereas these provisions are not intended nor shall they give rise to a cause of action for third parties under any third party beneficiary or any other theory of law. (b) Manager shall indemnify and hold harmless Owner against all liabilities of any kind whatsoever in connection with the management and operation of the Properties resulting directly from the acts and omissions of Manager, its employees and agent; provided, however, that this paragraph shall not impose any obligation on Manager to indemnify Owner against the willful misconduct or negligent acts of Owner or third parties, nor for any occurrence over which it could not have exercised control.

11. Payment to Owner. Manager shall remit to Owner, upon Owner's request, the revenues from the rentals of the Properties, less all expenses, fees



and reasonable reserves required or permitted by this Agreement to be paid to or by Manager.

12. No Representations by Owner; Right to Inspect. Owner has made no representations or warranties as to the condition of all or any part of the Properties, the Properties' projected income, profits and expenses, the use to which the Properties may be put or any other matter related to the Properties or this Agreement, including occupancy limits and licensing issues control of which has been delegated to Manager. Manager agrees and acknowledges that no representations or warranties of any nature, express or implied, have been made by Owner, its agents, representatives or employees. Manager further acknowledges that Owner is relying on Manager to determine, monitor, and comply with any laws or ordinances relative to the occupancy of any building, dwelling, or property now or hereinafter owned by Owner. Manager shall exercise due care but shall not be responsible for acts of governmental entities that are beyond its control.

13. Term. This Agreement shall have a term of one (1) year commencing on the date hereof, and thereafter renewed annually, unless either party provides written notice of its intention not to renew not less than sixty (60) days prior to the expiration of the term then in force; provided, however, that this Agreement or any renewal thereof may be terminated at any time by either party with cause, after giving thirty (30) days' prior written notice, cause including, but not limited to fraud, misrepresentation, conversion, permanent loss of required Michigan real estate brokers license, the nonperformance of obligations hereunder, the sale of any number of the Properties upon the option of the buyer to terminate this Agreement, or the occurrence of any major casualty loss which shall be determined by the Owner.

14. Binding. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns. Manager shall not be entitled to assign its rights or obligations under this Agreement.

15. Notices. Whenever provision is made in this Agreement for the giving of notices, such notice shall be deemed to have been duly given and delivered if mailed by United States first class mail addressed to the last known address available to the party giving notice.

16. Captions. Captions contained in this Agreement are for purposes of identification only and shall not be considered in construing this Agreement.

17. Equal Opportunity. In carrying out its duties hereunder, Manager shall act in a nondiscriminatory fashion and in compliance with all equal employment opportunity and fair housing laws. The Properties' buildings shall be leased and

operated without regard to age, race, sex, color, national origin, religion, disability, marital status or creed.

18. Discounts. All discounts, refunds, rebates and allowances received by Manager shall be passed directly on to and inure to the benefit of Owner.

19. Communication. All communications to be made hereunder shall be made directly to Owner, and only Owner shall have the authority to give instructions to Manager.

20. Bankruptcy. If a petition is filed by or against Manager in a bankruptcy or similar court, or if Manager becomes insolvent, and such action fails to be discharged within sixty (60) days, Owner shall have the right to terminate this contract immediately.

21. Interpretation and Venue. This Agreement shall be interpreted in accordance with the laws of the State of Michigan. Any and all actions shall be conducted in any court or district of competent jurisdiction located in or including Ingham County, Michigan.

22. Nontermination of Agreement. If any of the provisions of this Agreement are determined to be illegal, unconstitutional, unenforceable, null or void, such determination shall not terminate this Agreement if, after deletion of such clause or clauses, the essence of this Agreement may be preserved.

23. Licensing. Manager represents and covenants to Owner that it now holds, and shall at all times during the term of this Agreement hold, a valid Michigan real estate broker's license.

24. Conflict of Interest. If Manager, or an affiliate or subsidiary of Manager, or any officer, director or shareholder of Manager, or a person or party having an interest in Manager, shall now have or shall hereafter construct or have an interest in a property near or adjoining the Properties (hereinafter referred to as a "Competing Project"), Manager will not favor the Competing Project in the procurement of tenants, or in the operation or maintenance thereof, to the detriment of the Properties. This paragraph shall be in addition to and not in limitation of obligations and duties imposed upon Manager by applicable law. Nothing herein shall be construed, interpreted or applied, however, so as to prohibit Manager or its affiliates, subsidiaries, officers, directors or shareholders or any person or party having an interest in Manager from owning, managing or otherwise dealing with or participating in any such Competing Project or so as to require Manager to favor the Properties over the Competing Project.

25. Confidentiality. The parties agree that the terms of this Agreement are confidential and shall only be disclosed as reasonably necessary to effectuate this Agreement or as required by law.



**MANAGER**

**TERRA MANAGEMENT COMPANY**

By:_____
      Evert Kramer, Jr.
      Its Vice President

**OWNER**

**WOODLAND LAKES INVESTMENT GROUP, L.L.C.**

By: Terra Management Company
     Its Manager

By:_____
      Scott A. Chappelle
      Its President

# LOAN AGREEMENT

### by and between

## WOODLAND LAKES INVESTMENT GROUP, L.L.C.

*as the Borrower,*

### and

## HARTFORD MEZZANINE INVESTORS I, LLC,

*as the Lender,*

### dated as of

### January 4, 2006

### $3,340,000 Loan



EXHIBIT
B

Jones Day Cleveland
601755-HMI001
CLI-1362430v3

Woodland Lakes Apartments
Mezzanine Loa

# TABLE OF CONTENTS

Page

SECTION 1    DEFINITIONS AND TERMS ........................................................................... 1

    1.1    Certain Defined Terms ........................................................................... 1

    1.2    Computation of Time Periods ............................................................. 12

SECTION 2    AMOUNT AND TERMS OF THE LOAN ............................................. 12

    2.1    Commitment for Loan .......................................................................... 12

    2.2    Note; Loan Accounts ........................................................................... 12

    2.3    Interest Rates and Payment ................................................................. 13

    2.4    Illegality, Increased Costs, etc ............................................................ 14

    2.5    Term of the Loan ................................................................................. 14

SECTION 3    PAYMENTS AND PREPAYMENTS ...................................................... 14

    3.1    Voluntary Prepayments ....................................................................... 14

    3.2    Mandatory Prepayments ...................................................................... 14

    3.3    No Reborrowing ................................................................................... 15

    3.4    Application of Prepayments ................................................................. 15

    3.5    Method and Place of Payment ............................................................ 15

SECTION 4    FEES ....................................................................................................... 16

    4.1    Underwriting Fee ................................................................................. 16

SECTION 5    CONDITIONS PRECEDENT .................................................................. 16

    5.1    Conditions Precedent to Closing ........................................................ 16

SECTION 6    REPRESENTATIONS AND WARRANTIES ......................................... 18

    6.1    Organizational Status, etc ................................................................... 18

    6.2    Organizational Power and Authority, etc ........................................... 18

    6.3    No Violation ......................................................................................... 19

    6.4    Governmental Approvals ..................................................................... 19

    6.5    Litigation .............................................................................................. 19

    6.6    Use of Proceeds; Margin Regulations ................................................ 19

    6.7    Indebtedness ........................................................................................ 20

    6.8    Consideration and Solvency ............................................................... 20

    6.9    No Material Adverse Change ............................................................... 20

    6.10    Tax Returns and Payments .................................................................. 20

    6.11    Title to Properties, etc ......................................................................... 20

# TABLE OF CONTENTS
(continued)

<div align="right">Page</div>

| | | |
|---|---|---|
| 6.12 | Lawful Operations, etc | 21 |
| 6.13 | Compliance with ERISA | 21 |
| 6.14 | Intellectual Property, etc | 21 |
| 6.15 | Investment Company Act, etc | 21 |
| 6.16 | Office of Foreign Asset Control and the USA Patriot Act | 22 |
| 6.17 | True and Complete Disclosure | 22 |
| 6.18 | No Brokers | 22 |
| 6.19 | Senior Loan Documents | 22 |
| 6.20 | Insurance | 22 |
| 6.21 | Reimbursement Agreement | 23 |
| SECTION 7 | AFFIRMATIVE COVENANTS | 23 |
| 7.1 | Reporting Requirements | 23 |
| 7.2 | Books, Records and Inspections | 26 |
| 7.3 | Insurance | 26 |
| 7.4 | Lockbox Arrangements | 26 |
| 7.5 | Payment of Taxes and Claims | 27 |
| 7.6 | Organizational and Other Franchises | 27 |
| 7.7 | Good Repair | 27 |
| 7.8 | Compliance with Statutes, etc | 27 |
| 7.9 | Fiscal Years, Fiscal Quarters | 27 |
| 7.10 | Intentionally omitted | 27 |
| 7.11 | Management of the Project | 28 |
| 7.12 | Publicity | 28 |
| 7.13 | Reimbursement Agreement | 28 |
| 7.14 | Additional Funding Loan Agreement | 28 |
| 7.15 | UCC Financing Statements/Insurance | 28 |
| 7.16 | Further Assurances | 28 |
| SECTION 8 | NEGATIVE COVENANTS | 29 |
| 8.1 | Changes in Business | 29 |
| 8.2 | Consolidation, Merger or Sale of Assets | 29 |
| 8.3 | Liens | 29 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---:|
| 8.4 | Distributions to Equity Holders | 29 |
| 8.5 | Transactions with Affiliates | 29 |
| 8.6 | Plan Terminations, Minimum Funding, etc | 29 |
| 8.7 | Amendment of Organizational Documents | 30 |
| 8.8 | Intentionally omitted | 30 |
| 8.9 | Amendment of Senior Loan Documents | 30 |
| 8.10 | Amendment of Reimbursement Agreement | 30 |
| 8.11 | Indebtedness | 30 |
| SECTION 9 | EVENTS OF DEFAULT | 30 |
| 9.1 | Events of Default | 30 |
| 9.2 | Acceleration, etc | 33 |
| 9.3 | Application of Liquidation Proceeds | 33 |
| SECTION 10 | MISCELLANEOUS | 34 |
| 10.1 | Payment of Expenses, etc | 34 |
| 10.2 | Right of Setoff | 35 |
| 10.3 | Notices | 35 |
| 10.4 | Successors and Assigns | 37 |
| 10.5 | No Waiver; Remedies Cumulative | 38 |
| 10.6 | Financial Calculations | 38 |
| 10.7 | Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial | 38 |
| 10.8 | Counterparts | 39 |
| 10.9 | Headings Descriptive | 39 |
| 10.10 | Amendment or Waiver | 39 |
| 10.11 | Survival of Indemnities | 39 |
| 10.12 | Domicile of the Loan | 40 |
| 10.13 | General Limitation of Liability | 40 |
| 10.14 | No Duty | 40 |
| 10.15 | Lender Not Fiduciary to the Loan Parties | 40 |
| 10.16 | Survival of Representations and Warranties | 40 |
| 10.17 | Interest Rate Limitation | 40 |
| 10.18 | Sharing of Information | 41 |

ANNEX I     -    INFORMATION AS TO THE LENDER

EXHIBIT A  -    FORM OF NOTE

## LOAN AGREEMENT

**THIS LOAN AGREEMENT**, dated as of January 4, 2006, among the following:

(i)     **WOODLAND LAKES INVESTMENT GROUP, L.L.C.**, a Michigan limited liability company (herein, together with its successors and assigns, the *"Borrower"*); and

(ii)     **HARTFORD MEZZANINE INVESTORS I, LLC**, a Delaware limited liability company (herein, together with its successors and assigns, the *"Lender"*):

**PRELIMINARY STATEMENTS:**

(1)     Unless otherwise defined herein, all capitalized terms used herein and defined in section 1 are used herein as so defined.

(2)     The Borrower is the owner of approximately 60.33 acres of real property at 4200 Dell Road in the Township of Delhi, County of Ingham, State of Michigan (the *"Land"*) and a 344-unit Class A apartment community consisting of 21 two-story apartment buildings plus a 3,200 square foot clubhouse with locker rooms, exercise facility and in-ground swimming pool, situated on such Land, all known as the Woodland Lakes Apartments (the *"Project"*).

(3)     The Borrower has applied to the Lender for mezzanine financing in the amount of $3,340,000 in order to provide funds for lawful business purposes, namely, to refinance existing mezzanine financing of the Borrower secured by pledges of all of the equity interests in the Borrower.

(4)     Subject to and upon the terms and conditions set forth herein, the Lender is willing to make available to the Borrower the loan provided for herein.

**NOW, THEREFORE,** it is agreed:

## SECTION 1
## DEFINITIONS AND TERMS.

**1.1     Certain Defined Terms.** As used herein, the following terms shall have the meanings herein specified unless the context otherwise requires.   Defined terms in this Agreement shall include in the singular number the plural and in the plural the singular:

*"Additional Funding"* shall have the meaning ascribed to such term in the Additional Funding Loan Agreement.

*"Additional Funding Loan Agreement"* shall mean the Additional Funding Loan Agreement dated as of August 1, 2005 pursuant to which the Senior Lender shall disburse an Additional Funding in the original principal amount of $1,500,000.

"*Adjusted Debt Service*" shall mean the aggregate of debt service payments for a twelve (12) month period on a deemed principal amount equal to the sum of the then outstanding principal balance of the Senior Loan plus the then outstanding principal balance of the Loan, *assuming* (i) a per annum interest rate equal to the greater of (a) seven percent (7.00%) per annum, and (b) the yield on ten-year United States Treasury notes as of the close of business on the day preceding the date of calculation, as announced on Bloomberg.com or another reliable source selected by the Lender plus 150 basis points, and (ii) monthly payments of principal and interest based on an amortization period of thirty (30) years.

"*Adjusted DSCR*" shall mean, for the Project, with respect to the twelve month period preceding the date of measurement, the ratio of (a) Deemed Cash Flow, to (b) the Adjusted Debt Service.

"*Affiliate*" shall mean, with respect to any person, any other person directly or indirectly controlling, controlled by, or under direct or indirect common control with such person. A person shall be deemed to control a second person if such first person possesses, directly or indirectly, the power (i) to vote 10% or more of the securities having ordinary voting power in the election of directors or managers of such second person or (ii) to direct or cause the direction of the management and policies of such second person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, (x) a director, officer or employee of a person shall not, solely by reason of such status, be considered an Affiliate of such person and (y) the Lender shall not in any event be considered an Affiliate of any Loan Party.

"*Agreement*" shall mean this Loan Agreement, as the same may be from time to time modified, amended and/or supplemented.

"*Approved Management Fee*" shall mean monthly fees in an amount not to exceed 3% of Gross Revenues for such month.

"*Authorized Officer*" shall mean any officer or employee of any Loan Party designated by it in writing to the Lender as being authorized to execute and deliver any Loan Documents or take any actions in connection with the Loan Documents on behalf of such Loan Party.

"*Bankruptcy Code*" shall have the meaning provided in section 9.1(i)(i).

"*Base Interest*" shall have the meaning provided in section 2.3(a).

"*Borrower*" shall have the meaning provided in the first paragraph of this Agreement.

"*Business Day*" shall mean any day excluding Saturdays, Sundays and any day that is, in the city in which the Lending Office is located, a legal holiday or a day on which banking institutions are authorized by Law or other governmental actions to close.

"*Capital Event*" shall mean (i) title to a substantial portion of the Project is transferred pursuant to any condemnation or eminent domain proceeding or (ii) the Senior Lender and/or the Lender and/or Borrower collect insurance proceeds resulting from a casualty pursuant to which the Project was substantially destroyed.

"*Capital Lease*" as applied to any person shall mean any lease of any property (whether real, personal or mixed) by that person as lessee that, in conformity with sound accounting principles consistently applied, is accounted for as a capital lease on the balance sheet of that person.

"*Capitalized Lease Obligations*" shall mean all obligations under Capital Leases of the Borrower in each case taken at the amount thereof accounted for as liabilities in accordance with sound accounting principles consistently applied.

"*CERCLA*" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same may be amended from time to time, 42 U.S.C. § 9601 *et seq*.

"*Charges*" shall have the meaning provided in section 10.17.

"*Code*" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"*Cost Reimbursement for Eligible Activities*" shall be used as provided in Section 8(a) of the Reimbursement Agreement.

"*Deemed Cash Flow*" shall mean for any period, the Gross Revenues less Operating Expenses.

"*Default*" shall mean any event, act or condition that, with notice or lapse of time or both, would constitute an Event of Default.

"*Dollars*," "*U.S. dollars*," "*U.S. Dollars*" and the sign "*$*" each shall mean lawful money of the United States.

"*DTBRA*" shall mean the Delhi Township Brownfield Redevelopment Authority.

"*Environmental Claims*" shall mean any and all administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of non-compliance or violation, investigations or proceedings arising under any Environmental Law or any permit issued under any such law (hereafter "*Claims*"), including, without limitation, (a) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (b) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the storage, treatment or Release (as defined in CERCLA) of any Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

"*Environmental Indemnity*" shall mean the Environmental and Hazardous Substances Indemnity Agreement, dated as of the date hereof, by the Borrower and the Guarantors in favor of the Lender, as modified, amended or supplemented from time to time in accordance with the terms thereof and hereof.

"*Environmental Law*" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy and rule of common law now or hereafter in effect and in each case as amended, and any binding and enforceable judicial or administrative interpretation thereof, including, without limitation, any judicial or administrative order, consent, decree or judgment issued to or rendered against any Loan Party relating to the environment, employee health and safety or Hazardous Materials, including, without limitation, the CERCLA; the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601(20)(D); the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*; the Federal Water Pollution Control Act, as amended by the Clean Water Act, 33 U.S.C. § 1251 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the Hazardous Materials Transportation Act, 49 U.S.C. § 7401 *et seq.*; the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.*, as any such acts and laws may be amended, modified or supplemented from time to time.

"*Environmental Proceedings*" shall mean environmental proceedings, whether civil (including actions by private parties), criminal, or administrative proceedings, relating to the Project.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect on the date hereof, and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"*ERISA Affiliate*" shall mean each person (as defined in section 3(9) of ERISA) that together with the Borrower would be deemed to be a "single employer" within the meaning of section 414(b),(c), (m) or (o) of the Code.

"*Event of Default*" shall have the meaning provided in section 9.1.

"*Fees*" shall mean, collectively, the Underwriting Fee and all other fees payable to the Lender by any Loan Party in connection with this Agreement or any of the other Loan Documents.

"*GAAP*" shall mean generally accepted accounting principles in the United States of America as in effect from time to time.

"*Governmental Authority*" shall mean any government or political subdivision, whether federal, state, local or foreign, or any agency or instrumentality of any such government or political subdivision, or any federal, state, local or foreign court or arbitrator.

"*Gross Revenues*" shall mean, for the twelve calendar month period immediately preceding the date of measurement, all revenues of the Borrower, determined in accordance with sound cash basis accounting practices, consistently applied, derived from the ownership, operation, use, leasing and occupancy of the Project during such period, limited however to such revenues from not more than 95% occupancy of the Project; *provided* that in no event shall Gross Revenues include any (i) loan proceeds, (ii) proceeds or payments under insurance policies (except proceeds of business interruption insurance); (iii) condemnation proceeds; (iv) security deposits received from tenants in the Project, unless and until the same are applied to rent or

other obligations in accordance with the tenant's lease; (v) capital contributions made to Borrower, and (vi) any reimbursements from any replacement reserve accounts.

"*Guarantors*" shall mean each of the Principals, individually or collectively, as the context shall imply.

"*Guaranty*" shall mean the Guaranty, dated as of the date hereof, by the Guarantors in favor of the Lender, as modified, amended or supplemented from time to time in accordance with the terms thereof and hereof.

"*Guaranty Obligations*" shall mean as to any person (without duplication) any obligation of such person guaranteeing any Indebtedness ("*primary Indebtedness*") of any other person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of such person, whether or not contingent, (a) to purchase any such primary Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary Indebtedness of the ability of the primary obligor to make payment of such primary Indebtedness, or (d) otherwise to assure or hold harmless the owner of such primary Indebtedness against loss in respect thereof, *provided* that the term Guaranty Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guaranty Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary Indebtedness in respect of which such Guaranty Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"*Hazardous Materials*" shall mean (i) any petrochemical or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, toxic mold, and radon gas and (ii) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous materials," "extremely hazardous wastes," "restrictive hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants" or words of similar meaning and regulatory effect under any applicable Environmental Law.

"*Hedge Agreement*" shall mean (i) any interest rate swap agreement, any interest rate cap agreement, any interest rate collar agreement or other similar agreement or arrangement designed to protect against fluctuations in interest rates or (ii) any currency swap agreement, forward currency purchase agreement or similar agreement or arrangement designed to protect against fluctuations in currency exchange rates.

"*Indebtedness*" of any person shall mean, without duplication:

      (i)     all indebtedness of such person for borrowed money;

(ii)     all bonds, notes, debentures and similar debt securities of such person;

(iii)     the deferred purchase price of capital assets or services that in accordance with sound accounting principles consistently applied would be shown on the liability side of the balance sheet of such person;

(iv)     the face amount of all letters of credit issued for the account of such person and, without duplication, all drafts drawn thereunder;

(v)     all obligations, contingent or otherwise, of such person in respect of bankers' acceptances;

(vi)     all Indebtedness of a second person secured by any Lien on any property owned by such first person, whether or not such indebtedness has been assumed;

(vii)     all Capitalized Lease Obligations of such person and all Indebtedness of such Person secured by Purchase Money Security Interests;

(viii)     the present value, determined on the basis of the implicit interest rate, of all basic rental obligations under all "synthetic" leases (*i.e.*, leases accounted for by the lessee as operating leases under which the lessee is the "owner" of the leased property for Federal income tax purposes);

(ix)     all obligations of such person to pay a specified purchase price for goods or services whether or not delivered or accepted, *i.e.*, take-or-pay and similar obligations;

(x)     all net obligations of such person under Hedge Agreements;

(xi)     the full outstanding balance of trade receivables, notes or other instruments sold with full recourse (and the portion thereof subject to potential recourse, if sold with limited recourse), other than in any such case any thereof sold solely for purposes of collection of delinquent accounts;

(xii)     the stated value, or liquidation value if higher, of all Redeemable Stock of such person; and

(xiii)     all Guaranty Obligations of such person;

*provided* that (x) neither trade payables nor other similar accrued expenses, in each case arising in the ordinary course of business, nor obligations in respect of insurance policies or performance or surety bonds that themselves are not guarantees of Indebtedness (nor drafts, acceptances or similar instruments evidencing the same nor obligations in respect of letters of credit supporting the payment of the same), shall constitute Indebtedness and (y) the Indebtedness of any person shall in any event include (without duplication) the Indebtedness of any other entity (including any general partnership in which such person is a general partner) to the extent such person is liable thereon as a result of such person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide expressly that such person is not liable thereon.

"*Indemnitees*" shall have the meaning provided in section 10.1(d).

"*Initial Maturity Date*" shall mean September 1, 2015.

"*Intercreditor Agreement*" shall mean an intercreditor agreement, in form and substance satisfactory to the Lender, between the Lender and the Senior Lender and entered into as of the date hereof, as the same may be amended, modified or supplemented from time to time in accordance with the terms hereof and thereof.

"*Land*" shall have the meaning provided in the preliminary statements to this Agreement.

"*Laws*" shall mean collectively, all federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations, including, without limitation, judicial opinions or precedential authority in the applicable jurisdiction.

"*Leaseholds*" of any person shall mean all the right, title and interest of such person as lessee or licensee in, to and under leases or licenses of land, improvements, fixtures or personalty.

"*Lender*" shall have the meaning provided in the first paragraph of this Agreement.

"*Lending Office*" shall mean, with respect to the Lender, the office of the Lender specified as its Lending Office in **Annex I** or such other office of the Lender as the Lender may from time to time specify to the Borrower.

"*Lien*" shall mean any mortgage, pledge, security interest, encumbrance, lien or charge of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement or any lease in the nature thereof).

"*Loan*" shall have the meaning provided in section 2.1.

"*Loan Documents*" shall mean this Agreement, the Note, the Pledge Agreement, the Guaranty, and the Environmental Indemnity, and all other documents and agreements entered into among the Borrower and/or the Guarantors and/or the Members and the Lender in connection with the Loan, as the same may be modified, amended or supplemented from time to time in accordance with the terms hereof and thereof.

"*Loan Opening Date*" shall mean the date of Lender's initial disbursement hereunder.

"*Loan Party*" shall mean (i) the Borrower, (ii) the Guarantors, (iii) the Pledgors, and (iv) each other person (other than the Lender) that is or becomes a party to any Loan Document.

"*Manager*" shall mean WLA Management, Inc., a Michigan corporation.

"*Margin Stock*" shall have the meaning provided in Regulation U.

"*Material Adverse Effect*" shall mean (i) when used with reference to any Loan Party, a material adverse effect on the business, operations, prospects, property, assets, liabilities or

financial condition of, such person and its Subsidiaries, taken as a whole, or a material adverse effect on the ability of any Loan Party to perform its obligations under the Loan Documents or (ii) when used with reference to any other person, a material adverse effect on the business, operations, prospects, property, assets, liabilities or financial condition of such person and its Subsidiaries, taken as a whole, as the case may be.

"*Maturity Date*" shall mean the earliest of (i) the Initial Maturity Date; (ii) the maturity date of the Borrower's obligations under the Senior Loan Agreement; and (iii) the date on which the indebtedness of the Borrower hereunder becomes due and payable, whether by acceleration or otherwise.

"*Members*" shall mean (i) Harrison Investment Group, L.L.C., a Michigan limited liability company, (ii) Covenant Investment Group, Inc., a Michigan corporation, (iii) KTM Development Corporation, a Michigan corporation, (iv) TMC Investment Group, L.L.C., a Michigan limited liability company, (v) Shawn O'Brien, an individual, (vi) Frank Vargas, Jr., an individual, (vii) Alliance Investment Group, L.L.C., a Michigan limited liability company, (viii) Charles W. Crouch, an individual, (ix) Brent Chappelle, an individual, (x) Masonic Investment Group, L.L.C., a Michigan limited liability company, (xi) Abbott Road Commons, L.L.C., a Michigan limited liability company, (xii) Chasco Investment Properties, L.L.C., a Michigan limited liability company, (xiii) Evergreen Investment Group, L.L.C., a Michigan limited liability company, (xiv) Grand Ledge Investment Group, L.L.C., a Michigan limited liability company, (xv) SLHA Investment Group, L.L.C., a Michigan limited liability company, (xvi) Score Properties, Inc., a Michigan corporation, (xvii) Petoskey Investment Group, L.L.C., a Michigan limited liability company, (xviii) Terra Management Company, a Michigan corporation, and (ixx) WLA Management Company, Inc., a Michigan corporation, individually or collectively, as the context shall imply.

"*Monthly Excess Available Cash*" shall mean, for any calendar month, the amount by which Gross Revenues exceed the sum of, without duplication, (i) Operating Expenses; and (ii) scheduled principal and interest payments to the Senior Lender required by the Senior Loan Documents and (iii) scheduled payments of Base Interest hereunder.

"*Multiemployer Plan*" shall mean a multiemployer plan, as defined in section 4001(a)(3) of ERISA to which the Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions or has within any of the preceding three plan years made or accrued an obligation to make contributions.

"*Multiple Employer Plan*" shall mean an employee benefit plan, other than a Multiemployer Plan, to which the Borrower or any ERISA Affiliate, and one or more employers other than the Borrower or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Borrower or an ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

"*Note*" shall have the meaning provided in section 2.2(a).

"*Obligations*" shall mean all amounts, direct or indirect, contingent or absolute, of every type or description, and at any time existing, owing by the Borrower or any other Loan Party to the Lender pursuant to the terms of this Agreement or any other Loan Document.

"*OFAC*" shall have the meaning provided in section 6.16.

"*Operating Expenses*" shall mean, for the twelve calendar month period immediately preceding the date of measurement, the actual costs and expenses of owning, operating, managing and maintaining the Project during such period incurred by Borrower, determined in accordance with sound cash basis accounting practices, consistently applied (except for real and personal property taxes and insurance premiums, which shall be determined on an accrual basis, consistently applied), including, without limitation, a $200 per unit replacement reserve and, provided that no Event of Default has occurred, the Approved Management Fee. Operating Expenses shall not include (i) scheduled interest payments to the Senior Lender required by the Senior Loan Documents; (ii) scheduled interest payments or Fees to the Lender for this Loan; (iii) expenditures funded from the permitted replacement reserve described above; (vi) leasing commissions, and (v) all other capital expenditures except those approved in writing by the Lender.

"*Organizational Documents*" shall mean, with respect to any person (other than an individual), such person's articles of incorporation, articles of organization, certificate of limited partnership or other equivalent formation documents, and regulations, bylaws, operating agreement, limited partnership agreement or equivalent governing documents, and any amendments to any of the foregoing permitted hereunder.

"*PBGC*" shall mean the Pension Benefit Guaranty Corporation established pursuant to section 4002 of ERISA, or any successor thereto.

"*person*" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"*Plan*" shall mean any multiemployer or single-employer plan as defined in section 4001 of ERISA that is maintained or contributed to by (or to which there is an obligation to contribute by) the Borrower or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which the Borrower or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to such plan.

"*Pledge Agreement*" shall mean the Pledge Agreement (Pledge of Membership Interests by Members), dated as of the date hereof, made by all of the Members as Pledgors to the Lender pledging all of the membership interests in the Borrower, as it may be modified, amended or supplemented from time to time in accordance with the terms thereof and hereof.

"*Pledgor*" shall mean each Member pledging an interest to the Lender under the Pledge Agreement.

"*Prepayment Premium*" shall mean an amount equal to two percent (2%) of the principal balance of the Loan prepaid *plus* Yield Maintenance, if any.

*"Principal Party"* shall have the meaning provided in section 9.1(i)(i).

*"Principals"* shall mean (i) Scott A. Chappelle, an individual, (ii) Laura A. Chappelle, an individual, (iii) Kevin T. McGraw, an individual, (iv) Sharon D. McGraw, an individual, (v) Evert Kramer, Jr., an individual, and (vi) Rosalind Kramer, an individual, individually or collectively, as the context shall imply.

*"Prohibited Transaction"* shall mean a transaction with respect to a Plan that is prohibited under section 4975 of the Code or section 406 of ERISA and not exempt under section 4975 of the Code or section 408 of ERISA.

*"Project"* shall have the meaning provided in the preliminary statements to this Agreement.

*"Property Management Agreement"* shall have the meaning provided in section 5.1(r).

*"Property Manager"* shall mean Terra Management Company, a Michigan corporation, unless replaced as permitted by section 7.11.

*"Purchase Money Security Interest"* shall mean any mortgage, security interest or other lien that is created or assumed in purchasing, constructing or improving any real or personal property in the ordinary course of business.

*"Real Property"* of any person shall mean all of the right, title and interest of such person in and to land, improvements and fixtures, including Leaseholds.

*"Redeemable Stock"* shall mean with respect to any person any capital stock or similar equity interests of such person that (i) is by its terms subject to mandatory redemption, in whole or in part, pursuant to a sinking fund, scheduled redemption or similar provisions, at any time prior to the Maturity Date or (ii) otherwise is required to be repurchased or retired on a scheduled date or dates, upon the occurrence of any event or circumstance, at the option of the holder or holders thereof, or otherwise, at any time prior to the Maturity Date, other than any such repurchase or retirement occasioned by a "change of control" or similar event.

*"Reimbursement Agreement"* shall mean the Brownfield Reimbursement Agreement, dated March 26, 2002, executed by and between the Borrower and the DTBRA, as amended by First Amendment to Brownfield Reimbursement Agreement, dated June 13, 2003 by and among Borrower, DTBRA and the Senior Lender, as further amended by Second Amendment to Brownfield Reimbursement Agreement, dated on or about August 1, 2005 by and among Borrower, DTBRA and the Lender, and consented to by the Senior Lender.

*"Regulation U"* shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

*"Rent Roll"* shall have the meaning provided in section 7.1(d).

"*Reportable Event*" shall mean an event described in section 4043 of ERISA or the regulations thereunder with respect to a Plan, other than those events as to which the notice requirement is waived under subsections .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, .35, .62, .63, .64, .65 or .67 of PBGC Regulation section 4043.

"*Senior Lender*" shall mean John Hancock Life Insurance Company, and its successors and assigns.

"*Senior Loan*" shall mean the loan in the maximum principal amount of $24,000,000 made by the Senior Lender to the Borrower pursuant to and evidenced by the Senior Loan Documents.

"*Senior Loan Documents*" shall mean (i) the promissory note issued by the Borrower in favor of the Senior Lender in the original principal amount not in excess of $24,000,000; (ii) the Senior Mortgage; and (iii) all other documents and agreements entered into between the Borrower and/or the Principals and the Senior Lender in connection with the Senior Loan, as the same may be modified, amended or supplemented from time to time in accordance with the terms hereof and thereof.

"*Senior Mortgage*" shall mean the Mortgage dated as of August 1, 2005 made by the Borrower in favor of the Senior Lender, as the same may be further modified, amended or supplemented from time to time in accordance with the terms hereof and thereof. encumbering the Project securing the Borrower's obligations to the Senior Lender under the Senior Loan Documents.

"*Standard Lease*" shall mean the Borrower's standard form of apartment lease as approved by the Lender hereunder.

"*Subsidiary*" of any person shall mean and include (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such person directly or indirectly through Subsidiaries and (ii) any partnership, limited liability company, association, joint venture or other entity in which such person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time.

"*Transfer Date*" shall mean the date on which the Project or any interest therein is transferred or otherwise conveyed from the Borrower to any other person or, in the case of a Capital Event, on the date on which such Capital Event occurs.

"*UCC*" shall mean the Uniform Commercial Code.

"*Underwriting Fee*" shall have the meaning provided in section 4.

"*Unfunded Current Liability*" of any Plan shall mean the amount, if any, by which the actuarial present value of the accumulated plan benefits under the Plan as of the close of its most recent plan year exceeds the fair market value of the assets allocable thereto, each determined in

accordance with Statement of Financial Accounting Standards No. 87, based upon the actuarial assumptions used by the Plan's actuary in the most recent annual valuation of the Plan.

"*United States*" and "*U.S.*" each shall mean the United States of America.

"*written*" or "*in writing*" shall mean any form of written communication or a communication by means of telex, facsimile transmission, telegraph or cable.

"*Yield Maintenance*" shall mean an amount equal to the amount of interest, calculated at a per annum rate equal to 12% compounded on the first day of every month, that would have been due and payable had the full principal balance of the Loan been outstanding until the third anniversary of the Loan Opening Date *less* the actual amount of Base Interest paid by the Borrower to the Lender prior to such date of prepayment (but without giving effect to any interest that may have been paid at the default rate pursuant to section 2.3(c)).

**1.2    Computation of Time Periods.**  In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding."

## SECTION 2
## AMOUNT AND TERMS OF THE LOAN.

**2.1    Commitment for Loan.**  Subject to and upon the terms and conditions herein set forth, the Lender agrees to make a loan in the original principal amount of Three Million Three Hundred Forty Thousand Dollars ($3,340,000.00) (the "*Loan*") to the Borrower on the date of this Agreement, which shall be repaid in full on or before the Maturity Date.  The full disbursement of the Loan proceeds shall be made on the Loan Opening Date, upon the satisfaction of the terms and conditions contained herein, including, without limitation, section 5.1.

**2.2    Note; Loan Accounts.**

**(a)    Form of Note.**  The Borrower's obligation to pay the principal of, and interest on, the Loan shall be evidenced by a promissory note of the Borrower substantially in the form of **Exhibit A** (the "*Note*," such term to include all notes and other securities issued in exchange therefor or replacement thereof).

**(b)    Form of Note.**  The Note issued by the Borrower to the Lender shall be: (i) executed by the Borrower; (ii) payable to the order of the Lender and dated on the date of this Agreement; (iii) payable in the original principal amount of the Loan; (iv) due and payable on the Maturity Date; (v) bear interest as provided in section 2.3; and (vi) entitled to the benefits of this Agreement and the other Loan Documents.

**(c)    Loan Accounts of Lender.**  The Lender shall maintain accounts in which it shall record (i) the amount of the Loan made hereunder and (ii) the amount of any sum received by the Lender hereunder.  Upon reasonable prior written notice from the Borrower to the Lender, the Borrower shall have the right to review such accounts during normal business hours at the usual location where the Lender maintains such records.

(d) **Effect of Loan Accounts.** The entries made in the accounts maintained pursuant to section 2.2(c) shall be *prima facie* evidence of the existence and amounts of the obligations recorded therein; *provided* that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay or prepay the Loan in accordance with the terms of this Agreement.

**2.3      Interest Rates and Payment.**

(a) **Base Interest.** The unpaid principal amount of the Loan shall bear interest from the Loan Opening Date until indefeasibly paid in full at a per annum rate equal to 12%, which interest shall be compounded on the first day of each calendar month if not paid within the ten day grace period permitted by section 9.1(a)(iii) (the *"Base Interest"*).

(b) **Intentionally omitted.**

(c) **Default Interest.** Notwithstanding anything to the contrary in section 2.3(a), if a Default or an Event of Default is in existence, all outstanding amounts of principal and, to the extent permitted by Law, all overdue interest in respect of the Loan shall bear interest, payable on demand, at a rate of 20% per annum, compounded monthly on the first day of each calendar month. If any amount (other than the principal of and interest on the Loan) payable by the Borrower under the Loan Documents is not paid when due, such amount shall bear interest, payable on demand, at a rate of 20% per annum compounded monthly on the first day of each calendar month.

(d) **Accrual and Payment of Interest.**

(i)      Prior to maturity, whether by acceleration or otherwise, Base Interest on the Loan shall be due and payable in arrears for the prior calendar month on the first day of each month, beginning with the first day of February 2006.

(ii)      Intentionally omitted.

(iii)      After the Maturity Date, all Base Interest and all other interest on the Loan shall be due and payable on demand.

(e) **Late Charge.** If the Borrower shall fail to pay any portion of the Obligations within ten (10) days of its due date (provided that such Obligation is not otherwise accrued as permitted hereunder), the Borrower shall also pay the Lender a late charge calculated at the rate of 5% of such portion of the Obligations for the purpose of defraying the expenses incident to handling such delinquent payment; *provided* that in no event shall the Borrower be required to pay a late fee greater than the maximum amount permitted under applicable Law. Such late charge shall be in addition to, and not in lieu of, any other remedy the Lender may have and is in addition to any reasonable fees and charges of any agents or attorneys that the Lender is entitled to employ upon any Default or Event of Default by the Borrower hereunder or under any other Loan Document, whether authorized herein or by Law.

(f)     **Computations of Interest and Fees.** All computations of interest on the Loan hereunder and of other fees hereunder shall be made on the actual number of days elapsed over a year of 360 days.

2.4     **Illegality, Increased Costs, etc.** If the Lender shall have determined that, after the date hereof, the adoption of any applicable Law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged by Law with the interpretation or administration thereof, or compliance by the Lender or its parent corporation with any request or directive regarding capital adequacy (whether or not having the force of Law) of any such authority, central bank or comparable agency, in each case made subsequent to the date hereof, has or would have the effect of reducing by an amount reasonably deemed by the Lender to be material the rate of return on the Lender's or its parent corporation's capital or assets as a consequence of the Lender's commitments or obligations hereunder to a level below that which the Lender or its parent corporation could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration the Lender's or its parent corporation's policies with respect to capital adequacy), *then* from time to time, within 15 days after demand by the Lender, the Borrower shall pay to the Lender such additional amount or amounts as will compensate the Lender or its parent corporation for such reduction. The Lender, upon determining in good faith that any additional amounts will be payable pursuant to this section 2.4, will give prompt written notice thereof to the Borrower, which notice shall set forth, in reasonable detail, the basis of the calculation of such additional amounts, which basis must be reasonable, although the failure to give any such notice shall not release or diminish the Borrower's obligations to pay additional amounts pursuant to this section 2.4 upon the subsequent receipt of such notice.

2.5     **Term of the Loan.** All principal, interest and other sums due under the Loan Documents, including, without limitation, the Prepayment Premium if any, shall be due and payable in full on the Maturity Date.

<div align="center">

**SECTION 3**
**PAYMENTS AND PREPAYMENTS.**

</div>

3.1     **Voluntary Prepayments.** The Borrower shall have the right to prepay the Loan in full together with the Prepayment Premium at any time, *provided* that the Borrower shall give the Lender at the Lending Office written or telephonic notice (in the case of telephonic notice, promptly confirmed in writing if so requested by the Lender) of its intent to prepay the Loan, which notice shall be received by the Lender by 12:00 noon (local time at the Lending Office) on the date of such prepayment, provided, further however that any voluntary prepayment of the Loan shall be in full (and not in part) and shall include the interest provided for in section 2.3(a) and (c) and the Prepayment Premium.

3.2     **Mandatory Prepayments.**

(a)     Intentionally omitted.

(b)     The Borrower shall prepay the Loan in full (i) on or before the date of prepayment, or other payment, in full of the Borrower's obligations under the Senior Loan Documents to the Senior Lender, (ii) on or before the date on which the Borrower sells, assigns, conveys or transfers or refinances all or any part of the Obligations or of the Borrower's obligations under the Senior Loan Documents, and (iii) on the Transfer Date, which prepayments shall include the interest provided for in section 2.3(a) and(c) and the Prepayment Premium.

(c)     Following the occurrence of any Event of Default, on a quarterly basis and otherwise as and when received from the DTBRA, the Borrower shall prepay the Loan in part to the extent of the Cost Reimbursement for Eligible Activities as provided in section 7.13 hereof. Any payments received directly by the Lender from the DTBRA or from the Borrower shall be applied as provided herein.

(d)     In connection with any Additional Funding, the Borrower shall prepay the Loan in part as required by section 7.14. Any payments received by the Lender related to any Additional Funding shall be applied as provided herein.

**3.3     No Reborrowing.**  The Borrower shall not be entitled to reborrow any amounts that are prepaid.

**3.4     Application of Prepayments.**

(a)     Any voluntary prepayments made pursuant to section 3.1 or mandatory prepayments made pursuant to section 3.2(b) will be applied (i) *first*, to the payment of accrued but unpaid Base Interest on the Loan for the immediately preceding calendar month; (ii) *second*, to the payment of any accrued but unpaid Fee or other costs and expenses then accrued and payable to the Lender under this Agreement or any other Loan Document; (iii) *third*, to the payment of any accrued but unpaid, outstanding past due Base Interest on the Loan (which may have been added to the principal balance of the Loan); (iv) *fourth*, to the payment of the Prepayment Premium, and (v) *fifth*, to the payment of the principal balance then owing on the Loan.

(b)     **Intentionally omitted.**

(c)     Any mandatory prepayments of Cost Reimbursement for Eligible Activities pursuant to section 3.2(c) will be applied to the payment of Prepayment Premium and then to the principal balance then owing on the Loan.

(d)     Any mandatory prepayments of Additional Funding pursuant to section 3.2(d) will be applied to the payment of Prepayment Premium and then to the principal balance then owing on the Loan..

**3.5     Method and Place of Payment.**  Except as otherwise specifically provided herein, all payments under this Agreement shall be made to the Lender not later than 1:00 p.m. (local time at the Lending Office) on the date when due and shall be made at the Lending Office in immediately available funds and in lawful money of the United States of America, it being understood that telephonic notice (confirmed in writing) by the Borrower to the Lender to make

a payment from the funds in the Borrower's account at the Lending Office shall constitute the making of such payment to the extent of such funds held in such account. Any payments under this Agreement that are made later than 1:00 p.m. (local time at the Lending Office) shall be deemed to have been made on the next succeeding Business Day. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day. All payments made by the Borrower hereunder, under the Note or any other Loan Document will be made without setoff, counterclaim or other defense.

<div align="center">

**SECTION 4**
**FEES.**

</div>

**4.1    Underwriting Fee.**  On or prior to the Loan Opening Date, the Borrower shall pay to the Lender an underwriting fee in an amount equal to Twenty-Five Thousand Dollars ($25,000) (the *"Underwriting Fee"*) less the amount of any deposit previously paid by or on behalf of the Borrower to the Lender in connection with the Loan.

<div align="center">

**SECTION 5**
**CONDITIONS PRECEDENT.**

</div>

**5.1    Conditions Precedent to Closing.**  The obligation of the Lender to make the Loan is subject to the satisfaction of each of the following conditions:

**(a)    Note.**  The Borrower shall have delivered to the Lender the Note, executed by the Borrower in the amount, maturity and as otherwise provided herein.

**(b)    Fees.**  The Borrower shall have paid or caused to be paid the Underwriting Fee to the Lender and all reasonable fees and expenses of the Lender and of special counsel to the Lender that have been invoiced on or prior to the date hereof in connection with the preparation, execution and delivery of this Agreement and the other Loan Documents and the structuring and the consummation of the transactions contemplated hereby and thereby.

**(c)    Equity Investment.**  The Lender shall have received evidence satisfactory to it that the Members shall have made, and shall maintain, an equity investment in the Borrower in an aggregate amount not less than $4,885,000.

**(d)    Other Loan Documents.**  The Loan Parties named therein shall have duly executed and delivered and there shall be in full force and effect, and original counterparts shall have been delivered to the Lender of, (i) the Pledge Agreement, (ii) the Guaranty, and (iii) the Environmental Indemnity.

**(e)    Real Estate Due Diligence.**  The Borrower shall have provided the Lender with copies of the appraisal, ALTA/ACSM survey, title commitment together with copies of all exception items identified therein, site plan, phase I environmental report (and, if necessary, phase II environmental report), evidence of utilities serving the Project, property conditions report, all permits and approvals issued by any Governmental Authority related to the operation of the Project, certificates of insurance,

and the initial annual operating budget for the Project, all of which shall be in form and substance satisfactory to the Lender.

(f)     **Resolutions and Approvals.**  The Lender shall have received certified copies of the resolutions of the members, partners or board of directors of each Loan Party, approving the Loan Documents to which such Loan Party is or may become a party, and of all documents evidencing other necessary corporate or other organizational action and governmental approvals, if any, with respect to the execution, delivery and performance by such Loan Party of the Loan Documents to which it is or may become a party.

(g)     **Incumbency Certificates.**  The Lender shall have received a certificate of the Secretary or an Assistant Secretary (or other Authorized Officer) of each Loan Party, certifying the names and true signatures of the officers of such Loan Party authorized to sign the Loan Documents to which such Loan Party is a party and any other documents to which such Loan Party is a party that may be executed and delivered in connection herewith.

(h)     **Certificates Representing the Pledged Interests.**  The Lender shall have received certificates, if any, representing the equity interests pledged to the Lender pursuant to the Pledge Agreement.

(i)     **UCC, Tax and Judgment Lien Search Results.**  The Lender shall have received such UCC, tax and judgment lien search results on each of the Loan Parties, as debtors, from such jurisdictions and filing offices as the Lender may reasonably request.

(j)     **Opinion of Counsel.**  The Lender shall have received an opinion, addressed to the Lender and dated the date hereof, from counsel for the Loan Parties, substantially in the form previously provided by the Lender to the Borrower and covering such other matters incident to the transactions contemplated hereby as the Lender may reasonably request, such opinion letter to be in form and substance satisfactory to the Lender.

(k)     **Proceedings and Documents.**  All corporate (or other organizational), and other proceedings, and all documents incidental to the transactions contemplated hereby, including, without limitation, the Organizational Documents of the Loan Parties, shall be satisfactory in substance and form to the Lender and its special counsel and the Lender shall have received all such counterpart originals or certified or other copies of such documents as the Lender or its special counsel may reasonably request.

(l)     **No Defaults.**  None of the Loan Parties shall be in default under the terms of any promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement or any other material agreement or other instrument to which it is a party or by which it or any of its property or assets are bound or to which it may be subject.

(m)     **No Material Adverse Effect.**  None of the Loan Parties shall have experienced a Material Adverse Effect.

(n)  **Senior Loan Documents.**  The Lender shall have received copies of, reviewed and approved the Senior Loan Documents.  The closing and full funding of the Senior Loan shall have occurred on or prior to the Loan Opening Date.

(o)  **Intercreditor Agreement.**  The Lender and Senior Lender shall have executed and delivered and there shall be in full force and effect an Intercreditor Agreement in form and substance satisfactory to the Lender.

(p)  **Reimbursement Agreement.**  The Lender shall have received copies of, reviewed and approved the Reimbursement Agreement, including, without limitation, an amendment providing that Cost Reimbursement for Eligible Activities shall be paid directly by the DTBRA to the Borrower.

(q)  **Rent Roll.**  The Lender shall have received copies of, reviewed and approved the Standard Lease and a rent roll, and received copies each lease upon request.

(r)  **Property Management Agreement.**  The Borrower shall have provided to the Lender a management agreement in form and substance reasonably satisfactory to Lender (the "*Property Management Agreement*") with the Property Manager to fully lease the Project to qualified tenants and to professionally operate and manage the Project.  The Property Management Agreement must be terminable upon 30 days notice from Borrower or Lender to the Property Manager.  The compensation to the Property Manager shall not exceed the Approved Management Fee.

(s)  **Due Diligence.**  The Lender shall have completed all investigations, appraisals, reviews and audits with respect to any Loan Party, the Project and the Loan as the Lender deems appropriate, including any items set forth on the closing checklist provided by the Lender to the Borrower prior to the date hereof.

### SECTION 6
### REPRESENTATIONS AND WARRANTIES.

In order to induce the Lender to enter into this Agreement and to make the Loan, the Borrower makes the following representations and warranties to, and agreements with, the Lender, all of which shall survive the execution and delivery of this Agreement:

**6.1  Organizational Status, etc.**  Each Loan Party (i) is a duly organized or formed and validly existing partnership, limited liability company or corporation, as the case may be, in good standing under the laws of the jurisdiction of its formation and has the partnership or limited liability company or corporate power and authority, as applicable, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (ii) has duly qualified and is authorized to do business in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified would not have a Material Adverse Effect.  The Manager is the sole manager of the Borrower.  The Members hold all of the membership interests in the Borrower and there are no other equity interests in the Borrower.

**6.2  Organizational Power and Authority, etc.**  Each Loan Party has the corporate, partnership or other organizational power and authority to execute, deliver and carry out the

terms and provisions of the Loan Documents to which it is party and has taken all necessary corporate, partnership or other organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is party. Each Loan Party has duly executed and delivered each Loan Document to which it is party and each Loan Document to which it is party constitutes the legal, valid and binding agreement or obligation of such Loan Party enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

**6.3**    **No Violation.**  Neither the execution, delivery and performance by any Loan Party of the Loan Documents to which it is party nor compliance with the terms and provisions thereof, nor the consummation of the loan transactions contemplated therein (i) will contravene any provision of any law, statute, rule, regulation, order, writ, injunction or decree of any court or governmental instrumentality applicable to such Loan Party or its properties and assets; (ii) will conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (other than the Liens created under the Pledge Agreement and the Senior Mortgage) upon any of the property or assets of such Loan Party pursuant to the terms of any promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement or any other material agreement or other instrument to which such Loan Party is a party or by which it or any of its property or assets are bound or to which it may be subject; (iii) will violate any provision of the articles or certificate of incorporation or formation, code of regulations, by-laws, partnership agreement or other organizational document of such Loan Party; or (iv) will conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, any of the Senior Loan Documents.

**6.4**    **Governmental Approvals.**  No order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any foreign or domestic governmental or public body or authority, or any subdivision thereof, is required to authorize or is required as a condition to (i) the execution, delivery and performance by any Loan Party of any Loan Document to which it is a party or (ii) the legality, validity, binding effect or enforceability of any Loan Document to which any Loan Party is a party, except for any filings or recordings necessary to perfect the Liens provided for under the Pledge Agreement.

**6.5**    **Litigation.**  There are no actions, suits or proceedings pending or, to the knowledge of the Borrower, threatened with respect to any Loan Party that (i) has had, or could reasonably be expected to have, a Material Adverse Effect or (ii) question the validity or enforceability of any of the Loan Documents or of any action to be taken by such Loan Party pursuant to any of the Loan Documents.

**6.6**    **Use of Proceeds; Margin Regulations.**

(a)    The proceeds of the Loan shall be utilized for lawful purposes consistent with the requirements of this Agreement.

(b)      No part of the proceeds of the Loan will be used directly or indirectly to purchase or carry Margin Stock, or to extend credit to others for the purpose of purchasing or carrying any Margin Stock, in violation of any of the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System. No Borrower is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. At no time would more than 25% of the value of the assets of the Borrower that are subject to any "arrangement" (as such term is used in section 221.2(g) of such Regulation U) hereunder be represented by Margin Stock.

**6.7      Indebtedness.**  The Borrower is not liable for any Indebtedness other than, the Obligations and the obligations under the Senior Loan Documents.

**6.8      Consideration and Solvency.**  Each Loan Party has received consideration that is the reasonable equivalent value of the obligations and liabilities that it has incurred to the Lender. Each Loan Party has capital sufficient to carry on its business and transactions and all business and transactions in which it is about to engage, is solvent and able to pay its debts as they mature and owns property having a value, both at fair valuation and at present fair salable value, greater than the amount required to pay its debts, and no Loan Party is entering into the Loan Documents with the intent to hinder, delay or defraud its creditors. For purposes of this section 6.8, "*debt*" means any liability on a claim, and "*claim*" means (i) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (ii) right to an equitable remedy for breach of performance if such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

**6.9      No Material Adverse Change.**  Since the date of the most recent financial statements provided to the Lender by any Loan Party, there has been no change in the condition, business or affairs of such Loan Party or their properties and assets considered as an entirety, except for changes that, individually or in the aggregate, have not had or could not reasonably be expected to have a Material Adverse Effect or except as otherwise disclosed to the Lender in writing prior to the date hereof.

**6.10      Tax Returns and Payments.**  Each Loan Party has filed all federal income tax returns and all other material tax returns, domestic and foreign, required to be filed by it and has paid all material taxes and assessments payable by it that have become due, other than those not yet delinquent and except for those being contested in good faith. Each Loan Party has established on its books such charges, accruals and reserves in respect of taxes, assessments, fees and other governmental charges for all fiscal periods as are required by sound accounting principles consistently applied. No Loan Party knows of any proposed assessment for additional federal, foreign or state taxes for any period, or of any basis therefor, that, individually or in the aggregate, taking into account such charges, accruals and reserves in respect thereof as such Loan Party has made, could reasonably be expected to have a Material Adverse Effect.

**6.11      Title to Properties, etc.**  From and after the date hereof, the Borrower will have good and marketable title to the Land, subject only to the Senior Mortgage, and the exceptions

set forth in the title commitment provided to the Lender pursuant to section 5.1(e). As of and after the date hereof, the Borrower owns no Real Property other than the Land.

**6.12 Lawful Operations, etc.** Except for known situations or incidents that are reserved for on the most recent consolidated balance sheet referred to in section 6.9 or that, if not so reserved, could not reasonably be expected to have a Material Adverse Effect, each of the Loan Parties is in full compliance with all material requirements imposed by Law that are applicable to them, their operations or their properties, whether federal or state or local, including, without limitation, all Environmental Laws, the Americans with Disabilities Act of 1990, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities and zoning ordinances.

**6.13 Compliance with ERISA.** Compliance by the Borrower and each Loan Party with the provisions hereof will not involve any Prohibited Transaction. Each of the Borrower and each Loan Party (i) has fulfilled all obligations under minimum funding standards of ERISA and the Code with respect to each Plan that is not a Multiemployer Plan or a Multiple Employer Plan; (ii) has satisfied all respective contribution obligations in respect of each Multiemployer Plan and each Multiple Employer Plan; (iii) is in compliance in all material respects with all other applicable provisions of ERISA and the Code with respect to each Plan, each Multiemployer Plan and each Multiple Employer Plan; and (iv) has not incurred any liability under the Title IV of ERISA to the PBGC with respect to any Plan, any Multiemployer Plan, any Multiple Employer Plan or any trust established thereunder. No Plan or trust created thereunder has been terminated, and there have been no Reportable Events with respect to any Plan or trust created thereunder or with respect to any Multiemployer Plan or Multiple Employer Plan, which termination or Reportable Event will or could result in the termination of such Plan, Multiemployer Plan or Multiple Employer Plan and give rise to a material liability of the Borrower or any ERISA Affiliate in respect thereof. No Borrower, other Loan Party or ERISA Affiliate is at the date hereof, or has been at any time within the two years preceding the date hereof, an employer required to contribute to any Multiemployer Plan or Multiple Employer Plan, or a "contributing sponsor" (as such term is defined in section 4001 of ERISA) in any Multiemployer Plan or Multiple Employer Plan. No Loan Party nor any ERISA Affiliate has any contingent liability with respect to any post-retirement "welfare benefit plan" (as such term is defined in ERISA) except as disclosed to the Lender in writing.

**6.14 Intellectual Property, etc.** Each Loan Party has obtained or has the right to use all material patents, trademarks, service marks, trade names, copyrights, licenses and other rights with respect to the foregoing necessary for the present and planned future conduct of its business, without any known conflict with the rights of others, *except* for such patents, trademarks, service marks, trade names, copyrights, licenses and rights the loss of which, and such conflicts, that in any such case individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

**6.15 Investment Company Act, etc.** None of the Loan Parties is subject to regulation with respect to the creation or incurrence of Indebtedness under the Investment Act of 1940, as amended, the Interstate Commerce Act, as amended, the Federal Power Act, as amended, the Public Utility Holding Company Act of 1935, as amended, or any applicable state public utility Law.

**6.16    Office of Foreign Asset Control and the USA Patriot Act.**  No Loan Party is (or will be) a person with whom Lender is restricted from doing business under regulations of the Office of Foreign Asset Control ("*OFAC*") of the Department of the Treasury of the United States of America (including those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 #13224 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not engage in any dealings or transactions or otherwise be associated with such persons.  In addition, to help the US Government fight the funding of terrorism and money laundering activities, the USA Patriot Act ("*Patriot Act*") requires Lender to obtain, verify and record information that identifies its customers.  Borrower shall provide the Lender with any information that the Lender deems necessary from time to time in order to ensure compliance the Patriot Act and any other applicable Laws concerning money laundering and similar activities.

**6.17    True and Complete Disclosure.**  All factual information (taken as a whole) heretofore or contemporaneously furnished by or on behalf of any Loan Party to the Lender for purposes of or in connection with this Agreement or any transaction contemplated herein is, and all other such factual information (taken as a whole) hereafter furnished by or on behalf of such persons in writing to the Lender will be, true and accurate in all material respects on the date as of which such information is dated or certified and not incomplete by omitting to state any material fact necessary to make such information (taken as a whole) not misleading at such time in light of the circumstances under which such information was provided, except that any such future information consisting of financial projections prepared by management of the Borrower is only represented herein as being based on good faith estimates and assumptions believed by such persons to be reasonable at the time made.  The Lender recognizes that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ materially from the projected results.  As of the date hereof, there is no fact known to any Loan Party that has, or could reasonably be expected to have, a Material Adverse Effect that has not theretofore been disclosed in writing to the Lender.

**6.18    No Brokers.**  No person acting on behalf of the Borrower or any other Loan Party is or will be entitled to any commission or broker's or finder's fees in connection with the transactions contemplated by this Agreement.

**6.19    Senior Loan Documents.**  The Senior Loan Documents received by Lender pursuant to section 5.1(n) are true, correct and complete and no Event of Default (as defined therein) exists thereunder.  The performance by the Borrower and the Guarantors of their respective obligations thereunder will not conflict with or cause a breach or violation of the Loan Documents.

**6.20    Insurance.**  The Project is insured with financially sound and reputable insurance companies that are not Affiliates of any Loan Party, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower operates and in conformance with the requirements of the Senior Loan Documents.

**6.21    Reimbursement Agreement.**    The Reimbursement Agreement received by Lender pursuant to section 5.1 is true, correct and complete and no covenant or other default exists thereunder.  The performance by the Borrower and any Affiliates of their respective obligations thereunder will not conflict with or cause a breach or violation of the Loan Documents.

<div align="center">

**SECTION 7**
**AFFIRMATIVE COVENANTS.**

</div>

The Borrower hereby covenants and agrees that so long as this Agreement is in effect and until such time as the Loan, together with interest, fees and all other Obligations hereunder, have been paid in full:

**7.1    Reporting Requirements.**  The Borrower will furnish to the Lender:

**(a)    Quarterly Financial Statements.**  As soon as available and in any event within 45 days after the close of each of the quarterly accounting periods in each fiscal year of the Borrower, the unaudited balance sheet of the Borrower as of the end of such quarterly period and the related unaudited statements of income and of cash flows for such quarterly period and/or for the fiscal year to date and setting forth, in the case of such unaudited consolidated statements of income and of cash flows, comparative figures for the related periods in the prior fiscal year, and which consolidated financial statements shall be certified on behalf of the Borrower by its chief financial or accounting officer or other Authorized Officer of the Borrower, subject to changes resulting from normal year-end audit adjustments.

**(b)    Tax Returns.**  Within 120 days after the end of each calendar year and in any event within 10 days after filing, a copy of each federal or state tax return (or request for extension for the filing thereof) filed by the Borrower with the Internal Revenue Service or similar state taxing authority.

**(c)    Operating Statements/Budget.**

(i)    Within 30 days after the end of each calendar month, the Borrower shall provide the Lender with monthly operating statements for the Project, signed and certified by the chief financial or accounting officer or other Authorized Officer of the Borrower in the form required by the Lender, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) and major capital improvements for the month and containing appropriate year-to-date information.

(ii)    Within 30 days after the end of each calendar year, the Borrower shall provide the Lender with an annual operating budget for the Project, in form and substance satisfactory to the Lender.

**(d)    Rent Rolls.**  Within 15 days after the end of each calendar month, the Borrower shall provide the Lender a rent roll ("**_Rent Roll_**") for each calendar month, detailing the names of all tenants of the Project, the unit occupied by each tenant, the base

rent and any other charges payable under each lease and the term of each lease, including the expiration date, the extent to which any tenant is in default under any lease and any other information as is reasonably required by Lender.

(e) **Monthly Conference Call.** Reasonably promptly after the end of each calendar month, the Borrower will participate in a telephonic conference call with the Lender's asset manager, as reasonably scheduled by the Lender in its discretion during normal business hours, to discuss the results of operations of the Project and any other matters reasonably requested by the Lender or its asset manager. Borrower shall cause the Property Manager to participate in such telephonic conference if requested by Lender.

(f) **Senior Loan Correspondence.** Promptly after delivery thereof to the Senior Lender, copies of all compliance certificates and other notices and documents delivered pursuant to the Senior Loan Documents. Promptly upon receipt from the Senior Lender, copies of all notices and documents other than ordinary course notices related to interest rate elections.

(g) **Budget.** The Borrower shall provide to the Lender information related to any anticipated changes to the annual operating budget for the Project for its review and approval.

(h) **Officer's Compliance Certificates.** At the time of the delivery of the financial statements provided for in section 7.1(a), a certificate on behalf of the Borrower by its chief financial or accounting officer or other Authorized Officer of the Borrower to the effect that, to the best knowledge of the Borrower, no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof and the actions the Borrower proposes to take with respect thereto.

(i) **Notice of Default and Certain Other Matters.** Promptly, and in any event within three Business Days, in the case of clause (i) below, or five Business Days, in the case of clauses (ii) or (iii) below, after any Loan Party obtains knowledge thereof, notice of:

(i) the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(ii) any litigation or governmental or regulatory proceeding pending against any Loan Party that involves any reasonable possibility of having a Material Adverse Effect; and

(iii) any other event or circumstance involving or affecting any Loan Party that involves any reasonable possibility of having a Material Adverse Effect.

(j) **ERISA.** Promptly, and in any event within 10 days after any Loan Party or any ERISA Affiliate knows of the occurrence of any of the following, the Borrower shall deliver to the Lender a certificate of an Authorized Officer of the Borrower setting

forth the full details as to such occurrence and the action, if any, that such Loan Party or ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given to or filed with or by such Loan Party, the ERISA Affiliate, the PBGC, a Plan participant or the Plan administrator with respect thereto:

(i)     that a Reportable Event that reasonably could have a Material Adverse Effect has occurred with respect to any Plan;

(ii)    the institution of any steps by such Loan Party, any ERISA Affiliate, the PBGC or any other person to terminate any Plan;

(iii)   the institution of any steps by such Loan Party or any ERISA Affiliate to withdraw from any Plan;

(iv)    the institution of any steps by such Loan Party to withdraw from any Multiemployer Plan or Multiple Employer Plan, if such withdrawal could result in withdrawal liability (as described in Part 1 of Subtitle E of Title IV of ERISA) in excess of $250,000;

(v)     a non-exempt "prohibited transaction" within the meaning of section 406 of ERISA in connection with any Plan;

(vi)    that a Plan (other than a Multiemployer Plan or a Multiple Employer Plan) has an Unfunded Current Liability exceeding $250,000;

(vii)   any increase in the contingent liability of any Loan Party or ERISA Affiliate with respect to any post-retirement welfare liability that reasonably could have a Material Adverse Effect; or

(viii)  the taking of any action by, or the threatening of the taking of any imminent action by, the Internal Revenue Service, the Department of Labor or the PBGC with respect to any of the foregoing.

(k)     **Environmental Matters.** Promptly upon, and in any event within 10 Business Days after, an officer of any Loan Party obtains actual knowledge thereof, notice of one or more of the following environmental matters: (i) any pending or threatened material Environmental Claim against any Loan Party or any Real Property owned or operated by any Loan Party; (ii) any condition or occurrence on or arising from any Real Property owned or operated by any Loan Party that (A) results in material noncompliance by the any Loan Party with any applicable Environmental Law or (B) would reasonably be expected to form the basis of an Environmental Claim against any Loan Party or any such Real Property that, after giving effect to any rights of indemnification, reimbursement or similar claim in favor of any Loan Party, could reasonably be expected to have a Material Adverse Effect; (iii) any condition or occurrence on any Real Property owned, leased or operated by any Loan Party that could reasonably be expected to cause such Real Property to be subject to any material restrictions on the ownership, occupancy, use or transferability by any Loan Party of such Real Property under any Environmental Law; and (iv) the taking of any material removal

or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by any Loan Party as required by any Environmental Law or any governmental or other administrative agency. All such notices shall describe in reasonable detail the nature of the Environmental Claim and any Loan Party's response thereto.

(l)　**Other Information.** With reasonable promptness, such other information or documents (financial or otherwise) relating to any Loan Party as the Lender may reasonably request from time to time.

(m)　**Other Correspondence.** Promptly after delivery thereof to any party to the Reimbursement Agreement, copies of all certificates and other notices and documents delivered by the Borrower or any Affiliate pursuant to such Agreements or any related documents. Promptly upon receipt by the Borrower or any Affiliate from any party to the Reimbursement Agreement, copies of all certificates and other notices and documents.

7.2　**Books, Records and Inspections.** The Borrower will (i) keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrower in accordance with sound accounting principles consistently applied and (ii) permit, upon at least three Business Days' notice to the chief financial officer of the Borrower, officers and designated representatives of the Lender to visit and inspect any of the properties or assets of the Borrower in whomsoever's possession (but only to the extent the Borrower has the right to do so to the extent in the possession of another person), to examine the books of account of the Borrower, and make copies thereof and take extracts therefrom, and to discuss the affairs, finances and accounts of the Borrower with, and be advised as to the same by, its and their officers and independent accountants and independent actuaries, if any, all at such reasonable times and intervals and to such reasonable extent as the Lender may request.

7.3　**Insurance.** The Borrower will (i) maintain insurance coverage by such insurers and in such forms and amounts and against such risks, with such deductibles and covering such risks, as are generally consistent with the insurance coverages that are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower operates; (ii) maintain such insurance with financially sound and reputable insurance companies that are not Affiliates of any Loan Party; (iii) forthwith upon the Lender's written request, furnish to the Lender such information about such insurance as the Lender may from time to time reasonably request, which information shall be prepared in form and detail satisfactory to the Lender and certified by an Authorized Officer of the Borrower; and (iv) comply with all reasonable requirements of the Lender and the Senior Lender regarding insurance of the Project. The Lender shall be named as an additional insured or loss payee as designated by the Lender on all insurance policies maintained by the Borrower, and such policies shall provide that the Lender shall receive 30 day prior written notice of any termination. In no event shall the Lender be required to make insurance proceeds available to the Borrower following a casualty.

7.4　**Lockbox Arrangements.** The Borrower will, upon request by the Lender following the occurrence of an Event of Default, cooperate with the Senior Lender and the

Lender to establish a lockbox account for collection of operating revenues from the Project and the disbursement of such revenues.

**7.5    Payment of Taxes and Claims.**  The Borrower will pay and discharge all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims that, if unpaid, might become a Lien or charge upon any properties of the Borrower *provided* that the Borrower shall not be required to pay any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with sound accounting principles consistently applied; and *provided further* that the Borrower will not be considered to be in default of any of the provisions of this sentence if the Borrower fails to pay any such amount, individually or in the aggregate, that is immaterial.

**7.6    Organizational and Other Franchises.**  Each Loan Party will do or cause to be done all things necessary to preserve and keep in full force and effect its corporate, partnership, limited liability company or trust existence, rights and authority, and its rights and franchises.

**7.7    Good Repair.**  The Borrower will ensure that its material properties and equipment used or useful in its business, in whomsoever's possession they may be, are kept in good repair, working order and condition, normal wear and tear excepted, and that from time to time there are made in such properties and equipment all needful and proper repairs, renewals, replacements, extensions, additions, betterments and improvements thereto, to the extent and in the manner customary for companies in similar businesses.

**7.8    Compliance with Statutes, etc.**  The Borrower will comply, in all material respects, with all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all governmental bodies, domestic or foreign, in respect of the conduct of its business and the ownership of its property, including, without limitation, all Environmental Laws, the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities, other than those the noncompliance with which would not have, and that would not be reasonably expected to have, a Material Adverse Effect.

**7.9    Fiscal Years, Fiscal Quarters.**  If the Borrower shall change its fiscal year or fiscal quarter, the Borrower will promptly, and in any event within 30 days following any such change, deliver a notice to the Lender describing such change and any material accounting entries made in connection therewith and stating whether such change will have any impact upon any financial computations to be made hereunder, and if any such impact is foreseen, describing in reasonable detail the nature and extent of such impact. If the Lender determines that any such change will have any impact upon any financial computations to be made hereunder that is adverse to the Lender, the Borrower will, if so requested by the Lender, enter into an amendment to this Agreement, in form and substance satisfactory to the Lender, modifying any of the financial covenants or related provisions hereof in such manner as the Lender determines is necessary to eliminate such adverse effect.

**7.10   Intentionally omitted.**

**7.11   Management of the Project.**   The Borrower shall not amend, modify or terminate the Property Management Agreement, or enter into any other agreement providing for the management or operation of the Project, or replace the Property Manager of the Project, without the Lender's prior written consent which consent shall not be unreasonably withheld or delayed.  The Property Management Agreement must be terminable upon 30 days notice from Borrower to the Property Manager, and upon Lender's request and with the consent of the Senior Lender, the Borrower shall give such termination notice to the Property Manager.   The compensation to the Property Manager shall not exceed the Approved Management Fee. Promptly upon receipt from the Property Manager, the Borrower shall provide to the Lender, copies of all notices and documents other than ordinary course notices related to leasing or tenant matters.

**7.12   Publicity.**  The Lender reserves the right to publicize the making of the Loan.

**7.13   Reimbursement Agreement.**   The Borrower shall diligently and continuously pursue completion of the Eligible Activities (as defined in the Reimbursement Agreement).  The Borrower shall submit to the DTBRA, on a quarterly basis or otherwise at the soonest time permitted under the Reimbursement Agreement, a request for Cost Reimbursement for Eligible Activities.  Following the occurrence of any Event of Default, the Borrower shall pay to the Lender, as a mandatory prepayment of principal hereunder, all reimbursements received from the DTBRA under the Reimbursement Agreement promptly upon its receipt of same.

**7.14   Additional Funding Loan Agreement.**   The Borrower may pursue qualification for the Additional Funding, *provided, however,* if, at the time of Borrower's request for all or any part of the Additional Funding, the Adjusted DSCR is not equal to or greater than 1.15:1.00, then the Borrower shall pay to the Lender, as a mandatory prepayment of principal hereunder, all Senior Loan proceeds received from the Senior Lender under the Additional Funding Loan Agreement promptly upon its receipt of same but only until the application of such prepayment as provided herein causes the foregoing Adjusted DSCR to be satisfied.

**7.15   UCC Financing Statements/Insurance.**  (i) Within 10 days of the Loan Opening Date, the Lender shall have received the following: (i) evidence of the filing of the UCC financing statements required by the Lender hereunder to perfect its security interests under the Pledge Agreement, (ii) the original so-called "Eagle 9" UCC policy, and (iii) a copy of the Borrower's owner's policy of title insurance with the original Mezzanine Endorsement, if available and requested by the Lender, all as required by the Lender hereunder.

**7.16   Further Assurances.**  Promptly upon the request of the Lender, each Loan Party shall take such additional actions as the Lender may reasonably require from time to time in order to (i) carry out more effectively the purposes of this Agreement or any other Loan Document; (ii) subject to the Liens created by the Pledge Agreement, any property, right or interest covered thereby; (iii) perfect and maintain the validity, effectiveness and priority of the Pledge Agreement and the Liens intended to be created thereby; and (iv) better assure, convey, grant, assign, transfer, preserve, protect and confirm to the Lender the rights granted or hereafter intended to be granted to the Lender under any Loan Document.

## SECTION 8
## NEGATIVE COVENANTS.

The Borrower hereby covenants and agrees that on the date hereof and thereafter for so long as this Agreement is in effect and until such time as the Loan, together with interest, fees and all other Obligations incurred hereunder, are paid in full:

**8.1    Changes in Business.** The Borrower will not engage in any business other than the ownership and operation of the Project.

**8.2    Consolidation, Merger or Sale of Assets.** The Borrower will not (i) wind up, liquidate or dissolve its affairs; (ii) enter into any transaction of merger or consolidation; or (iii) transfer, convey, sell, assign or otherwise hypothecate all or substantially all of its assets; or (iv) agree to do any of the foregoing at any time. The Borrower will not assign or attempt to assign its rights under this Agreement to any person and any purported assignment will be void.

**8.3    Liens.** The Borrower will not create, incur, assume or suffer to exist any Lien upon or with respect to any of the Project (except for the Senior Mortgage), or sell such property or any portion thereof or assign any right to receive income therefrom, or file or permit the filing of any financing statement under the UCC or any other similar notice of Lien upon such property under any similar recording or notice statute, *except* for such filings necessary to perfect the Senior Mortgage. Further, without the Lender's prior written consent, the Borrower will not create, incur, assume or suffer to exist any other encumbrance upon or with respect to any of the Project (except as shown in the title commitment referenced in section 5.1(e) and reviewed by the Lender prior to the Loan Opening Date), and any agreement containing covenants, conditions and/or restrictions governing the Project. The Borrower will not seek any change in the zoning designation or requirements applicable to the Land as of the Loan Opening Date without the Lender's prior written consent, including, without limitation, any change to a condominium regime.

**8.4    Distributions to Equity Holders.** The Borrower will not make any distribution to any of its partners, members, shareholders or other equity holders other than Monthly Excess Available Cash.

**8.5    Transactions with Affiliates.** The Borrower will not enter into any transaction or series of transactions (other than those contemplated by the Property Management Agreement) with any Affiliate other than in the ordinary course of business of and pursuant to the reasonable requirements of the Borrower's business and upon fair and reasonable terms no less favorable to the Borrower than would be obtained in a comparable arms' length transaction with a person other than an Affiliate.

**8.6    Plan Terminations, Minimum Funding, etc.** Except for actions taken by persons who are not Affiliates of any Loan Party in respect of any Multiemployer Plan or Multiple Employer Plan, no Loan Party will permit any ERISA Affiliate to, (i) terminate any Plan or Plans so as to result in liability of such Loan Party or any ERISA Affiliate to the PBGC in excess of, in the aggregate, $250,000, (ii) permit to exist one or more events or conditions that reasonably present a material risk of the termination by the PBGC of any Plan or Plans with

respect to which such Loan Party or any ERISA Affiliate could, in the event of such termination, incur liability to the PBGC in excess of such amount in the aggregate or (iii) fail to comply with the minimum funding standards of ERISA and the Code with respect to any Plan.

**8.7 Amendment of Organizational Documents.** The Borrower shall not amend its Organizational Documents without the Lender's prior written consent, and no other Loan Party shall amend its Organization Documents unless (i) such amendment does not affect such Loan Party's ability to perform its obligations under the Loan Documents to which it is a party, (ii) such amendment does not affect the control or management of such Loan Party, and (iii) such Loan Party provides prior written notice of such amendment to the Lender.

**8.8 Intentionally omitted.**

**8.9 Amendment of Senior Loan Documents.** In no event shall the Borrower amend, modify or terminate, any of the Senior Loan Documents without the Lender's prior written consent.

**8.10 Amendment of Reimbursement Agreement.** In no event shall the Borrower amend, modify or terminate, the Reimbursement Agreement without the Lender's prior written consent.

**8.11 Indebtedness.** In no event shall the Borrower incur any Indebtedness without the Lender's prior written consent other than the Obligations, the obligations under the Senior Loan Documents and customary trade payables incurred in the ordinary course of business. In no event shall the Borrower acquire the promissory note of the Senior Loan Documents. In no event shall the Borrower refinance the obligations evidenced by the Senior Loan Documents without the Lender's prior written consent unless the Loan is indefeasibly paid in full in connection with, or on or prior to, the consummation of such refinance. In no event shall the Borrower enter into any transaction or confirmation under any Hedge Agreement without the Lender's prior written consent.

<div align="center">

**SECTION 9**
**EVENTS OF DEFAULT.**

</div>

**9.1 Events of Default.** Any of the following specified events shall constitute an Event of Default (each an *"Event of Default"*):

    **(a) Payments.** The Borrower shall (i) default in the payment when due of any principal of the Loan; (ii) default in the payment of any Fee when due; or (iii) default in the payment within ten (10) days of its due date of any interest on the Loan, or (iv) default, and such default under this subsection (iv) shall continue for ten or more Business Days after the Lender's written request therefor, in the payment when due of any fees or any other amounts owing hereunder or under any other Loan Document.

    **(b) Representations.** Any representation, warranty or statement made by the Borrower or any other Loan Party herein or in any other Loan Document or in any statement or certificate delivered or required to be delivered pursuant hereto or thereto

shall prove to be untrue in any material respect on the date as of which made or deemed made.

(c) **Certain Negative Covenants.** The Borrower shall default in the due performance or observance by them of any term, covenant or agreement contained in sections 8.1 through 8.11, inclusive, of this Agreement.

(d) **Other Covenants.** Any Loan Party shall default in the due performance or observance by it of any term, covenant or agreement contained in this Agreement, other than those referred to in sections 9.1(a), 9.1(b), or 9.1(c) above, and such default is not remedied within 30 days after the earlier of (i) an officer of the Borrower obtaining actual knowledge of such default and (ii) the Borrower receiving written notice of such default from the Lender (any such notice to be identified as a "notice of default" and to refer specifically to this paragraph), *provided, however,* no cure period shall be afforded for the breach of any covenant of any Pledgor contained in section 3(b)(ii), (iii) or (vii) or the Pledge Agreement.

(e) **Cross Default under the Senior Loan Documents.** Any Default or Event of Default (as such terms are defined in the Senior Loan Agreement) shall occur and shall be continuing beyond any applicable grace periods under such Senior Loan Documents.

(f) **Change of Control.** Any Guarantor, that is an individual, shall die and his/her legal representatives shall fail to affirm the obligations under the Loan Documents to which such deceased Guarantor is a party within thirty days of such death. The Manager shall cease to be the sole manager of the Borrower, or Scott A. Chappelle shall cease to control the Manager.

(g) **Other Loan Documents.** Any of the Loan Documents shall cease for any reason to be in full force and effect; or any Loan Party shall default in any payment obligation thereunder beyond any grace period provided in respect thereof (taking into account any notice required to be given in connection therewith); or any Loan Party shall default in any material respect in the due performance and observance of any other obligation thereunder and such default shall continue unremedied for a period of at least 30 days after notice by the Lender; or any Loan Party shall (or seek to) disaffirm or otherwise limit its obligations thereunder otherwise than in strict compliance with the terms thereof.

(h) **Judgments.** One or more judgments or decrees shall be entered against any Loan Party involving a liability (other than a liability covered by insurance, as to which the carrier has adequate claims paying ability and has not denied coverage or reserved its rights) of $100,000 or more in the aggregate for all such judgments and decrees for all Loan Parties, and any such judgments or decrees shall not have been vacated, discharged or stayed or bonded pending appeal within 30 days (or such longer period, not in excess of 60 days, during which enforcement thereof, and the filing of any judgment lien, is effectively stayed or prohibited) from the entry thereof.

(i)     **Bankruptcy, etc.** Any of the following shall occur:

(i)     Any Loan Party (each such person, a *"Principal Party"*) shall commence a voluntary case concerning itself under Title 11 of the United States Code entitled "Bankruptcy," as now or hereafter in effect, or any successor thereto (the *"Bankruptcy Code"*);

(ii)    an involuntary case is commenced under the Bankruptcy Code against any Principal Party and the petition is not controverted within 10 days, or is not dismissed within 90 days, after commencement of the case;

(iii)   a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of any Principal Party;

(iv)    any Principal Party commences (including by way of applying for or consenting to the appointment of, or the taking of possession by, a rehabilitator, receiver, custodian, trustee, conservator or liquidator (collectively, a *"conservator"*) of itself or all or any substantial portion of its property) any other proceeding under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency, liquidation, rehabilitation, conservatorship or similar law of any jurisdiction whether now or hereafter in effect relating to such Principal Party;

(v)     any such proceeding is commenced against any Principal Party to the extent such proceeding is consented by such person or remains undismissed for a period of 90 days;

(vi)    any Principal Party is adjudicated insolvent or bankrupt;

(vii)   any order of relief or other order approving any such case or proceeding is entered;

(viii)  any Principal Party suffers any appointment of any conservator or the like for it or any substantial part of its property that continues undischarged or unstayed for a period of 90 days;

(ix)    any Principal Party makes a general assignment for the benefit of creditors; or

(x)     any corporate (or similar organizational) action is taken by any Principal Party for the purpose of effecting any of the foregoing.

(j)     **ERISA.** Any of the events described in section 7.1(j) shall have occurred, or there shall result from any such event or events the imposition of a lien, the granting of a security interest or a liability or a material risk of incurring a liability, and any such event or events or any such lien, security interest or liability, individually and/or in the aggregate, in the reasonable opinion of the Lender, has had, or could reasonably be expected to have, a Material Adverse Effect.

    **(k)**    **Material Adverse Effect.** Any event or circumstance shall occur or exist that has a Material Adverse Effect upon any Loan Party or the Project.

    **9.2**    **Acceleration, etc.** Upon the occurrence of any Event of Default, and at any time thereafter, if any Event of Default shall then be continuing, the Lender may, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Lender to enforce its claims against the Borrower or any other Loan Party in any manner permitted under applicable Law:

    **(a)**    declare the principal of and any accrued interest in respect of the Loan and all other Obligations, including, without limitation, the Prepayment Premium, owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and/or

    **(b)**    exercise any other right or remedy available under any of the Loan Documents or applicable Law;

*provided* that, if an Event of Default specified in section 9.1(i) shall occur with respect to any Principal Party, the result that would occur upon the giving of written notice by the Lender as specified in clauses (a) and/or (b) above shall occur automatically without the giving of any such notice.

    **9.3**    **Application of Liquidation Proceeds.** All monies received by the Lender from the exercise of remedies hereunder or under the other Loan Documents or under any other documents relating to this Agreement shall, unless otherwise required by the terms of the other Loan Documents or by applicable Law, be applied as follows:

    **(a)**    *first,* to the payment of all expenses (to the extent not paid by the Borrower) incurred by the Lender in connection with the exercise of such remedies, including, without limitation, all reasonable costs and expenses of collection, attorneys' fees, court costs and any foreclosure expenses;

    **(b)**    *second,* to the payment of interest then accrued on the Loan;

    **(c)**    *third,* to the payment of any Fees then accrued and payable to the Lender under this Agreement or any other Loan Document;

    **(d)**    *fourth,* to the payment of the Prepayment Premium;

    **(e)**    *fifth,* to the payment of the principal balance then owing on the Loan;

    **(f)**    *sixth,* to the payment of all other amounts owed by the Borrower to the Lender under this Agreement or any other Loan Document; and

    **(g)**    *finally,* any remaining surplus after all of the Obligations have been paid in full, to the Borrower or to whomsoever shall be lawfully entitled thereto.

## SECTION 10
## MISCELLANEOUS.

**10.1    Payment of Expenses, etc.**

(a)    Whether or not the transactions contemplated hereby are consummated, the Borrower shall pay (or reimburse the Lender for) all reasonable out-of-pocket costs and expenses of the Lender in connection with (i) the negotiation, preparation, execution and delivery of the Loan Documents and the documents and instruments referred to therein, (ii) any amendment, waiver or consent relating to any of the Loan Documents that is requested by any Loan Party and (iii) the enforcement of any of the Loan Documents or the other documents and instruments referred to therein, including, without limitation, in each such case the fees and disbursements of Jones Day or other special counsel to the Lender.

(b)    Without limitation of the preceding section 10.1(a), in the event of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of any Loan Party, the Borrower shall pay all costs of collection and defense, including reasonable attorneys' fees in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, that shall be due and payable together with all required service or use taxes.

(c)    The Borrower shall pay and hold the Lender harmless from and against any and all present and future stamp and other similar taxes with respect to the foregoing matters and hold the Lender harmless from and against any and all liabilities with respect to or resulting from any delay or omission (other than to the extent attributable to the Lender) to pay such taxes.

(d)    The Borrower shall indemnify the Lender and its officers, directors, employees, representatives and agents (collectively, the *"Indemnitees"*) from and hold each of them harmless against any and all losses, liabilities, claims, damages or expenses reasonably incurred by any of them as a result of, or arising out of, or in any way related to, or by reason of

(i)    any investigation, litigation or other proceeding (whether or not the Lender is a party thereto) related to the entering into and/or performance of any Loan Document or the use of the proceeds of the Loan hereunder or the consummation of any transactions contemplated in any Loan Document, other than any such investigation, litigation or proceeding or arising solely out of any examination of the Lender by any regulatory or other governmental authority having jurisdiction over it; or

(ii)    the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property owned, leased or at any time operated by any Loan Party, the release, generation, storage, transportation, handling or disposal of Hazardous Materials at any location, whether or not owned or operated by any Loan Party, if any Loan Party

could have or is alleged to have any responsibility in respect thereof, the non-compliance of any such Real Property with foreign, federal, state and local Laws, regulations and ordinances (including applicable permits thereunder) applicable thereto, or any Environmental Claim asserted against any Loan Party, in respect of any such Real Property, or

(iii)     all claims, liabilities, costs and expenses (including attorneys' fees and expenses) incurred in relation to any claim by broker, finder or similar person related to any brokerage, finder or similar fees or commissions payable in connection with the transactions contemplated hereby or by the Senior Loan Documents;

including, in each case, without limitation, the fees and disbursements of counsel incurred in connection with any such investigation, litigation or other proceeding, provided, however, that Borrower shall not be liable for indemnification to the extent that Lender is found to be responsible for gross negligence or willful misconduct. To the extent that the undertaking to indemnify, pay or hold harmless any person set forth in the preceding sentence may be unenforceable because it is violative of any Law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities that is permissible under applicable Law.

10.2     **Right of Setoff.**  In addition to any rights now or hereafter granted under applicable Law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to the Borrower or to any other person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Lender (including, without limitation, by branches and agencies of the Lender wherever located) to or for the credit or the account of the Borrower against and on account of the Obligations and liabilities of the Borrower to the Lender under this Agreement or under any of the other Loan Documents, including, without limitation, all other claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not the Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

10.3     **Notices.**  All notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto or any other person shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by prepaid courier and shall be deemed to be given for purpose of this Agreement (i) in regard to registered or certified mail, three Business Days after mailing and (ii) in regard to personal delivery or prepaid courier, on the day that such writing is delivered. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this section 10.3, notices, demands, instructions and other communications in writing shall be given to or made upon the following persons at its addresses indicated below:

To the Borrower or any Loan Party:

WOODLAND LAKES INVESTMENT GROUP, L.L.C.
1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attention: Scott A. Chappelle
Telephone: (517) 336-4400
Facsimile: (517) 336-4499

With a courtesy copy to:

McGraw & Eckhardt, PC
1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attention: Thomas R. Eckhardt, Esq.
Telephone: (517) 336-4400
Facsimile: (517) 336-4499

To the Lender:

HARTFORD MEZZANINE INVESTORS I, LLC
127 Public Square, 7th Floor
Cleveland, Ohio 44114
Attention: Asset Manager - James MacQueen
Facsimile: (216) 689-4700
Telephone: (216) 689-4504

with a courtesy copy to:

Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Attention: Bernadette M. Mast, Esq.
Facsimile: (216) 579-0212
Telephone: (216) 586-7088

or at such other address as any of the persons identified above may from time to time designate by written notice given as herein required. Rejection or refusal to accept or inability to deliver because of changed addresses or because notice of changed address was given shall be deemed a receipt of such notice. The effectiveness of such notice will not be affected by the giving or lack thereof of courtesy copies of such notice.

If any day on which any notice, demand, instruction or other communication is given or sent by any party hereto is not a Business Day, such notice, demand, instruction or other communication shall be deemed to have been given or sent on the Business Day next succeeding such non-Business Day.

**10.4    Successors and Assigns.**

(a)    **General.**  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns, ***provided*** that the Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of the Lender.

(b)    The Lender may at any time sell to one or more persons (each a "***Participant***") participating interests in the Loan, all on such terms as the Lender may deem acceptable.  In the event of any such sale of a participating interest to a Participant, the Lender's obligations under this Agreement shall remain unchanged, the Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, the Lender shall remain the holder of the Note issued hereunder for all purposes under this Agreement, and the Borrower shall continue to deal solely and directly with the Lender in connection with the rights and obligations derived through the Lender under this Agreement.

(c)    The Lender and any assignee thereof (each an "***Assignor***") may at any time assign to one or more banks, financial institutions or other persons (each an "Assignee") all or any of its rights and obligations under this Agreement, the Note and the other Loan Documents, and such Assignee shall assume all such rights and obligations, pursuant to an assignment and assumption agreement executed by such Assignee, all on such terms as Lender may deem acceptable.  Upon the execution, delivery and acceptance of such assignment and assumption agreement in accordance with this Agreement, from and after the effective date of the assignment effected thereby, (i) the Assignee thereunder shall be a party hereto and, to the extent of that portion of the Loan covered by such assignment and assumption agreement, have the same rights and obligations as the Assignor, (ii) all references to the Lender contained in this Agreement or any other Loan Document shall be deemed to be a referenced to the Lender and any Assignee, and (iii) the Assignor shall, to the extent provided in such assignment and assumption agreement, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an assignment and assumption agreement covering all or the remaining portion of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto).  Such assignment and assumption agreement shall be deemed to amend this Agreement to the extent, and only to the extent, necessary to reflect the addition of such Assignee as a party to this Agreement and the resulting adjustment arising from the purchase by such Assignee of all or a portion of the rights and obligations of the Assignor under this Agreement, the Note and the other Loan Documents.  On or prior to the effective date of the assignment effected by such assignment and assumption agreement, the Borrower, if so requested by the Lender, shall execute and deliver to the Assignee in exchange for the Assignor's Note or Notes a new Note or Notes to the order of the Assignee in an amount equal to the amount of the Loan assumed by it pursuant to such assignment and assumption agreement and to the Assignor a new Note or Notes to the order of such Assignor in an amount equal to the amount of the Loan retained by it hereunder.  Such new Note or Notes shall be dated as of the date hereof and shall otherwise be in the form of the Note or Notes replaced thereby.  The Note or Notes surrendered by the Assignor shall be marked "canceled."

(d)    The Borrower authorizes any Assignor to disclose to any Participant, Assignee or other transferee (each, a "Transferee") and any prospective Transferee any and all financial information in such Assignor's possession concerning the Borrower that has been delivered to such Assignor by the Borrower pursuant to this Agreement or that has been delivered to such Assignor by the Borrower in connection with the Lender's credit evaluation prior to entering into this Agreement.

(e)    Anything in this section 10.4 to the contrary notwithstanding, any Assignor may assign and pledge all or any portion of the Loan and/or obligations owing to it to any Federal Reserve Bank or the United States Treasury as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any Operating Circular issued by such Federal Reserve Bank, provided that any payment in respect of such assigned portion of the Loan and/or obligations made by the Borrower to the assigning and/or pledging Assignor in accordance with the terms of this Agreement shall satisfy the Borrower's obligations hereunder in respect of such assigned Loan and/or obligations to the extent of such payment.  No such assignment shall release the assigning and/or pledging Assignor from its obligations hereunder.

(f)    The Lender agrees to furnish to the Borrower upon its written request a copy of any assignment and assumption agreement executed pursuant to section 10.4(a).

**10.5    No Waiver; Remedies Cumulative.**  No failure or delay on the part of the Lender in exercising any right, power or privilege hereunder or under any other Loan Document and no course of dealing between the Borrower and the Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.  The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies that the Lender would otherwise have.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Lender to any other or further action in any circumstances without notice or demand.

**10.6    Financial Calculations.**  The financial statements to be furnished to the Lender pursuant hereto shall be made and prepared in accordance with sound accounting principles consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Borrower to the Lender).

**10.7    Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial.**

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAW OF THE STATE OF OHIO, TO THE FULLEST EXTENT PERMITTED BY LAW, AND THE BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF OHIO GOVERNS THIS

AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (EXCEPT AS OTHERWISE PROVIDED FOR THEREIN). Any legal action or proceeding with respect to this Agreement or any other Loan Document may be brought in the United States District Court for the Northern District of Ohio or in any Ohio court sitting in the City of Cleveland, and, by execution and delivery of this Agreement, the Borrower hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts. The Borrower hereby further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the Borrower at its address for notices pursuant to section 10.3, such service to become effective 30 days after such mailing or at such earlier time as may be provided under applicable Law. Nothing herein shall affect the right of the Lender to serve process in any other manner permitted by Law or to commence legal proceedings or otherwise proceed against the Borrower in any other jurisdiction.

**(b)** The Borrower hereby irrevocably waives any objection that it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other Loan Document brought in the courts referred to in section 10.7(a) above and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

**(c)** EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

**10.8 Counterparts.** This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same agreement. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower and the Lender.

**10.9 Headings Descriptive.** The headings of the several sections and other portions of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

**10.10 Amendment or Waiver.** Neither this Agreement, any of the other Loan Documents, nor any terms hereof or thereof, may be amended, changed, waived, discharged or terminated *unless* such amendment, change, waiver, discharge or termination is in writing signed by the Borrower (or other appropriate Loan Party) and the Lender.

**10.11 Survival of Indemnities.** All indemnities set forth herein including, without limitation, in section 10.1, shall survive the execution and delivery of this Agreement and the making and prepayment or repayment of the Loan.

**10.12  Domicile of the Loan.** The Lender may transfer and carry the Loan at, to or for the account of any branch office, subsidiary or Affiliate of the Lender.

**10.13  General Limitation of Liability.** No claim may be made by the Borrower or any other person against the Lender or its Affiliates, directors, officers, employees, attorneys or agents for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any of the other Loan Documents, or any act, omission or event occurring in connection therewith; and the Borrower hereby, to the fullest extent permitted under applicable Law, waives, releases and agrees not to sue or counterclaim upon any such claim for any special, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in its favor.

**10.14  No Duty.** All attorneys, accountants, appraisers, consultants and other professional persons (including the firms or other entities on behalf of which any such person may act) retained by the Lender with respect to the transactions contemplated by the Loan Documents shall have the right to act exclusively in the interest of the Lender and shall have no duty of disclosure, duty of loyalty, duty of care or other duty or obligation of any type or nature whatsoever to any Loan Party or to any other person with respect to any matters within the scope of such representation or related to their activities in connection with such representation.

**10.15  Lender Not Fiduciary to the Loan Parties.** The relationship among the Loan Parties and the Lender is solely that of debtor and creditor, and the Lender has no fiduciary or other special relationship with any Loan Party, and no term or provision of any Loan Document, no course of dealing, no written or oral communication or other action shall be construed so as to deem such relationship to be other than that of debtor and creditor.

**10.16  Survival of Representations and Warranties.** All representations and warranties herein shall survive the making of the Loan hereunder, the execution and delivery of this Agreement, the Note and the other Loan Documents, the issue and delivery of the Note, any disposition thereof by the holder thereof and any investigation made by the Lender or on its behalf. All statements contained in any certificate or other document delivered to the Lender by or on behalf of any Loan Party pursuant hereto or otherwise specifically for use in connection with the transactions contemplated hereby shall constitute representations and warranties by the Borrower hereunder, made as of the respective dates specified therein or, if no date is specified, and if the context does not require otherwise, as of the date delivered.

**10.17  Interest Rate Limitation.** Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Loan, together with all fees, charges and other amounts that are treated as interest on the Loan under applicable Law (collectively the *"Charges"*), shall exceed the maximum lawful rate that may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable Law, the rate of interest payable in respect of the Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the maximum lawful rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Loan but were not payable as a result of the operation of this section 10.17 shall be cumulated and the interest and Charges payable to the Lender in respect of other periods shall be increased (but not above the maximum lawful rate

therefor) until such cumulated amount, together with interest thereon to the date of repayment, shall have been received by the Lender. Any amount collected by the Lender in excess of that which can be spread over the life of the Loan in accordance with this section 10.17 shall be promptly refunded to the Borrower and shall be deemed by the parties to never have been charged at all.

**10.18  Sharing of Information.**  Borrower acknowledges and agrees that the Lender and the Senior Lender may share information that each may acquire with respect to Borrower, the other Loan Parties or the Project and consents to the transfer of such information, whether financial or otherwise, between them, without having to obtain the Borrower's consent.

*(Signatures are on the following page.)*

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Agreement to be duly executed and delivered as of the date first above written.

<div style="text-align:center">

**BORROWER:**

**WOODLAND LAKES INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company

</div>

By:    WLA Management, Inc., a Michigan corporation

Its:    Manager

        By: _____

        Name: Scott A. Chappelle

        Its:    President

<div style="text-align:center">

**LENDER:**

**HARTFORD MEZZANINE INVESTORS I, LLC,** a Delaware limited liability company

</div>

By:    Key Real Estate Equity Capital, Inc., an Ohio corporation, its Managing Member

        By: _____

        Name: _____

        Title:  Vice President

And By: Hartford Investment Management Company, a Delaware corporation, its Managing Member

        By: _____

        Name: _____

        Title:  Vice President

<div style="text-align:center">

Signature Page
to
Loan Agreement

</div>

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:

**WOODLAND LAKES INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company

By:    WLA Management, Inc., a Michigan corporation
Its:    Manager

      By: _____
      Name: Scott A. Chappelle
      Its:    President

LENDER:

**HARTFORD MEZZANINE INVESTORS I, LLC,** a Delaware limited liability company

By:    Key Real Estate Equity Capital, Inc., an Ohio corporation, its Managing Member

      By: _____
      Name: JAMES MacQUEEN
      Title:  Vice President

And By: Hartford Investment Management Company, a Delaware corporation, its Managing Member

      By: _____
      Name: _____
      Title:  Vice President

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed and delivered as of the date first above written.

BORROWER:

**WOODLAND LAKES INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company

By: WLA Management, Inc., a Michigan corporation
Its: Manager

By: _____
Name: Scott A. Chappelle
Its: President

LENDER:

**HARTFORD MEZZANINE INVESTORS I, LLC,** a Delaware limited liability company

By: Key Real Estate Equity Capital, Inc., an Ohio corporation, its Managing Member

By: _____
Name: _____
Title: Vice President

And By: Hartford Investment Management Company, a Delaware corporation, its Managing Member

By: _____
Name: William P. Bowman
Title: Vice President

Signature Page
to
Loan Agreement

# ANNEX I

## INFORMATION AS TO LENDER

### HARTFORD MEZZANINE INVESTORS I, LLC

#### Lending Office

Hartford Mezzanine Investors I, LLC
127 Public Square, 7th Floor
Cleveland, Ohio 44114

**Primary Contact:**
Mr. James MacQueen
Telephone: (216) 689-4504
Facsimile: (216) 689-4700

**Contact for Rates, Payments, etc.:**
Mr. James MacQueen
Telephone: (216) 689-4504
Facsimile: (216) 689-4700

**Wiring Information:**
Hartford Mezzanine Investors I, LLC
Cleveland, OH 44114
ABA No. 041001039
Credit Account No. 114010
Please notify: Paula Struchen. (216) 689-0878 upon
arrival

# EXHIBIT A

*[See next page.]*

# TERM NOTE

US $3,340,000.00

Cleveland, Ohio

January 4, 2006

**FOR VALUE RECEIVED,** the undersigned **WOODLAND LAKES INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company and together, with its successors and assigns, is referred to herein as the *"Borrower,"* hereby promises to pay to the order of **HARTFORD MEZZANINE INVESTORS I, LLC** (the *"Lender"*), in lawful money of the United States of America and in immediately available funds, at the Lending Office of the Lender, on the Maturity Date, Three Million Three Hundred Forty Thousand and 00/100 Dollars ($3,340,000.00), or the aggregate principal amount then outstanding pursuant to the Loan Agreement referred to below. Capitalized terms used herein without definition shall have the respective meanings ascribed thereto in the Loan Agreement referred to below.

The Initial Maturity Date under the Loan Agreement is September 1, 2015, *provided, however,* the Maturity Date may be accelerated as provided in the Loan Agreement.

The Borrower also promises to pay interest in like currency and funds on the unpaid principal amount of the Loan made by the Lender, at said office, from the date hereof until paid at the rates and at the times provided in section 2.3 of the Loan Agreement.

This Note is the Note referred to in the Loan Agreement, dated as of even date herewith, between the Borrower and the Lender (as from time to time in effect, the *"Loan Agreement"*) and is entitled to the benefits thereof and of the other Loan Documents.

If an Event of Default shall occur and be continuing, the principal of and accrued interest on this Note may be declared to be due and payable in the manner and with the effect provided in the Loan Agreement.

The Borrower hereby waives presentment, demand, protest or notice of any kind in connection with this Note. No failure to exercise, or delay in exercising, any rights hereunder on the part of the holder hereof shall operate as a waiver of any such rights.

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE LAWS OF THE STATE OF OHIO, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.

*(Signature page follows.)*

**IN WITNESS WHEREOF,** the Borrower has executed this Note as of the date first above written.

BORROWER:

**WOODLAND LAKES INVESTMENT GROUP,**
**L.L.C.,** a Michigan limited liability company

By:    WLA    Management,    Inc.,    a    Michigan
      corporation
Its:    Manager

    By: _____
    Name: Scott A. Chappelle
    Its:    President

**PLEDGE AGREEMENT**
*(Pledge of Membership Interests by Members)*

in

**WOODLAND LAKES INVESTMENT GROUP, L.L.C.,**

dated as of
January 4, 2006

By

**EACH PLEDGOR A PARTY HERETO,**
*as the Pledgors*

To

**HARTFORD MEZZANINE INVESTORS I, LLC,**
*as the Lender*



EXHIBIT
C

Jones Day Cleveland
601755-HMI001
CLI-1362509v2

Woodland Lakes Apartments
Mezzanine Loan

# PLEDGE AGREEMENT

**THIS PLEDGE AGREEMENT**, dated as of January 4, 2006 (herein as amended, supplemented or otherwise modified from time to time, this "*Agreement*"), is made by (i) each of the undersigned (herein, together with their respective successors, assigns, heirs and personal representatives, collectively, the "*Pledgors*" and, individually, each a "*Pledgor*"), whose address is set forth on *Schedule I* annexed hereto and incorporated herein by this reference, for the benefit of (ii) HARTFORD MEZZANINE INVESTORS I, LLC, a Delaware limited liability company, the lender under the Loan Agreement referred to below (herein, together with its successors and assigns, the "*Lender*"), whose address is 127 Public Square, 7th Floor, Cleveland, Ohio 44114:

## PRELIMINARY STATEMENTS:

(A) This Agreement is made pursuant to the Loan Agreement of even date herewith (herein, as amended or otherwise modified from time to time, the "*Loan Agreement*"), between Woodland Lakes Investment Group, L.L.C., a Michigan limited liability company (herein, together with its successors and assigns, the "*Borrower*"), and the Lender. The Borrower is a single asset entity whose sole asset is approximately 60.33 acres of real property at 4200 Dell Road in the Township of Delhi, County of Ingham, State of Michigan (the "*Land*") and a 344-unit Class A apartment community consisting of 21 two-story apartment buildings plus a 3,200 square foot clubhouse with locker rooms, exercise facility and in-ground swimming pool situated on the Land, all known as the Woodland Lakes Apartments (the "*Project*")

(B) Except as otherwise defined herein, terms that are defined in the Loan Agreement are used herein with the same meanings.

(C) The Loan Agreement provides, among other things, for a loan in the principal amount of U.S. $3,340,000.00 by the Lender to the Borrower (the "*Loan*"), which Loan shall be evidenced by a promissory note (the "*Note*," such term to include all notes and other securities issued in exchange therefor or in replacement thereof).

(D) The Pledgors will derive material financial benefits from the incurrence by the Borrower of the Secured Obligations (hereinafter defined), and this Agreement is made to induce the Lender to extend the Secured Obligations.

(E) The Pledgors, collectively, are the legal and beneficial owners of one hundred percent (100%) of the equity interests in the Borrower (hereinafter referred to collectively as the "*Pledged Interests*"), which Pledged Interests are listed on *Schedule I*. The Borrower is sometimes referred to herein as the "*Company.*"

(F) It is a condition precedent to the making of the Loan to the Borrower under the Loan Agreement that the Note and the Loan Documents be secured by, among other things, the pledge of one hundred percent of the equity interests in the Borrower, and that the Pledgors, as the legal and

beneficial owners of the Pledged Interests, constituting all of the equity interests in the Company, shall have executed and delivered this Agreement to the Lender.

(G)     The Pledgors desire to execute this Agreement to satisfy the condition described in the preceding paragraph.

NOW, THEREFORE, in consideration of the premises, and in order to induce the Lender to extend the Secured Obligations, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Pledgor hereby agrees with the Lender as follows:

1.     **Security for Secured Obligations.**  This Agreement is made by the Pledgors to the Lender to secure:

(a)     the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the Loan and all interest on the Loan and other related obligations (including obligations that, but for the automatic stay under section 362(a) of the Bankruptcy Code or other applicable provisions of law, are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving any Loan Party) and liabilities of the Borrower to the Lender, under the Loan Agreement, whether now existing or hereafter incurred;

(b)     the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the Fees, and all other obligations (including obligations that, but for the automatic stay under section 362(a) of the Bankruptcy Code or other applicable provisions of law, are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving any Loan Party) and liabilities of the Borrower and/or any other Loan Party to the Lender, whether now existing or hereafter incurred under, arising out of, or in connection with the Loan Agreement or any other Loan Document, and the due performance and compliance by the Borrower and/or the other Loan Parties with all of the terms, conditions and agreements contained in the Loan Agreement and such other Loan Documents;

(c)     any and all sums advanced by the Lender in order to preserve any or all of the Pledged Collateral (as hereinafter defined) or preserve its security interest in the Pledged Collateral; and

(d)     in the event of any proceeding for the collection or enforcement of any indebtedness, obligations, or liabilities referred to in clauses (a), (b) and (c) above, after an Event of Default shall have occurred, the expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Pledged Collateral, or of any exercise by the Lender of its rights hereunder, together with reasonable attorneys' fees and court costs.

All such obligations, liabilities, sums and expenses set forth in clauses (a) through (d) of this section 1 are herein collectively called the "**Secured Obligations**," it being acknowledged and agreed

that the *"Secured Obligations"* shall include extensions of credit of the types described above, whether outstanding on the date of this Agreement or extended from time to time after the date of this Agreement.

2.     **Security Pledge; Remedies.** (a) As security for the due payment and performance of all Secured Obligations, each Pledgor hereby pledges, and grants to the Lender a first priority security interest in and an assignment of, all of the following, whether now existing or hereinafter arising (collectively, the *"Pledged Collateral"*):

(i)     all of the Pledged Interests and any certificates representing the Pledged Interests and any interest of such Pledgor in the entries on the books of any financial intermediary pertaining to the Pledged Interests, and all dividends, distributions, cash, warrants, rights, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Interests;

(ii)     all additional interests in, and all securities convertible into and warrants, options and other rights to purchase or otherwise acquire, interests in any issuer of the Pledged Interests from time to time acquired by such Pledgor in any manner (which interests shall be deemed to be part of the Pledged Interests), any certificates or other instruments representing such additional interests, securities, warrants, options or other rights and any interest of such Pledgor in the entries on the books of any financial intermediary pertaining to such additional interests, and all dividends, distributions, cash, warrants, rights, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such additional interests, securities, warrants, options or other rights;

(iii)     all of the right, title and interest of such Pledgor in the Organizational Documents of the Company;

(iv)     all of such Pledgor's rights and interest as a member of the Company, including, without limitation, such Pledgor's voting, managerial and control rights, if any, as well as such Pledgor's rights and interest in and to the profits and losses of the Company, if any, whether now existing or hereafter arising, whether pursuant to the Organizational Documents of the Company, arising at law or in equity or otherwise;

(v)     all of such Pledgor's rights to receive distributions, in cash or in kind, as well as any right to any surplus or any monies due or to become due to such Pledgor in respect of the Company, whether now existing or hereafter arising, whether pursuant to the terms of the Organizational Documents of the Company, arising at law or in equity or otherwise;

(vi)     all of such Pledgor's interest, if any, in any property or assets of the Company; and

(vii)     any and all proceeds, products, monies, claims for monies due or to become due, increases in ownership share and any other payments arising from or in connection with

> any of the foregoing Pledged Collateral. (For purposes of this Agreement, the term "proceeds" includes whatever is receivable or received when Pledged Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes, without limitation, proceeds of any indemnity or guaranty payable to any Pledgor or the Lender from time to time with respect to any of the Pledged Collateral.)

Such security interest shall include, without limitation, any and all rights and remedies of a secured party under the UCC from time to time, or otherwise provided by applicable law.

(b)     Subject to the provisions of sections 2(d) and (e) hereof, notwithstanding the pledge, delivery and the granting of a security interest in the Pledged Collateral hereunder, each Pledgor shall continue to be a member in the Company and shall be entitled to exercise all voting, managerial, control and other rights, if any, that it may have relating to the Pledged Collateral and to receive and keep any distributions with respect thereto.

(c)     If any Pledgor shall become entitled to receive or shall receive any instrument, certificate, option or right, whether as an addition to, in substitution of, or in exchange for, the Pledged Collateral or any part thereof, such Pledgor shall accept any such instruments as the Lender's agent, shall hold them in trust for the Lender and shall deliver them forthwith to the Lender in the exact form received, with such Pledgor's endorsement when necessary, to be held by the Lender, subject to the terms and conditions hereof, as further collateral security for the Secured Obligations.

(d)     Following the occurrence of any Event of Default, (i) the Lender shall have all rights and remedies available at law or equity, including, without limitation, all rights and remedies available under this Agreement and the other Loan Documents and all rights and remedies available under the UCC, and (ii) the Lender shall have the right to require that any cash payable with respect to the Pledged Collateral (whether as a distribution of net cash flow, upon redemption or otherwise), be paid to the Lender, as additional collateral security hereunder; otherwise such payments may be received and retained by the Pledgors.

(e)     Following the occurrence of any Event of Default, the Lender, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale, and the notice of repossession referred to below) to or upon any Pledgor or any other person (all and each of which demands, advertisements and/or notices are, to the extent permitted by law, hereby expressly waived), may forthwith collect the Pledged Collateral not then in the possession of the Lender and sell the Pledged Collateral at a public or private sale, at any exchange, broker's board or at any of the Lender's offices or elsewhere, for cash or credit, with right to any purchaser upon any such sale to purchase, to the extent permitted by law, the Pledged Collateral so sold, free of any right or equity of redemption of any Pledgor in such Pledged Collateral, which right or equity is hereby expressly waived and released to the extent permitted by law, and the Lender may be a purchaser in such sale and may apply (in its sole discretion) all or any portion of the unpaid amount of any of the Secured Obligations against the purchase thereof, *provided, however*, other than in the case of any of the Pledged Collateral that the Lender determines to be declining speedily in value or that is customarily sold in any securities

exchange, over the counter market or other recognized market, in the case of (i) any public sale, the Lender shall give at least ten days' notice to the Pledgors of the time and place of any public sale and (ii) any private sale, such sale shall be conditioned upon the Lender providing notice of such sale terms to the Pledgors and not consummating such sale until ten days after provision of such notice. Such notice of public or private sale shall be deemed to be reasonable notification of such matters. Each Pledgor hereby consents to the admission as a member in the Company of any purchaser (upon the written request of such purchaser served upon the Company) of the Pledged Collateral, upon a sale of the Pledged Collateral, and agrees that such purchaser of the Pledge Collateral shall be a transferee of all of such Pledgor's right, title and interest in the Pledged Collateral, including, without limitation, any voting, management or other control rights.

(f)     In connection with the enforcement by the Lender of any remedies available to the Lender as a result of any Event of Default, each Pledgor agrees to (and to cause the Company to, to the extent of such Pledgor's right) join and cooperate fully, in each case at the Lender's election, with the Lender, any receiver and/or the successful bidder or bidders at any sale of the Pledged Collateral, in a filing of an application (and furnishing any additional information that may be required in connection with such application) with all applicable federal, state and local governmental authorities, to the extent required by law, requesting their prior approval of the transfer of control of the Company (including, without limitation, the admission of any purchaser of the Pledged Collateral as a member of the Company as provided in section 2(e)) or assignment of all licenses, authorizations and permits issued to the Company by any such authorities to the receiver or to the successful bidder or bidders, including, without limitation, the Lender. In connection with the foregoing, each Pledgor shall (and shall cause the Company to, to the extent of such Pledgor's right) take such further actions, and execute all such instruments, as the Lender reasonably deems necessary or desirable to carry out the purposes of this provision. Each Pledgor agrees that the Lender may enforce any obligations of such Pledgor as set forth in this provision by specific performance.

(g)     The proceeds of any sale as aforesaid shall be applied as provided in the order of priority indicated as follows:

(i)     First, to the payment of all costs and expenses, fees, commissions and taxes at any time and from time to time incurred by the Lender under or in connection with the administration or enforcement of this Agreement or the other Loan Documents (including, without limitation, the fees and expenses of counsel employed by the Lender in connection therewith) and the payment of all indemnities at any time and from time to time payable to the Lender under or in connection with this Agreement or any of the other Loan Documents;

(ii)     Second, to the payment of the Secured Obligations as the Lender may determine; and

(iii)     Third, to the Pledgors or to whomsoever shall be lawfully entitled thereto.

(h)     The Lender shall be entitled to appointment of a receiver or trustee to assume, upon receipt of all necessary judicial or other governmental authority, consents or approvals, control of

or ownership of the Pledged Collateral. Such receiver or trustee shall have all rights and powers provided to it by law or by court order or provided to the Lender under this Agreement.

      3.      **Representations, Warranties and Covenants.** (a) Each Pledgor represents and warrants to the Lender that:

      (i)      such Pledgor, if a natural person, has the legal and mental capacity to enter into this Agreement and to consummate the transactions contemplated hereby, and if not a natural person, (i) is a duly organized or formed and validly existing corporation, partnership, limited liability company or irrevocable trust, as the case may be, in good standing under the laws of the jurisdiction of its formation and has the corporate, partnership, limited liability company or trust power and authority, as applicable, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage, and (ii) has duly qualified and is authorized to do business in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified would not have a Material Adverse Effect;

      (ii)      such Pledgor, if not a natural person, has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of this Agreement and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Agreement. Such Pledgor has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid and binding agreement or obligation of such Pledgor enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law);

      (iii)      such Pledgor is the direct beneficial owner of its portion of the Pledged Collateral and, to the best of the Pledgor's knowledge, the Pledgors, in the aggregate, own the entirety of the membership interests in the Company;

      (iii)      the Company is a limited liability company duly formed under the laws of the State of Michigan;

      (iv)      there exists no membership interests (including, but not limited to, warrants, options or other rights) in the Company and no other equity interests (including, but not limited to, warrants, options or other rights) in the Company other than the membership interests described in *Schedule I*;

      (v)      the Pledged Interests are not represented by certificates or other evidence of ownership unless such certificates have been delivered to the Lender together with a transfer power (or other instrument of assignment acceptable to the Lender) duly executed in blank;

(vi)      such Pledgor owns such Pledged Collateral free and clear of any pledge, mortgage, hypothecation, lien, charge, encumbrance or any security interest therein, except for the pledge and security interest granted to the Lender hereunder;

(vii)     such Pledgor's exact legal name and State of principal residence, if a natural person, or State of formation, if not a natural person, are as set forth on *Schedule I* and such Pledgor is a registered organization in such State. The Pledgor shall notify the Lender in writing of any change in its name or State of principal residence or formation or qualification as a registered organization in such State, not later than thirty days after the occurrence of any such change;

(viii)    this Agreement constitutes, creates and grants a valid first priority security interest in and an assignment of such Pledgor's portion of the Pledged Collateral, subject to no prior security interest, assignment, lien, charge or encumbrance or to any agreement purporting to grant to any third party a security interest in the property or assets of such Pledgor that would include the Pledged Collateral hereby pledged by the Pledgor or any portion thereof;

(ix)      the execution and delivery by such Pledgor of this Agreement and the security interest granted herein does not violate (A) the Organizational Documents of such Pledgor, if applicable, or the Company or any indenture, mortgage, bank loan or credit agreement, or other agreement to which such Pledgor or the Company or any Affiliate of such Pledgor or the Company is a party or by which any of their respective properties or assets may be bound, including, without limitation, the Senior Loan Documents; (B) to the best knowledge of such Pledgor, any provision of any applicable law, rule or regulation or of any order, judgement, writ, award or decree of any court, arbitrator or governmental instrumentality, domestic or foreign, applicable to such Pledgor or the Borrower; or (C) any restriction on the transfer or encumbrance of the Pledged Collateral;

(x)       no consent, license, approval or authorization of, exemption by, or registration with any governmental instrumentality is required to be obtained in connection with the execution, delivery, performance, validity or enforceability of this Agreement, and no consent of any other person or entity is required for any of the foregoing;

(xi)      to each Pledgor's actual knowledge, the Lender has been tendered a true and correct copy of the Organizational Documents of the Company and of the Pledgor, if applicable, together with any and all amendments and supplements thereto; other than the amendments and supplements so provided, there are no agreements, whether oral or written, that modify the terms of any of such Organizational Documents;

(xii)     all of the necessary documents for the creation and continued existence of the Pledgor, if applicable, and the Company have been fully executed by each of the parties thereto, and each such document is in full force and effect in accordance with its terms; and each of the parties to each such document is in full compliance with all of the requirements, terms, conditions and covenants of the same; and

(xiii)   the Pledgor has received and reviewed a copy of the Loan Agreement and all of the other Loan Documents.

(b)   Each Pledgor hereby covenants and agrees with the Lender as follows:

(i)   the Pledgors (A) shall cause the Company to make a notation on its records, which notation shall indicate the security interest granted hereby, (B) shall deliver to the Lender, concurrently herewith, all certificates (if any) that evidence their respective Pledged Interests, and (C) hereby authorizes the Lender to file financing statements (and any amendments thereto and continuations thereof) containing a description of the Pledged Collateral pursuant to the UCC as the Lender may reasonably require from time to time to perfect the security interest granted hereby;

(ii)   so long as the Secured Obligations shall be outstanding and unpaid, in whole or in part, such Pledgor will not consent to or approve the creation of any new, additional or substitute equity interests in the Company, other than the Pledged Collateral;

(iii)   so long as the Secured Obligations shall be outstanding and unpaid, in whole or in part, such Pledgor will not, without the prior written consent of the Lender, which may be granted or withheld in its sole discretion, (A) sell, convey or otherwise dispose of the Pledged Collateral or any interest therein, create, incur or permit to exist any pledge, mortgage, lien, charge, encumbrance or any security interest whatsoever with respect to the Pledged Collateral, other than that created hereby, or (B) cause or permit the Company to sell, convey (except for leases in accordance with the terms and conditions of the Loan Agreement) or otherwise dispose of the Project or any interest therein, or create, incur or permit to exist any pledge, mortgage, lien, charge, encumbrance or any security interest whatsoever with respect to the Project, other than that created pursuant to the Loan Documents or Senior Loan Documents;

(iv)   such Pledgor shall, at any time and from time to time upon the written request of the Lender, execute and deliver such further documents and do such further acts and things as the Lender may reasonably request to effect the purposes of this Agreement;

(v)   such Pledgor shall defend all of the right, title and interest of the Lender in and to such Pledgor's portion of the Pledged Collateral against all claims and demands;

(vi)   such Pledgor shall promptly notify the Lender of any event of which such Pledgor becomes aware causing a material loss or depreciation in value of the Pledged Collateral or the Project, and shall provide financial statements of such Pledgor to the Lender upon the Lender's reasonable request;

(vii)   such Pledgor shall not do any of the following without the prior written consent of the Lender:

(A)   vote or agree to dissolve the Company;

(B)     vote or agree to amend the charter documents including the Organizational Documents of the Company;

(C)     withdraw capital, make or take distributions (unless permitted by the express terms of the Loan Agreement), or borrow from the Company;

(D)     vote or agree to admit any person or entity as an additional or substitute member of the Company except with respect to any purchaser of any interest in the Company in enforcement proceedings by the Lender pursuant to this Agreement or any other agreement whereby any interest in the Company is pledged to the Lender as security for the Secured Obligations; or

(E)     vote or agree to issue (if none as of the date hereof), or amend (if any as of the date hereof), certificates or other evidence of the Pledged Interests, or otherwise elect that the Pledged Interests shall be covered or governed by Article 8 of the UCC as in effect in the State in which the Company is a registered organization;

(viii)   no Pledgor, nor any Affiliate of such Pledgor, shall acquire any interest in promissory note under the Senior Loan Documents;

(ix)    no Pledgor shall cause or permit the Company to amend or modify the Senior Loan Documents, or otherwise refinance the Senior Loan, or amend or modify the Reimbursement Agreement without the Lender's prior written consent which consent shall not be unreasonably withheld or delayed, or incur any debt other than the Loan and the Senior Loan;

(x)     neither the execution, delivery and performance by such Pledgor of this Agreement nor compliance with the terms and provisions hereof, nor the consummation of the loan transactions contemplated in the Loan Documents (A) will contravene any provision of any Law, statute, rule, regulation, order, writ, injunction or decree of any court or governmental instrumentality applicable to such Pledgor or its properties and assets; (B) will conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (other than the Liens created under this Agreement and the Senior Mortgage) upon any of the property or assets of such Pledgor pursuant to the terms of any promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement or any other material agreement or other instrument to which such Pledgor is a party or by which it or any of its property or assets are bound or to which it may be subject; (C) will violate any provision of the articles or certificate of incorporation, code of regulations, by-laws or other Organizational Document of the Pledgor; or (D) will conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, any of the Senior Loan Documents; and

(xi)   no order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any foreign or domestic governmental or public body or authority, or any subdivision thereof, is required to authorize or is required as a condition to (A) the execution, delivery and performance by such Pledgor of this Agreement or (B) the legality, validity, binding effect or enforceability of this Agreement, except for any filings or recordings necessary to perfect the Liens provided for under this Agreement.

   **4.     Indemnification.** Each Pledgor shall indemnify the Lender against, and shall hold it free and harmless from, any and all claims, demands, lawsuits, judgments, awards, costs and expenses, including (but not limited to) reasonable attorneys' fees, and any other liabilities whatsoever incurred by the Lender as the result of a breach by such Pledgor of this Agreement or such Pledgor's representations or warranties herein.

   **5.     Lender as Attorney-In-Fact.** Each Pledgor does hereby make, constitute and appoint the Lender, and any officer or agent of the Lender, with full power of substitution, as such Pledgor's attorney-in-fact, with power, in its own name or in the name of such Pledgor, upon the occurrence of an Event of Default, generally to do (to the extent so permitted) at the Lender's option, at any time or from time to time, all acts and things that the Lender deems necessary to protect, preserve and realize upon the Pledged Collateral and the Lender's security interest therein to effect the intent of this Agreement, all as fully and effectually as such Pledgor might or could do; and such Pledgor hereby ratifies all that said attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable for the term of this Agreement and thereafter as long as any of the Secured Obligations shall be outstanding.

   **6.     Lender's Duties and Rights.** (a)  The Lender shall have no duties or responsibilities except those expressly set forth in this Agreement. Nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Lender any obligations in respect of this Agreement except as expressly set forth herein.

   (b)     The Lender shall be entitled to rely upon any written notice, statement, certificate, order or other document or any telephone message believed by it to be genuine and correct and to have been signed, sent or made by any Pledgor and, with respect to all matters pertaining to this Agreement and the duties hereunder, upon advice of counsel selected by it.

   (c)     The Lender shall be entitled to exercise any and all of the rights granted hereunder irrespective of (i) the validity or enforceability of any of the Secured Obligations or of any promissory note or other document evidencing all or any part of the Secured Obligations; (ii) the absence of any attempt to collect the Secured Obligations from the Borrower or any guarantor or other action to enforce the same; (iii) the waiver or consent by the Lender with respect to any provision of any instrument evidencing any of the Secured Obligations, or any part thereof, or any other agreement now or hereafter executed by the Borrower and delivered to the Lender, except to the extent that as a result of such waiver or consent, no Event of Default exists that allows the Lender to take action hereunder; (iv) failure by the Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for the Secured Obligations; (v) the Lender's election, in any proceeding instituted under the Bankruptcy Code or the application

of section 1111(b)(2) thereof; (vi) any borrowing or grant of a security interest by the Borrower, as debtor-in-possession, under section 364 of the Bankruptcy Code; (vii) the disallowance, under section 502 of the Bankruptcy Code, of all or any portion of the Lender's claim(s) for repayment of the Secured Obligations; or (viii) any other circumstance that might otherwise constitute a legal or equitable discharge or defense of the Borrower or any Pledgor.

7. **Member's/Manager's Consent.** The execution of this Agreement by each member in the Company constitutes such person's unanimous written consent to the terms and conditions contained herein, including, without limitation, the pledging of the Pledged Collateral by each party hereto, and to the sale and assignment thereof upon foreclosure or other sale conducted in accordance with the terms of this Agreement, and to the substitution and/or replacement of the Pledgor by the successor of the Pledged Interests. Each such member further consents and acknowledges that, upon such foreclosure or other sale, the purchaser of that portion of the Pledged Collateral that represents the membership interests in the Company shall have all rights of such Pledgor, including, without limitation, such Pledgor's voting, managerial and control rights, if any, and such Pledgor's right to receive profits and a return on such Pledgor's capital account, if any. In addition, the manager of the Company has executed this Agreement to evidence its acknowledgement and consent to its replacement as the manager of the Company (without compensation of any sort) upon any such foreclosure or other sale, by a manager designated by the successor of the Pledged Interests.

8. **Cumulative Remedies.** The rights and remedies herein provided and provided in the Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law including, without limitation, the rights and remedies of a secured party under the UCC.

9. **Severability.** The provisions of this Agreement are severable and, if any clause or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction and shall not in any manner affect such clause or provision in any other jurisdiction or any other clause or provision in this Agreement in any jurisdiction.

10. **Successors and Assigns.** This Agreement shall be binding upon each Pledgor and their respective successors, assigns, heirs and personal representatives and shall inure to the benefit of the Lender, **_provided, however,_** that the obligations of any Pledgor under this Agreement may not be assigned or delegated. Nothing herein nor in the other Loan Documents shall impose any obligation upon the Lender, under the Organizational Documents of the Company or otherwise, unless or until the Lender shall have succeeded to the ownership of the Pledged Interests, and then any such obligation shall be prospective only from the date of such succession.

11. **Waivers.** (a) The obligations of the Pledgors under this Agreement shall be performed without demand by the Lender and shall be unconditional irrespective of the genuineness, validity, regularity or enforceability of any of the other Loan Documents and without regard to any other circumstance that might otherwise constitute a legal or equitable discharge of a surety or a guarantor.

(b)     Each Pledgor hereby waives the following:

(i)     diligence, presentment, demand of payment (except as expressly required hereunder), filing of claims with a court in the event of receivership or bankruptcy of the Company, protest or notice with respect to the Secured Obligations, all setoffs and counterclaims and all presentments, demands for performance, all notices with respect to the other Loan Documents and this Agreement that may be required by statute, rule of law or otherwise to preserve the Lender's rights against each Pledgor under this Agreement, including, but not limited to, notice of acceptance, notice of any amendment of the Loan Documents, notice of the occurrence of any default, notice of intent to accelerate, notice of acceleration, notice of dishonor, notice of foreclosure, notice of protest, notice of the incurring by the Borrower of any obligation or indebtedness, notices of nonperformance, protests, notices of protest, notices of dishonor and notices of acceptance of this Agreement, promptness in commencing suit and the benefits of all statutes of limitation and all other demands (except as expressly required hereunder) whatsoever (and shall not require that the same be made on the Company as a condition precedent to each Pledgor's obligations hereunder);

(ii)    all notices of the existence, creation or incurring of new or additional indebtedness, arising either from additional loans extended to the Borrower or otherwise;

(iii)   all notices that the principal amount, or any portion thereof, and/or any interest on any instrument or document evidencing all or any part of the Secured Obligations is due (except as expressly required hereunder), notices of any and all proceedings to collect from the maker, any endorser or any other pledgor of all or any part of the Secured Obligations, or from any other person and, to the extent permitted by law, notices of exchange, sale, surrender or other handling of any security or collateral given to the Lender to secure payment of all or any part of the Secured Obligations;

(iv)    any and all benefits and defenses under any applicable law that may limit any Pledgor's liability if the Borrower had no liability at the time of execution of the Note or any other Loan Document, or thereafter ceases to be liable;

(v)     any and all benefits and defenses under any applicable law that may limit any Pledgor's liability if such liability is larger in amount and more burdensome than that of the Borrower;

(vi)    the benefit of all principles or provisions of law, statutory or otherwise, that are or might be in conflict with the terms of this Agreement, and each Pledgor agrees that its obligations shall not be affected by any circumstances, whether or not referred to in this Agreement, that might otherwise constitute a legal or equitable discharge of a surety or a guarantor;

(vii)   the benefits of any right of discharge under any and all statutes or other laws relating to guarantors or sureties and any other rights of sureties and guarantors thereunder; and

(viii)    all rights to require the Lender to (A) proceed against the Borrower or any guarantor of the Borrower's payment or performance or provider of security therefor (an "*Other Guarantor*"); (B) proceed against or exhaust any collateral held by the Lender to secure the repayment of the Secured Obligations; or (C) pursue any other remedy it may now or hereafter have against the Borrower.

(c)    Each Pledgor hereby waives any objection it may have, and any right to notice thereof, as a result of any action by the Lender, acting on its own behalf or through an agent (i) to renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, all or any part of the Secured Obligations, or to otherwise modify, amend or change the terms of any of the Loan Documents; (ii) to accept partial payments on all or any part of the Secured Obligations; (iii) to take and hold security or collateral for the payment of all or any part of the Secured Obligations, this Agreement or any guaranties of all or any part of the Secured Obligations or other liabilities of the Borrower; (iv) to exchange, enforce, waive and release any such security, collateral or guaranties; (v) to apply such security or collateral and direct the order or manner of sale thereof as in its reasonable discretion it may determine; and (vi) to settle, release, exchange, enforce, waive, compromise or collect or otherwise liquidate all or any part of the Secured Obligations, this Agreement, any guaranty of all or any part of the Secured Obligations and any security or collateral for the Secured Obligations. Any of the foregoing may be done in any manner, without affecting or impairing the Secured Obligations of any Pledgor hereunder.

(d)    Each Pledgor understands that the exercise by the Lender of certain rights and remedies contained in the Loan Documents may affect or eliminate such Pledgor's right of subrogation against the Borrower and that such Pledgor may therefore incur a partially or totally nonreimbursable liability under this Agreement. Nevertheless, each Pledgor hereby authorizes and empowers the Lender to exercise, in its sole and absolute discretion, any right or remedy, or any combination thereof, that may then be available, because it is the intent and purpose of such Pledgor that the obligations under this Agreement shall be absolute, independent and unconditional under any and all circumstances. Each Pledgor expressly waives any defense (which defense, if such Pledgor had not given this waiver, such Pledgor might otherwise have) to a judgment against such Pledgor by reason of a nonjudicial foreclosure. Without limiting the generality of the foregoing, each Pledgor hereby expressly waives any and all benefits under any applicable law that, if such Pledgor had not given this waiver, (i) would otherwise limit such Pledgor's liability after a nonjudicial foreclosure sale to the difference between the obligations of such Pledgor under this Agreement and the fair market value of the property or interests sold in such nonjudicial foreclosure sale; (ii) would otherwise limit the Lender's right to recover a deficiency judgment with respect to purchase money obligations and after a nonjudicial foreclosure sale; and (iii) would otherwise require the Lender to exhaust all of its security before a personal judgment could be obtained for a deficiency. Notwithstanding any foreclosure of the lien of any other Loan Document, whether by the exercise of the power of sale contained in the instrument, by an action for judicial foreclosure or by the Lender's acceptance of a deed in lieu of foreclosure, each Pledgor shall remain bound under this Agreement.

(e)    Each Pledgor also waives any right or defense based upon an election of remedies by the Lender, even though such election (*e.g.*, foreclosure with respect to any collateral held by the Lender to secure repayment of the Secured Obligations) may destroy or otherwise impair the

subrogation rights of such Pledgor or the right of such Pledgor (after payment of the obligations guaranteed by such Pledgor under this Agreement) to proceed against the Borrower for reimbursement, or both.

12.     **Setoff.** In addition to and not in limitation of all rights of offset that the Lender may have under applicable law, upon the occurrence of any Event of Default, and whether or not the Lender has made any demand on the Secured Obligations of the Borrower or of the Pledgors have matured, the Lender shall have the right to appropriate and apply to the payment of the Secured Obligations (a) all deposits and other obligations then or thereafter owing by the Lender to the Pledgors and (b) any moneys, credits or other property belonging to the Pledgors, at any time held by or coming into the possession of the Lender. The Lender shall provide notice to the Pledgors of any setoff rights so exercised.

13.     **Financial Information.** Each Pledgor hereby assumes responsibility for keeping itself informed of the financial condition of the Borrower and any and all endorsers and/or other pledgor of all or any part of the Secured Obligations and of all other circumstances bearing upon the risk of nonpayment of the Secured Obligations, or any part thereof, that diligent inquiry would reveal, and each Pledgor hereby agrees that the Lender shall have no duty to advise such Pledgor of information known to the Lender regarding such condition or any such circumstances. In the event the Lender, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Pledgor, the Lender shall be under no obligation (a) to undertake any investigation not a part of its regular business routine; (b) to disclose any information that the Lender, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential; or (c) to make any other or future disclosures of such information or any other information to any Pledgor.

14.     **No Marshaling; Reinstatement.** Each Pledgor consents and agrees that the Lender shall be under no obligation to marshal any assets in favor of any Pledgor or any other person or against or in payment of any or all of the Secured Obligations. Each Pledgor further agrees that, to the extent that the Borrower, such Pledgor or any other pledgor or guarantor of all or any part of the Secured Obligations makes a payment or payments to the Lender, or the Lender otherwise receives any proceeds of the Pledged Collateral, which payment or payments or receipt or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to the Borrower, the Pledgors, such other pledgor or guarantor or any other person, or their respective estates, trustees, receivers or any other person under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, the part of the Secured Obligations that has been paid, reduced or satisfied by such amount shall be reinstated and continued in full force and effect as of the time immediately preceding such initial payment, reduction or satisfaction.

15.     **Subrogation, Contribution, etc.** Until the Loan and the Secured Obligations (other than unasserted indemnity obligations) have been fully and indefeasibly paid in cash and satisfied, the Lender has released, transferred or disposed of all its rights, title and interest in such collateral or security, and there has expired the maximum possible period thereafter during which any payment made by the Borrower or others to the Lender with respect to the Secured Obligations or Loan could be deemed a preference under the Bankruptcy Code, each Pledgor hereby irrevocably waives and

14

agrees not to assert (a) any claim, right or remedy, direct or indirect, that such Pledgor now or may hereafter have against the Borrower, any assets of the Borrower or against any other person or any collateral or security for the Secured Obligations in connection with the performance by such Pledgor of its obligations hereunder or under the other Loan Documents or Senior Loan Documents, whether such claim, right or remedy arises in equity, under contract, by statute (including, without limitation, under section 509 of the Bankruptcy Code), under common law or otherwise and including without limitation (i) any right of subrogation, reimbursement, indemnification or contribution that such Pledgor now has or may hereafter have against the Borrower; (ii) any right to enforce, or to participate in, any claim, right or remedy that the Lender now has or may hereafter have against the Borrower; and (iii) any benefit of, and any right to participate in, any collateral or security now or hereafter held by the Lender; and (b) any right of contribution such Pledgor may have against any other person liable (whether as a primary obligor or otherwise) for all or any of the Secured Obligations. Each Pledgor further agrees that, to the extent the foregoing waiver with respect to its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Pledgor may have against the Borrower or against any collateral or security, and any rights of contribution such Pledgor may have against any other pledgor, shall be subordinated to the payment of the Secured Obligations as set forth in section 16.

      **16.**   **Subordination.** Each Pledgor agrees that any and all claims of such Pledgor against the Borrower, any endorser or any other pledgor of all or any part of the Secured Obligations, or against any of their respective properties, shall be subordinate and subject in right of payment to the prior full and indefeasible payment, of all Secured Obligations. Notwithstanding any failure of any Pledgor to ask, demand, sue for, take or receive any payment from the Borrower, all rights, liens and security interests of the Pledgors, whether now or hereafter arising and howsoever existing, in any assets of the Borrower (whether constituting part of the security or collateral given to the Lender to secure payment of all or any part of the Secured Obligations or otherwise) shall be and hereby are subordinated to the rights of the Lender against the Borrower and in those assets. No Pledgor shall have any right to possession of any such asset or to foreclose upon any such asset, whether by judicial action or otherwise, unless and until all of the Secured Obligations (other than unasserted indemnity obligations) shall have been fully paid in cash and satisfied. If all or any part of the assets of the Borrower, or the proceeds thereof, are subject to any distribution, division or application to the creditors of the Borrower, whether partial or complete, voluntary or involuntary, and whether by reason of liquidation, bankruptcy, arrangement, receivership, assignment for the benefit of creditors or any other action or proceeding, or if the business of the Borrower is dissolved or if substantially all of the assets of the Borrower are sold, *then,* and in any such event, any payment or distribution of any kind or character, either in cash, securities or other property, which shall be payable or deliverable upon or with respect to any indebtedness of the Borrower to any Pledgor ("***Borrower Indebtedness***") shall be paid or delivered directly to the Lender for application on any of the Secured Obligations, due or to become due, until such Secured Obligations shall have first been fully paid in cash. Each Pledgor irrevocably authorizes and empowers the Lender to demand, sue for, collect and receive every such payment or distribution and give acquittance therefor and to make and present for and on behalf of such Pledgor such proofs of claim and take such other action, in the Lender's own name or in the name of such Pledgor or otherwise, as the Lender may deem necessary or advisable for the enforcement of this Agreement. The Lender may vote such proofs of claim in any

such proceeding, receive and collect any and all dividends or other payments or disbursements made on the Borrower Indebtedness in whatever form the same may be paid or issued and apply the same on account of any of the Secured Obligations. Subject to the provisos to the first sentence of this section 16, should any payment, distribution, security or instrument or proceeds thereof be received by any Pledgor upon or with respect to Borrower Indebtedness prior to the full and indefeasible payment of all of the Secured Obligations (other than unasserted indemnity obligations) and such Secured Obligations being satisfied, such Pledgor shall receive and hold the same in trust, as trustee, for the benefit of the Lender, and shall forthwith deliver the same to the Lender in precisely the form received (except for the endorsement or assignment of such Pledgor where necessary), for application to any of the Secured Obligations, due or not due, and, until so delivered, the same shall be held in trust by such Pledgor as the property of the Lender. If any Pledgor fails to make any such endorsement or assignment to the Lender, the Lender or any of its officers or employees are hereby irrevocably authorized to make the same. Each Pledgor agrees that until the Secured Obligations have been fully and indefeasibly paid (other than unasserted indemnity obligations), such Pledgor will not assign or transfer to any person any claim such Pledgor has or may have against the Borrower.

17. **Enforcement; Amendments; Waivers.** No delay on the part of the Lender in the exercise of any right or remedy arising under this Agreement, any of the other Loan Documents or otherwise with respect to all or any part of the Secured Obligations, the Pledged Collateral or any other guaranty of or security for all or any part of the Secured Obligations shall operate as a waiver thereof, and no single or partial exercise by the Lender of any such right or remedy shall preclude any further exercise thereof. Failure by the Lender at any time or times hereafter to require strict performance by the Borrower, any Pledgor, any other pledgor of all or any part of the Secured Obligations or any other person of any of the provisions, warranties, terms and conditions contained in any of the Loan Documents now or at any time or times hereafter executed by such persons and delivered to the Lender shall not waive, affect or diminish any right of the Lender at any time or times hereafter to demand strict performance thereof and such right shall not be deemed to have been waived by any act or knowledge of the Lender or its agents, officers or employees, unless such waiver is contained in a written instrument, directed and delivered to the Borrower or the Pledgors or any other Loan Party, as applicable, specifying such waiver. No waiver of any Event of Default by the Lender shall operate as a waiver of any other Event of Default or the same Event of Default on a future occasion, and no action by the Lender permitted hereunder shall in any way affect or impair the Lender's rights and remedies or the Secured Obligations of the Pledgors under this Agreement. Any determination by a court of competent jurisdiction of the amount of any Secured Obligation owing by the Borrower to the Lender shall be conclusive and binding on each Pledgor irrespective of whether such Pledgor was a party to the suit or action in which such determination was made. The provisions of this Agreement may be amended only by an instrument in writing signed by the party or parties against whom the same is to be enforced.

18. **Effectiveness; Termination.** This Agreement shall become effective upon its execution by the Pledgors and shall continue in full force and effect and may not be terminated or otherwise revoked until the Secured Obligations shall have been fully paid or otherwise finally and irrevocably satisfied. Each Pledgor hereby expressly waives the benefits of any law purporting to allow a pledgor to revoke a continuing pledge with respect to any transactions occurring after the date of the pledge. If, notwithstanding the foregoing, any Pledgor shall have any right under

applicable law to terminate or revoke its pledge hereunder, such Pledgor agrees that such termination or revocation shall not be effective until a written notice of such revocation or termination, specifically referring hereto, signed by such Pledgor, is actually received by the Lender. Such notice shall not affect the right and power of the Lender to enforce rights arising prior to receipt thereof by the Lender. If the Lender makes loans or otherwise extends credit to or for the benefit of the Borrower or takes other action after any Pledgor terminates or revokes this Agreement but before the Lender receives such written notice, the rights of the Lender with respect thereto shall be the same as if such termination or revocation had not occurred.

19.    **Advice of Counsel.** Each Pledgor warrants that it has consulted with its respective legal counsel regarding all waivers under this Agreement, that it believes that it fully understands all rights that it is waiving and the effect of such waivers, that it assumes the risk of any misunderstanding that it may have regarding any of the foregoing and that it intends that such waivers shall be a material inducement to the Lender to extend the Secured Obligations secured hereby.

20.    **Notices.** All notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto or any other person shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by prepaid courier and shall be deemed to be given for purpose of this Agreement (i) in regard to registered or certified mail, three Business Days after mailing and (ii) in regard to personal delivery or prepaid courier, on the Business Day that such writing is delivered (or if such day is not a Business Day, the next succeeding Business Day). Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this section 20, notices, demands, instructions and other communications in writing shall be given to or made (a) if to a Pledgor, at its address specified in *Schedule I*, with a courtesy copy to the Borrower, at its address specified in the Loan Agreement; and (b) if to the Lender, at its address specified in the Loan Agreement; or at such other address as any of the persons identified above may from time to time designate by written notice given as herein required. Rejection or refusal to accept or inability to deliver because of changed addresses or because notice of changed address was given shall be deemed a receipt of such notice. The effectiveness of such notice will not be affected by the giving or lack thereof of courtesy copies of such notice.

21.    **Governing Law. THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND ANY DISPUTE ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT, EQUITY OR OTHERWISE, SHALL BE GOVERNED BY THE INTERNAL LAWS AND DECISIONS OF THE STATE OF OHIO, WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICTS OF LAWS.**

22.    **Submission to Jurisdiction. ALL DISPUTES BETWEEN ANY PLEDGOR AND THE LENDER, WHETHER SOUNDING IN CONTRACT, TORT, EQUITY OR OTHERWISE, SHALL BE RESOLVED ONLY BY STATE AND FEDERAL COURTS LOCATED WITHIN CUYAHOGA COUNTY, STATE OF OHIO, AND THE COURTS TO WHICH AN APPEAL THEREFROM MAY BE TAKEN; PROVIDED, HOWEVER, THAT THE LENDER SHALL HAVE THE RIGHT, TO THE EXTENT PERMITTED BY**

APPLICABLE LAW, TO PROCEED AGAINST ANY PLEDGOR OR ITS PROPERTY IN ANY LOCATION REASONABLY SELECTED BY THE LENDER IN GOOD FAITH TO ENABLE THE LENDER TO REALIZE ON SUCH PROPERTY OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER. EACH PLEDGOR WAIVES ANY OBJECTION THAT IT MAY HAVE TO THE LOCATION OF THE COURT IN WHICH THE LENDER HAS COMMENCED A PROCEEDING (AS AFORESAID), INCLUDING, WITHOUT LIMITATION, ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON FORUM NON CONVENIENS.

23.    Service of Process. EACH PLEDGOR HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE COURTS REFERENCED IN SECTION 22 IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PLEDGOR AT ITS ADDRESS FOR NOTICES PURSUANT TO SECTION 20, SUCH SERVICE TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING OR AT SUCH EARLIER TIME AS MAY BE PROVIDED UNDER APPLICABLE LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST SUCH PLEDGOR IN ANY OTHER JURISDICTION.

24.    Limitation of Liability. THE LENDER SHALL NOT HAVE ANY LIABILITY TO ANY PLEDGOR (WHETHER SOUNDING IN TORT, CONTRACT, OR OTHERWISE) FOR LOSSES SUFFERED BY ANY PLEDGOR, AND EACH PLEDGOR HEREBY WAIVES AND RELEASES ANY CLAIMS IN CONNECTION WITH, ARISING OUT OF, OR IN ANY WAY RELATED TO THE TRANSACTIONS OR RELATIONSHIPS CONTEMPLATED BY THIS AGREEMENT OR ANY ACT, OMISSION OR EVENT OCCURRING IN CONNECTION HEREWITH, UNLESS (AND THEN ONLY TO THE EXTENT) IT IS DETERMINED BY A FINAL AND NONAPPEALABLE JUDGMENT OR COURT ORDER BINDING ON THE LENDER THAT THE LOSSES WERE THE RESULT OF ACTS OR OMISSIONS CONSTITUTING GROSS NEGLIGENCE, WILLFUL MISCONDUCT, BREACH OF CONTRACT OR KNOWING OR GROSSLY NEGLIGENT VIOLATIONS OF APPLICABLE REQUIREMENTS OF LAW.

25.    Waiver of Jury Trial. EACH PLEDGOR AND THE LENDER WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE LENDER AND ANY PLEDGOR ARISING OUT OF, CONNECTED WITH, RELATED TO OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH OR THE TRANSACTIONS RELATED THERETO. EACH PLEDGOR AND THE LENDER HEREBY AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT EITHER OF THEM MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY

**COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES BENEFITED OR BURDENED HEREUNDER TO THE WAIVER OF ITS OR THEIR RIGHT TO TRIAL BY JURY.**

**26.    Secondary Market Transactions.** Each Pledgor acknowledges that pursuant to the Loan Documents, the Lender may sell all or any portion of its interest in the Note and such Pledgor agrees that the pledge herein made and the rights and benefits inuring to the Lender shall inure to its successors and assigns as if such persons were the original Lender hereunder. The Lender agrees that, if one or more participations are granted in the Note, the then holder of the participated Note shall be deemed the servicing agent for all participants with the sole authority to exercise the remedies of the Lender thereunder and the Borrower shall be entitled to, and shall, only rely on the requests and directives of the then lender. Each Pledgor agrees to execute and deliver such instruments to any such successor or assign, including, without limitation, a new pledge agreement in identical in form and substance to this Agreement, that evidence the rights of such successor or assign to the Pledged Collateral.

**27.    Enforcement Expenses.** Each Pledgor hereby agrees to pay all out-of-pocket costs and expenses of the Lender in connection with the enforcement of this Agreement, any amendment, waiver or consent relating hereto, and defending or protecting the Lender's interest in this Agreement or any Pledged Collateral from and against any claim or assertion made by any person, including, without limitation, any judicial or non-judicial action, suit or proceeding arising out of or in connection with this Agreement or the Lender's position as secured party or beneficiary under this Agreement (including, without limitation, the fees and disbursements of counsel employed by the Lender).

**28.    Headings.** Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**29.    Counterparts/Facsimile Signatures.** This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same agreement. Each party hereto may rely on the facsimile signature of each other party hereto.

**30.    Sharing of Information.** Each Pledgor acknowledges and agrees that the Lender and the Senior Lender may share information that each may acquire with respect to the Borrower, the Managers, the Members, the Pledgors, the Guarantors or the Project and consents to the transfer of such information, whether financial or otherwise, between them, without having to obtain such Pledgor's consent.

**31.    Recourse.** The Secured Obligations of the Pledgors as set forth herein shall only be enforced against the Pledged Collateral. The Secured Obligations shall not be enforced by any action or proceeding against any assets of any Pledgor other than the Pledged Collateral. In no way shall

the foregoing limit the obligations of any Guarantor under the Guaranty or the Completion Guaranty, or any Indemnitor under the Environmental Indemnity.

      **32.**     **Gender.** References to one gender or neuter herein shall apply to the other gender or neuter as the case may be.

*(Signatures are on the following page.)*

*IN WITNESS WHEREOF,* the undersigned hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**PLEDGORS:**

**HARRISON INVESTMENT GROUP, L.L.C.,** a
Michigan limited liability company

By: _____
Name:  Brent A. Titus
Its:      Manager

_____

**SHAWN O'BRIEN,** individually

_____

**FRANK R. VARGAS, JR.,** individually

**COVENANT INVESTMENT GROUP, INC.**

By:_____
Name:  Laura A. Chappelle
Its:      President

**KTM DEVELOPMENT CORPORATION,** a
Michigan corporation

By:_____
Name:  Kevin T. McGraw
Its:      President

_____

**CHARLES W. CROUCH,** individually

_____

**BRENT CHAPPELLE,** individually

Signature Page 1 of 5
to
Pledge Agreement

*IN WITNESS WHEREOF,* the undersigned hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

**PLEDGORS:**

**HARRISON INVESTMENT GROUP, L.L.C.,** a
Michigan limited liability company

By: _____
Name: Brent A. Titus
Its:     Manager

_____
**SHAWN O'BRIEN,** individually

_____
**FRANK R. VARGAS, JR.,** individually

**COVENANT INVESTMENT GROUP, INC.**

By:_____
Name: Laura A. Chappelle
Its:     President

**KTM DEVELOPMENT CORPORATION,** a
Michigan corporation

By:_____
Name: Kevin T. McGraw
Its:     President

_____
**CHARLES W. CROUCH,** individually

_____
**BRENT CHAPPELLE,** individually

Signature Page 1 of 5
to
Pledge Agreement

*IN WITNESS WHEREOF,* the undersigned hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

PLEDGORS:

**HARRISON INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company

By: _____
Name:  Brent A. Titus
Its:      Manager


_____
**SHAWN O'BRIEN,** individually


_____
**FRANK R. VARGAS, JR.,** individually


**COVENANT INVESTMENT GROUP, INC.**

By: _____
Name:  Laura A. Chappelle
Its:      President


**KTM DEVELOPMENT CORPORATION,** a Michigan corporation

By: _____
Name:  Kevin T. McGraw
Its:      President


_____
**CHARLES W. CROUCH,** individually


_____
**BRENT CHAPPELLE,** individually


Signature Page 1 of 5
to
Pledge Agreement

*IN WITNESS WHEREOF,* the undersigned hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

PLEDGORS:

**HARRISON INVESTMENT GROUP, L.L.C.,** a
Michigan limited liability company

By: _____
Name:  Brent A. Titus
Its:      Manager


_____

**SHAWN O'BRIEN,** individually


_____

**FRANK R. VARGAS, JR.,** individually


**COVENANT INVESTMENT GROUP, INC.**

By: _____
Name:  Laura A. Chappelle
Its:      President


**KTM DEVELOPMENT CORPORATION,** a
Michigan corporation

By: _____
Name:  Kevin T. McGraw
Its:      President


_____

**CHARLES W. CROUCH,** individually


_____

**BRENT CHAPPELLE,** individually


Signature Page 1 of 5
to
Pledge Agreement

*IN WITNESS WHEREOF,* the undersigned hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

PLEDGORS:

**HARRISON INVESTMENT GROUP, L.L.C.,** a
Michigan limited liability company

By: _____
Name: Brent A. Titus
Its:    Manager


_____

**SHAWN O'BRIEN,** individually


_____

**FRANK R. VARGAS, JR.,** individually


**COVENANT INVESTMENT GROUP, INC.**

By:_____
Name: Laura A. Chappelle
Its:    President


**KTM DEVELOPMENT CORPORATION,** a
Michigan corporation

By:_____
Name: Kevin T. McGraw
Its:    President


_____

**CHARLES W. CROUCH,** individually


_____

**BRENT CHAPPELLE,** individually


Signature Page 1 of 5
to
Pledge Agreement

**TMC INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company

By: Terra Management Company, a Michigan corporation
Its: Manager

By:_____
Name: Scott A. Chappelle
Its: President


**ALLIANCE INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company

By: Terra Management Company, a Michigan corporation
Its: Manager

    By:_____
    Name: Scott A. Chappelle
    Its: President


**MASONIC INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company

By: Terra Management Company, a Michigan corporation
Its: Manager

    By:_____
    Name: Scott A. Chappelle
    Its: President


**ABBOTT ROAD COMMONS, L.L.C.,** a Michigan limited liability company

By: Terra Management Company, a Michigan corporation
Its: Manager

    By:_____
    Name: Scott A. Chappelle
    Its: President

**CHASCO INVESTMENT PROPERTIES, L.L.C.**, a
Michigan limited liability company

By: Terra Management Company, a Michigan
    corporation
Its:  Manager

    By:_____
    Name:  Scott A. Chappelle
    Its:      President


**EVERGREEN INVESTMENT GROUP, L.L.C.**, a
Michigan limited liability company

By: Terra Management Company, a Michigan
    corporation
Its:  Manager

    By:_____
    Name:  Scott A. Chappelle
    Its:      President


**GRAND LEDGE INVESTMENT GROUP, L.L.C.**, a
Michigan limited liability company

By: Terra Management Company, a Michigan
    corporation
Its:  Manager

    By:_____
    Name:  Scott A. Chappelle
    Its:      President


**SLHA INVESTMENT GROUP, L.L.C.**, a Michigan
limited liability company

By: Terra Management Company, a Michigan
    corporation
Its:  Manager

    By:_____
    Name:  Scott A. Chappelle
    Its:      President

**PETOSKEY INVESTMENT GROUP, L.L.C.,** a
Michigan limited liability company

By:  Terra Management Company, a Michigan
     corporation
Its:  Manager

    By:_____
    Name:  Scott A. Chappelle
    Its:    President


**SCORE PROPERTIES, INC.,** a Michigan corporation

By: _____
Name:  Laura A. Chappelle
Its:  President


**TERRA MANAGEMENT COMPANY,** a Michigan
corporation

By:_____
Name:  Scott A. Chappelle
Its:    President


**WLA MANAGEMENT, INC.,** a Michigan corporation

By: _____
Name:  Scott A. Chappelle
Its:    President

LENDER:

**HARTFORD MEZZANINE INVESTORS I, LLC,** a
Delaware limited liability company

By:    Key Real Estate Equity Capital, Inc.,
       an Ohio corporation, its Managing Member

       By: _____
       Name:   JAMES H. MacQUEEN
       Title:  Vice President VICE PRESIDENT

And By: Hartford Investment Management Company,
       a Delaware corporation, its Managing
       Member

       By: _____
       Name: _____
       Title:  Vice President

LENDER:

HARTFORD MEZZANINE INVESTORS I, LLC, a
Delaware limited liability company

By:     Key Real Estate Equity Capital, Inc.,
          an Ohio corporation, its Managing Member

          By: _____
          Name: _____
          Title:  Vice President

And By: Hartford Investment Management Company,
          a Delaware corporation, its Managing
          Member

          By: _____
          Name:  William P. Bowman
          Title:  Vice President

**Manager's Consent given pursuant to
section 7 with respect to the Company:**

The undersigned sole Manager of the Borrower
agrees and consents to the foregoing, including,
without limitation, the terms and conditions
contained in Section 7 hereof.

**WLA MANAGEMENT, INC.,**
a Michigan corporation

By: _____
Name:  Scott A. Chappelle
Its:  President

**SCHEDULE I**
**TO**
**PLEDGE AGREEMENT**
*(Woodland Lakes Investment Group, L.L.C.)*

| Pledgor and Address | State of Principal Residence/Formation and Organizational ID Number |
|---|---|
| Harrison Investment Group, L.L.C. c/o Brent Titus 313 S. Washington Square Lansing, MI 48933 Telephone: (517) 371-8268 Facsimile: (517) 367-7321 | Michigan limited liability company B71-661 |
| Shawn O'Brien c/o Terra Management Company 1427 W. Saginaw, Suite 200 East Lansing, MI 48823 Telephone: (517) 336-4400 Facsimile: (517) 336-4499 | Michigan |
| Frank R. Vargas, Jr. c/o Terra Management Company 1427 W. Saginaw, Suite 200 East Lansing, MI 48823 Telephone: (517) 336-4400 Facsimile: (517) 336-4499 | Michigan |
| Covenant Investment Group, Inc. c/o Terra Management Company 1427 W. Saginaw, Suite 200 East Lansing, MI 48823 Telephone: (517) 336-4400 Facsimile: (517) 336-4499 | Michigan corporation 430-555 |

| | |
|---|---|
| KTM Development Corporation<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan corporation<br><br>453-142 |
| Charles W. Crouch<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan |
| Brent Chappelle<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan |
| TMC Investment Group, L.L.C.<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan limited liability company<br><br>B56-308 |
| Alliance Investment Group, L.L.C.<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan limited liability company<br><br>B67-26E |

| | |
|---|---|
| Masonic Investment Group, L.L.C.<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan limited liability company<br><br>B18-193 |
| Abbott Road Commons, L.L.C.<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan limited liability company<br><br>B03-564 |
| Chasco Investment Properties, L.L.C.<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan limited liability company<br><br>B31-175 |
| Evergreen Investment Group, L.L.C.<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan limited liability company<br><br>B35-878 |
| Grand Ledge Investment Group, L.L.C.<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan limited liability company<br><br>B71-662 |

| | |
|---|---|
| SLHA Investment Group, L.L.C.<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan limited liability company<br><br>B75-755 |
| Petoskey Investment Group, L.L.C.<br>c/o Terra Management Company<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan limited liability company<br><br>B71-660 |
| Score Properties, Inc.<br>c/o Scott Chappelle<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan corporation<br><br>297-869 |
| Terra Management Company<br>c/o Scott Chappelle<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan corporation<br><br>503-104 |
| WLA Management, Inc.<br>c/o Julia L. Skinner<br>1427 W. Saginaw, Suite 200<br>East Lansing, MI 48823<br>Telephone: (517) 336-4400<br>Facsimile: (517) 336-4499 | Michigan corporation<br><br>493-92D |

# GUARANTY

dated as of
January 4, 2006

by

## SCOTT A. CHAPPELLE,

## LAURA A. CHAPPELLE,

## KEVIN T. MCGRAW,

## SHARON D. MCGRAW,

## EVERT KRAMER, JR.,

and

## ROSALIND KRAMER,

*as Guarantors*

for the benefit of

## HARTFORD MEZZANINE INVESTORS I, LLC,

*as the Lender*

Jones Day Cleveland
601755-HMI001
CLI-1364709v2

Woodland Lakes Apartments
Mezzanine Loan



## GUARANTY

This **GUARANTY** (this "*Guaranty*"), dated as of January 4, 2006, is made jointly and severally by (i) SCOTT A. CHAPPELLE, (ii) LAURA A. CHAPPELLE, (iii) KEVIN T. MCGRAW, (iv) SHARON D. MCGRAW, (v) EVERT KRAMER, JR. and (vi) ROSALIND KRAMER, each an individual (herein, together with each of their respective successors, assigns, heirs and personal representatives, collectively, the "*Guarantors*" and each a "*Guarantor*") in favor of HARTFORD MEZZANINE INVESTORS I, LLC, a Delaware limited liability company (herein, together with its successors and assigns, the "*Lender*").

All capitalized terms appearing and not defined herein shall have the same meanings ascribed to them in the Loan Agreement, dated as of the date hereof (as hereafter amended or otherwise modified, the "*Loan Agreement*"), between Woodland Lakes Investment Group, L.L.C., a Michigan limited liability company (herein, together with its successors and assigns, the "*Borrower*") and the Lender.

### W I T N E S E T H:

WHEREAS, the Borrower is a single asset entity whose sole asset is approximately 60.33 acres of real property at 4200 Dell Road in the Township of Delhi, County of Ingham, State of Michigan (the "*Land*") and a 344-unit Class A apartment community consisting of 21 two-story apartment buildings plus a 3,200 square foot clubhouse with locker rooms, exercise facility and in-ground swimming pool situated on the Land, all known as the Woodland Lakes Apartments (the "*Project*");

WHEREAS, pursuant to the terms and conditions of the Loan Agreement, the Lender agreed to make a secured loan (the "*Loan*") available to Borrower in the original principal amount of $3,340,000.00 to provide funds for lawful business purposes, namely, to refinance existing mezzanine financing of Borrower;

WHEREAS, the Loan is secured by, among other things, pledges of one hundred percent of the membership interest in the Borrower (the "*Pledge Agreement*");

WHEREAS, the Loan will be advanced by the Lender to the Borrower upon the Borrower's compliance with, and subject to, the terms, conditions and limitations of the Loan Agreement;

WHEREAS, the Guarantors will benefit from the making of the Loan;

WHEREAS, to induce the Lender to make the Loan pursuant to the Loan Agreement, and to accept the Note and the Pledge Agreement, the Guarantors have agreed to execute and deliver this Guaranty to be binding upon the Guarantors and their respective successors, assigns, heirs and personal representatives;

WHEREAS, the Lender is unwilling to extend credit to the Borrower unless this Guaranty is executed by the Guarantors and delivered to the Lender; and

**WHEREAS,** it is a condition to the obligations of the Lender to make the Loan to the Borrower pursuant to the Loan Agreement that this Guaranty is executed by the Guarantors and delivered to the Lender.

**NOW, THEREFORE,** in consideration of the Loan to the Borrower, in order to induce the Lender to execute and deliver the Loan Agreement and to accept the Note and the Pledge Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Guarantors, for themselves, their successors, assigns, heirs and personal representatives hereby covenant and agree with the Lender, for the benefit of the Lender and its successors and assigns, as follows:

1. **Guaranty Obligations.** For purposes of this Guaranty only, *"Guaranty Obligations"* shall mean the prompt, absolute and unconditional payment in full of the following:

    (a)    the aggregate outstanding principal amount of the Loan;

    (b)    all Fees due under the Loan Agreement;

    (c)    all interest on the aggregate outstanding principal amount of the Loan, whether such interest accrues at the regular interest rate applicable thereto, at the default rate specified in section 2.3(c) of the Loan Agreement, and whether such interest accrues prior to or after the Maturity Date;

    (d)    late charges, prepayment fees and premiums, including, without limitation, the Prepayment Premium, if any, including the Yield Maintenance, if any, whether before or after any petition under the Bankruptcy Code, as the same shall become due and payable under the Loan Agreement and the Note, and all fees, charges and expenses and other sums now or hereafter due to the Lender under the Loan Agreement, the Note or any other Loan Document, including, without limitation, any and all reasonable costs and expenses incurred by the Lender in connection with the collection and enforcement of the Note, the Pledge Agreement or any other Loan Document, all attorneys' fees and expenses, investigative costs and all court costs, whether or not suit is filed thereon, or whether at maturity, by acceleration otherwise; and

    (e)    damages incurred by the Lender as a result of any Loan Party (or their respective agents, employees, heirs, personal representatives, successors or assigns) (i) committing fraud in connection with the Loan Agreement, the Senior Loan Documents and/or the transactions contemplated thereby or making any material misrepresentation in any Loan Document, any Senior Loan Document or any other instrument, agreement or document delivered in connection with the Loan Agreement or the Senior Loan Documents, (ii) failing timely to pay any accrued and due and payable property taxes, assessments or other lienable impositions or any insurance premiums with respect to the Project, (iii) failing to apply tenant security deposits, insurance proceeds or condemnation proceeds in connection with the Project in accordance with the Loan Documents and the Senior Loan Documents, (iv) damaging the Project (or any portion thereof) as a result of waste suffered or permitted to occur with respect to the Project (or any portion thereof), (v) violating applicable law as a result of its willful acts or omissions or its gross

negligence, (vi) incurring any material environmental liability with respect to the Project, and (vii) with respect to the Borrower, except as otherwise permitted by the express terms of the Loan Agreement, (A) engaging in any business or activity other than the ownership, leasing and operation of the Project, (B) incurring any Indebtedness other than the Loan, the Senior Loan, and trade payables incurred in the ordinary course of business, (C) granting any Lien on its interest in the Project other than the Senior Mortgage, (D) selling, leasing or otherwise disposing of all or substantially all of its assets, and (E) merging, combining or otherwise consolidating with any other person, and (viii) selling, conveying, assigning, pledging or, otherwise transferring, directly or indirectly, any interest in the Borrower or the Project except as permitted by the express terms of the Pledge Agreement and/or the Loan Agreement.

2. **Guaranty.** The Guarantors unconditionally and irrevocably guarantee, on a joint and several basis, the Guaranty Obligations to the Lender. The Guarantors shall, within five Business Days following written notice from the Lender to the Guarantors demanding payment hereunder, pay to the Lender, in immediately available funds, at the office of the Lender set forth in the introductory paragraph to this Guaranty, such amount of the Guaranty Obligations as the Lender shall specify in such notice and that are owed hereunder. Notwithstanding anything contained in the foregoing to the contrary, Lender shall not demand payment for the Guaranty Obligations identified in Sections 1(a) through (d) above unless any one of the following events shall occur:

(a) if any Loan Party shall (i) make an assignment for the benefit of creditors; (ii) admit in writing such person's inability to pay its debts as they become due; (iii) file a voluntary petition in bankruptcy; (iv) become insolvent as defined in the Bankruptcy Code; (v) file any petition or answer seeking for such person any reorganization, arrangement, composition, readjustment of debt or similar relief under any present or future statute, law or regulation of any jurisdiction; (vi) petition or apply to any tribunal for any receiver, custodian or any trustee for any substantial part of such person's property; (vii) be the subject of any proceeding described in Sections 2(a) (iii), (v) or (vi) commenced against such person by a person other than the Lender that remains undismissed for a period of 60 days; (viii) file any answer admitting or not contesting the material allegations of any such petition filed against such person or of any order, judgment or decree approving such petition in any such proceeding; or (ix) seek, approve, consent to, or acquiesce in any such proceeding, or in the appointment of any trustee, receiver, custodian, liquidator, or fiscal agent for such person or any substantial part of such person's property or if an order is entered appointing any such trustee, receiver, custodian, liquidator or fiscal agent and such order remains in effect for 60 days; or

(b) if an order for relief is entered under the Bankruptcy Code or any other decree or order is entered by a court of competent jurisdiction (i) adjudicating any Loan Party bankrupt or insolvent; (ii) approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of any Loan Party; or (iii) appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any Loan Party of any substantial part of such person's property; and

(c)     if any Loan Party commences or seeks to sell, convey, assign, pledge or otherwise transfer, directly or indirectly, any interest in the Borrower or the Project except as permitted by the express terms of the Pledge Agreement and/or the Loan Agreement.

3.     **Representations, Warranties and Covenants of Guarantors.**  Each Guarantor hereby represents, warrants and covenants to the Lender as follows:

(a)     If such Guarantor is a natural person, such Guarantor has the legal and mental capacity to enter into this Guaranty and to consummate the transactions contemplated hereby.  If such Guarantor is not a natural person, such Guarantor (i) is a duly organized or formed and validly existing corporation, partnership, limited liability company or irrevocable trust, as the case may be, in good standing under the laws of the jurisdiction of its formation and has the corporate, partnership, limited liability company or trust power and authority, as applicable, to own its property and assets and to transact the business in which it is engaged and presently proposes to engage, and (ii) has duly qualified and is authorized to do business in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified would not have a Material Adverse Effect.

(b)     If such Guarantor is not a natural person, such Guarantor has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of this Guaranty and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of this Guaranty.  Such Guarantor has duly executed and delivered this Guaranty and this Guaranty constitutes the legal, valid and binding agreement or obligation of such Guarantor enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

(c)     Neither the execution, delivery and performance by such Guarantor of this Guaranty nor compliance with the terms and provisions hereof, nor the consummation of the loan transactions contemplated in the Loan Documents (i) to the best of such person's knowledge, will contravene any provision of any Law, statute, rule, regulation, order, writ, injunction or decree of any court or governmental instrumentality applicable to such Guarantor or their properties and assets; (ii) will conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (other than the Liens created under the Pledge Agreement and the Senior Deed of Trust) upon any of the property or assets of such Guarantor pursuant to the terms of any promissory note, bond, debenture, indenture, mortgage, deed of trust, credit or loan agreement or any other material agreement or other instrument to which such Guarantor is a party or by which it or any of its property or assets are bound or to which it may be subject; (iii) will violate any provision of the articles or certificate of incorporation, code of regulations, by-laws or other Organizational Document, if applicable, of such Guarantor; or (iv) will conflict with or result in any breach of, any of the terms,

covenants, conditions or provisions of, or constitute a default under, any of the Senior Loan Documents.

(d)     To the best of such Guarantor's knowledge, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by, any foreign or domestic governmental or public body or authority, or any subdivision thereof, is required to authorize or is required as a condition to (i) the execution, delivery and performance by such Guarantor of this Guaranty or (ii) the legality, validity, binding effect or enforceability of this Guaranty.

(e)     Such Guarantor is not insolvent (as such term is defined in the Bankruptcy Code), and such Guarantor will not be rendered insolvent by execution of this Guaranty or any other Loan Document to which such Guarantor is a party or by the consummation of the transactions contemplated hereby or thereby.

(f)     The consummation of the transactions contemplated hereby and the performance by such Guarantor of the Guarantor's obligations under this Guaranty or any other Loan Document to which such Guarantor is a party will not result in any breach of, give rise to a lien under, or constitute a default under, any mortgage, deed of trust, lease, bank loan or credit agreement, including, without limitation the Senior Loan Documents, any operating agreement, partnership agreement, corporate charter, by-laws, shareholder agreement or other agreement or instrument to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's properties may be bound or affected.

(g)     The financial statements, tax returns and other information regarding the net worth of such Guarantor delivered by such Guarantor to the Lender at or prior to the date hereof fairly and accurately present the financial condition of such Guarantor as of the date thereof, and no adverse change has occurred in the financial condition or net worth reflected therein since the date thereof. Such financial statements have been prepared in accordance with sound accounting methods, principles and standards, consistently applied, and do not omit facts, the omission of which would make such financial statements materially misleading. All of the assets reflected on the financial statements provided to the Lender by such Guarantor are available (on an unsecured basis) to satisfy such Guarantor's obligations hereunder.

(h)     Except as disclosed in writing to the Lender, there are no actions, suits or proceedings pending, or to the knowledge of such Guarantor threatened, against or affecting such Guarantor or the Project, or involving the validity or enforceability of the Pledge Agreement, or the priority of the liens created thereby, at law or in equity, before or by any Governmental Authority, and such Guarantor is not subject to, in default of or in violation with respect to any order, writ, injunction, decree or demand of any court or any Governmental Authority that could affect such Guarantor's obligations hereunder.

(i)     Such Guarantor shall promptly provide the Lender with written notice of any pending or threatened litigation against such Guarantor or the Project involving claims in excess of $250,000 not fully covered by insurance or any such claims in excess of $1,000,000, regardless of insurance coverage, or the commencement against such

Guarantor or the Project of any proceedings or investigations by a Governmental Authority.

(j)     There is no default on the part of such Guarantor under or with respect to this Guaranty or any other Loan Document to which such Guarantor is a party, and no event has occurred and is continuing that, with the giving of notice or the passage of time, or both, would constitute a default under any of the aforesaid documents.

(k)     Such Guarantor has no counterclaims, offsets or defenses with respect to the Loan or with respect to this Guaranty, the Note or any other Loan Document to which such Guarantor is a party.

(l)     Such Guarantor will not join in any action, or consent to amend, terminate or modify the Organizational Documents of the Borrower, or any Pledgor (except as expressly permitted by the terms of the Loan Agreement) or such Guarantor, if any, without the prior written consent of the Lender.

(m)     Such Guarantor will promptly comply with all conditions of this Guaranty and the other Loan Documents with which such Guarantor is required to comply. Such Guarantor will promptly and fully respond to any inquiry of the Lender made with respect to the Loan, the Project or any of the matters covered by this Guaranty.

(n)     Such Guarantor will not modify or amend or terminate (other than by full performance thereof) or cancel any Loan Document or any Senior Loan Document without the prior written consent of the Lender.

(o)     Such Guarantor is deriving or expects to derive a financial or other advantage from each and every obligation incurred by the Borrower to the Lender.

(p)     Such Guarantor hereby acknowledges receipt of copies of, and hereby approves, the Loan Agreement and the other Loan Documents and the Senior Loan Documents.

(q)     Such Guarantor shall execute and deliver to the Lender, from time to time, such other documents as shall be reasonably necessary to give full effect to the rights and remedies granted or provided to the Lender by this Guaranty.

(r)     Such Guarantor acknowledges and agrees that the Lender may apply any payments or recoveries received after a default under any of the Loan Documents to principal, interest, fees, expenses and other sums due with respect to the Loan in such order as may be provided in the Loan Agreement or the other Loan Documents or, to the extent not so provided, in such order as the Lender, in its sole discretion, may elect.

(s)     Such Guarantor acknowledges and agrees that the Lender and the Senior Lender may share information that each may acquire with respect to any Loan Party and the Project and consents to the transfer of such information, whether financial or otherwise, between them, without having to obtain such Guarantor's consent.

4. **Transfer of Property, Sales, Mergers, etc.** The Guarantors hereby covenant and agree, that until this Guaranty is terminated in accordance with its terms, (a) no Guarantor shall, without the Lender's prior written consent, directly or indirectly, convey, transfer or assign any property or asset of any nature, or any interest therein, having a fair market value of more than $250,000, whether such property is real property, personal property or mixed, tangible or intangible, for less than fair market value; (b) no Guarantor shall permit the Borrower to sell, assign, mortgage (other than the Senior Mortgage), pledge or encumber or otherwise dispose of its interests in the Project; (c) no Guarantor shall permit any Pledgor to sell, assign, mortgage, pledge or encumber or otherwise dispose of its ownership interests in the Borrower; (d) the Guarantors shall cause the Borrower and each Pledgor and each Guarantor to take all actions necessary to maintain its limited liability company/partnership/corporate, as applicable, existence; (e) no Guarantor shall permit any Loan Party to consolidate or merge with, or to sell all or substantially all of its assets to, any other person, (f) no Guarantor shall permit the Borrower to enter into, modify, amend, terminate or cancel any of the Senior Loan Documents without the Lender's prior written consent, and (g) no Guarantor shall permit the Borrower to use the proceeds from the Senior Loan for any purpose other than as contemplated by the Loan Agreement.

5. **Financial Covenants.** The Guarantors shall submit to the Lender the following reports and other information:

(a)     As soon as available and in any event within 60 days after the end of each calendar quarter, the unaudited balance sheet of each of the Guarantors as of such date and the related unaudited statements of income and cash flows for such year and setting forth the comparative figures for the prior year, certified by the respective Guarantor.

(b)     Within thirty (30) days after timely filing, a copy of each federal or state tax return (or request for extension for the filing thereof) filed by the respective Guarantor with the Internal Revenue Service or similar state taxing authority.

(c)     Promptly upon request therefor, any other information reasonably requested by the Lender.

6. **Defaults.** The following shall constitute a default hereunder (each, an "*Event of Default*"):

(a)     the Guarantors shall fail to make any payment required to be made under section 2 in accordance with the terms thereof; or

(b)     the Guarantors shall fail to perform, observe, or comply with any covenant under this Guaranty (other than the covenants in section 2), within ten (10) days after notice from the Lender demanding such performance, observance, or compliance; or

(c)     any Guarantor that is a natural person shall die and his personal representatives shall fail to ratify and confirm the Guaranty Obligations in writing within ninety (90) days after his death.

**7.    Remedies.** Upon the occurrence of an Event of Default hereunder, in addition to any other remedy provided for under this Guaranty or at law or in equity, the Guarantors hereby authorize the Lender, in the Lender's sole discretion, at any time, to foreclose nonjudicially or judicially against any real or personal property security it holds for the Guaranty Obligations or any part thereof or exercise any other remedy against the Guarantors, or any of them, or any security.

**8.    Waiver of Election of Remedies.** Each Guarantor waives (to the extent permitted by law) any right to require or compel the Lender to (a) proceed against the Borrower or any other guarantor; (b) proceed against or exhaust any security for the Loan or the Guaranty Obligations; or (c) pursue any other remedy in the Lender's power whatsoever; and failure of the Lender to do any of the foregoing shall not exonerate, release or discharge the Guarantors from their absolute, unconditional and independent liabilities to the Lender hereunder. Each Guarantor hereby waives (to the extent permitted by law) any and all legal requirements that the Lender shall institute any action or proceedings at law or in equity against the Borrower or anyone else in respect of the Loan or the Loan Agreement or any other Loan Document or resort to or seek to realize upon any security held by the Lender, as a condition precedent to bringing an action against any Guarantor upon this Guaranty.

**9.    Right of Separate Actions.** The Lender may bring and prosecute a separate action against any Guarantor to enforce the Guarantor's liabilities hereunder, whether or not any action is brought against any Guarantor or any other person and whether or not any other Guarantor or any other person is joined in any such action or actions. Nothing shall prohibit the Lender from exercising its rights against any Guarantor, the Borrower, any security for the Guaranty Obligations or the Note, or any other person, simultaneously, jointly and/or severally. The Guarantors shall be bound by each and every ruling, order and judgment obtained by the Lender against the Borrower in respect of the Loan and the Loan Documents, whether or not any Guarantor is a party to the action or proceeding in which such ruling, order or judgment is issued or rendered.

**10.    Waiver of Rights of Subrogation.** Each Guarantor hereby irrevocably waives any rights to be subrogated to the rights of the Lender with respect to the Guaranty Obligations and the Note or any other Loan Document. Each Guarantor hereby agrees that such Guarantor will not institute or take any action seeking reimbursement against the Borrower or any other Guarantor until such time as the Lender shall have received payment in full in cash in satisfaction of all the obligations of the Borrower under the Note and the other Loan Documents. No failure on the part of the Lender to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Lender of any right, remedy or power hereunder preclude any other or future exercise of any other right, remedy or power.

**11.    Waiver of Notice, Consent, etc.**

(a)    This Guaranty shall be construed as a continuing, absolute and unconditional guaranty of payment except as limited by section 2 of this Guaranty.

(b)     Each Guarantor hereby waives acceptance and notice of acceptance of this Guaranty by the Lender and notice of presentment, demand, protest, notice of protest and of dishonor, notices of default and all other notices relative to this Guaranty of every kind and description now or hereafter provided by any agreement between the Borrower and the Lender or any statute or rule of law, except those specifically required by this Guaranty.

(c)     Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the obligations of the Borrower under any of the Loan Documents. The obligations of the Borrower under any of the Loan Documents, and each of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guaranty and all dealings between the Borrower and the Lender shall likewise be conclusively presumed to have been made or consummated in reliance upon this Guaranty.

(d)     The Guarantors hereby agree that the terms, covenants and provisions contained in the Loan Agreement, the Note or in any other Loan Document may be altered, extended, modified, waived, released or cancelled by the Lender, and the Guarantors agree that this Guaranty and the Guarantors' liability hereunder shall be in no way affected, diminished or released by any such alteration, extension, modification, release, waiver or cancellation.

12.     **Waiver of Priority of Collateral.** Each Guarantor hereby agrees that, in the event that any of the Guarantor's property is or may be hypothecated with property of the Borrower, as security for any obligations of the Borrower under any other Loan Document, any right of such Guarantor to have such other property of the Borrower first applied to the discharge of such obligations is hereby irrevocably waived by such Guarantor. Each Guarantor hereby expressly recognizes that any of its property that is or may be hereafter hypothecated pursuant to the Pledge Agreement is security for such obligations and is not security for this Guaranty.

13.     **No Discharge; Remedies Cumulative.**  No Guarantor shall be discharged, released or exonerated, in any way, from such Guarantor's absolute, unconditional and independent liabilities hereunder, even though any rights or defenses that such Guarantor may have against the Lender or others may be destroyed, diminished or otherwise affected by:

(a)     any declaration by the Lender of a default in respect of any of the obligations of the Borrower under any of the Loan Documents;

(b)     the exercise by the Lender of any rights or remedies against the Borrower, any Loan Party or any other person;

(c)     the failure of the Lender to exercise any rights or remedies against the Borrower, any Loan Party or any other person;

(d)     the sale or enforcement of, or realization upon (through judicial foreclosure, power of sale or any other means) any security for any of the obligations of the Borrower under any of the Loan Documents or any security for any of the Guaranty Obligations, even though (i) recourse may not thereafter be had against the Borrower or any other person for any deficiency or (ii) the Lender fails to pursue any such recourse that might otherwise be available, whether by way of deficiency judgment following judicial foreclosure or otherwise;

(e)     any bankruptcy or reorganization of the Borrower or the voluntary or involuntary participation by the Borrower in any settlement or composition for the benefit of such Borrower's creditors either in liquidation, readjustment, receivership, bankruptcy or otherwise;

(f)     the release of any other guarantor by agreement, operation of law or otherwise; or

(g)     any such action by the Lender that would release or limit the liability of any guarantor to the Lender even if the effect of that action is to deprive the Guarantor of the right to collect reimbursement from the Borrower or any other guarantor for any sums paid to the Lender.

All rights and remedies of the Lender hereunder or under any of the Loan Documents shall be cumulative and may be exercised singularly or concurrently. The rights of the Lender under this Guaranty are in addition to and not in diminution of the rights of the Lender under any other Loan Document.

14.     **Continuing Guaranty.** Until all obligations of the Borrower to the Lender under the Loan Documents are fulfilled and each and every of the terms, covenants and conditions of this Guaranty are fully performed and the Loan is fully repaid, no Guarantor shall be released by any act or thing that might, but for this provision, be deemed a legal or equitable discharge of a surety, or by reason of any waiver, extension, modification, forbearance or delay or other act or omission of the Lender or its failure to proceed promptly or otherwise, or by reason of any action taken or omitted or circumstance that may or might vary the risk or affect the rights or remedies of such Guarantor or by reason of any further dealings between the Borrower and the Lender, whether relating to the Loan or otherwise, and each Guarantor hereby expressly waives and surrenders any defenses to such Guarantor's liability hereunder based upon any of the foregoing acts, omissions, things or agreements or waivers of the Lender; it being the purpose and intent of this Guaranty that the obligations of the Guarantors hereunder are absolute and unconditional under any and all circumstances. The Guarantors have also executed and delivered the Environmental Indemnity in favor of the Lender and (a) performance by the Guarantors of their obligations under this Guaranty shall not decrease the Guarantor's liability under the Environmental Indemnity, and (b) performance by the Guarantors under the Environmental Indemnity shall not decrease or diminish the Guarantor's liability under this Guaranty.

15.     **Notices.** All notices, demands, instructions and other communications required or permitted to be given to or made upon any party hereto or any other person shall be in writing and shall be personally delivered or sent by registered or certified mail, postage prepaid, return receipt requested, or by prepaid courier and shall be deemed to be given for purpose of this Guaranty (i) in regard to registered or certified mail, 3 Business Days after mailing, and (ii) in regard to personal delivery or prepaid courier, on the day that such writing is delivered. Unless otherwise specified in a notice sent or delivered in accordance with the foregoing provisions of this section 15, notices, demands, instructions and other communications in writing shall be given to or made upon the following persons at the addresses indicated below:

To the Guarantors:

c/o 1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attention: Scott A. Chappelle
Telephone: (517) 336-4400
Facsimile: (517) 336-4499

With a courtesy copy to:

McGraw & Eckhardt, PC
1427 West Saginaw, Suite 200
East Lansing, MI 48823
Attention: Thomas R. Eckhardt, Esq.
Telephone: (517) 336-4400
Facsimile: (517) 336-4499

To the Lender:

Hartford Mezzanine Investors I, LLC
127 Public Square, 7th Floor
Cleveland, Ohio  44114
Attention:  Asset Manager – James MacQueen
Facsimile:  (216) 689-4700
Telephone:  (216) 689-4504

With a courtesy copy to:

Jones Day
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Attention:     Bernadette M. Mast, Esq.
Facsimile:     (216) 579-0212
Telephone:    (216) 586-7088

or at such other address as any of the persons identified above may from time to time designate by written notice given as herein required.  Rejection or refusal to accept or inability to deliver because of changed addresses shall be deemed a receipt of such notice.  The effectiveness of such notice will not be affected by the giving or lack thereof of courtesy copies of such notice.

If any day on which any notice, demand, instruction or other communication is given or sent by any party hereto is not a Business Day, such notice, demand, instruction or other communication shall be deemed to have been given or sent on the Business Day next succeeding such non-Business Day.

16.    **Submission to Jurisdiction.** (a) Each Guarantor irrevocably submits to the non-exclusive jurisdiction of the courts of the State of Ohio, the courts of the United States for the Northern District of the State of Ohio, and appellate courts from any of such courts, as the Lender in its sole discretion may elect, over any suit, action or proceeding arising out of or relating to this Guaranty. Each Guarantor hereby irrevocably waives, to the fullest extent permitted by law, any objection that the Guarantor may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Each Guarantor agrees that a final judgment in any such suit, action or proceeding brought in such a court shall be conclusive and binding upon such Guarantor.

(b)    Each Guarantor hereby further irrevocably consents, to the extent permitted by Law, to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to such Guarantor at its address for notices pursuant to section 15, such service to become effective 30 days after such mailing or at such earlier time as may be provided under applicable law. Nothing herein shall affect the right of the Lender to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against any Guarantor in any other jurisdiction.

17.    **Entire Agreement; Modification and Waiver.** This Guaranty, together with the other Loan Documents to which the Guarantors are a party (the *"Guarantor Documents"*), represents the entire agreement between the Guarantors and the Lender with respect to the matters referred to herein and therein together with the Loan Documents to the extent referenced herein or therein, and no waiver or modification hereof or thereof shall be effective unless in writing and signed by the party against whom enforcement of the same is sought. Each of the Guarantor Documents is an independent agreement and shall be so construed in accordance with its respective terms. The other Guarantor Documents are additional security and benefit to the Lender and are not in lieu of and do not in any way diminish the Guaranty Obligations of any Guarantor hereunder. The Guarantors shall be fully liable to the Lender hereunder whether or not the Lender has or shall obtain any other or further guaranties, security or agreements, and irrespective of whether the other Guarantor Documents or other or further guaranties, security or agreements are effective or enforceable or are released or assigned in whole or in part, voluntarily or involuntarily or by operation of law or otherwise. The Lender shall not have any obligation to pursue or attempt to pursue any remedies under the other Guarantor Documents or any other or further guaranties, security or agreement and may enforce all rights and obligations hereunder, irrespective of the existence or nonexistence of other or further guaranties, security or agreements.

18.    **Governing Law.    THIS GUARANTY AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES AND OTHER PERSONS BENEFITTED HEREUNDER SHALL BE CONSTRUED, ENFORCED, AND INTERPRETED ACCORDING TO THE LAWS OF THE STATE OF OHIO, APPLICABLE TO CONTRACTS MADE IN AND PERFORMED IN THE STATE OF OHIO, WITHOUT REGARD TO ITS PRINCIPLES OF CONFLICT OF LAWS.**

**19.    Heirs and Assigns.**  This Guaranty shall be binding upon the Guarantors and upon their respective successors, assigns, heirs and personal representatives and shall inure to the benefit of the Lender and its successors and assigns.

**20.    Time of the Essence.**  Time shall be of the essence with regard to the performance by the Guarantors of their obligations under this Guaranty.

**21.    Singular and Plural.**  As used in this Guaranty, the singular shall include the plural as the context requires, and the masculine, feminine and neuter pronouns shall each include the other as the context requires.

**23.    Waiver of Trial by Jury.**  EACH OF THE GUARANTORS AND THE LENDER BY ITS ACCEPTANCE OF THE BENEFITS HEREOF, HEREBY IRREVOCABLY WAIVES, TO THE EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM AMONG ANY OF THEM, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, ARISING OUT OF OR IN ANY WAY CONNECTED TO THE LOAN, THIS GUARANTY OR ANY OF THE OTHER LOAN DOCUMENTS.

**24.    Severability.**  If any term or provision of this Guaranty or any application thereof shall be held to be invalid, illegal or unenforceable, the remainder of this Guaranty and any other application of such term or provision shall not be affected thereby.

**25.    Enforcement Expenses.**  The Guarantors shall pay, on a joint and several basis, all costs and expenses of the Lender in connection with the enforcement of this Guaranty and any amendment, waiver or consent relating hereto (including, without limitation, the fees and disbursements of counsel employed by the Lender).

**26.    Counterparts.**  This Guaranty may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument.

**27.    Headings.**  The headings in this Guaranty are for purposes of reference only and shall not limit or define the meaning hereof.

**28.    Joint and Several.**  The warranties, covenants and other obligations of the Guarantors hereunder are made and undertaken jointly and severally by each of the Guarantors.

*(Signature page follows.)*

**IN WITNESS WHEREOF**, this Guaranty has been executed by the undersigned as of the date first above written.

Guarantors:

_____
SCOTT A. CHAPPELLE, individually

_____
LAURA A. CHAPPELLE, individually

_____
KEVIN T. MCGRAW, individually

_____
SHARON D. MCGRAW, individually

_____
EVERT KRAMER, JR., individually

_____
ROSALIND KRAMER, individually

Signature Page
to
Guaranty

### Forbearance and Modification Agreement
(Woodland Lakes Apartments)


This Forbearance and Modification Agreement ("**Agreement**") is made this 3rd day of June, 2008, by and among HARTFORD MEZZANINE INVESTORS I, LLC, a Delaware limited liability company ("**Lender**"), WOODLAND LAKES INVESTMENT GROUP, L.L.C., a Michigan limited liability company ("**Borrower**"), SCOTT A. CHAPPELLE, an adult individual ("**S. Chappelle**"), LAURA A. CHAPPELLE, an adult individual ("**L. Chappelle**"), KEVIN T. MCGRAW, an adult individual ("**K. McGraw**"), SHARON D. MCGRAW, an adult individual ("**S. McGraw**"), EVERT KRAMER, JR., an adult individual ("**E. Kramer**"), and ROSALIND KRAMER, an adult individual ("**R. Kramer**") (S. Chappelle, L. Chappelle, K. McGraw, S. McGraw, E. Kramer, and R. Kramer sometimes being referred to in this Agreement collectively as the "**Guarantors**"), and each of the entities and individuals set forth on Exhibit A attached hereto ("**Pledgors**"). Borrower, Guarantors and the Pledgors are sometimes referred to as the "**Borrower Parties**," and Lender and the Borrower Parties are sometimes referred to collectively herein as the "**Parties.**"

The following recitals are a material part of this Agreement:

A.     Lender is the owner and holder of the loan ("**Loan**") evidenced by that certain Term Note (the "**Note**") in the original principal amount of $3,340,000.00 executed by Borrower in favor of Lender.

B.     The Loan was made pursuant to that certain Loan Agreement dated as of January 4, 2006, between Borrower and Lender ("**Loan Agreement**"). Borrower is the sole owner of the Project (as defined below), and in addition to the Note and Loan Agreement, the Loan is further evidenced or secured by various documents, including the following:

(i)     Pledge Agreement dated January 4, 2006, executed by the Pledgors for the benefit of Lender (the "**Pledge Agreement**"), which grants a security interest in the Pledged Collateral (as defined in the Pledge Agreement). Each Pledgor has remained a member of Borrower and Pledgor, other than Masonic Investment Group, L.L.C., which conveyed its interests in Borrower to another member. In addition, KTM Development Corporation and Harrison Investment Group, LLC may, subject to the Pledge Agreement, sell some or all of their membership interests in Borrower to Covenant Investment Group, Inc., a Pledgor, or other Pledgors.

(ii)     Guaranty dated January 4, 2006, executed by the Guarantors in favor of Lender, as amended by that certain Amendment to Guaranty dated December 19, 2007 (collectively, the "**Guaranty**"), pursuant to which the Guarantors have guaranteed and are jointly and severally liable to Lender for full payment and performance of all obligations relating to the Loan upon the occurrence of certain events and the limited obligations (under certain exceptions to the non-recourse provisions of the Loan Documents) for which Borrower is personally liable in connection with the Loan.

1650758.19



(iii)    Financing Statements under the Uniform Commercial Code ("**UCCs**").

(iv)    Environmental and Hazardous Substances Indemnity Agreement ("**Environmental Indemnity**") dated January 4, 2006, executed by Guarantors and Borrower for the benefit of Lender.

C.    Contemporaneously herewith, Scott A. Chappelle, Laura A. Chappelle, Evert Kramer, Jr. and Rosalind Kramer have delivered to Lender a Guaranty ("**Supplemental Guaranty**").

D.    Contemporaneously herewith, (i) Borrower, Lender, Senior Lender (as defined below) and KeyBank National Association have executed that certain Lockbox-Deposit Account Control Agreement ("**Lockbox Agreement**"), (ii) Borrower, Lender, Senior Lender, and Terra Management Company have executed that certain Cash Management Agreement ("**Cash Management Agreement**"). The Lockbox Agreement and Cash Management Agreement supersede and replace any prior document in connection with the collection of rents at the Project and the application of such rents.

E.    On May 16, 2008, Borrower sent to each tenant at the Project a letter ("**Tenant Direction Letter**") substantially similar to the Tenant Direction Letter attached to the Lockbox Agreement as Exhibit B.

F.    Borrower and Delhi Township Brownfield Redevelopment Authority ("**DTBRA**") executed that certain Brownfield Reimbursement Agreement dated March 26, 2002 ("**Initial Reimbursement Agreement**"), amended by that certain First Amendment to Brownfield Reimbursement Agreement ("**First Amendment**"), further amended by the Second Amendment to Brownfield Reimbursement Agreement dated August 1, 2005 ("**Second Amendment**"), and further amended by the Third Amendment to Brownfield Reimbursement Agreement dated January 24, 2006 ("**Third Amendment**") (the Initial Reimbursement Agreement, together with the First Amendment, the Second Amendment, the Third Amendment and any further amendments or modifications thereto, the "**Reimbursement Agreement**"). Pursuant to the terms of the Reimbursement Agreement, Borrower is the recipient of certain payments from the DTBRA for reimbursement of certain costs ("**Reimbursements**"). On May 19, 2008, Borrower sent to the DTBRA a notice substantially similar to the letter attached hereto as Exhibit C.

G.    The Note, Loan Agreement, Pledge Agreement, Guaranty, the Environmental Indemnity, UCCs, this Agreement, the Lockbox Agreement, Cash Management Agreement, Supplemental Guaranty, and all other existing or future documents evidencing, securing or executed in connection with the Loan, and all documents that hereafter modify, amend, extend, restate, replace, or otherwise affect the Loan or any of the foregoing documents are referred to collectively herein as the "**Loan Documents**." All covenants, agreements, and obligations of Borrower Parties in this Agreement shall be included within the definition of "Obligations" under the Loan Documents.

2

H.  Borrower obtained a loan (the "**Senior Loan**") from John Hancock Life Insurance Company (the "**Senior Lender**") evidenced by that certain Promissory Note dated August 1, 2005 in the amount of $24,000,000.00 (the "**Senior Loan Note**") and that certain Additional Funding Loan Agreement dated as of August 1, 2005, between Borrower and Senior Lender and is further evidenced or secured by various documents, including (i) that certain Mortgage dated as of August 1, 2005, executed by Borrower in favor of Senior Lender ("**Security Instrument**") that encumbers with first-priority liens and security interests certain real property, improvements, appurtenances and related personal property owned by Borrower, located at 4200 Dell Road in the Township of Delhi, County of Ingham, State of Michigan and commonly known as the Woodland Lakes Apartments (collectively, the "**Project**"), (ii) an Assignment of Leases and Rents dated as of August 1, 2005, executed by Borrower in favor of Senior Lender ("**Assignment of Leases and Rents**"), (iii) that certain Indemnification Agreement dated as of August 1, 2005 executed by Borrower, Scott A. Chappelle, Laura A. Chappelle, Kevin T. McGraw, and Sharon D. McGraw (collectively, "**Senior Loan Guarantors**"), and (iv) that certain Guaranty Agreement dated as of August 1, 2005 executed by the Senior Loan Guarantors (the Senior Loan Note, Security Instrument, and all other documents and agreements entered into between the Borrower and/or the Senior Loan Guarantors and the Senior Lender in connection with the Senior Loan (including the Senior Loan Forbearance Agreement), as may be modified, amended or supplemented, are collectively referred to herein as the "**Senior Loan Documents**"). On or about the same date herewith, Senior Lender and Borrower have signed and delivered a Forbearance Agreement (collectively, "**Senior Loan Forbearance Agreement**").

I.  An event of default occurred under the Senior Loan Documents, which caused an Event of Default (as defined in the Loan Agreement) under the Loan Agreement, and Borrower failed to make certain payments under the Loan, which also caused an Event of Default. Such Events of Default have remained uncured (such Events of Default, collectively with any other Event of Default that remains outstanding as of the date hereof, "**Existing Defaults**"). On January 8, 2008, Lender notified Borrower and Pledgors of an Event of Default ("**Default Notice**"). On February 14, 2008, Lender notified Borrower and Pledgors that such Event of Default remained uncured and that the Loan had been accelerated ("**Acceleration Notice**"). On February 14, 2008, Lender notified Borrower and Pledgors of Lender's intended disposition of collateral securing the Loan ("**UCC Sale Notice**") through a public sale ("**UCC Sale**") to have occurred on March 21, 2008. Pursuant to a letter ("**UCC Sale Extension Notice**") dated March 20, 2008, the UCC Sale was continued to April 4, 2008. Pursuant to a letter dated April 3, 2008, the UCC Sale was continued to April 18, 2008 ("**UCC Sale Second Extension Notice**"), pursuant to a letter dated April 17, 2008, the UCC Sale was continued to April 30, 2008 ("**UCC Sale Third Extension Notice**"), pursuant to a letter dated April 29, 2008, the UCC Sale was continued to May 9, 2008 ("**UCC Sale Fourth Extension Notice**"), pursuant to a letter dated May 8, 2008, the UCC Sale was continued to May 30, 2008 ("**UCC Sale Fifth Extension Notice**"), on May 30, 2008, Lender verbally extended the UCC Sale to June 2, 2008 ("**UCC Sale Sixth Extension Notice**"), and pursuant to a letter dated June 2, 2008, the UCC Sale was continued to June 16, 2008 ("**UCC Sale Seventh Extension Notice**") (the UCC Sale Notice, the UCC Sale Extension Notice, the UCC Sale Second Extension Notice, the UCC Sale Third Extension Notice, the UCC Sale Fourth Extension Notice, the UCC Sale Fifth Extension Notice, the UCC Sale Sixth Extension Notice, and the UCC Sale Seventh Extension Notice are sometimes collectively referred to herein as the "**UCC Notices.**").

J.    The following sums (collectively, "**June 2008 Outstanding Amounts**") are due and owing under the Loan Documents, prior to payment of any sums required under this Agreement:

(i)    The outstanding principal balance of $3,340,000.00.

(ii)    Default Interest payments from October and November, 2007 in the aggregate amount of $7,422.23, plus monthly payments from December 1, 2007, through and including July 10, 2008, for a total amount of $405,587.72 ("**Accrued Default Interest Payments**") calculated at the default rate specified in the Loan Agreement of 20% per annum.

(iii)    Late charges in accordance with Section 2.3(e) of the Loan Agreement in the aggregate amount of $11,877.01 ("**Late Charges**"), and other administrative expenses in the aggregate amount of $800.00 ("**Administrative Expenses**").

(iv)    Loan-related expenses (including an appraisal, publishing costs and other third party fees and costs) incurred by Lender and collection and enforcement-related expenses including all attorneys' fees (which shall be in the amount of $85,000.00) and costs incurred by Lender through the Closing Date, collectively, "**Loan Related Expenses**".

K.    Interest continues to accrue on the outstanding balance of the Loan at the default rate and late charges, expenses (including Loan Related Expenses) and other amounts continue to accrue, and Lender has the right to conduct the UCC Sale, to collect the Loan and enforce the Loan Documents, and the right to immediately commence and pursue any or all of the other rights and remedies available to Lender under the Loan Documents or applicable law.

L.    On July 25, 2008 ("**Closing Date**"), Borrower shall deposit with Lender a payment in the amount of (i) all outstanding Base Interest payments through and including the payment due for July, 2008, in the amount of $237,139.99 ("**Accrued Base Interest Payments**"), (ii) all Administrative Expenses (not to exceed $800.00), (iii) all Loan Related Expenses, and (iv) the amount of $34,613.33, which is the amount of Base Interest payable for one month under the Loan (the "**Interest Reserve Deposit**"). On the Closing Date, Borrower shall also deposit with Senior Lender the amounts then due under the Senior Loan Forbearance Agreement.

M.    Borrower and Pledgors have requested that Lender forbear in the pursuit of Lender's remedies, and Lender is willing to do so, but only on the terms and conditions specified in this Agreement, in reliance upon the agreements of Borrower Parties herein, and subject to full performance by Borrower Parties of all acts required of them hereunder or that are necessary to give effect to the provisions of this Agreement.

4

NOW, THEREFORE, in consideration of the mutual agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Defined Terms.    All capitalized terms used in this Agreement that are not otherwise defined herein shall have the meanings defined for them in the Loan Agreement.

2.    Recitals; Status of and Effect of Loan Documents.    Each of the Borrower Parties acknowledges, confirms, and agrees that the matters stated in the Recitals set forth above are true and accurate in all respects, are a material part of this Agreement, are hereby incorporated by reference, and may be relied upon for all purposes by the parties and that:

(a)    The Loan Documents (including this Agreement) have been duly authorized, executed, and delivered to Lender, remain in full force and effect as originally written or as modified herein or as previously modified by mutual written agreement of the parties, and are valid, binding and enforceable against each respective party in accordance with their respective terms.    Each Borrower Party hereby ratifies and reaffirms the terms and provisions of the Loan Documents, including Section 9.1 of the Loan Agreement.

(b)    All liens and security interests created in favor of Lender under the Loan Documents have been validly created and duly perfected as encumbrances upon all property and collateral of the Pledgors in first priority as represented by the Pledgors or other persons or entities in the Pledge Agreements or any other Loan Documents.

(c)    All indebtedness created under the Loan Documents (including the June 2008 Outstanding Amounts) is validly and unconditionally owing in full to Lender, in accordance with the terms thereof, as modified hereby, without any defense or offset whatsoever, and Borrower Parties have no defenses, claims, counterclaims, or other rights that could be asserted to impair, delay, or adversely affect Lender's receipt of full payment and performance of all obligations owed to Lender by such parties with respect to the Loan.

(d)    Lender has given and Borrower Parties have received all notices to which they are respectively entitled under the Loan Documents (including the Default Notice, Acceleration Notice, and UCC Notices) with respect to the Existing Defaults, and the Borrower Parties hereby unconditionally and irrevocably waive any and all such notices that Lender might have neglected to give.    All notice, grace, or cure periods provided for in the Loan Documents that applied to the Existing Defaults were duly provided to the Borrower Parties and have now expired by their terms.

(e)    The continued existence of uncured Existing Defaults has given Lender the unconditional right, at Lender's election in Lender's discretion and without further notice to Borrower Parties or any other person, to commence and pursue the UCC Sale and any or all of the other remedies for collection of the Loan and enforcement of the

1650758.19

Loan Documents that are available to Lender under the Loan Documents or applicable law, in such order and manner as Lender may elect from time to time.

3.　　Warranties and Representations. Borrower Parties unconditionally and irrevocably ratify, remake and confirm all warranties and representations previously made by them in the respective Loan Documents to which they are parties (except to the extent, if any, that the provisions of this Agreement reflect variances from such existing warranties and representations with respect to facts and circumstances existing on the date hereof), and the respective parties, each as to itself, further warrant and represent the following:

(a)　　Each Borrower Party, other than any individual Guarantor or Pledgor, is duly organized, validly existing, and in good standing under the laws of its state of organization and is duly qualified as a foreign entity and is currently in good standing in each state in which such qualification is required for the conduct of its business as it is currently being conducted (including, as applicable, the state where the Project is located).

(b)　　Each Borrower Party has full authority and due capacity to execute, deliver, and perform this Agreement and all documents, instruments and agreements executed in connection herewith. Such execution, delivery, and performance has been duly authorized as required under their organizational documents (if any) or under applicable law, and the individuals and entities executing this Agreement on their behalf have been duly authorized and empowered to bind the Borrower Parties by such execution.

(c)　　This Agreement has been duly executed and delivered to Lender by each Borrower Party, and is valid, binding, and enforceable against each of them in accordance with its terms.

(d)　　Each Borrower Party agrees that neither the execution and delivery of this Agreement nor the performance of its terms and compliance with its conditions will conflict with or result in a breach of any of the terms, conditions or provisions of or constitute a violation or default under any organizational document of such Borrower Party or any contract, agreement, or to the knowledge of each Borrower Party, applicable law, regulation, judgment, writ, order or decree to which such Borrower Party or any property of such Borrower Party is subject.

(e)　　All documents and information furnished by any Borrower Party to Lender with respect to the Loan or this Agreement are complete and accurate in all material respects, and none contains any misrepresentation or misstatement of a material fact or omits to state a material fact.

(f)　　To their knowledge, Borrower Parties are in compliance in all material respects with all federal, state and local laws, rules, and regulations applicable to their respective properties, operations, businesses, and finances.

6

(g)     To the knowledge of Borrower, no Default or Event of Default exists under any Loan Document except for the Existing Defaults.

(h)     The Borrower Parties hereby acknowledge that the Borrower Parties gain a substantial opportunity to receive significant economic benefit or avoid significant economic detriment from the Lender's forbearance herein, which constitutes reasonably equivalent value for the Borrower Parties' agreements herein.

(i)     Borrower represents and warrants that the revised 2008 Budget (as defined below) attached hereto as Exhibit B is materially complete and correct.

(j)     Borrower represents and warrants that (i) the list of Pledgors on Exhibit A is true, complete and correct, (ii) there are no owners of membership interests in Borrower that are not set forth on such list, (iii) no certificates have been issued evidencing the membership interests in Borrower, and (iv) the organizational chart set forth on Exhibit E is accurate and complete.

(k)     Each Pledgor represents and warrants that its membership interest in Borrower is not evidenced by a certificate.

(l)     Borrower represents and warrants that the Schedule of Reimbursements attached hereto as Exhibit D is a complete and correct schedule of dates of receipt of Reimbursements.

4.     <u>Acceptance of Collateral in Satisfaction of Indebtedness.</u>

(a)     Pursuant to Section 1309.620 of the Uniform Commercial Code of the State of Ohio ("UCC") and in reliance on the covenants and agreements and warranties and representations made in this Agreement, Lender hereby proposes ("**Proposal**") to accept, under and subject to the terms and conditions set forth in this Agreement, the Pledged Collateral (as defined in the Pledge Agreement) in satisfaction of $100,000.00 of the Obligations ("**Collateral Acceptance**").  Borrower Parties hereby consent to and accept the terms of the Proposal, and this Agreement shall be deemed to be "a record authenticated after default" pursuant to Section 1309.620(C)(1) of the UCC.  The Collateral Acceptance shall be effective upon (i) the occurrence of a Forbearance Termination Event followed by (ii) Lender's written notice, which it may send or not in it its discretion, to the Borrower and Pledgors that the Collateral Acceptance is effective, complete, and final and designating the Lender or its designee as the recipient of the Collateral Acceptance. Until and unless the Collateral Acceptance is effective, complete, and final, all provisions of the Mezzanine Loan Documents shall remain in full force and effect and Lender may pursue any or all of its other remedies under the Loan Documents and applicable law.

(b)     The Pledgors agree to continue to be subject to the terms of the Pledge Agreement. The Pledgors and Guarantors acknowledge and agree that (i) they are not "secondary obligors" under Section 1309.621(B) of the UCC, (ii) Lender is not required

7

to send the Proposal to the Pledgors and Guarantors under Section 1309.621 of the UCC, (iii) the Pledgors have no right to object to the Proposal under Section 1309.620 of the UCC, (iv) to the extent Pledgors are deemed to be secondary obligors under Section 1309.621(B) of the UCC, they hereby waive all rights to notice and objections to the Proposal under Sections 1309.620 and 1309.621 of the UCC, and (v) to the extent Pledgors are deemed to be secondary obligors under Section 1309.621(B) of the UCC and if the rights of secondary obligors under Sections 1309.620 and 1309.621 of the UCC may not be waived, this Agreement constitutes the sending to the Pledgors of the Lender's "proposal to accept collateral in full or partial satisfaction of the obligation it secures" required under Section 1309.621 of the UCC, and the period within which the Pledgors may object to the Proposal under Sections 1309.620 and 1309.621 shall begin on the date of this Agreement and end on the date that is twenty (20) days after the date of this Agreement.

5.    Forbearance by Lender on Conditions; Effects of Forbearance.

(a)    Subject to and in consideration of the full performance by the Borrower Parties of all of their covenants and agreements in this Agreement and in the other Loan Documents as modified by this Agreement, and only until the occurrence of a Forbearance Termination Event (as defined below), Lender agrees that Lender shall:

(i)    Forbear from commencement or further active pursuit of (A) the UCC Sale, (B) the Collateral Acceptance, and (C) the other remedies available to Lender under this Agreement or the other Loan Documents or applicable law for collection of the Loan and enforcement of the Loan Documents.

(ii)    So long as a Forbearance Termination Event does not occur, waive the payment of the Late Charges and Accrued Default Interest Payments (through the Closing Date).  Notwithstanding the foregoing, upon the occurrence of a Forbearance Termination Event, all June 2008 Outstanding Amounts, together with all other amounts then due (including any additional applicable late charges or default interest), shall immediately become due.

(b)    Lender's agreement herein to forego immediate pursuit of its rights and remedies constitutes a postponement and forbearance only, and does not in any event constitute a waiver of any such rights or remedies.  Nothing herein shall be deemed to (i) waive any condition or requirement contained in any of the Loan Documents, as modified by this Agreement, unless expressly stated herein, or (ii) constitute or establish a course of conduct or course of dealing with respect to the Borrower Parties' compliance with any such condition or requirement or that varies any provision of any Loan Document relating to any waiver, approval or consent by Lender (other than the modifications specified in Section 6 below or other provisions of this Agreement).

6.    Modifications to Loan Documents; Covenants.  The parties agree that the Loan Documents are hereby modified in accordance with the following:

8

(a)  Payment Due Dates.  Section 2.3(d)(i) of the Loan Agreement is hereby replaced with the following:  "Prior to maturity, whether by acceleration or otherwise, Base Interest on the Loan shall be due and payable in arrears for the prior calendar month on the tenth day of each month."

(b)  Budget.  In accordance with Section 7.1(g) of the Loan Agreement, Borrower has delivered to Lender an annual operating budget for the Project ("**Budget**") showing anticipated income and expenses for Borrower's current fiscal year.  Lender has approved the Budget attached hereto.  Not later than sixty (60) days before the end of each fiscal year of Borrower, Borrower shall deliver to Lender the Project's updated annual operating Budget for the following fiscal year, which shall require the written approval of Lender, which shall not be unreasonably withheld, conditioned or delayed, and shall include, among other expenses, the amount of $10,000.00 for payment of expenses to be incurred in accordance with Section 7.2 of the Loan Agreement (as modified below).  If Lender does not approve the Budget for the following fiscal year prior to the commencement thereof, the then current Budget shall remain in effect until Lender's approval is granted, with an increase in any non-discretionary expense item to the lesser of the following: (i) the prior budgeted expense amount with a 5% increase or (ii) the actual expense incurred as evidenced by the applicable bill or invoice.  Borrower shall comply with the Budget unless otherwise approved by Lender.

(c)  Books, Records and Inspections.  Section 7.2 of the Loan Agreement is modified to further provide that Borrower shall, and shall cause the Property Manager to, comply with all reasonable requests from Lender and officers and designated representatives of Lender for information and documents in connection with a review of the accounting practices, finances and accounts of Borrower and collection of rents by the Borrower and Property Manager to confirm, among other things, compliance with the requirements under the Lockbox Agreement and Cash Management Agreement. Borrower shall be responsible for all of Lender's fees and costs incurred in connection with the provisions of Section 7.2 as amended hereby, provided however, Borrower's obligation to pay all such fees and costs shall not exceed the aggregate amount of $10,000.00 within any twelve month period.  Upon Borrower's request, Lender shall deliver to Borrower and to Senior Lender the results of any of the inspections set forth in this Section.

(d)  Reserve Accounts Generally.  Lender has required that the Interest Reserve Account, the Excess Cash Flow Reserve Account, and the DTBRA Reserve Account (each defined below) (sometimes referred to herein collectively as "**Reserve Accounts**") be established with KeyBank National Association and that the following shall apply with respect to such Reserve Accounts:

(i)  Borrower hereby confirms and grants to Lender a security interest in, and assigns and transfers to Lender, as security for the Obligations, all of its right, title, and interest in and to the Reserve Accounts, and all proceeds thereof. Each Reserve Account shall be a custodial account (and not a trust account) established by Lender or its designee, and, at Lender's option, funds deposited

into a Reserve Account may be commingled with other money held by or on behalf of Lender. Each Reserve Account shall be under the sole dominion and control of Lender, and Borrower shall not have any right to withdraw funds from a Reserve Account other than in accordance with the terms hereof. The Reserve Accounts shall bear interest at commercially reasonable rates, and all interest earned shall be deposited directly into the respective Reserve Accounts (and therefore available for disbursement in accordance with the provisions hereof or available as an offset to deposits or fees in connection with the respective Reserve Account into which the interest is deposited). Each Reserve Account shall be additional collateral for the Loan.

(ii)     Upon payment in full of the Loan, pursuant to Borrower's request, Lender shall at Borrower's option either disburse to Borrower or credit against the final payment all unapplied funds held by Lender in the Reserve Accounts.

(iii)     No disbursements made from a Reserve Account at the time when a Default or Event of Default has occurred and is then continuing shall be deemed a waiver or cure by Lender of that Default or Event of Default, and Lender's rights and remedies shall not be prejudiced in any manner thereby.

(e)     Interest Reserve Account. On the Closing Date, Borrower shall deposit with Lender the Interest Reserve Deposit to be deposited into an account held by Lender or its designee (the "**Interest Reserve Account**"). Amounts in the Interest Reserve Account are to be used for the purpose of paying the accrued interest due from Borrower under the Loan Agreement. So long as no Event of Default shall be continuing, Lender shall, upon receiving written request from Borrower (which shall include evidence indicating that the cash flow from the Project is insufficient for Borrower to pay the accrued interest then due), disburse the amounts from the Interest Reserve Account requested by Borrower to pay, in full, all amounts due in accordance with the Loan Agreement. The amounts disbursed shall not exceed the actual shortfall in the revenues generated by the Project. Borrower acknowledges that Lender has no obligation to disburse more than the remaining balance of the Interest Reserve Account if such amount is less than the full payment requested. Thereafter, Borrower shall, prior to the next succeeding payment due date (and in addition to any payment due on such payment due date), deposit sufficient funds with Lender so that the balance of the Interest Reserve Account is again in the amount of the Interest Reserve Deposit.

(f)     Excess Cash Flow Reserve Account. In accordance with the terms of the Cash Management Agreement, all Monthly Excess Available Cash shall be deposited into an account (the "**Excess Cash Flow Reserve Account**") to be held by Lender or its designee as additional collateral for the Loan. Lender shall, so long as no Event of Default shall be continuing, upon receiving written request from Borrower, disburse the deposits as follows: (i) upon receipt of evidence indicating that the cash flow from the Project is insufficient for Borrower to pay the accrued interest then due but not yet paid, disburse the amounts from the Excess Cash Flow Reserve Account requested by Borrower to pay such all amounts due in accordance with the Loan Agreement (the

10

amount to be disbursed shall not exceed the actual shortfall in the revenues generated by the Project); (ii) to be reimbursed to Borrower for payment of operating expenses for the Project to the extent that (A) such operating expenses are consistent with the then applicable approved Budget or otherwise approved by Lender upon receipt of receipts, paid invoices, or other evidence indicating such payment and describing the items or services purchased, and (B) insufficient funds exist from the cash flow of the Project to pay such operating expenses; or (iii) to be applied to any other use requested by Borrower in connection with the Project that Lender determines in its reasonable discretion to be necessary in order to operate a multi-family project of the size and nature of the Project.

(g) **DTBRA; DTBRA Reserve Account.** Borrower hereby confirms and grants to Lender a first priority security interest in, and assigns and transfers to Lender, as security for the Obligations, all of its right, title, and interest in and to, and all rights, Reimbursements and other payments, accounts and general intangibles arising under or related to the Reimbursement Agreement and all products and proceeds thereof, whether now owned or hereafter acquired. Lender shall have no obligations or liabilities under the Reimbursement Agreement. Borrower hereby appoints Lender its attorney-in-fact with full power of substitution (and which shall be deemed to be coupled with an interest and irrevocable until the Loan is paid in full, with Borrower hereby ratifying all that its said attorney shall do by virtue thereof) to complete and undertake all steps necessary to request and receive the Reimbursements from the DTBRA. Borrower acknowledges that under Section 7.13 of the Loan Agreement, following the occurrence of an Event of Default, Borrower is required to deposit with Lender each Reimbursement from the DTBRA as a mandatory prepayment of principal under the Loan; notwithstanding the foregoing, Borrower hereby further agrees that, (i) pursuant to the letter sent to the DTBRA on May 19, 2008 (substantially similar to the letter attached hereto as Exhibit C), Borrower has requested DTBRA's acknowledgment of the security interest granted to Lender, and Borrower shall use its best efforts to obtain DTBRA's agreement to the provisions of such letter and (ii) if, following the date of this Agreement, Borrower receives a Reimbursement, it shall hold such Reimbursement in trust for Lender and promptly deliver such Reimbursement to Lender whether or not an Event of Default or Forbearance Termination Event then exists. Lender shall, so long as no Forbearance Termination Event or Event of Default Default shall have occurred and be continuing, deposit all Reimbursements received into an account (the **"DTBRA Reserve Account"**) to be held by Lender as additional collateral for the Loan. So long as no Event of Default shall be continuing, Lender shall disburse the first $50,000 (in the aggregate) of the DTBRA Reserve Account for reimbursements of costs and expenses for Capital Expenditures (as defined below), and thereafter, so long as no Event of Default shall have occurred and be continuing, following Borrower's request, the deposits shall be disbursed as follows: (i) upon receipt of evidence indicating that the cash flow from the Project is insufficient for Borrower to pay the accrued interest then due but not yet paid, disburse the amounts from the DTBRA Reserve Account requested by Borrower to pay such all amounts due in accordance with the Loan Agreement (the amount to be disbursed shall not exceed the actual shortfall in the revenues generated by the Project); (ii) to be reimbursed to Borrower for payment of operating expenses for the Project to the extent that (A) such operating expenses are consistent with the then applicable approved Budget

or otherwise approved by Lender upon receipt of receipts, paid invoices, or other evidence indicating such payment and describing the items or services purchased, and (B) insufficient funds exist from the cash flow of the Project to pay such operating expenses; or (iii) to be applied to any other use requested by Borrower in connection with the Project that Lender determines in its reasonable discretion to be necessary in order to operate a multi-family project of the size and nature of the Project. With respect to each disbursement from the DTBRA Reserve Account for Capital Expenditures, Borrower shall satisfy each of the following disbursement requirements:

> (i)     Borrower shall deliver to Lender a request for disbursement, together with a reasonably detailed description and cost breakdown of the Capital Expenditures covered by the request and Borrower's certification that all such Capital Expenditures have been paid (unless a joint check is issued) for work completed lien-free and in a workmanlike manner; and

> (ii)    copies of valid and verifiable invoices supporting the request for such disbursement.

For purposes herein, the term **"Capital Expenditures"** shall mean major repairs and replacements (including but limited to carpeting, windows, doors, appliances, furniture and equipment) to maintain or improve the Project.

(h)     Additional Covenant.  On the Closing Date, Borrower shall deposit with Lender the payment of (i) all Accrued Base Interest Payments, (ii) all Administrative Expenses, (iii) all Loan Related Expenses, and (iv) the Interest Reserve Deposit.

7.      Ratification by Pledgors; Guarantors.

(a)     Each Pledgor hereby (i) ratifies the Pledge Agreement previously executed by it and confirms that the Pledge Agreement and all waivers, covenants and agreements therein remain in full force and effect for the benefit of Lender, (ii) confirms that the Pledge Agreement has not been modified or amended, and that no Pledgor has assigned, conveyed or encumbered the Pledged Collateral (other than to Lender under the Pledge Agreement or pursuant to conveyances to other Pledgors following notice to Lender), (iii) agrees that its execution of this Agreement is not required under the Pledge Agreement or under any other Loan Document, (iv) agrees that the fact that Lender requested Pledgors' execution of this Agreement does not constitute or establish any course of conduct or course of dealing that modifies any provision of the Pledge Agreement or affect Pledgors' liability thereunder in any manner, (v) Lender shall have the full benefit of this Agreement and the Pledge Agreements without any obligation to obtain any future ratification, reaffirmation, consent, waiver or other agreement from Pledgors (vi) acknowledges receipt of the UCC Notices, and that all such notices were commercially reasonable and duly delivered in accordance with all applicable requirements of law, and waives any defense to notice and objection to such notices, and (vi) acknowledges that Lender's agreements herein concerning forbearance set forth in Section 5 below provide

Pledgors an opportunity to protect the value of their ownership interest in Borrower constituting reasonably equivalent value to the Pledgors.

(b)     Guarantors hereby (i) ratify the Guaranty previously executed by them and confirm that the Guaranty and all waivers, covenants and agreements therein remain in full force and effect for the benefit of Lender, (ii) reaffirm their continuing liability under the Guaranty, without any defense or offset whatsoever, (iii) confirm that Guarantors' liabilities under the Guaranty have not been limited, impaired or affected in any manner by any existing or previous event, fact or circumstance. Guarantors further acknowledge and agree that (i) their execution of this Agreement is not required under the Guaranty or under any other Loan Document, (ii) Guarantors would remain fully liable to Lender for all obligations owed under the Guaranty with respect to the Loan as modified by this Agreement whether or not Guarantors executed this Agreement or entered into any of the agreements herein, (iii) Lender has and shall continue to have the right, but shall not be obligated to, further modify any or all of the terms of the Loan or the Loan Documents, extend the maturity of the Loan, obtain or release collateral or security for the Loan, pursue or forbear in the pursuit of remedies, and take any or all other actions Lender is authorized to take under the Guaranty, this Agreement or any other Loan Document without giving notice to, obtaining any consent, approval or agreement from, or obtaining execution of any document by any Guarantor, (iv) the fact that Lender requested Guarantors' execution of this Agreement does not constitute or establish any course of conduct or course of dealing that modifies any provision of the Guaranty or affect Guarantors' liability thereunder in any manner, (v) Lender shall have the full benefit of this Agreement and the Guaranty without any obligation to obtain any future ratification, reaffirmation, consent, waiver or other agreement from Guarantor, (vi) the UCC Notices, and that all such UCC Notices were commercially reasonable and duly delivered in accordance with all applicable requirements of law, and each Guarantor waives any defense to, and all rights to notice and objection of, such notices, and (vii) Lender's agreements herein concerning forbearance set forth in Section 5 below provide Guarantors an opportunity to protect the value of their ownership interest in Pledgors constituting reasonably equivalent value to the Guarantors.

8.     Discussions and Sharing of Information.  To the extent reasonably necessary to carry out or enforce the terms of this Agreement or the other Loan Documents or to facilitate the sale of the Loan or the sale of the Pledged Collateral or to protect the value of the Pledged Collateral, Lender may choose to communicate with one or more Third Parties (as defined below) about (a) the Loan, (b) the Project, (c) the Senior Loan, (d) the action or inaction of the Borrower Parties (collectively, the **"Authorized Subject Matter"**).  The Borrower Parties hereby irrevocably agree that Lender may, and authorize Lender to, (X) impart, receive, and otherwise share with Third Parties from time to time documents and information specifically related to the Project or the Loan that Lender may now or hereafter obtain from any source with respect to any of the Authorized Subject Matter (collectively, the **"Authorized Information"**), and (Y) conduct discussions and communications with Third Parties (collectively, **"Authorized Communications"**) with respect to any of the Authorized Subject Matter or Authorized Information, without notice to or consent by any of the Borrower Parties.  For purposes herein, the term **"Third Parties"** means (i) advisors or consultants to Lender (or as receivers, trustees,

13

appraisers, consultants, or managers for the Project or in similar capacities), any contractor, subcontractor, vendor, material supplier, service provider, or other party having any contractual or other relationship with a Borrower Party, (ii) the Senior Lender, (iii) the Borrower Parties, (iv) any potential bona fide participant in or bona fide purchaser of the Loan or the Senior Loan, (v) any potential bona fide purchaser of any portion of or interest in the Project, and (vi) any potential bona fide investor or acquirer of an interest in Borrower or any Pledgor. The Borrower Parties agree to furnish to Lender or any Third Party within five days of request any Authorized Information such parties may reasonably request. Prior to an Event of Default, Lender will use commercially reasonable efforts to obtain from each Third Party an agreement to maintain the confidentiality of the information provided. Notwithstanding the foregoing, Lender shall not release any personal information of Guarantors without receipt of a commercially reasonable confidentiality agreement.

9.     Releases and Indemnifications.   As a material part of the consideration for Lender's execution of this Agreement, the Borrower Parties hereby unconditionally, irrevocably and unequivocally:

(a)     acknowledge, agree and affirm that none of them possesses any claims, defenses, offsets, rights of recoupment or counterclaims of any kind or nature against or with respect to the enforcement or administration of the Loan or the Loan Documents (including any aspect of the origination, administration or enforcement thereof) or any knowledge of any facts or circumstances that might give rise to or be the basis of any such claims, defenses, offsets, rights of recoupment or counterclaims.

(b)     release and forever discharge Lender, and its predecessors in interest, affiliates, subsidiaries, participants or assigns, and all of their respective past, present, and future shareholders, members, directors, managers, officers, employees, attorneys, advisers, consultants, servicers, representatives or agents (collectively, the "**Released Parties**") from any and all existing, or potential liabilities, obligations, actions, claims, causes of action, suits, proceedings, demands, damages, costs and expenses of every kind whatsoever, whether known or unknown, arising from or relating to any alleged or actual act, omission, occurrence, or transaction prior to or the date of this Agreement including any of the foregoing relating to the making, administration, servicing, enforcement, or collection of the Loan (collectively, the "**Claims and Liabilities**").

(c)     acknowledge that, subsequent to the execution of this Agreement, they may discover Claims and Liabilities that are now unknown to or unanticipated by them, including unknown or unanticipated Claims and Liabilities that arise from, are based upon, or relate to one or more of the statements (in the recitals or other provisions of this Agreement) concerning the subject matter of this Agreement that the parties have agreed upon or acknowledged as accurate herein, the existence of which Claims and Liabilities, if known to a Borrower Party at the execution of this Agreement, may have materially affected its decision to execute this Agreement. Borrower Parties acknowledge that they are assuming the risk that such unknown or unanticipated Claims and Liabilities exist, and agree that the releases granted by Borrower Parties and the agreements concerning indemnification of the Released Parties made by Borrower Parties in this Agreement shall

14

apply to and are effective with respect to all such Claims and Liabilities. Borrower Parties expressly waive the benefits of any state, federal, or other law providing that a general release does not extend to claims that a releasing party does not know or suspect to exist in its favor when the releasing party executes the release, and that if known by the releasing party must or may have materially affected the releasing party's settlement with the released party.

      (d)    intentionally deleted.

      (e)    acknowledge that Lender is specifically relying upon the Borrower Parties' acknowledgments and agreements in this Section 9 in executing this Agreement, and that in the absence of such agreements Lender would be unwilling to agree to the advances provided for in this Agreement.

      (f)    agree that all releases and discharges by any of the Borrower Parties in this Agreement shall have the same effect as if each released or discharged matter had been the subject of a legal proceeding, adjudicated to final judgment from which no appeal could be taken and therein dismissed with prejudice.

      10.    Forbearance Termination Events. Borrower Parties agree that the occurrence of any of the following events shall constitute a **"Forbearance Termination Event"** under this Agreement, regardless of the reason or reasons for the occurrence of any such event, whether or not such occurrence is voluntary or involuntary, and whether or not such event occurs by operation of law or from some other cause that is not within the control of the Borrower Parties:

      (a)    Borrower's failure to timely pay each of the following on or before the Closing Date: (i) all Accrued Base Interest Payments, (ii) required Administrative Expenses, (iii) all Loan Related Expenses, and (iv) the Interest Reserve Deposit.

      (b)    Other than item 10(a) above, failure by any of the Borrower Parties to timely perform any of the covenants, agreements or obligations to be performed under this Agreement following notice of such failure and five days to cure such failure.

      (c)    The failure of Borrower or Guarantors under any Senior Loan Document (including the Senior Loan Forbearance Agreement) to timely cure a default or event of default thereunder.

      (d)    The occurrence of an Event of Default under any Loan Document that remains uncured following notice of such Event of Default and a five day cure period; provided however, if the Event of Default is solely due to a Pledgor's (such Pledgor, the **"Debtor Pledgor"**) actions (and not the actions of Borrower or any Guarantor):

            (i) that cause a breach under Section 9.1(i) of the Loan Agreement, such Event of Default shall not cause a Forbearance Termination Event and shall be deemed cured if each of the following is satisfied, so long as no other Event of Default shall have then occurred: (A) within 180 days of

the occurrence of such event, any other Pledgor or Guarantor acquires the Pledged Collateral of the Debtor Pledgor; (B) the Debtor Pledgor is no longer a member of Borrower; (C) by virtue of such acquisition, the Pledged Collateral does not become property of any bankruptcy estate and does not become subject to any lien, pledge or encumbrance other than the pledge to Mezzanine Lender; and (D) no other Default or Event of Default shall have occurred and be continuing; or

(ii) that violate a provision of the Loan Documents (other than 9.1(i) of the Loan Agreement), so long as no other Event of Default shall have occurred and each of the following is satisfied, such Event of Default shall not cause a Forbearance Termination Event: (A) the action that caused the Event of Default is caused directly or indirectly by a Pledgor that is not controlled directly or indirectly by any Guarantor; (B) no other Event of Default or Forbearance Termination Event shall have occurred and be continuing; (C) neither Borrower nor any Guarantor, nor any person directly or indirectly owned or controlled by Borrower or any Guarantor directly or indirectly participated, colluded, assisted, or acted in concert with Pledgor to cause the action creating the Event of Default; and (D) the action of such Pledgor does not affect the Pledged Collateral or impede, alter or interfere with Lender's ability to exercise its rights to foreclose upon all of its Pledged Collateral.

(e)     The interference by any Borrower Party (or any person acting or claiming by, through, under, or in concert with or for the benefit of any of them) in any manner with Lender's exercise of its rights and remedies hereunder, under the Loan Documents, or under applicable law.

Any Forbearance Termination Event shall also constitute an Event of Default under each of the Loan Documents, for which no notice shall be required and with respect to which no grace or cure period shall apply, other than as provided for herein.

11.     Lender's Rights Upon Occurrence of a Forbearance Termination Event. Upon and at any time after the occurrence of any Forbearance Termination Event, Lender may take any or all of the following actions without notice of any kind to Borrower Parties or any other person:

(a)     Lender may immediately cease the forbearance to which Lender agreed pursuant to Section 5 of this Agreement and commence and pursue any or all rights and remedies Lender may have pursuant to this Agreement (including the UCC Sale or other sale under the UCC or the Proposal or Collateral Acceptance) or under the other Loan Documents or applicable law, all in such order and manner as Lender may elect from time to time in its discretion, and without notice of any kind to Borrower Parties or any other person, as if Section 5 had never been agreed to by Lender.

(b)     Lender may charge and collect interest on the outstanding balance of the Loan at the default rate of 20% per annum effective from and after the date of the earliest Existing Default that previously occurred under the Loan Documents and until the Loan is paid in full, notwithstanding the provisions of Section 5 of this Agreement.

(c)     Borrower Parties agree to the appointment of a receiver of and for the Borrower, the membership interests in Borrower, or any of Borrower's property on an <u>ex parte</u> basis and without regard to the adequacy of the security for the Loan.

12.     <u>Intentionally Deleted</u>.

13.     <u>Waiver of Automatic Stay; Supplemental Stay</u>.  The Borrower Parties unconditionally and irrevocably acknowledge and agree that:

(a)     due to the Existing Defaults, (i) Borrower Parties are currently in default under the Loan Documents and Lender has an immediate, noncontingent right to exercise its rights and remedies with respect to the Pledged Collateral and Reimbursements, and (ii) Lenders' liens and security interests on the Pledged Collateral and Reimbursements are senior, enforceable, duly perfected and non-avoidable.

(b)     if any bankruptcy proceeding is commenced by or against any Borrower Party and not dismissed within 45 days of filing, "cause" for termination of the automatic stay exists and Lender shall be entitled, subject to the approval of a court of competent jurisdiction, to the immediate entry of an order granting Lender relief from the automatic stay imposed by Section 362 of the United States Bankruptcy Code (the "**Code**"). Borrower Parties consent to the entry of such order and Borrower Parties agree that in no event will they object to or oppose Lender's motion seeking relief from the automatic stay.  Borrower Parties further agree that upon Lender's reasonable request from time to time they shall execute and file all documents and take all other actions Lender may deem reasonably necessary or appropriate to enable Lender to obtain stay relief and exercise all of its rights and remedies for collection and enforcement of the Loan.

(c)     Borrower Parties shall not seek or request any other party to seek a supplemental stay or any other relief, whether injunctive or otherwise, under Section 105 or any other provision of the Code, to stay, interdict, condition, reduce or inhibit the ability of Lender to enforce any rights it has, under the Loan Documents or otherwise, against any Borrower Party or against the Pledged Collateral.

(d)     Lender, as a material inducement to enter into this Agreement, has specifically bargained for the concessions set forth herein, and that this Agreement may be deemed conclusive evidence as to such negotiated ongoing intention of the Parties and that it is intended to be the primary element in determining if cause exists for granting such concessions.

14.     <u>Future Negotiations</u>.  Borrower Parties acknowledge and agree that:

17

(a)     Lender has no obligation whatsoever to discuss, negotiate or to agree to any restructuring of the Loan or to any modification, amendment, restructuring or reinstatement of the Loan Documents or to forbear from exercising its rights and remedies under the Loan Documents.

(b)     If there are any future discussions among Lender and any Borrower Party concerning any restructuring, modification, amendment or reinstatement with respect to the Loan, then no restructuring, modification, amendment, reinstatement, compromise, settlement, agreement or understanding with respect to the Loan, the Loan Documents, the Pledged Collateral, Project, or any aspect of any of them, shall constitute a legally binding agreement or contract or have any force or effect whatsoever unless and until reduced to writing and signed by authorized representatives of the parties.

15.     Additional Documents / Further Assurances.  Borrower Parties shall at any time, and from time to time, upon the written request of Lender, sign and deliver such further documents and do such further acts and things as Lender may reasonably request to effect the purposes of this Agreement.

16.     Time is of the Essence.  Time is of the essence with respect to all agreements and obligations of Borrower Parties contained herein.

17.     Entire Agreement; Written Modifications Only.  This Agreement, the exhibits attached hereto, and the documents referred to, contemplated, or required herein, constitute the sole and entire agreement between the parties with respect to the subject matter hereof, and there are no other covenants, promises, agreements or understandings regarding the same.  This Agreement, including the provisions of this Section, may not be modified except by written amendment to this Agreement signed by the Parties affected by the same, and the parties hereby: a) expressly agree that it shall not be reasonable for any of them to rely on any alleged, non-written amendment to this Agreement; b) irrevocably waive any and all right to enforce any alleged, non-written amendment to this Agreement; and c) expressly agree that it shall be beyond the scope of authority (apparent or otherwise) for any of their respective agents to agree to any non-written modification of this Agreement.

18.     No Third-Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto and no persons other than the undersigned and the Released Parties shall be entitled to claim or receive any benefit by reason of this Agreement.

19.     Due Diligence Performed; Parties Fully Informed; No Right to Rely.  Each Borrower Party hereby warrants, represents and agrees that it has, by itself and with the assistance of counsel (or, if without the assistance of counsel, such party having of its own volition chosen not to seek such assistance), performed any and all due diligence and investigation it deems necessary or desirable in connection with making a fully informed decision to enter into and sign this Agreement.  Borrower Parties are relying on their own investigations and their own decision-making processes in determining to sign this Agreement, are not relying on the representations or omissions of each other or of Lender in so doing, and

18

fully understand the terms and provisions of this Agreement and of the documents contemplated hereby.

20.     Severability. If any one or more of the provisions of this Agreement are deemed unenforceable, the remainder of this Agreement shall, at the sole option of Lender, remain enforceable in accordance with its original terms to the fullest extent possible.

21.     Delay Not a Waiver. Neither the failure nor any delay on the part of Lender to exercise any right, power or privilege under this Agreement or under any document executed in connection herewith shall operate as a waiver of such right, power or privilege and any single or partial exercise of any such right, power or privilege shall not preclude any other or further exercise thereof.

22.     Successors and Assigns. This Agreement shall be binding on and shall inure to the benefit of each party's permitted successors and assigns.

23.     Construction of Provisions. The following rules of construction are applicable for the purposes of this Agreement and all documents and instruments supplemental hereto unless the context clearly requires otherwise:

(a)     All references herein to numbered sections or to lettered exhibits are references to the sections hereof and the exhibits annexed hereto.

(b)     The terms "include," "including," and similar terms shall be construed as if followed by the phrase "without being limited to" or the phrase "without limitation," as the context may require.

(c)     Words of masculine, feminine or neutral gender shall mean and include the correlative words of the other genders, and words importing the singular number shall mean and include the plural, and vice versa.

(d)     No inference in favor of or against any party hereto shall be drawn from the fact that such party has drafted any portion of this Agreement or any other Loan Document.

(e)     All provisions of this Agreement and each of the Loan Documents relating to consents or approvals by Lender, elections Lender has a right to make, or decisions or exercises of discretion by Lender are hereby modified as necessary to give effect to the following provision, which shall control in any event over all contrary or inconsistent provisions of the Loan Documents with respect to all of the foregoing matters and all other issues relating to the Loan from and after the execution and delivery of this Agreement: "Whenever under this Agreement or any other Loan Document Lender has any right, option, election or power ("**Decision Power**") to (a) approve or disapprove, or consent or withhold consent to, any matter, (b) determine whether or not any arrangement or term is satisfactory or acceptable to Lender, (c) determine whether any condition has been satisfied or any requirement has been met, or (d) make any other determination,

19

judgment or decision whatsoever, Lender may do so in each instance in Lender's sole and absolute discretion, unless a provision of this Agreement or another Loan Document executed after this Agreement that directly relates to the applicable approval, consent, determination, judgment or decision states that Lender's discretion must be exercised reasonably or in some other specified manner in a particular instance."

(f)     All references to the Loan shall be deemed to include all existing or future modifications, amendments, extensions, restatements, or replacements of the Loan made by mutual written agreement of the parties.

(g)     The terms "person" and "party" shall mean any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, entity or government (whether federal, state, county, city, municipal or otherwise, including an instrumentality, division, agency, body or department thereof).

(h)     The Loan Documents are hereby modified in all respects necessary to give effect to the provisions of this Agreement, which shall control over any contrary or inconsistent provisions of any of the other Loan Documents.  In all other respects, all Loan Documents shall remain in full force and effect as originally written or previously modified by mutual written agreement of the parties.  All of Lender's liens, security interests, priorities, rights, and remedies under the Loan Documents shall continue in full force and effect as security for the Loan following the modification thereof by this Agreement.  All references in any Loan Document to any other Loan Document shall hereafter be construed to refer to such other Loan Document as modified by this Agreement.

24.     Counterparts. This Agreement may be executed in more than one counterpart, each of which shall be deemed an original and all of which together shall constitute one and the same document, binding upon all the parties hereto notwithstanding that all such parties are not signatories to the same counterpart.  This Agreement shall become effective when all parties hereto have executed a counterpart hereof.  A signature of a party by facsimile or other electronic transmission shall be deemed to constitute an original and fully effective signature of such party.

25.     Costs and Expenses.  Without limiting any other provision of this Agreement or any other Loan Document relating to payment of expenses, Borrower shall, upon execution of this Agreement pay or reimburse Lender for all actual out-of-pocket costs and expenses, including attorneys fees, incurred by Lender in connection with the negotiation, drafting, implementation, or enforcement of this Agreement.   .

26.     Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of Ohio.

27.     Waiver of Jury Trial.  THE PARTIES HERETO EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY CONTROVERSY OR CLAIM,

20

WHETHER ARISING IN TORT OR CONTRACT, BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONJUNCTION WITH, THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS (INCLUDING THE VALIDITY, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR THEREOF), OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY IN CONNECTION HEREWITH OR THEREWITH.   EACH PARTY ACKNOWLEDGES AND AGREES THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY AN PERSON TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER'S ENTERING INTO THIS AGREEMENT AND  LENDER WOULD NOT HAVE ENTERED INTO THIS AGREEMENT WITHOUT THIS WAIVER.   LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.  SIGNATURES APPEAR ON THE FOLLOWING PAGES.]

1650758.19

**LENDER:**

**HARTFORD MEZZANINE INVESTORS I, LLC,**
a Delaware limited liability company

By:    Hartford Investment Management Company,
        a Delaware corporation, a Managing Member

        By: _____
        Name: _____
        Title: _____

By:    Key Real Estate Equity Capital, Inc.,
        an Ohio corporation, a Managing Member

        By:_____
        Name:_____
        Title:  Vice President

STATE OF _____ )
                           )
COUNTY OF _____ )

      On this ____ day of _____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared _____, to me personally known, who being by me duly sworn, did state that he is a _____ of Hartford Investment Management Company, a Delaware corporation, a Managing Member of **HARTFORD MEZZANINE INVESTORS I, LLC,** a Delaware limited liability company, known to me to be the person who executed the foregoing instrument on behalf of Lender and acknowledged to me that he executed the same for the purposes therein stated.

      In witness whereof, I have set my hand and affixed my official seal at my office in _____, the day and year last above written.

                                        _____
                                        Notary Public

My commission expires:

STATE OF _____ )
                           )
COUNTY OF _____ )

      On this ____ day of _____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared _____, to me personally known, who being by me duly sworn, did state that he is a Vice President for Key Real Estate Equity Capital, Inc., an Ohio corporation, a Managing Member of **HARTFORD MEZZANINE INVESTORS I, LLC**, a Delaware limited liability company, known to me to be the person who executed the foregoing instrument on behalf of Lender and acknowledged to me that he executed the same for the purposes therein stated.

      In witness whereof, I have set my hand and affixed my official seal at my office in _____, the day and year last above written.


                                            _____
                                           Notary Public

My commission expires:


_____

**BORROWER:**

**WOODLAND LAKES INVESTMENT
GROUP, L.L.C.,**
a Michigan limited liability company

By:   WLA Management, Inc.,
      a Michigan corporation, its Manager

     By:_____
         Scott A. Chappelle, its President


STATE OF _MICHIGAN_ )
                    )
COUNTY OF _INGHAM_ )

     On this _6th_ day of _June_, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Scott A. Chappelle, to me personally known, who being by me duly sworn, did state that he is the President of WLA Management, Inc., a Michigan corporation, Manager of **WOODLAND LAKES INVESTMENT GROUP, L.L.C.,** a Michigan limited liability, known to me to be the person who executed the foregoing instrument on behalf of said limited liability company, and acknowledged to me that he executed the same for the purposes therein stated.

     In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_ County, State of _Michigan_, the day and year last above written.

                                    _____
                                  Notary Public

                                  JULIA L. SKINNER
                     NOTARY PUBLIC - STATE OF MICHIGAN
My commission expires:           COUNTY OF INGHAM
                       My Commission Expires April 15, 2011
_4/15/2011_           Acting in the County of _Ingham_

**HARRISON INVESTMENT GROUP, L.L.C.,**
a Michigan limited liability company

By: _____
        Brent A. Titus, its Manager

STATE OF _MICHIGAN_     )
                                              )
COUNTY OF _INGHAM_     )

　　　On this _12th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Brent A. Titus, to me personally known, who being by me duly sworn, did state that he is the authorized Manager of **HARRISON INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company, known to me to be the person who executed the foregoing instrument on behalf of said limited liability company, and acknowledged to me that he executed the same for the purposes therein stated.

　　　In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_ the day and year last above written.

_____
Notary Public

My commission expires:

_____

JOYCE A. MILLER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires Nov. 2, 2014
Acting in the County of Ingham

**SHAWN O'BRIEN**

STATE OF Michigan )
COUNTY OF Clinton )
)

    On this 12 day of June , 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **SHAWN O'BRIEN**, to me personally known, who being by me duly sworn, acknowledged to me that he executed the same for the purposes therein stated.

    . In witness whereof, I have set my hand and affixed my official seal at my office in Clinton County, State of Michigan , the day and year last above written.

                                  Notary Public

My commission expires:

July 8, 2014

ARICYN R. THOMPSON
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires July 8, 2014
Acting in the County of Clinton

_____
FRANK R. VARGAS, JR.


STATE OF _MICHIGAN_     )
                        )
COUNTY OF _INGHAM_      )

    On this _13th_ day of __June__, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **FRANK R. VARGAS, JR.,** to me personally known, who being by me duly sworn, acknowledged to me that he executed the same for the purposes therein stated.

    In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_ County, State of _Michigan_, the day and year last above written.

_____
Notary Public

My commission expires:

_4/15/2011_

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of _Ingham_

**COVENANT INVESTMENT GROUP, INC.**
a Michigan corporation

By: _Laura A. Chappelle_
        Laura A. Chappelle, its President


STATE OF _MICHIGAN_      )
                                            )
COUNTY OF _INGHAM_      )

        On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public
within and for said County and State, personally appeared Laura A. Chappelle, to me personally
known, who being by me duly sworn, did state that she is the President of **COVENANT
INVESTMENT GROUP, INC.**, a Michigan corporation, known to me to be the person who
executed the foregoing instrument on behalf of said corporation, and acknowledged to me that
she executed the same for the purposes therein stated.

        In witness whereof, I have set my hand and affixed my official seal at my office in
_Ingham_____ County, State of _Michigan_____, the day and year last above written.

                                            _Julia L. Skinner_
                                            Notary Public

                                            JULIA L. SKINNER
                                            NOTARY PUBLIC - STATE OF MICHIGAN
                                            COUNTY OF INGHAM
                                            My Commission Expires April 15, 2011
                                            Acting in the County of _Ingham_

My commission expires:

_4/15/2011_____

KTM DEVELOPMENT CORPORATION,
a Michigan corporation

By: _____
Kevin T. McGraw, its President


STATE OF _MICHIGAN_ )
                                        )
COUNTY OF _INGHAM_ )

On this 6th day of _June_, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Kevin T. Mcgraw, to me personally known, who being by me duly sworn, did state that he is the President of **KTM DEVELOPMENT CORPORATION**, a Michigan corporation, known to me to be the person who executed the foregoing instrument on behalf of said corporation, and acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_ County, State of _Michigan_ the day and year last above written.

_____
Notary Public

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of _____

My commission expires:

_4/15/2011_

_(signature)_

**CHARLES W. CROUCH**


STATE OF _MICHIGAN_     )

                           )

COUNTY OF _INGHAM_     )

On this _12th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **CHARLES W. CROUCH**, to me personally known, who being by me duly sworn, acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_____, the day and year last above written.

_(signature)_

Notary Public

My commission expires:

_2/17/15_____

A. RICHTER
NOTARY PUBLIC-STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires Feb. 17, 2015
_Acting in County of Ingham_

**BRENT CHAPPELLE**


STATE OF _MICHIGAN_ )
)
COUNTY OF _INGHAM_ )

On this _12th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **BRENT CHAPPELLE**, to me personally known, who being by me duly sworn, acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_, the day and year last above written.

Notary Public

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of _Ingham_

**TMC INVESTMENT GROUP, L.L.C.,**
a Michigan limited liability company

By: Terra Management Company,
    a Michigan corporation,
    its Manager

    By: _____
        Scott A. Chappelle, its President


STATE OF _MICHIGAN_    )
                  )
COUNTY OF _INGHAM_    )

    On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Scott A. Chappelle, to me personally known, who being by me duly sworn, did state that he is the President of Terra Management Company, a Michigan corporation, Manager of **TMC INVESTMENT GROUP, L.L.C.**, a Michigan limited liability, known to me to be the person who executed the foregoing instrument on behalf of said limited liability company, and acknowledged to me that he executed the same for the purposes therein stated.

    In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_, the day and year last above written.

                               Notary Public

My commission expires:

_4 | 15 | 2011_

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of Ingham

**ALLIANCE INVESTMENT GROUP, L.L.C.,**
a Michigan limited liability company

By:   Terra Management Company,
      a Michigan corporation,
      its Manager

      By: _____
           Scott A. Chappelle, its President


STATE OF _MICHIGAN_          )
                             )
COUNTY OF _INGHAM_           )

    On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Scott A. Chappelle, to me personally known, who being by me duly sworn, did state that he is the President of Terra Management Company, a Michigan corporation, Manager of **ALLIANCE INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company, known to me to be the person who executed the foregoing instrument on behalf of said limited liability company, and acknowledged to me that he executed the same for the purposes therein stated.

    In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_____, the day and year last above written.

                    _____
                    Notary Public

My commission expires:                    JULIA L. SKINNER
                                   NOTARY PUBLIC - STATE OF MICHIGAN
_4 / 15 / 2011_____                      COUNTY OF INGHAM
                                   My Commission Expires April 15, 2011
                                   Acting in the County of __Ingham__

**ABBOTT ROAD COMMONS, L.L.C.,**
a Michigan limited liability company

By: Terra Management Company,
    a Michigan corporation,
    its Manager

    By: _____
         Scott A. Chappelle, its President


STATE OF _MICHIGAN_ )
                     )
COUNTY OF _INGHAM_ )

On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Scott A. Chappelle, to me personally known, who being by me duly sworn, did state that he is the President of Terra Management Company, a Michigan corporation, Manager of **ABBOTT ROAD COMMONS, L.L.C.**, a Michigan limited liability company, known to me to be the person who executed the foregoing instrument on behalf of said limited liability company, and acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_, the day and year last above written.

                                _____
                                Notary Public

My commission expires:

    _4/15/2011_____

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of _____

**CHASCO INVESTMENT PROPERTIES, L.L.C.,**
a Michigan limited liability company

By:  Terra Management Company,
     a Michigan corporation,
     its Manager

     By: _____
          Scott A. Chappelle, its President


STATE OF _MICHIGAN_ )
                                        )
COUNTY OF _INGHAM_  )

     On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Scott A. Chappelle, to me personally known, who being by me duly sworn, did state that he is the President of Terra Management Company, a Michigan corporation, Manager of **CHASCO INVESTMENT PROPERTIES, L.L.C.,** a Michigan limited liability company, known to me to be the person who executed the foregoing instrument on behalf of said limited liability company, and acknowledged to me that he executed the same for the purposes therein stated.

     In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_, the day and year last above written.

                                        _____
                                        Notary Public

My commission expires:                JULIA L. SKINNER
                                      NOTARY PUBLIC - STATE OF MICHIGAN
_4 / 15 / 2011_                       COUNTY OF INGHAM
                                      My Commission Expires April 15, 2011
                                      Acting in the County of _Ingham_

**EVERGREEN INVESTMENT GROUP, L.L.C.,**
a Michigan limited liability company

By:  Terra Management Company,
     a Michigan corporation,
     its Manager

     By: _____
         Scott A. Chappelle, its President


STATE OF _MICHIGAN_ )
                                        )
COUNTY OF _INGHAM_ )

On this 6th day of _June_____, 2008, before me, the undersigned, a notary
public within and for said County and State, personally appeared Scott A. Chappelle, to me
personally known, who being by me duly sworn, did state that he is the President of Terra
Management Company, a Michigan corporation, Manager of **EVERGREEN INVESTMENT
GROUP, L.L.C.,** known to me to be the person who executed the foregoing instrument on
behalf of said limited liability company and acknowledged to me that he executed the same for
the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in
_Ingham_____ County, State of _Michigan_, the day and year last above written.

_____
Notary Public

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of _____

My commission expires:

4/15/2011

**GRAND LEDGE INVESTMENT GROUP, L.L.C.,**
a Michigan limited liability company

By: Terra Management Company,
    a Michigan corporation,
    its Manager

    By: _____
        Scott A. Chappelle, its President

STATE OF MICHIGAN )
                  )
COUNTY OF INGHAM )

    On this 6th day of June_____, 2008, before me, the undersigned, a notary
public within and for said County and State, personally appeared Scott A. Chappelle, to me
personally known, who being by me duly sworn, did state that he is the President of Terra
Management Company, a Michigan corporation, Manager of **GRAND LEDGE
INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company, known to me to be the
person who executed the foregoing instrument on behalf of said limited liability company, and
acknowledged to me that he executed the same for the purposes therein stated.

    In witness whereof, I have set my hand and affixed my official seal at my office in
Ingham_____ County, State of Michigan___, the day and year last above written.

                        _____
                        Notary Public

My commission expires:

4/15/2011_____

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of Ingham

**SLHA INVESTMENT GROUP, L.L.C.,**
a Michigan limited liability company

By: Terra Management Company,
a Michigan corporation,
its Manager

By: _____
Scott A. Chappelle, its President


STATE OF _Michigan_ )
)
COUNTY OF _Ingham_ )

On this 6th day of _June_____, 2008, before me, the undersigned, a notary
public within and for said County and State, personally appeared Scott A. Chappelle, to me
personally known, who being by me duly sworn, did state that he is the President of Terra
Management Company, a Michigan corporation, Manager of **SLHA INVESTMENT GROUP,
L.L.C.,** a Michigan limited liability company, known to me to be the person who executed the
foregoing instrument on behalf of said limited liability company, and acknowledged to me that
he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in
_Ingham_____ County, State of _Michigan_, the day and year last above written.

_____
Notary Public

My commission expires:

_2/ 15 2011_

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of Ingham

**PETOSKEY INVESTMENT GROUP, L.L.C.,**
a Michigan limited liability company

By:  Terra Management Company,
     a Michigan corporation,
     its Manager

     By:  _____
          Scott A. Chappelle, its President


STATE OF _MICHIGAN_       )
                          )
COUNTY OF _INGHAM_        )

    On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Scott A. Chappelle, to me personally known, who being by me duly sworn, did state that he is the President of Terra Management Company, a Michigan corporation, Manager of **PETOSKEY INVESTMENT GROUP, L.L.C.,** a Michigan limited liability company, known to me to be the person who executed the foregoing instrument on behalf of said limited liability company, and acknowledged to me that he executed the same for the purposes therein stated.

    In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_, the day and year last above written.

                _____
                Notary Public

My commission expires:

_4/15/2011_

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of Ingham

**SCORE PROPERTIES, INC.,**
a Michigan corporation

By: _Laura A. Chappelle_
   Laura A. Chappelle, its President


STATE OF _MICHIGAN_ )
                    )
COUNTY OF _INGHAM_  )

   On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Laura A. Chappelle, to me personally known, who being by me duly sworn, did state that she is the President of **SCORE PROPERTIES, INC.,** a Michigan corporation, known to me to be the person who executed the foregoing instrument on behalf of said corporation, and acknowledged to me that she executed the same for the purposes therein stated.

   In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_, the day and year last above written.

                        _____
                        Notary Public
                              JULIA L. SKINNER
                              NOTARY PUBLIC - STATE OF MICHIGAN
                              COUNTY OF INGHAM
                              My Commission Expires April 15, 2011
                              Acting in the County of Ingham

My commission expires:

_4/15/2011_

**TERRA MANAGEMENT COMPANY,**
a Michigan corporation

By: _____
    Scott A. Chappelle, its President




STATE OF _MICHIGAN_      )
                          )
COUNTY OF _INGHAM_        )

     On this _8th_ day of ___June___, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Scott A. Chappelle, to me personally known, who being by me duly sworn, did state that he is the President of **TERRA MANAGEMENT COMPANY**, a Michigan corporation, known to me to be the person who executed the foregoing instrument on behalf of said corporation, and acknowledged to me that he executed the same for the purposes therein stated.

     In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_ County, State of _Michigan_, the day and year last above written.

                           _____
                           Notary Public

My commission expires:

_4/15/2011_

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 6, 2011
Acting in the County of _Ingham_

**WLA MANAGEMENT, INC.,**
a Michigan corporation

By: _____

    Scott A. Chappelle, its President


STATE OF _MICHIGAN_ )
                                        )
COUNTY OF _INGHAM_ )

On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared Scott A. Chappelle, to me personally known, who being by me duly sworn, did state that he is the President of **WLA MANAGEMENT, INC.**, a Michigan corporation, known to me to be the person who executed the foregoing instrument on behalf of said corporation, and acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_____, the day and year last above written.

_____
Notary Public

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
My Co... ... OF INGHAM
Acting in the County of ... Expires April 15, 2011

My commission expires:

_4|15|2011_

**GUARANTORS:**

SCOTT A. CHAPPELLE

STATE OF _MICHIGAN_ )
)
COUNTY OF _INGHAM_ )

On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **SCOTT A. CHAPPELLE**, to me personally known, who being by me duly sworn, acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_, the day and year last above written.

Notary Public

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of Ingham

My commission expires:

_4 / 15 / 2011_____

*Laura A. Chappelle*

**LAURA A. CHAPPELLE**

STATE OF MICHIGAN )
)
COUNTY OF INGHAM )

On this 6th day of June ____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **LAURA A. CHAPPELLE**, to me personally known, who being by me duly sworn, acknowledged to me that she executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in Ingham County, State of Michigan, the day and year last above written.

*Julia L. Skinner*

Notary Public

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of Ingham

My commission expires:

4/15/2011

KEVIN T. McGRAW

STATE OF __MICHIGAN__ )
                     )
COUNTY OF __INGHAM__ )

    On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **KEVIN T. McGRAW**, to me personally known, who being by me duly sworn, acknowledged to me that he executed the same for the purposes therein stated.

    In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan___, the day and year last above written.

_____
Notary Public

My commission expires:

_4 | 15 | 2011_____

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of _____

_(signature)_

SHARON D. McGRAW


STATE OF _MICHIGAN_     )
                     )
COUNTY OF _INGHAM_     )

On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **SHARON D. McGRAW**, to me personally known, who being by me duly sworn, acknowledged to me that she executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_, the day and year last above written.

_(signature)_

Notary Public

My commission expires:

_4/15/2011_____

JULIA L. SKINNER
NOTARY PUBLIC · STATE OF MICHIGAN
My Com... ... ...ed Apr 15, 2011
Acting in the County of ____

EVERT KRAMER, JR.

STATE OF MICHIGAN )
                               )
COUNTY OF INGHAM )

On this 6th day of June, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **EVERT KRAMER, JR.**, to me personally known, who being by me duly sworn, acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in Ingham County, State of Michigan, the day and year last above written.

Notary Public

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of Ingham

My commission expires:

4/15/2011

*Rosalind Kramer*

**ROSALIND KRAMER**


STATE OF MICHIGAN )
)
COUNTY OF INGHAM )

On this 6th day of June _____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared **ROSALIND KRAMER**, to me personally known, who being by me duly sworn, acknowledged to me that she executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in Ingham _____ County, State of Michigan, the day and year last above written.

_____
Notary Public

JULIA L. SKINNER
NOTARY PUBLIC · STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting In the County of Ingham

My commission expires:

4/15/2011

EXHIBIT A

PLEDGORS

Harrison Investment Group, L.L.C., a Michigan limited liability company ₱
Shawn O'Brien
Frank R. Vargas, Jr.
Covenant Investment Group, Inc., a Michigan corporation
KTM Development Corporation, a Michigan corporation ✱
Charles W. Crouch
Brent Chappelle
TMC Investment Group, L.L.C., a Michigan limited liability company
Alliance Investment Group, L.L.C., a Michigan limited liability company
Masonic Investment Group, L.L.C., a Michigan limited liability company **
Abbott Road Commons, L.L.C., a Michigan limited liability company
Chasco Investment Properties, L.L.C., a Michigan limited liability company
Evergreen Investment Group, L.L.C., a Michigan limited liability company
Grand Ledge Investment Group, L.L.C., a Michigan limited liability company
SLHA Investment Group, L.L.C., a Michigan limited liability company
Petoskey Investment Group, L.L.C., a Michigan limited liability company
Score Properties, Inc., a Michigan corporation
Terra Management Company, a Michigan corporation
WLA Management, Inc., a Michigan corporation

**Was originally a Pledgor, but is not a Pledgor as of the date of this Agreement

✱ KTM Development Corporation transferred its interest to Pledgor Alliance Investment Group, L.L.C.

₱ Harrison Investment Group, L.L.C. transferred 5% interest to Pledgor Covenant Investment Group, Inc.

EXHIBIT A

EXHIBIT B

2008 OPERATING BUDGET

[CONTAINED ON NEXT PAGE]

EXHIBIT A

**Woodland Lakes Apartments**
**Forbearance Agreement Sponsor Cash Requirements**

|  |  |  | Lockbox |  |
|---|---|---|---|---|
|  |  |  | $ | - |
| Property Rental Income |  |  |  | - |
| Lockbox Balance for June 5, 2008 |  |  |  | 43,292.12 |
| Less: Est. Property Operating Expenses - June 2008 |  |  |  | (89,472.67) |
|  |  |  |  | (46,180.55) |
| Debt Service Payment due to Senior Lender - July, 2008 | $188,439.47 | Hancock |  | 188,439.47 |
| One Month Debt Service Escrow Due to Senior Lender |  |  |  | 188,439.47 |
| Interest to change payment date to 10th |  |  |  | 34,867.44 |
| Est. Legal Fees due to Senior Lender |  |  |  | 80,300.58 |
| **Est. Total due Senior Lender at Closing:** |  |  | $ | 492,046.96 |
| Base Interest Due: Mezzanine Lender - Through June 26, 2008 |  | HMI |  | 237,139.99 |
| One Month Debt Service Escrow due to Mezzanine Lender | $ 34,613.13 |  |  | 34,613.13 |

**WOODLAND LAKES INVESTMENT GROUP LLC**
12 Month Actual to Budget
Period = Jan 2008-Mar 2008
Book = Actual

| | Account | Jan-08 Actual | Feb-08 Actual | Mar-08 Actual | Apr-08 Budget | May-08 Budget | Jun-08 Budget | Jul-08 Budget | Aug-08 Budget | Sep-08 Budget | Oct-08 Budget | Nov-08 Budget | Dec-08 Budget | Total Actuals+Budget | Original Budget | $Variance | %Variance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **INCOME** | 4001-0000 | | | | | | | | | | | | | | | | |
| **RENT INCOME** | 4405-0000 | | | | | | | | | | | | | | | | |
| **MARKET RENT** | 4406-0000 | | | | | | | | | | | | | | | | |
| GROSS POTENTIAL RENT | 4110-0000 | 307,972.40 | 307,345.00 | 322,945.00 | 307,500.00 | 307,500.00 | 307,500.00 | 307,500.00 | 307,500.00 | 307,500.00 | 307,500.00 | 307,500.00 | 307,500.00 | 3,691,762.40 | 3,690,000.00 | 1,762.40 | 0.04 |
| LOSS/GAIN TO LEASE | 4120-0000 | 11,470.86 | 5,914.00 | 12,820.13 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 | 41,714.99 | 42,000.00 | 19,714.99 | -46.94 |
| **MARKET RENT** | 4199-9999 | 319,443.26 | 313,859.00 | 335,765.00 | 311,000.00 | 311,000.00 | 311,000.00 | 311,000.00 | 311,000.00 | 311,000.00 | 311,000.00 | 311,000.00 | 311,000.00 | 3,733,077.39 | 3,732,000.00 | 21,077.39 | 0.56 |
| RENT | 4510-0000 | 0.00 | 0.00 | -975.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | -975.00 | 0.00 | -975.00 | 0.00 |
| LESS: CONCESSIONS | 4515-0000 | -47,843.45 | -48,760.96 | -51,883.38 | -60,000.00 | -60,000.00 | -60,000.00 | -65,000.00 | -65,000.00 | -60,000.00 | -60,000.00 | -60,000.00 | -60,000.00 | -693,492.79 | -705,000.00 | 11,507.21 | -1.53 |
| LESS: DELINQUENCY | 4520-0000 | -1,370.00 | -1,370.00 | 0.00 | -2,500.00 | -2,500.00 | -2,500.00 | -2,500.00 | -2,500.00 | -2,500.00 | -2,500.00 | -2,500.00 | -2,500.00 | -25,240.00 | -30,000.00 | 4,760.00 | -15.87 |
| LESS: VACANCY | 4525-0000 | -22,951.71 | -20,851.88 | -32,410.31 | -25,000.00 | -25,000.00 | -25,000.00 | -30,000.00 | -30,000.00 | -28,000.00 | -28,000.00 | -30,000.00 | -30,000.00 | -320,153.90 | -334,000.00 | 13,846.10 | -4.15 |
| LOSS FROM MODEL | 4540-0000 | -1,920.00 | -1,920.00 | -1,920.00 | -1,920.00 | -1,920.00 | -1,920.00 | -1,920.00 | -1,920.00 | -1,920.00 | -1,920.00 | -1,920.00 | -1,920.00 | -21,960.00 | -21,960.00 | 0.00 | 0.00 |
| **NET UNIT RENT INCOME** | 4599-9999 | 244,538.10 | 241,016.16 | 293,671.44 | 218,670.00 | 220,670.00 | 221,670.00 | 218,670.00 | 211,670.00 | 218,670.00 | 218,670.00 | 216,670.00 | 216,670.00 | 2,691,255.70 | 2,641,040.00 | 50,215.70 | 1.90 |
| **OTHER RENT AND ANCILLARY FEES** | 4600-0009 | | | | | | | | | | | | | | | | |
| APPLICATION/AMENITY FEE | 4605-0000 | 1,200.00 | 1,000.00 | 800.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 9,750.00 | 9,000.00 | 750.00 | 8.33 |
| PET FEES | 4610-0000 | 3,855.48 | 3,117.09 | 3,242.40 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 37,548.87 | 36,000.00 | 1,548.87 | 4.30 |
| GARAGE/PARKING INCOME | 4615-0000 | 2,631.30 | 2,071.29 | 2,504.42 | 2,333.33 | 2,333.33 | 2,333.33 | 2,333.33 | 2,333.33 | 2,333.33 | 2,333.33 | 2,333.33 | 2,333.33 | 28,597.82 | 28,000.00 | 597.82 | 2.10 |
| TERMINATION + NOTICE INCOME | 4616-0000 | 2,300.00 | 0.00 | 0.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 6,800.00 | 6,000.00 | 600.00 | 13.33 |
| LATE CHARGES/NSF FEES | 4634-0000 | 733.47 | 487.00 | 460.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 8,430.47 | 9,000.00 | -569.53 | -6.33 |
| INTERNET SERVICE INCOME | 4625-0000 | 7,356.88 | 6,645.10 | 7,062.81 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 6,000.00 | 75,264.00 | 72,000.00 | 3,264.00 | 4.53 |
| TV SERVICE INCOME | 4630-0000 | 11,003.07 | 10,566.42 | 11,193.43 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 114,141.22 | 108,000.00 | 6,141.22 | 5.69 |
| COLLECTIONS RECOVERY INCOME | 4634-0000 | 506.52 | 0.00 | 0.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 2,106.52 | 2,400.00 | -93.48 | -3.90 |
| MISCELLANEOUS INCOME | 4635-0000 | 365.00 | 1,045.00 | 75.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 3,335.00 | 2,400.00 | 535.00 | 21.33 |
| **TOTAL OTHER RENT AND ANCILLARY FEES** | 4649-9999 | 28,951.82 | 25,031.20 | 25,438.07 | 22,733.33 | 22,733.33 | 22,733.33 | 22,733.33 | 22,733.33 | 22,733.33 | 22,733.33 | 22,733.37 | 22,733.37 | 286,053.10 | 272,400.00 | 13,253.10 | 4.86 |
| **MULTI-FAMILY PASS THRU RECOVERIES** | 4690-0000 | | | | | | | | | | | | | | | | |
| WATER & SEWER PASS THRU | 4651-0000 | 13,235.31 | 8,770.01 | 10,924.16 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 117,933.38 | 108,000.00 | 4,933.38 | 4.57 |
| REPAIR & MAINTENANCE PASS THRU | 4653-0000 | 0.00 | 0.00 | 0.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 2,250.00 | 3,000.00 | -750.00 | -25.00 |
| DAMAGES | 4655-0000 | 1,431.49 | 0.00 | 0.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 10,411.49 | 12,000.00 | -1,588.51 | -13.24 |
| **TOTAL MULTI-FAMILY PASS THRU RECOVERIES** | 4659-9999 | 13,650.60 | 8,770.01 | 10,924.16 | 10,250.00 | 10,250.00 | 10,250.00 | 10,250.00 | 10,250.00 | 10,250.00 | 10,250.00 | 10,250.00 | 10,250.00 | 135,594.87 | 123,000.00 | 2,594.87 | 2.11 |
| **TOTAL INCOME MULTI-FAMILY** | 4699-9999 | 286,120.81 | 275,619.38 | 289,233.67 | 251,653.33 | 253,653.33 | 254,653.33 | 251,653.33 | 244,653.33 | 251,653.33 | 251,653.33 | 249,653.33 | 249,653.37 | 3,102,903.67 | 3,036,540.00 | 66,463.67 | 2.19 |
| **NON-OPERATING INCOME** | 4850-0000 | | | | | | | | | | | | | | | | |

**EXHIBIT B**

| Description | Account | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total | Budget | Variance | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OTHER INCOME | 4855-0000 | | | | | | | | | | | | | | | -532.62 | 0.24 |
| TOTAL NON-OPERATING INCOME | 4070-9999 | 0.00 | 142,927.28 | 0.00 | 0.00 | 142,927.28 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 199,927.28 | 190,500.00 | -532.62 | -0.20 |
| TOTAL INCOME | 4999-9999 | 288,170.61 | 418,816.76 | 280,233.67 | 151,933.33 | 253,903.33 | 234,903.33 | 251,903.33 | 244,902.33 | 296,653.33 | 251,903.33 | 249,903.33 | 249,903.37 | 3,292,871.05 | 3,227,340.00 | 65,531.05 | 2.03 |
| **EXPENSES** | 5000-0000 | | | | | | | | | | | | | | | | |
| MULTI-FAMILY-CONTRACT REPAIR & MAINT | 6710-0000 | | | | | | | | | | | | | | | | |
| CONTRACT-LANDSCAPING | 6714-0000 | 245.00 | 0.00 | 0.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 150.00 | 2,495.00 | 3,000.00 | 505.00 | 16.83 |
| CONTRACT-EXTERMINATION | 6715-0000 | 0.00 | 0.00 | 0.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 255.00 | 250.00 | 2,495.00 | 3,000.00 | 555.00 | 33.90 |
| CONTRACT-SNOW REMOVAL | 6717-0007 | 5,288.55 | 14,575.17 | 7,023.35 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 4,000.00 | 6,200.00 | 39,397.92 | 34,000.00 | -5,395.52 | -17.01 |
| **TOTAL MULTI-FAMILY-CONTRACT REPAIR & MAINT** | 6710-9999 | 5,533.55 | 14,575.17 | 7,023.35 | 8,250.00 | 7,250.00 | 7,250.00 | 7,250.00 | 5,250.00 | 7,250.00 | 7,250.00 | 7,285.00 | 6,250.00 | 86,884.52 | 83,000.00 | -3,884.52 | -4.57 |
| MULTI-FAMILY-NON CONTRACT REP & MAINT | 6720-0000 | | | | | | | | | | | | | | | | |
| APLIANCE REPAIR | 6721-0000 | 599.93 | 591.16 | 778.12 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 1,200.00 | 13,069.21 | 15,000.00 | 1,330.79 | 9.24 |
| CLEANING | 6722-0000 | 4,814.41 | 3,466.66 | 3,718.63 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 47,266.10 | 48,000.00 | 33.90 | 0.07 |
| CARPETING & FLOORING | 6723-0000 | 19.00 | 0.00 | 22.25 | 1,739.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 1,750.00 | 15,794.25 | 21,000.00 | 5,200.75 | 24.78 |
| ELECTRICAL REPAIR | 6724-0000 | 615.15 | 292.29 | 452.70 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 10,460.14 | 12,000.00 | 1,539.86 | 12.83 |
| HVAC REPAIR & MAINTENANCE | 6725-0000 | 220.14 | 81.25 | 571.61 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,250.00 | 1,253.00 | 1,250.00 | 12,123.00 | 15,000.00 | 2,667.00 | 13.11 |
| PLUMBING REPAIR | 6726-0000 | 730.50 | 596.66 | 935.51 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 750.00 | 500.00 | 9,013.97 | 9,050.00 | -13.97 | -0.16 |
| FIRE SAFETY | 6727-0000 | 61.33 | 0.00 | 266.48 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 4,870.73 | 6,000.00 | 1,129.27 | 18.82 |
| WALLS AND DOORS | 6728-0000 | 436.62 | 371.65 | 363.59 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 14,455.84 | 18,000.00 | 3,134.16 | 17.41 |
| WINDOWS AND SCREENS | 6729-0000 | 65.00 | 106.43 | 25.93 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 2,200.93 | 2,400.00 | 199.07 | 16.63 |
| PAINTING INTERIOR | 6730-0000 | 78.23 | 0.00 | 0.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 9,078.23 | 12,000.00 | 2,921.77 | 24.35 |
| PAINTING EXTERIOR | 6731-0000 | 0.00 | 0.00 | 0.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 2,250.00 | 3,000.00 | 750.00 | 25.00 |
| EXTERIOR REPAIR | 6732-0000 | 167.00 | 0.00 | 52.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 2,469.00 | 3,000.00 | 531.00 | 17.70 |
| PARKING LOT GROUNDS CLEANING | 6733-0000 | 2,489.00 | 31.68 | 1,094.18 | 800.00 | 800.00 | 800.00 | 800.00 | 800.00 | 800.00 | 800.00 | 500.00 | 600.00 | 10,666.86 | 11,000.00 | 333.94 | 3.04 |
| POOL MAINTENANCE | 6734-0000 | 0.00 | 0.00 | 0.00 | 500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,000.00 | 750.00 | 500.00 | 250.00 | 0.00 | 8,500.00 | 8,500.00 | 0.00 | 0.00 |
| TURNOVER EXPENSE | 6735-0000 | 3,229.00 | 1,089.50 | 2,712.75 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 1,000.00 | 25,031.25 | 24,000.00 | -1,031.25 | -4.30 |
| EQUIPMENT REPAIR & MAINTENANCE | 6736-0000 | 13.59 | 606.58 | 0.00 | 250.00 | 250.00 | 250.00 | 250.00 | 125.00 | 250.00 | 250.00 | 250.00 | 250.00 | 2,871.18 | 3,000.00 | 128.82 | 4.29 |
| PEST CONTROL NON-CONTRACT | 6738-0000 | 75.00 | 245.00 | 245.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 1,690.00 | 1,550.00 | -190.00 | -12.67 |
| OTHER REPAIRS AND MAINTENANCE | 6739-0008 | 292.50 | 73.64 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 236.14 | 0.00 | -256.14 | 0.00 |
| **TOTAL MULTI-FAMILY-NON CONTRACT REP & MAINT** | 6749-9999 | 14,266.33 | 8,055.28 | 11,221.02 | 17,925.00 | 18,325.00 | 18,325.00 | 18,325.00 | 18,325.00 | 17,825.00 | 17,575.00 | 16,775.00 | 16,625.00 | 193,948.03 | 211,900.00 | 18,031.97 | 8.89 |
| MULTI-FAMILY MARKETING & LEASING | 6741-0000 | | | | | | | | | | | | | | | | |
| MARKETING & LEASING-ADVERTISING | 6742-0000 | 10,871.12 | 1,617.27 | 1,421.19 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 31,673.58 | 24,000.00 | -7,671.56 | -22.60 |
| MARKETING & LEASING-LOCATORS & REFERRALS | 6743-0000 | 2,377.00 | 1,167.00 | 28.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 21,572.00 | 24,000.00 | 2,428.00 | 10.12 |
| MARKETING & LEASING- OFFICE EXPENSE | 6744-0000 | 9,299.29 | 12,235.57 | 11,422.96 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 14,000.00 | 9,000.00 | 10,000.00 | 10,000.00 | 10,000.00 | 111,298.27 | 121,000.00 | -658.27 | -0.75 |
| MARKETING & LEASING-OTHER | 6745-0000 | 0.00 | 0.00 | 76.20 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 1,976.30 | 2,400.00 | 523.70 | 21.82 |
| MARKETING & LEASING-PROMO | 6746-0000 | 0.00 | 0.00 | 0.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 200.00 | 1,800.00 | 2,400.00 | 600.00 | 25.00 |
| **TOTAL MULTI-FAMILY MARKETING & LEASING** | 6749-9999 | 22,509.31 | 15,096.49 | 12,972.15 | 13,400.00 | 13,400.00 | 13,400.00 | 13,400.00 | 18,400.00 | 13,400.00 | 14,400.00 | 14,400.00 | 14,400.00 | 179,078.15 | 173,800.00 | -5,278.15 | -3.04 |

EXHIBIT B

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PROFESSIONAL FEES-APPRAISAL | 7100-0000 | 0.00 | 0.00 | 0.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 900.00 | 1,200.00 | 300.00 | 25.00 |
| TOTAL PROFESSIONAL FEES | 7110-0000 | 694.00 | 0.00 | 248.50 | 2,350.00 | 2,350.00 | 2,350.00 | 2,350.00 | 2,350.00 | 2,350.00 | 2,350.00 | 2,350.00 | 2,350.00 | 22,044.50 | 26,200.00 | 4,155.50 | 15.56 |
| TOTAL NON-OPERATING EXPENSES | 7197-9999 | 151,208.00 | 150,690.00 | 150,865.50 | 152,416.67 | 152,416.67 | 152,416.67 | 152,416.67 | 152,416.67 | 152,416.67 | 152,416.67 | 152,416.67 | 152,416.63 | 1,823,664.19 | 1,827,000.00 | 2,555.51 | 0.14 |
| TOTAL EXPENSES | 7198-9999 | 269,931.80 | 276,637.22 | 253,803.29 | 274,039.24 | 281,039.34 | 276,039.24 | 281,039.34 | 276,039.34 | 276,189.34 | 273,189.34 | 277,339.28 | | 3,301,036.39 | 3,302,432.00 | 1,395.61 | 0.04 |
| NET INCOME BEFORE DEPRECIATION | 7199-9999 | -1,761.19 | 141,949.44 | 27,420.35 | -22,136.01 | -20,916.01 | -22,136.01 | -29,136.01 | -33,136.01 | -29,136.01 | -24,386.01 | -22,586.01 | -22,436.89 | -8,155.34 | -75,082.00 | 65,926.66 | -89.13 |
| TOTAL NET INCOME AFTER DEPRECIATION | 7599-9999 | -1,761.19 | 141,949.44 | 27,420.38 | -22,136.01 | -20,936.01 | -22,136.01 | -29,136.01 | -33,136.01 | 21,113.99 | -24,386.01 | -22,586.01 | -22,436.89 | -8,155.34 | -75,082.00 | 66,926.66 | -89.14 |

EXHIBIT B

| Account / Description | Acct | P1 | P2 | P3 | P4 | P5 | P6 | P7 | P8 | P9 | P10 | P11 | P12 | Total | Budget | Variance | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MULTI-FAMILY-REPLACEMENT RESERVE | 6755-9999 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | 6759-0000 | | | | | | | | | | | | | | | | |
| **MULTI-FAMILY-ADMINISTRATIVE** | | | | | | | | | | | | | | | | | |
| MANAGEMENT FEE | 6760-0000 | 10,023.33 | 8,470.63 | 8,594.54 | 8,466.67 | 8,466.67 | 8,466.67 | 8,466.67 | 8,466.67 | 8,466.67 | 8,466.67 | 8,466.67 | 8,466.67 | 99,658.69 | 96,900.00 | -2,858.69 | -2.95 |
| MANAGER FEE | 6761-0000 | 3,750.00 | 3,750.00 | 3,750.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 | 56,250.00 | 56,250.00 | 0.00 | 0.00 |
| OFFICE EXPENSE | 6762-0000 | 24.00 | 63.71 | 0.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 500.00 | 4,587.72 | 6,000.00 | 1,412.28 | 23.54 |
| OFFICE EQUIPMENT RENTAL & MAINTENANCE | 6764-0000 | 412.94 | 428.75 | 241.37 | 420.00 | 420.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 4,734.66 | 4,800.00 | 45.34 | 0.84 |
| TELEPHONE OFFICE | 6765-0000 | 784.71 | 561.62 | 595.81 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 600.00 | 7,251.94 | 7,200.00 | -51.94 | -0.72 |
| INTERNET SERVICES | 6767-0000 | 2,393.38 | 2,408.41 | 991.36 | 1,931.00 | 1,931.00 | 1,931.00 | 1,931.00 | 1,931.00 | 1,931.00 | 1,931.00 | 1,931.00 | 1,931.00 | 23,172.75 | 23,172.00 | -0.75 | 0.00 |
| TV SERVICE EXPENSE | 6768-0000 | 9,433.63 | 4,027.63 | 815.38 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 4,500.00 | 54,776.64 | 54,000.00 | -776.64 | -1.44 |
| PROFESSIONAL FEES - OPERATING | 6770-0000 | 0.00 | 0.00 | 0.00 | 800.00 | 800.00 | 800.00 | 800.00 | 800.00 | 800.00 | 800.00 | 800.00 | 900.00 | 7,200.00 | 9,600.00 | 2,400.00 | 25.00 |
| FILING FEES | 6771-0000 | 0.00 | 0.00 | 0.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 50.00 | 450.00 | 600.00 | 150.00 | 25.00 |
| INSURANCE UMBRELLA | 6772-0000 | 0.00 | 1,500.00 | 0.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 125.00 | 2,625.00 | 1,500.00 | -1,125.00 | -75.00 |
| POSTAGE-MAILING | 6780-0000 | 231.55 | 41.33 | 142.03 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 1,765.32 | 1,800.00 | 34.68 | 1.93 |
| BANK FEES AND CHARGES | 6781-0000 | 279.27 | 457.15 | 502.96 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 400.00 | 4,839.50 | 4,500.00 | -39.50 | -0.82 |
| UNIFORM EXPENSE | 6785-0000 | 52.20 | 9.97 | -4.43 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 75.00 | 732.84 | 900.00 | 167.16 | 18.57 |
| VEHICLE EXPENSE | 6786-0000 | 239.20 | 208.95 | 335.28 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 3,143.43 | 3,000.00 | -143.43 | -4.78 |
| **TOTAL MULTI-FAMILY-ADMINISTRATIVE** | 6769-9999 | 27,698.12 | 22,018.16 | 25,665.22 | 23,847.67 | 22,847.67 | 22,847.67 | 22,847.67 | 22,847.67 | 22,847.67 | 22,847.67 | 22,847.67 | 22,847.67 | 271,208.49 | 270,422.00 | -786.49 | -0.29 |
| | 6790-0000 | | | | | | | | | | | | | | | | |
| **MULTI-FAMILY UTILITIES** | | | | | | | | | | | | | | | | | |
| ELECTRIC | 6791-0000 | 3,021.46 | 4,051.29 | 4,374.41 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 2,500.00 | 32,990.66 | 30,000.00 | -2,990.66 | -9.97 |
| GAS | 6792-0000 | 1,954.28 | 2,340.12 | 1,873.44 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 15,167.84 | 12,000.00 | -3,167.91 | -26.40 |
| WATER-SEWER | 6793-0000 | 28,966.65 | 13,570.53 | 5,712.35 | 13,000.00 | 13,000.00 | 13,000.00 | 13,000.00 | 13,000.00 | 13,000.00 | 13,000.00 | 13,000.00 | 13,000.00 | 157,099.45 | 156,066.67 | -1,059.45 | -0.56 |
| WATER/IRRIGATION | 6794-0000 | 0.00 | 0.00 | 0.20 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 0.00 | 0.00 | 16,800.00 | 16,000.00 | 0.00 | 0.00 |
| TRASH | 6795-0000 | 1,392.50 | 1,721.89 | 533.95 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 12,818.70 | 12,000.00 | -818.70 | -6.81 |
| **TOTAL MULTI-FAMILY UTILITIES** | 6799-9999 | 26,326.39 | 21,596.31 | 12,624.65 | 17,500.00 | 18,300.00 | 20,900.00 | 20,500.00 | 23,500.00 | 19,500.00 | 19,500.00 | 17,500.00 | 17,500.00 | 234,846.75 | 225,800.00 | -9,046.75 | -3.35 |
| | 6800-0000 | | | | | | | | | | | | | | | | |
| **MULTI-FAMILY TAXES AND INSURANCE** | | | | | | | | | | | | | | | | | |
| REAL ESTATE TAXES | 6810-0000 | 37,590.00 | 26,495.96 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 37,500.00 | 451,995.05 | 450,000.00 | -1,995.05 | -0.44 |
| INSURANCE - PROPERTY | 6814-0000 | 4,900.00 | 4,600.00 | 4,600.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 4,800.00 | 57,600.00 | 57,600.00 | 0.00 | 0.00 |
| **TOTAL MULTI-FAMILY TAXES AND INSURANCE** | 6815-9999 | 43,200.00 | 414,295.96 | 42,500.00 | 42,300.00 | 42,300.00 | 42,300.00 | 42,300.00 | 42,300.00 | 42,300.00 | 42,300.00 | 42,300.00 | 42,300.00 | 809,595.06 | 807,600.00 | -1,935.06 | -0.39 |
| **TOTAL MULTI-FAMILY OPERATING EXPENSES** | 6698-9999 | 130,723.60 | 126,037.32 | 101,916.79 | 121,022.67 | 122,422.67 | 124,822.67 | 128,622.67 | 135,822.67 | 123,122.67 | 123,872.67 | 120,172.67 | 119,922.63 | 1,476,281.10 | 1,475,422.00 | -1,159.00 | -0.08 |
| | 7000-0000 | | | | | | | | | | | | | | | | |
| **NON-OPERATING EXPENSES** | | | | | | | | | | | | | | | | | |
| | 7009-0000 | | | | | | | | | | | | | | | | |
| **INTEREST EXPENSE** | | | | | | | | | | | | | | | | | |
| INTEREST EXPENSE-MTG PAYABLE | 7040-0000 | 117,200.00 | 117,200.00 | 117,200.00 | 116,666.67 | 116,666.67 | 116,666.67 | 116,666.67 | 116,666.67 | 116,666.67 | 116,666.67 | 116,666.67 | 116,666.67 | 1,401,199.99 | 1,400,000.00 | -1,599.99 | -4.11 |
| INTEREST EXPENSE MEZZANINE | 7042-0000 | 33,400.00 | 33,400.00 | 33,400.00 | 33,400.00 | 33,400.00 | 33,400.00 | 33,400.00 | 33,400.00 | 33,400.00 | 33,400.00 | 33,400.00 | 33,400.00 | 400,800.00 | 400,800.00 | 0.00 | 0.00 |
| **TOTAL INTEREST EXPENSE** | 7049-9999 | 150,600.00 | 150,600.00 | 150,600.00 | 150,066.67 | 150,066.67 | 150,066.67 | 150,066.67 | 150,066.67 | 150,066.67 | 150,066.67 | 150,066.67 | 150,066.67 | 1,802,399.99 | 1,800,800.00 | -1,599.99 | -0.09 |
| **PROFESSIONAL FEES** | | | | | | | | | | | | | | | | | |
| | 7009-0000 | | | | | | | | | | | | | | | | |
| PROFESSIONAL FEES-LEGAL | 7050-0000 | 698.00 | 0.00 | 286.50 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 9,984.50 | 12,090.00 | 2,105.50 | 17.55 |
| PROFESSIONAL FEES-AUDIT | 7080-0000 | 0.00 | 0.00 | 0.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 9,000.00 | 10,000.00 | 1,000.00 | 10.00 |
| PROFESSIONAL FEES-TAX PREP | 7090-0000 | 0.00 | 0.00 | 0.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 250.00 | 2,250.00 | 3,000.00 | 750.00 | 25.00 |

EXHIBIT B

EXHIBIT C

LETTER TO DTBRA

May ___, 2008

Delhi Township Brownfield
    Redevelopment Authority

_____

_____

Attn: _____

> **Re:** Brownfield Reimbursement Agreement dated March 26, 2002 by and between Delhi Township Brownfield Redevelopment Authority ("**DTBRA**") and Woodland Lakes Investment Group, L.L.C. ("**Borrower**") ("**Initial Reimbursement Agreement**"), amended by that certain First Amendment to Brownfield Reimbursement Agreement, ("**First Amendment**") that certain Second Amendment to Brownfield Reimbursement Agreement dated August 1, 2005 ("**Second Amendment**") and further amended by the Third Amendment to Brownfield Reimbursement Agreement dated January 24, 2006 ("**Third Amendment**") (the Initial Reimbursement Agreement, together with the First Amendment, the Second Amendment, the Third Amendment and any further amendments or modifications thereto, the "**Reimbursement Agreement**")

Ladies and Gentlemen:

Borrower, the owner of that certain property located at 4200 Dell Road in the Township of Delhi, County of Ingham, State of Michigan and commonly known as the Woodland Lakes Apartments (the "Property"), has pledged and granted a security interest to HARTFORD MEZZANINE INVESTORS I, LLC, a Delaware limited liability company ("Lender") (together with its successors and assigns, the "Lender") and has collaterally assigned to Lender all of its right, title and interest in and to the Reimbursement Agreement, which includes the right to receive all payments thereunder (which will be paid by the DTBRA when it receives the funds necessary to make such payments). In connection therewith, notwithstanding anything to the contrary in the Reimbursement Agreement, Borrower has agreed that (i) all reimbursement payments due to Borrower from DTBRA under the Reimbursement Agreement shall be deposited directly with Lender (rather than Borrower), and (ii) Lender has the right to request all such reimbursement payments and deliver all documentation to DTBRA necessary to receive such reimbursement payments. Accordingly, from and after the date of this letter, Borrower irrevocably requests and directs that DTBRA deliver directly to Lender at the following address each reimbursement payment that becomes payable to Borrower under the Reimbursement Agreement:

EXHIBIT C

HARTFORD MEZZANINE INVESTORS I, LLC
c/o Key Real Estate Equity Capital, Inc.
127 Public Square, 7th Floor
Cleveland, Ohio 44114
Attention: Director of Asset Management
    – James MacQueen
Telecopy: (216) 689-4700

These payment instructions cannot be withdrawn or modified without prior written consent of the Lender or its agent or pursuant to a joint written instruction from Borrower and Lender or its agent.

Please contact me if you have any questions.

Thank you.

WOODLAND LAKES INVESTMENT GROUP, L.L.C

By: _____
Name: _____
Title: _____

The undersigned acknowledges receipt of this letter and agrees to comply with the provisions hereof.

DELHI TOWNSHIP BROWNFIELD
REDEVELOPMENT AUTHORITY

By:_____
Name:_____
Title:_____

EXHIBIT C

# EXHIBIT D
## SCHEDULE OF REIMBURSEMENTS

04/24/2008 7:02:05 PM Page 1

Woodland Lakes Brownfield Interest Rate Calculation

Compound Period ......... : Annual

Nominal Annual Rate .... : 6.762 %

AMORTIZATION SCHEDULE - Normal Amortization

|  | Date | Loan | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|---|
| 11 | 02/15/2008 |  | 142,139.38 | 22,780.25 | 119,359.13 | 663,813.00 |
| 12 | 09/30/2008 |  | 46,000.00 | 28,040.27 | 17,959.73 | 645,853.27 |
| 2008 Totals |  | 0.00 | 188,139.38 | 50,820.52 | 137,318.86 |  |
| 13 | 02/15/2009 |  | 150,000.00 | 16,512.56 | 133,487.44 | 512,365.83 |
| 14 | 09/30/2009 |  | 46,000.00 | 21,548.03 | 24,451.97 | 487,913.86 |
| 2009 Totals |  | 0.00 | 196,000.00 | 38,060.59 | 157,939.41 |  |
| 15 | 02/15/2010 |  | 150,000.00 | 12,474.52 | 137,525.48 | 350,388.38 |
| 16 | 09/30/2010 |  | 46,000.00 | 14,735.92 | 31,264.08 | 319,124.30 |
| 2010 Totals |  | 0.00 | 196,000.00 | 27,210.44 | 168,789.56 |  |
| 17 | 02/15/2011 |  | 155,000.00 | 8,159.07 | 146,840.93 | 172,283.37 |
| 18 | 09/30/2011 |  | 48,000.00 | 7,245.54 | 40,754.46 | 131,528.91 |
| 2011 Totals |  | 0.00 | 203,000.00 | 15,404.61 | 187,595.39 |  |
| 19 | 02/15/2012 |  | 134,891.70 | 3,362.79 | 131,528.91 | 0.00 |
| 2012 Totals |  | 0.00 | 134,891.70 | 3,362.79 | 131,528.91 |  |
| Grand Totals |  | 0.00 | 918,031.08 | 134,858.95 | 783,172.13 |  |

EXHIBIT E
ORGANIZATIONAL CHART

[contained on next page]

EXHIBIT E



EXHIBIT E

## GUARANTY

THIS GUARANTY ("**Guaranty**") is made as of June 3, 2008 by SCOTT A. CHAPPELLE, LAURA A. CHAPPELLE, EVERT KRAMER, JR., AND ROSALIND KRAMER (together with their successors, assigns, heirs, and personal representatives, individually, collectively, jointly and severally, the "**Guarantor**"), to and for the benefit of HARTFORD MEZZANINE INVESTORS I, LLC, a Delaware limited liability company (together with its successors and assigns, the "**Lender**").

## RECITALS

A.      WOODLAND LAKES INVESTMENT GROUP, L.L.C., a Michigan limited liability company ("**Borrower**") and Lender are entering into a certain Forbearance and Modification Agreement of even date herewith ("**Forbearance Agreement**") in connection with that certain loan ("**Loan**") made to Borrower in the maximum principal amount of $3,340,000.00. The Loan is evidenced by Borrower's promissory note to Lender dated January 4, 2006 ("**Note**") and that certain Loan Agreement dated January 4, 2006 ("**Loan Agreement**"), and is secured by, among other things, a Pledge Agreement dated January 4, 2006 ("**Pledge Agreement**"). Scott A. Chappelle, Laura A. Chappelle, Kevin T. McGraw, Sharon D. McGraw, Evert Kramer, Jr., and Rosalind Kramer (collectively, "**Limited Guarantors**") executed that certain Guaranty dated January 4, 2006 ("**Limited Guaranty**"). The Note, the Loan Agreement, the Pledge Agreement, the Guaranty, this Guaranty, and all other existing or future documents evidencing, securing or executed in connection with the Loan, and all documents that hereafter modify, amend, extend, restate, replace, or otherwise affect the Loan or any of the foregoing documents are referred to collectively herein as the "**Loan Documents.**"

B.      Guarantor may derive material benefits from the Forbearance Agreement. Guarantor acknowledges that Lender would not enter into the Forbearance Agreement if Guarantor did not deliver this Guaranty to Lender.

C.      Lender has relied on the statements and agreements contained herein in agreeing to enter into the Forbearance Agreement. The execution and delivery of this Guaranty by Guarantor is a condition precedent to the execution of the Forbearance Agreement by Lender. Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the Loan Agreement and Forbearance Agreement.

## AGREEMENTS

NOW, THEREFORE, intending to be legally bound, Guarantor, in consideration of the matters described in the foregoing Recitals, which Recitals are incorporated herein and made a part hereof, and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, hereby covenants and agrees for the benefit of Lender and its successors, endorsees, transferees, participants and assigns as follows:

1651809.8

EXHIBIT

F

2.1     Guaranty.

Each Guarantor, jointly and severally, absolutely, irrevocably and unconditionally guarantees the punctual and complete payment and performance when due of (i) all payments of Base Interest at the stated interest rate in the Loan Agreement (which shall not include default interest, late fees, or any other cost or charges due to Lender in accordance with the Loan Agreement) ("Base Interest Payments") for a period ("Obligation Period") commencing on the date hereof and continuing through and including the payment due on December 1, 2009, and (ii) payments to all suppliers of goods or services (other than the claims of the Senior Lender and Mezzanine Lender) having claims against the Borrower, which shall be limited in an amount not to exceed amounts contemplated in the approved Budget arising during the Obligation Period ("Borrower Liabilities") (the Base Interest Payments and Borrower Liabilities are hereinafter collectively referred to as the "Guaranteed Obligations").

Notwithstanding the foregoing,

(i)     with respect to the Borrower Liabilities, if there is a conveyance of membership interests in the Borrower that is approved by Lender and Senior Lender by which the Guarantors no longer directly or indirectly control the operations of the Borrower and the Project, the amount of the Borrower Liabilities shall be limited to only those Borrower Liabilities that have been incurred prior to such conveyance and are contemplated under the approved Budget that is in place as of the date of such conveyance, and

(ii)    the Guaranteed Obligations shall not be due and payable from Guarantors if either (A) or (B) below is satisfied:

(A) an Event of Default occurs due to a breach by a Pledgor ("Debtor Pledgor") under Section 9.1(i) of the Loan Agreement, and each of the following is satisfied: (1) no other Event of Default shall have then occurred and be continuing; (2) within 180 days of the occurrence of such event, any other Pledgor or Guarantor acquires the Pledged Collateral of the Debtor Pledgor; (3) the Debtor Pledgor is no longer a member of Borrower; and (4) by virtue of such acquisition, the Pledged Collateral does not become property of any bankruptcy estate and does not become subject to any lien, pledge or encumbrance other than the pledge to Lender; or

(B) a Pledgor violates a provision of the Loan Documents (other than 9.1(i) of the Loan Agreement), and each of the following is satisfied: (1) no other Event of Default shall have occurred and be continuing; (2) the action that caused the Event of Default is caused directly or indirectly by a Pledgor that is not controlled directly or indirectly by any Guarantor; (3) no other Event of Default shall have occurred and be continuing; (4) neither Borrower nor any Guarantor, nor any person directly or indirectly owned or controlled by Borrower or any Guarantor directly or indirectly participated, colluded, assisted, or acted in concert with Pledgor to cause the action creating the Event of Default; and (5) the action of such Pledgor does not affect the Pledged

Collateral or impede, alter or interfere with Lender's ability to exercise its
rights to foreclose upon all of its Pledged Collateral.

2.2     Continuing Obligation.

This Guaranty is a continuing guaranty and in full force and effect and will be discharged
upon the first to occur of (i) December 31, 2009, if Lender has been paid all Base Interest
Payments under the Loan Agreement, or (ii) if and when the Loan has been paid in full (unless
discharged in accordance with Section 2.1 above), and all obligations under the Loan Agreement,
Forbearance Agreement and other Loan Documents have been fully performed; provided,
however, that notwithstanding any of the foregoing to the contrary, this Guaranty shall remain in
full force and effect for so long as any payment hereunder (or under the Loan Agreement) may
be voided in bankruptcy proceedings as a preference or for any other reason.

2.3     Direct Action Against Guarantor.

This Guaranty is a guaranty of payment and performance and not of collection.  Lender
has the right to require each Guarantor to pay, comply with and satisfy its obligations and
liabilities under this Guaranty, and shall have the right to proceed immediately against each
Guarantor with respect thereto, without being required to attempt recovery first from Borrower
or any other party, without first suing on the Note or any other Loan Document and without
demonstrating that the collateral for the Loan is inadequate security or that Lender has exercised
(to any degree) or exhausted any of Lender's other rights and remedies with respect to Borrower
or any collateral for the Loan.

<center>ARTICLE 3
GENERAL TERMS AND CONDITIONS</center>

3.1     Payments.

Amounts payable to Lender under this Guaranty shall be immediately due and payable on
Lender's written demand and shall be paid without reduction by set-off, defense, counterclaim or
cross-claim.  Lender may apply all money received by Lender to payment or reduction of the
Loan or reimbursement of Lender's expenses, in such priority and proportions, and at such time
or times as Lender may elect.

3.2     Cumulative Remedies.

Guarantors acknowledge that  whenever an uncured Event of Default exists and remains
uncured following five days notice thereof to Borrower, Lender shall be entitled to accelerate the
Loan and exercise all other rights and remedies as have been provided to Lender hereunder,
under the other Loan Documents, by law or in equity including enforcement of this Guaranty.
All rights and remedies are cumulative and may be exercised independently, concurrently or
successively in such order and manner as Lender may elect from time to time and as often as
occasion therefor shall arise.  Lender's delay or failure to accelerate the Loan or exercise any
other remedy upon the occurrence of an Event of Default with respect to the Loan shall not be
deemed a waiver of such right as remedy.  No partial exercise by Lender of any right or remedy
will preclude further exercise thereof.  Notice or demand given to Borrower in any instance will

not entitle Borrower to notice or demand in similar or other circumstances nor constitute Lender's waiver of its right to take any future action in any circumstance without notice or demand (except where expressly required by this Guaranty to be given). Lender may release other security for the Loan, may release any party liable for the Loan, may grant extensions, renewals or forbearances with respect thereto, may accept a partial or past due payment or grant other indulgences, or may apply any other security held by it to payment of the Loan, in each case without prejudice to its rights under this Guaranty and without such action being deemed an accord and satisfaction or a reinstatement of the Loan. Lender will not be deemed as a consequence of its delay or failure to act, or any forbearance granted, to have waived or be estopped from exercising any of its rights or remedies.

3.3     Enforcement Costs.

        Guarantors hereby agree to pay, on written demand by Lender, all reasonable legal expenses and other reasonable  Loan related expenses necessarily incurred by Lender in collecting any amount payable under this Guaranty or enforcing or protecting its rights under this Guaranty in each case whether or not legal proceedings are commenced, which fees and costs shall not exceed the amount of $50,000.   Amounts incurred by Lender (up to the amount of $50,000) shall be due and payable on demand.

3.4     Unimpaired Liability.

        Each Guarantor acknowledges and agrees that all obligations hereunder are and shall be absolute and unconditional under any and all circumstances without regard to the validity, regularity or enforceability of any or all of the Loan Documents or the existence of any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor or surety.  Without limiting the foregoing, each Guarantor acknowledges and agrees that its respective liability hereunder shall in no way be released, terminated, discharged, limited or impaired by reason of any of the following (whether or not Guarantor has any knowledge or notice thereof):  (a) Borrower's lack of authority or lawful right to enter into any of the Loan Documents; (b) any modification, supplement, extension, consolidation, restatement, waiver or consent provided by Lender with respect to any of the Loan Documents including approval of a Transfer or the grant of extensions of time for payment or performance; (c) failure to record any Loan Document or to perfect any security interest intended to be provided thereby or otherwise to protect, secure or insure any collateral for the Loan; (d) Lender's failure to exercise, or delay in exercising, any rights or remedies Lender may have under the Loan Documents or under this Guaranty; (e) the release or substitution, in whole or in part, of any collateral for the Loan or acceptance of additional collateral for the Loan; (f) the release of any Guarantor from performance, in whole or in part, under this Guaranty or the release of Borrower from performance, in whole or in part, under any of the Loan Documents in each case whether by operation of law, Lender's voluntary act, or otherwise; (g) any bankruptcy, insolvency, reorganization, adjustment, dissolution, liquidation or other like proceeding involving or affecting Borrower, any other Guarantor or Lender; (h) the termination or discharge of the Security Instrument or the exercise of any power of sale or any foreclosure (judicial or otherwise) or delivery or acceptance of a deed-in-lieu of foreclosure; (i) the existence of any claim, setoff, counterclaim, defense or other rights which Guarantor may have against Borrower, any other Guarantor or Lender, whether in connection with the Loan or any other transaction; or

1651809.8                                         4

(j) the accuracy or inaccuracy of the representations and warranties made by Borrower in any of the Loan Documents.

3.5    Waivers.

Each Guarantor hereby waives and relinquishes, to the fullest extent permitted by law: (a) all rights or claims of right to cause a marshalling of assets or to cause Lender to proceed against any of the collateral for the Loan before proceeding under this Guaranty against it or any other Guarantor; (b) all rights and remedies accorded by applicable law to sureties or guarantors, except any rights of subrogation and contribution (the exercise of which are subject to the terms of this Guaranty); (c) the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought by or against it; (d) notice of acceptance of this Guaranty and of any action taken or omitted in reliance hereon; (e) presentment for payment, demand, protest, notice of nonpayment or failure to perform or observe, or any other proof, notice or demand to which it might otherwise be entitled with respect to its obligations hereunder; and (f) all homestead or exemption rights against the obligations hereunder and the benefits of any statutes of limitation or repose.

3.6    Certain Consequences of Borrower's Bankruptcy.

(a)    If Borrower shall be subject to the protection of the Bankruptcy Code or any other insolvency law the effect of which is to prevent or delay Lender from taking any remedial action against Borrower, including the exercise of any option Lender has to accelerate and declare the Loan immediately due and payable, Lender may, as against each Guarantor, nevertheless declare the Loan due and payable and enforce any or all of its rights and remedies against any Guarantor as provided herein.

(b)    If Lender is required to refund or return any payment or amount (a "Avoided Payment") received by Lender in payment of any of the Guaranteed Obligations or any obligation owed under the Note or any other Loan Document because Lender's receipt of the Avoided Payment is held by a court of competent jurisdiction to be a voidable preference, a fraudulent transfer or conveyance, or otherwise invalid under the Bankruptcy Code or any other insolvency law, or for any other reason, the Avoided Payment shall be treated for all purposes as if it had never been received by Lender. Each Guarantor's liability under this Guaranty shall continue or be automatically reinstated with respect to any Avoided Payment, notwithstanding any notice of revocation of this Guaranty or any recovery or payment in full of the Loan, until such time as all periods have expired within which Lender could be required to return any amount paid at any time on account of the Guaranteed Obligations.

(c)    Until payment in full of the Loan (including interest accruing on the Note after the commencement of a proceeding by or against Borrower under the Bankruptcy Code, which interest the parties agree remains a claim that is prior and superior to any claim of Guarantor notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally), Guarantors agree not to accept any payment or satisfaction of any kind of indebtedness of Borrower to Guarantors and hereby assign such indebtedness to Lender, including the right (but not the obligation) to file proof of claim and to vote in any other

bankruptcy or insolvency action, including the right to vote on any plan of reorganization, liquidation or other proposal for debt adjustment under Federal or state law.

3.7    Subrogation and Contribution.

Each Guarantor agrees that no payment by it under this Guaranty shall give rise to (a) any rights of subrogation against Borrower or the collateral for the Loan, or (b) any rights of contribution against any other Guarantor, in each case unless and until Lender has received full and indefeasible payment of the Loan. If the deferral of such rights shall be unenforceable for any reason, each Guarantor agrees that (a) its rights of subrogation shall be junior and subordinate to Lender's rights against Borrower and the collateral for the Loan, and (b) its rights of contribution against any other Guarantor shall be junior and subordinate to Lender's rights against each other Guarantor.

3.8    Subordination of Borrower's Obligations to Guarantor.

Any indebtedness of Borrower to any Guarantor, now or hereafter existing, together with any interest thereon, shall be and hereby is deferred, postponed and subordinated to the prior payment in full of the Loan. Further, each Guarantor agrees that should such Guarantor receive any payment, satisfaction or security for any indebtedness owed by Borrower to it, the same shall be delivered to Lender in the form received (endorsed or assigned as may be appropriate) for application on account of, or as security for, the Loan and until so delivered to Lender, shall be held in trust for Lender as security for the Loan.

3.9    Financial Reports; Inspection of Records.

Each Guarantor agrees to furnish to Lender from time to time, by such dates as Lender may require (but no more frequently than annually unless a failure to cure an Event of Default under the Loan Agreement or any other Loan Document exists, in which event Lender may require same from time to time), Guarantor's Federal and State income tax returns, a personal financial statement if Guarantor is an individual and a balance sheet and statement of changes in Guarantor's financial position if Guarantor is not an individual, in each case certified by such Guarantor as complete and accurate in all material respects. Such financial statements shall be in reasonable detail and prepared in accordance with consistently applied accounting methods reasonably acceptable to Lender.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES

4.1    Guarantor Due Diligence and Benefit.

Each Guarantor represents and warrants to Lender that (a) the Loan and this Guaranty are for commercial purposes, (b) it has had adequate opportunity to review this Guaranty and all Loan Documents, (c) it is fully aware of obligations of Borrower thereunder and of the financial condition, assets and prospects of Borrower, and (d) it is executing and delivering this Guaranty based solely upon Guarantor's own independent investigation of the matters contemplated by clauses (a)-(c) and in no part upon any representation, warranty or statement of Lender with respect thereto.

1651809.8                                        6

4.2     General.

Each Guarantor individually, as to such Guarantor, represents and warrants that:

(a)     Authority.  Guarantor has the full power and authority to execute and deliver this Guaranty and to perform its obligations hereunder.  If Guarantor is not an individual: (i) Guarantor is duly organized, validly existing and in good standing under the laws of the state of its formation, and (ii) the execution, delivery and performance of this Guaranty by Guarantor has been duly and validly authorized and the person(s) signing this Guaranty on Guarantor's behalf has been validly authorized and directed to sign this Guaranty.

(b)     Valid and Binding Obligation.  This Guaranty constitutes Guarantor's legal, valid and binding obligation, enforceable against it in accordance with its terms, except to the extent enforceability may be limited under applicable bankruptcy and insolvency laws and similar laws affecting creditors' rights generally and to general principles of equity.

(c)     No Conflict with Other Agreement.  Guarantor's execution, delivery and performance of this Guaranty will not (i) violate Guarantor's organizational documents if Guarantor is not an individual, (ii) result in the breach of, or conflict with, or result in the acceleration of, any obligation under any guaranty, indenture, credit facility or other instrument to which Guarantor or any of its assets may be subject, or (iii) violate any order, judgment or decree to which Guarantor or any of its assets is subject.

(d)     No Pending Litigation.  No action, suit, proceeding or investigation currently is pending or, to the best of Guarantor's knowledge, threatened against Guarantor which, either in any one instance or in the aggregate, may have a material, adverse effect on Guarantor's ability to perform its obligations under this Guaranty.

(e)     Consideration.  Guarantor owns a direct or indirect interest in Borrower and will derive substantial benefit from the Forbearance Agreement.

ARTICLE 5
INTENTIONALLY DELETED

ARTICLE 6
MISCELLANEOUS

6.1     Notices.

All notices and other communications under this Guaranty are to be in writing and addressed in the case of Lender to the address as set forth below and in the case of each Guarantor, as set forth below such Guarantor's signature hereto.  Default or demand notices shall be deemed to have been duly given upon the earlier of: (a) actual receipt; (b) one (1) business day after having been timely deposited for overnight delivery, fee prepaid, with a reputable overnight courier service, having a reliable tracking system; (c) one (1) business day after having been sent by telecopier (with answer back acknowledged) provided an additional notice is given pursuant to (b); or (d) three (3) business days after having been deposited in any post office or mail depository regularly maintained by the U.S. Postal Service and sent by certified mail,

postage prepaid, return receipt requested, and in the case of clause (b) and (d) irrespective of whether delivery is accepted.  A new address for notice may be established by written notice to the other parties; provided, however, that no change of address will be effective until written notice thereof actually is received by the party to whom such address change is sent.  Notice to outside counsel or parties other than a named Guarantor and Lender, now or hereafter designated by a party as entitled to notice, are for convenience only and are not required for notice to a party to be effective in accordance with this section.  Notice addresses are as follows:

<div style="margin-left:2em;">

Address for Lender:

    127 Public Square, 7th Floor
    Cleveland, Ohio 44114
    Attention: Director of Asset Management
        – James MacQueen
    Telecopy: (216) 689-4700

With a copy to:

    Daniel J. Flanigan, Esq.
    Polsinelli Shalton Flanigan Suelthaus PC
    700 W. 47th St., Suite 1000
    Kansas City, Missouri 64112
    Telephone:  (816) 753-1000
    Facsimile:  (816) 753-1536

Address for Guarantor:

    Scott A. Chappelle and Laura A. Chappelle
    1427 West Saginaw, Ste. 200
    East Lansing, MI  48823
    Telephone:  (517) 336-4400
    Facsimile:  (517) 336-4499

    Evert Kramer, Jr. and Rosalind Kramer
    1427 West Saginaw, Ste. 200
    East Lansing, MI  48823
    Telephone:  (517) 336-4400
    Facsimile:  (517) 336-4499

</div>

6.2    Entire Agreement; Modification.

This Guaranty is the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes and replaces all prior discussions, representations, communications and agreements (oral or written).  This Guaranty shall not be modified, supplemented, or terminated, nor any provision hereof waived, except by a written instrument signed by the party against whom enforcement thereof is sought, and then only to the extent expressly set forth in such writing.

6.3    Successors and Assigns Bound; Obligations Not Delegable.

This Guaranty is binding upon and inures to the benefit of the Guarantors, Lender and their respective heirs, executors, legal representatives, successors, and assigns, whether by

voluntary action of the parties or by operation of law.  No Guarantor may delegate or transfer its obligations under this Guaranty.

6.4     Offsets, Counterclaims and Defenses.

Any assignee of Lender's interest in and to this Guaranty or the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to the Guaranty, the Loan, or the Loan Documents which any Guarantor may otherwise have against any assignor, and no such unrelated counterclaim or defense shall be interposed or asserted by any Guarantor in any action or proceeding brought by any such assignee upon, this Guaranty or the other Loan Documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by each Guarantor.

6.5     Joint and Several Obligations.

If more than one Guarantor signs this Guaranty, each Guarantor shall be jointly and severally liable hereunder.  Unless the context clearly indicates that a reference is only to a signer of this Guaranty, references to the "Guarantor" or "Guarantors" herein shall also be deemed to include all other Persons who sign separate guaranty agreements in connection with the Loan.

6.6     Time of the Essence.

Each Guarantor agrees that time is of the essence of all of such Guarantor's obligations under this Guaranty.

6.7     Unenforceable Provisions.

Any provision of this Guaranty which is determined by a court of competent jurisdiction or government body to be invalid, unenforceable or illegal shall be ineffective only to the extent of such determination and shall not affect the validity, enforceability or legality of any other provision, nor shall such determination apply in any circumstance or to any party not controlled by such determination.

6.8     Duplicate Originals; Counterparts.

This Guaranty may be executed in any number of duplicate originals, and each duplicate original shall be deemed to be an original.  This Guaranty (and each duplicate original) also may be executed in any number of counterparts, each of which shall be deemed an original and all of which together constitute a fully executed Guaranty even though all signatures do not appear on the same document.

6.9     Rules of Construction.

The following rules of construction shall be applicable for all purposes of this Guaranty and all documents or instruments supplemental hereto, unless the context otherwise requires:

1651809.8                                                    9

(a)     The terms "include," "including," and similar terms shall be construed as if followed by the phrase "without being limited to."

(b)     No inference in favor of or against any party shall be drawn from the fact that such party has drafted any portion hereof or any other Loan Document.

(c)     The cover page (if any) of, all recitals set forth in, and all Exhibits to, this Guaranty are hereby incorporated herein.

(d)     Wherever Lender's judgment, consent, or approval is required under this Guaranty or any other Loan Document for any matter or thing, or Lender shall have an option, election, or right of determination thereunder including any right to determine that something is satisfactory or not ("Decision Power"), such Decision Power shall be exercised in the sole and absolute discretion of Lender unless otherwise expressly stated to be reasonably exercised.  Such Decision Power and each other power granted to Lender upon this Guaranty or any other Loan Document may be exercised by Lender or by any authorized agent of Lender (including any servicer or attorney-in-fact), and Borrower hereby expressly agrees to recognize the exercise of such Decision Power by such authorized agent.

(e)     Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine, or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

(f)     The term "or" has the inclusive meaning represented by the phrase "and/or," except where otherwise stated.

(g)     Article and section headings are for convenience only and shall not be used in interpretation of this Guaranty.

(h)     The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Guaranty as a whole and not to any particular section, paragraph or other subdivision; and the word "section" refers to the entire section and not to any particular subsection, paragraph or other subdivision; and "Guaranty" and each of the Loan Documents referred to herein mean the agreement as originally executed and as hereafter modified, supplemented, extended, consolidated, or restated from time to time.

6.10    Governing Law.

This Guaranty shall be interpreted and enforced according to the laws of Ohio (without giving effect to its rules governing conflict of laws).

6.11    Consent to Jurisdiction.

Each Guarantor irrevocably consents and submits to the exclusive jurisdiction and venue of any state or federal court sitting in the county and State of Ohio with respect to any legal action arising with respect to this Guaranty and waives all objections that it may have to such jurisdiction and venue.

6.12    Waiver of Counterclaim.

EACH GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND
INTENTIONALLY WAIVES THE RIGHT TO ASSERT ANY COUNTERCLAIM,
OTHER THAN A COMPULSORY OR MANDATORY COUNTERCLAIM, IN ANY
ACTION OR PROCEEDING BROUGHT AGAINST SUCH GUARANTOR BY LENDER
OR ITS AGENTS.

6.13    Waiver of Trial by Jury.

EACH GUARANTOR AND LENDER HEREBY KNOWINGLY, VOLUNTARILY
AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY
JURY IN RESPECT OF ANY LITIGATION BASED ON THE LOAN OR ARISING OUT
OF, UNDER, OR IN CONNECTION WITH THE LOAN, THIS GUARANTY, THE
NOTE, THE LOAN AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY
COURSE OF CONDUCT, COURSE OF DEALING, STATEMENT (WHETHER
VERBAL OR WRITTEN), OR ACTION OF GUARANTOR OR LENDER.  THIS
PROVISION IS A MATERIAL INDUCEMENT FOR LENDER'S ACCEPTANCE OF
THIS GUARANTY AND LENDER'S MAKING OF THE LOAN.

*[Remainder of page is blank; signature page follows.]*

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty as of the date first written above.

"GUARANTOR":

_____
Scott A. Chappelle

_____
~~Linda A~~, Chappelle
Laura

_____
Evert Kramer, Jr.

_____
Rosalind Kramer

STATE OF _MICHIGAN_   )
                    )

COUNTY OF _INGHAM_   )

     On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared SCOTT A. CHAPPELLE, to me personally known, who being by me duly sworn, acknowledged to me that he executed the same for the purposes therein stated.

     In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _Michigan_, the day and year last above written.

                           _____
                           Notary Public

My commission expires:

_4/15/2011_____

                           JULIA L. SKINNER
              NOTARY PUBLIC - STATE OF MICHIGAN
                 COUNTY OF INGHAM
           My Commission Expires April 15, 2011
           Acting in the County of Ingham

STATE OF _MICHIGAN_   )
                    )

COUNTY OF _INGHAM_   )

     On this _6th_ day of _June_____, 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared LAURA A. CHAPPELLE, to me personally known, who being by me duly sworn, acknowledged to me that she executed the same for the purposes therein stated.

     In witness whereof, I have set my hand and affixed my official seal at my office in _Ingham_____ County, State of _MICHIGAN_ the day and year last above written.

                           _____
                           Notary Public

My commission expires:

_4/15/2011_____

                           JULIA L. SKINNER
               NOTARY PUBLIC - STATE OF MICHIGAN
                 COUNTY OF INGHAM
           My Commission Expires April 15, 2011
           Acting in the County of Ingham

STATE OF MICHIGAN )
COUNTY OF INGHAM )

On this 6th day of June , 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared EVERT KRAMER, JR. to me personally known, who being by me duly sworn, acknowledged to me that he executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in Ingham County, State of MICHIGAN, the day and year last above written.

Notary Public

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of Ingham

My commission expires:

4/15/2011

STATE OF MICHIGAN )
COUNTY OF INGHAM )

On this 6th day of June , 2008, before me, the undersigned, a notary public within and for said County and State, personally appeared ROSALIND KRAMER, to me personally known, who being by me duly sworn, acknowledged to me that she executed the same for the purposes therein stated.

In witness whereof, I have set my hand and affixed my official seal at my office in Ingham County, State of MICHIGAN, the day and year last above written.

Notary Public

JULIA L. SKINNER
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF INGHAM
My Commission Expires April 15, 2011
Acting in the County of Ingham

My commission expires:

4/15/2011

# Polsinelli

### Shalton | Flanigan | Suelthaus ᴘᴄ

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

Daniel J. Flanigan
(816) 360-4260
dflanigan@polsinelli.com

July 26, 2008

**VIA FEDERAL EXPRESS
AND REGISTERED MAIL
RETURN RECEIPT REQUESTED**

Evergreen Investment Group, L.L.C.
c/o Terra Management Company
1427 W. Saginaw, Suite 200
East Lansing, MI 48823

> **RE:** Woodland Lakes Investment Group, L.L.C., a Michigan limited liability
> company ("**Borrower**")
>
> Harrison Investment Group, L.L.C., Shawn O'Brien, Frank R. Vargas, Jr.,
> Covenant Investment Group, Inc., KTM Development Corporation, Charles W.
> Crouch, Brent Chappelle, TMC Investment Group, L.L.C., Alliance Investment
> Group, L.L.C., Masonic Investment Group, L.L.C., Abbott Road Commons,
> L.L.C., Chasco Investment Properties, L.L.C., Evergreen Investment Group,
> L.L.C., Grand Ledge Investment Group, L.L.C., SLHA Investment Group,
> L.L.C., Petoskey Investment Group, L.L.C., Score Properties, Inc., Terra
> Management Company, and WLA Management, Inc. (collectively, the
> "**Pledgors**" and, individually, each a "**Pledgor**"), Scott A. Chappelle, Laura A.
> Chappelle, Kevin T. McGraw, Sharon D. McGraw, Evert Kramer, Jr., and
> Rosalind Kramer (collectively as the "**Guarantors**")

Ladies and Gentlemen:

    We are counsel to Hartford Mezzanine Investors I, LLC, a Delaware limited
liability company ("**Secured Creditor**") and HMI I Woodland Lakes Holdings, LLC, a
Delaware limited liability company ("**Designee**"). The Secured Creditor is the holder of
that certain Term Note from Borrower to Secured Creditor dated January 4, 2006 in the
original principal amount of $3,340,000.00 (the "**Note**"). As security for the Note, the
Pledgors, as the legal and beneficial owners of one hundred percent (100%) of the equity
interests in Borrower (the "**Pledged Interests**"), executed that certain Pledge Agreement
dated January 4, 2006 (the "**Pledge Agreement**"). Pursuant to the Pledge Agreement, the
indebtedness owed under the Note is secured by the Pledged Collateral (as defined
therein).

1686751.1     Kansas City    St. Louis    Chicago    New York    Washington, D.C.
                                            Overland Park    Topeka    Edwardsville

**EXHIBIT
G**

**Polsinelli**
Shalton | Flanigan | Suelthaus

Evergreen Investment Group, L.L.C.
July 26, 2008
Page 2

Borrower, Guarantors and Pledgors executed that certain Forbearance and Modification Agreement dated June 3, 2008 ("**Agreement**"). Pursuant to Section 4(a) of the Agreement, Borrower, each Guarantor and each Pledgor agreed that, effective upon the occurrence of a Forbearance Termination Event (as defined in the Agreement), followed by written notice from Secured Creditor, (i) Secured Creditor may accept ownership of the Pledged Collateral and thereby become the owner of 100% of the Pledged Interests pursuant to the Collateral Acceptance (as defined in the Agreement), and (ii) the Pledgors shall no longer own any interests in the Borrower or in the Pledged Collateral.

This letter serves as notice to you, pursuant to Section 4(a) of the Agreement, (i) that a Forbearance Termination Event (as defined in the Agreement) has occurred, (ii) that the Collateral Acceptance is effective, complete, and final, (iii) that Secured Creditor has designated Designee as the recipient of the Collateral Acceptance, and (iv) that Designee and Secured Creditor have accepted the Pledged Collateral in satisfaction of $100,000.00 of the Obligations (as defined in the Agreement) owed to Secured Creditor.

Designee owns 100% of the Pledged Collateral, including the Pledged Interests, and, accordingly, has all voting, managerial and control rights of Borrower and all rights and interests in and to the Pledged Collateral.

**Notwithstanding the conveyance of the Pledged Interests and Collateral to Designee, the Borrower's and Guarantor's obligations under the Loan remain in full force and effect under the Agreement and under the Loan Documents (as defined in the Agreement).**

Sincerely,

POLSINELLI, SHALTON, FLANIGAN
SUELTHAUS PC

Daniel J. Flanigan, Esq.

DJF/dr

1686751.1

# Polsinelli

### Shalton | Flanigan | Suelthaus ₚc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

July 28, 2008

**VIA FEDERAL EXPRESS**

**WLA MANAGEMENT, INC.**
c/o Scott Chappelle, President
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

> **RE:**  Operating Agreement of Woodland Lakes Investment Group, LLC
> ("**Borrower**") executed October 5, 2001 (together with all amendments and
> modifications thereto, "**Operating Agreement**");
> Harrison Investment Group, L.L.C., Shawn O'Brien, Frank R. Vargas, Jr.,
> Covenant Investment Group, Inc., KTM Development Corporation, Charles W.
> Crouch, Brent Chappelle, TMC Investment Group, L.L.C., Alliance Investment
> Group, L.L.C., Masonic Investment Group, L.L.C., Abbott Road Commons,
> L.L.C., Chasco Investment Properties, L.L.C., Evergreen Investment Group,
> L.L.C., Grand Ledge Investment Group, L.L.C., SLHA Investment Group,
> L.L.C., Petoskey Investment Group, L.L.C., Score Properties, Inc., Terra
> Management Company, and WLA Management, Inc. (collectively, the
> "**Members**" and, individually, each a "**Member**")

Dear Scott:

We are counsel to Hartford Mezzanine Investors I, LLC, a Delaware limited
liability company ("**Secured Creditor**") and HMI I Woodland Lakes Holdings, LLC, a
Delaware limited liability company ("**Designee**"). The Secured Creditor is the holder of
that certain Term Note from Borrower to Secured Creditor dated January 4, 2006 in the
original principal amount of $3,340,000.00 (the "**Note**"). As security for Borrower's
obligations owed to Secured Creditor, including those obligations owed under the Note,
the Members, as the legal and beneficial owners of one hundred percent (100%) of the
equity interests in Borrower (the "**Pledged Interests**"), executed that certain Pledge
Agreement dated January 4, 2006 (the "**Pledge Agreement**") granting Secured Creditor
security interests in the Pledged Collateral (as defined therein), including the Pledged
Interests. Pursuant to that certain Forbearance and Modification Agreement dated June 3,
2008 ("**Agreement**"), Borrower and the Members agreed that, effective upon the
occurrence of a Forbearance Termination Event (as defined in the Agreement), followed
by written notice from Secured Creditor, (i) Secured Creditor may accept ownership of
the Pledged Collateral and thereby become the owner of 100% of the Pledged Interests
pursuant to the Collateral Acceptance (as defined in the Agreement), and (ii) the
Members shall no longer own any interests in the Borrower or in the Pledged Collateral.



EXHIBIT
H

# Polsinelli
Shalton | Flanigan | Suelthaus **WBA MANAGEMENT, INC.**
July 28, 2008
Page 2

Notice has been sent to the Borrower and Members, and this letter serves as notice to you, that (i) a Forbearance Termination Event has occurred, (ii) Secured Creditor has designated Designee as the recipient of the Collateral Acceptance, and (iii) Designee and Secured Creditor have accepted the Pledged Collateral in satisfaction of $100,000.00 of the Obligations (as defined in the Agreement) owed to Secured Creditor.

Designee now owns 100% of the Pledged Collateral, including 100% of the Pledged Interests, and, accordingly, owns all voting, managerial and control rights of Borrower. You, as Manager of the Borrower now have no authority to take any action whatsoever (including, without limitation, any expenditure of funds or incurring any obligation) without the prior written consent of the Designee, and any existing express or implied authority that you may have to bind the Borrower is hereby revoked.

The Designee hereby removes you as Manager of the Borrower. James MacQueen, Frank Sasso, or Samuel Russo, acting on behalf of the Designee as the new owner of the Borrower, will be contacting you with respect to the turnover of the business, property, affairs, and management of the Borrower. The Designee expects you to conduct yourself in all respects consistent with your continuing fiduciary duty to the Designee as owner of all interests in the Borrower.

Your cooperation with respect to the delivery of all books and records of the Borrower and the property owned by Borrower is appreciated.

Sincerely,

POLSINELLI SHALTON FLANIGAN
SUELTHAUS, PC

Daniel J. Flanigan

DJF/dr

1686783.3

# Polsinelli

**Shalton | Flanigan | Suelthaus**ʀᴄ

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

Brett D. Anders
(816) 360-4267
banders@polsinelli.com

October 14, 2008

**BY FEDERAL EXPRESS**

Scott A. Chappelle
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Laura A. Chappelle
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Evert Kramer, Jr.
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Rosalind Kramer
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Kevin T. McGraw
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Sharon D. McGraw
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

· Re:   **Guarantys Dated January 4, 2006 and June 3, 2008**

Ladies and Gentlemen:

This firm is counsel to Hartford Mezzanine Investors I, LLC, a Delaware limited liability company ("Mezzanine Lender").  Mezzanine Lender is the owner of that certain loan (the "Mezzanine Loan") evidenced in part by that certain Term Note, in the original principal amount of $3,340,000.00 (the "Mezzanine Note"), dated January 4, 2006, executed by Woodland Lakes Investment Group, L.L.C., a Michigan limited liability company ("Borrower").  The Mezzanine Loan was made pursuant to that certain Loan Agreement dated January 4, 2006, executed by Mezzanine Lender and Mezzanine Borrower (the "Mezzanine Loan Agreement").  On or about January 4, 2006, each of you (collectively, the "Guarantors") signed and delivered to Mezzanine Lender that certain Guaranty dated January 4, 2006 (the "January 2006 Guaranty").

On or about June 3, 2008, Scott A. Chappelle, Laura A. Chappelle, Evert Kramer, Jr. and Rosalind Kramer signed and delivered to Mezzanine Lender that certain Guaranty dated June 3, 2008 (the "June 2008 Guaranty") as a condition precedent to Mezzanine Lender's execution of that certain Forbearance and Modification Agreement ("Forbearance Agreement") dated June 3,

**EXHIBIT I**



**Polsinelli**
Shalton | Flanigan | Suelthaus

Scott A. Chappelle
Laura A. Chappelle
Evert Kramer, Jr.
Rosalind Kramer
Kevin T. McGraw
Sharon D. McGraw
October 14, 2008
Page 2

2008, between Mezzanine Lender, Borrower, Guarantors, and other entities and individuals listed on Exhibit A of the Forbearance Agreement.

Under the January 2006 Guaranty, Guarantors guaranteed specific obligations on a recourse basis as set forth therein. In turn, under Section 2.1 of the June 2008 Guaranty, Guarantors (except for Kevin and Sharon McGraw) guaranteed the punctual and complete payment of base interest on the unpaid principal amount of the Mezzanine Loan at a rate of 12 percent per annum (the "Base Interest Payments") for the period commencing June 3, 2008 through and including December 1, 2009. Additionally, under Section 2.1 of the June 2008 Guaranty, Guarantors guaranteed the punctual and complete payment and performance of all payments to all suppliers of goods or services having claims against the Borrower ("Borrower Liabilities"). The Base Interest Payments and the Borrower Liabilities are collectively referred to in the Second Guaranty and in this letter as the "Guaranteed Obligations."

Please note that, as of September 30, 2008, the amount due and owing under the January 2006 Guaranty is $42,352. This amount is owed by Guarantors to Mezzanine Lender by virtue of Borrower's failure to pay certain vendors for the months of February through July 2008 when there was cash flow generated by the property and brownfield reimbursements sufficient to pay the invoices submitted by such vendors, including: $28,221 in unpaid invoices for the month of February 2008; $910 in unpaid invoices for the month of March 2008; $1707 in unpaid invoices for the month of April 2008; $1436 in unpaid invoices for the month of May 2008; $2306 in unpaid invoices for the month of June 2008; and $7772 in unpaid invoices for the month of July 2008.

Please note further that, as of September 30, 2008, the amount of the Guaranteed Obligations under the June 2008 Guaranty is $180,417.99. This amount consists of $170,339.99 in Base Interest Payments due from June 3, 2008 through October 2008, including: $33,400.00 due for June 2008; $34,513.33 due for July 2008; $34,513.33 due for August 2008; $33,400.00 due for September 2008; and $34,513.33 due for October 2008. This amount further consists of $10,078.00 in Borrower Liabilities due from June 3, 2008 through July 2008, including $2306.00 for the month of June 2008; and $7772.00 for July 2008. Please make payment of the foregoing amounts to Mezzanine Lender on or before Monday, October 20, 2008, together with fees and costs incurred by the Mezzanine Lender, including attorneys fees, in the amount of $9576.00.

The total of the amounts itemized herein is $222,769.99. The amount owed to Lender is subject to increase as obligations continue to accrue under the January 2006 Guaranty and as additional Guaranteed Obligations are either quantified or continue to accrue under the June 2008 Guaranty. For instance, Mezzanine Lender has not yet quantified Borrower Liabilities for the

# Polsinelli
Shalton | Flanigan | Suelthaus.

Scott A. Chappelle
Laura A. Chappelle
Evert Kramer, Jr.
Rosalind Kramer
Kevin T. McGraw
Sharon D. McGraw
October 14, 2008
Page 3

months of August and September 2008, and, when those amounts are determined by Mezzanine Lender, they will be the subject of further demand.  In addition, Base Interest will continue to accrue, and will be added to the Guaranteed Obligations by Mezzanine Lender on a monthly basis, in the following amounts:

in November 2008 in the amount of $33,400.00;
in December 2008 in the amount of $34,513.33;
in January 2009 in the amount of $34,513.00;
in February 2009 in the amount of $31,173.33;
in March 2009 in the amount of $34,513.33;
in April 2009 in the amount of $33,400.00;
in May 2009 in the amount of $34,513.33;
in June 2009 in the amount of $33,400.00;
in July 2009 in the amount of $34,513.33;
in August 2009 in the amount of $34,513.33;
in September 2009 in the amount of $33,400.00;
in October 2009 in the amount of $34,513.33;
in November 2009 in the amount of $33,400.00; and
in December 2009 in the amount of $34,513.33.

You are hereby further notified that any past or future negotiation between you or your representatives or agents on the one hand and Mezzanine Lender and its representatives or agents on the other do not and shall not constitute a waiver of Mezzanine Lender's right to exercise its rights and remedies at law or in equity.  Any alleged waiver of any of Mezzanine Lender's rights shall not be effective unless in writing and duly executed by an authorized representative of Mezzanine Lender.  You shall not be entitled to rely upon any oral statements made or purported to be made by or on behalf of Mezzanine Lender or its agents in connection with any alleged agreement by or on behalf of Mezzanine Lender to refrain from exercising any of Mezzanine Lender's rights.

Nothing set forth herein is intended, and shall not be deemed, to modify, limit, release, reduce or waive any of Mezzanine Lender's rights, remedies, and/or privileges, whether at law or in equity, all of which are hereby specifically reserved.  Furthermore, the enumeration of any specific default herein is not intended, and shall not be deemed, to waive other defaults that may currently exist under the Mezzanine Loan.

# Polsinelli

Shalton | Flanigan | Suelthaus

Scott A. Chappelle
Laura A. Chappelle
Evert Kramer, Jr.
Rosalind Kramer
Kevin T. McGraw
Sharon D. McGraw
October 14, 2008
Page 4

Your immediate attention to the matters addressed in this letter is appreciated.  Thank you.

Sincerely,

Brett D. Anders  /by Matt Moriarity

Brett D. Anders


BDA:mrm

cc:   McGraw & Eckhardt, PC
1427 West Saginaw, Ste. 200
East Lansing, MI 48823
Attn: Thomas R. Eckhardt, Esq.

James MacQueen (via e-mail)
Alyson Cameron (via e-mail)
Kathryn Louttit (via e-mail)
Daniel Flanigan (via e-mail)
Matt Moriarity (via e-mail)
Marla Bell (via e-mail)

# Polsinelli

### Shalton | Flanigan | Suelthaus ℅

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

Brett D. Anders
(816) 360-4267
banders@polsinelli.com

October 22, 2008

**BY FEDERAL EXPRESS**

Scott A. Chappelle
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Laura A. Chappelle
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Evert Kramer, Jr.
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Rosalind Kramer
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Kevin T. McGraw
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Sharon D. McGraw
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

> **Re:** **Guarantys Dated January 4, 2006 and June 3, 2008**

Ladies and Gentlemen:

This firm is counsel to Hartford Mezzanine Investors I, LLC, a Delaware limited liability company ("Mezzanine Lender"). Mezzanine Lender is the owner of that certain loan (the "Mezzanine Loan") evidenced in part by that certain Term Note, in the original principal amount of $3,340,000.00 (the "Mezzanine Note"), dated January 4, 2006, executed by Woodland Lakes Investment Group, L.L.C., a Michigan limited liability company ("Borrower"). The Mezzanine Loan was made pursuant to that certain Loan Agreement dated January 4, 2006, executed by Mezzanine Lender and Mezzanine Borrower (the "Mezzanine Loan Agreement"). On or about January 4, 2006, each of you (collectively, the "Guarantors") signed and delivered to Mezzanine Lender that certain Guaranty dated January 4, 2006 (the "January 2006 Guaranty").

On or about June 3, 2008, Scott A. Chappelle, Laura A. Chappelle, Evert Kramer, Jr. and Rosalind Kramer signed and delivered to Mezzanine Lender that certain Guaranty dated June 3, 2008 (the "June 2008 Guaranty") as a condition precedent to Mezzanine Lender's execution of that certain Forbearance and Modification Agreement ("Forbearance Agreement") dated June 3, 2008, between Mezzanine Lender, Borrower, Guarantors, and other entities and individuals listed on Exhibit A of the Forbearance Agreement.

1708010.4    Kansas City    St. Louis    Chicago    New York    Washington, D.C.    Wilmington
Overland Park    Topeka    Edwardsville



EXHIBIT
J



**Polsinelli**
Shalton | Flanigan | Suelthaus

Scott A. Chappelle
Laura A. Chappelle
Evert Kramer, Jr.
Rosalind Kramer
Kevin T. McGraw
Sharon D. McGraw
October 22, 2008
Page 2

On October 14, 2008, the undersigned sent to each of you a letter notifying you of certain defaults that have occurred due to obligations that have not been met under the Guarantys, and demanding that Guarantors cure said defaults. To date, Guarantors have not cured the defaults outlined in the October 14, 2008 letter. Guarantors are hereby given further notice that the defaults set out in our October 14 letter, which are again detailed below, must be cured on or before <u>Monday, November 3, 2008.</u>

Under the January 2006 Guaranty, Guarantors guaranteed specific obligations on a recourse basis as set forth therein. In turn, under Section 2.1 of the June 2008 Guaranty, Guarantors (except for Kevin and Sharon McGraw) guaranteed the punctual and complete payment of base interest on the unpaid principal amount of the Mezzanine Loan at a rate of 12 percent per annum (the "<u>Base Interest Payments</u>") for the period commencing June 3, 2008 through and including December 1, 2009. Additionally, under Section 2.1 of the June 2008 Guaranty, Guarantors guaranteed the punctual and complete payment and performance of all payments to all suppliers of goods or services having claims against the Borrower ("<u>Borrower Liabilities</u>"). The Base Interest Payments and the Borrower Liabilities are collectively referred to in the Second Guaranty and in this letter as the "<u>Guaranteed Obligations.</u>"

Please note that, as of September 30, 2008, the amount due and owing under the January 2006 Guaranty is $42,352. This amount is owed by Guarantors to Mezzanine Lender by virtue of Borrower's failure to pay certain vendors for the months of February through July 2008 when there was cash flow generated by the property and Brownfield reimbursements sufficient to pay the invoices submitted by such vendors, including: $28,221 in unpaid invoices for the month of February 2008; $910 in unpaid invoices for the month of March 2008; $1707 in unpaid invoices for the month of April 2008; $1436 in unpaid invoices for the month of May 2008; $2306 in unpaid invoices for the month of June 2008; and $7772 in unpaid invoices for the month of July 2008.

Please note further that, as of September 30, 2008, the amount of the Guaranteed Obligations under the June 2008 Guaranty is $180,417.99. This amount consists of $170,339.99 in Base Interest Payments due from June 3, 2008 through October 2008, including: $33,400.00 due for June 2008; $34,513.33 due for July 2008; $34,513.33 due for August 2008; $33,400.00 due for September 2008; and $34,513.33 due for October 2008. This amount further consists of $10,078.00 in Borrower Liabilities due from June 3, 2008 through July 2008, including $2306.00 for the month of June 2008; and $7772.00 for July 2008. **Please make payment of the foregoing amounts to Mezzanine Lender on or before Monday, November 3, 2008, together with fees and costs incurred by the Mezzanine Lender, including attorneys fees, in the amount of $9961.00.**

1708010.4

# Polsinelli
Shelton | Flanigan | Suelthaus℠

Scott A. Chappelle
Laura A. Chappelle
Evert Kramer, Jr.
Rosalind Kramer
Kevin T. McGraw
Sharon D. McGraw
October 22, 2008
Page 3

The total of the amounts itemized herein is $222,652.99.  The amount owed to Lender is subject to increase as obligations continue to accrue under the January 2006 Guaranty and as additional Guaranteed Obligations are either quantified or continue to accrue under the June 2008 Guaranty.  For instance, Mezzanine Lender has not yet quantified Borrower Liabilities for the months of August and September 2008, and, when those amounts are determined by Mezzanine Lender, they will be the subject of further demand.  In addition, Base Interest will continue to accrue, and will be added to the Guaranteed Obligations by Mezzanine Lender on a monthly basis, in the following amounts:

in November 2008 in the amount of $33,400.00;
in December 2008 in the amount of $34,513.33;
in January 2009 in the amount of $34,513.00;
in February 2009 in the amount of $31,173.33;
in March 2009 in the amount of $34,513.33;
in April 2009 in the amount of $33,400.00;
in May 2009 in the amount of $34,513.33;
in June 2009 in the amount of $33,400.00;
in July 2009 in the amount of $34,513.33;
in August 2009 in the amount of $34,513.33;
in September 2009 in the amount of $33,400.00;
in October 2009 in the amount of $34,513.33;
in November 2009 in the amount of $33,400.00; and
in December 2009 in the amount of $34,513.33.

You are hereby further notified that any past or future negotiation between you or your representatives or agents on the one hand and Mezzanine Lender and its representatives or agents on the other do not and shall not constitute a waiver of Mezzanine Lender's right to exercise its rights and remedies at law or in equity.  Any alleged waiver of any of Mezzanine Lender's rights shall not be effective unless in writing and duly executed by an authorized representative of Mezzanine Lender.  You shall not be entitled to rely upon any oral statements made or purported to be made by or on behalf of Mezzanine Lender or its agents in connection with any alleged agreement by or on behalf of Mezzanine Lender to refrain from exercising any of Mezzanine Lender's rights.

Nothing set forth herein is intended, and shall not be deemed, to modify, limit, release, reduce or waive any of Mezzanine Lender's rights, remedies, and/or privileges, whether at law or in equity, all of which are hereby specifically reserved.  Furthermore, the enumeration of any

# Polsinelli
Shalton | Flanigan | Suelthaus..

Scott A. Chappelle
Laura A. Chappelle
Evert Kramer, Jr.
Rosalind Kramer
Kevin T. McGraw
Sharon D. McGraw
October 22, 2008
Page 4

specific default herein is not intended, and shall not be deemed, to waive other defaults that may currently exist under the Mezzanine Loan.

Your immediate attention to the matters addressed in this letter is appreciated. Thank you.

Sincerely,

Brett D. Anders

Brett D. Anders

BDA:mrm

cc:     McGraw & Eckhardt, PC
        1427 West Saginaw, Ste. 200
        East Lansing, MI 48823
        Attn: Thomas R. Eckhardt, Esq.

        James MacQueen (via e-mail)
        Frank Sasso (via e-mail)
        Alyson Cameron (via e-mail)
        Kathryn Louttit (via e-mail)
        Bill Bowman (via e-mail)
        Margie Keeley (via e-mail)
        Daniel Flanigan (via e-mail)
        Matt Moriarity (via e-mail)
        Marla Bell (via e-mail)

1708010.4

# Polsinelli

### Shalton | Flanigan | Suelthaus rc

700 West 47th Street, Suite 1000 | Kansas City, MO 64112-1802
(816) 753-1000 | Facsimile: (816) 753-1536 | www.polsinelli.com

Brett D. Anders
(816) 360-4267
banders@polsinelli.com

November 11, 2008

**BY FEDERAL EXPRESS**

Scott A. Chappelle
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Laura A. Chappelle
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Evert Kramer, Jr.
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Rosalind Kramer
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Kevin T. McGraw
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Sharon D. McGraw
1427 West Saginaw, Ste. 200
East Lansing, MI 48823

Re:     **Guarantys Dated January 4, 2006 and June 3, 2008**

Ladies and Gentlemen:

This Firm is counsel to Hartford Mezzanine Investors I, LLC, a Delaware limited liability company ("Mezzanine Lender"). Mezzanine Lender is the owner of that certain loan (the "Mezzanine Loan") evidenced in part by that certain Term Note, in the original principal amount of $3,340,000.00 (the "Mezzanine Note"), dated January 4, 2006, executed by Woodland Lakes Investment Group, L.L.C., a Michigan limited liability company ("Borrower"). The Mezzanine Loan was made pursuant to that certain Loan Agreement dated January 4, 2006, executed by Mezzanine Lender and Mezzanine Borrower (the "Mezzanine Loan Agreement"). On or about January 4, 2006, each of you (collectively, the "Guarantors") signed and delivered to Mezzanine Lender that certain Guaranty dated January 4, 2006 (the "January 2006 Guaranty").

On or about June 3, 2008, Scott A. Chappelle, Laura A. Chappelle, Evert Kramer, Jr. and Rosalind Kramer signed and delivered to Mezzanine Lender that certain Guaranty dated June 3, 2008 (the "June 2008 Guaranty") as a condition precedent to Mezzanine Lender's execution of that certain Forbearance and Modification Agreement ("Forbearance Agreement") dated June 3, 2008, between Mezzanine Lender, Borrower, Guarantors, and other entities and individuals listed on Exhibit A of the Forbearance Agreement.

**EXHIBIT**

K

1713854.1     Kansas City     St. Louis     Chicago     New York     Washington, D.C.     Wilmington
                              Overland Park     Topeka     Edwardsville



Scott A. Chappelle
Laura A. Chappelle
Evert Kramer, Jr.
Rosalind Kramer
Kevin T. McGraw
Sharon D. McGraw
November 11, 2008
Page 2

On October 14, 2008, the undersigned sent to each of you a letter notifying you of certain defaults that have occurred due to obligations that have not been met under the Guarantys, and demanding that Guarantors cure said defaults. Further, on October 21, 2008, the undersigned sent to each of you a second demand letter again outlining the defaults that have occurred. Copies of both the October 14, 2008 letter and the October 21, 2008 letter are enclosed for your reference. Please note that demand is hereby renewed for payment of such amounts.

In addition, Mezzanine Lender is informed and believes that one or more of the events set out in the January 2006 Guaranty have occurred which trigger recourse liability thereunder for all of Borrower's obligations owed to Lender under the Loan Documents. Accordingly, demand is hereby made for payment, pursuant to sections 1(a) through (d) of the January 2006 Guaranty, in the following amounts: outstanding principal in the amount of $3,340,000.00; interest through November 6, 2008 in the amount of $724,746.63; interest continuing to accrue thereafter on a per diem basis; late charges in the amount of $35,562.12; fees, costs and expenses in the amount of $427,884.29; and prepayment consideration in the amount of $132,836.91. The amounts itemized herein will increase in amount as interest, late charges, fees, costs and expenses continue to accrue. In order to satisfy the demands for payment set forth herein, please make delivery of payment to Lender, so as actually received by Lender, on or before <u>Tuesday, November 18, 2008</u>.

You are hereby further notified that any past or future negotiation between you or your representatives or agents on the one hand and Mezzanine Lender and its representatives or agents on the other do not and shall not constitute a waiver of Mezzanine Lender's right to exercise its rights and remedies at law or in equity. Any alleged waiver of any of Mezzanine Lender's rights shall not be effective unless in writing and duly executed by an authorized representative of Mezzanine Lender. You shall not be entitled to rely upon any oral statements made or purported to be made by or on behalf of Mezzanine Lender or its agents in connection with any alleged agreement by or on behalf of Mezzanine Lender to refrain from exercising any of Mezzanine Lender's rights.

Nothing set forth herein is intended, and shall not be deemed, to modify, limit, release, reduce or waive any of Mezzanine Lender's rights, remedies, and/or privileges, whether at law or in equity, all of which are hereby specifically reserved. Furthermore, the enumeration of any specific default herein is not intended, and shall not be deemed, to waive other defaults that may currently exist under the Mezzanine Loan.

Your immediate attention to the matters addressed in this letter is appreciated. Thank you.



Scott A. Chappelle
Laura A. Chappelle
Evert Kramer, Jr.
Rosalind Kramer
Kevin T. McGraw
Sharon D. McGraw
November 11, 2008
Page 3

Sincerely,

Brett D. Anders  /by M-M

Brett D. Anders


BDA:mrm

cc:     McGraw & Eckhardt, PC
        1427 West Saginaw, Ste. 200
        East Lansing, MI 48823
        Attn: Thomas R. Eckhardt, Esq.

        James MacQueen (via e-mail)
        Frank Sasso (via e-mail)
        Alyson Cameron (via e-mail)
        Kathryn Louttit (via e-mail)
        Bill Bowman (via e-mail)
        Margie Keeley (via e-mail)
        Daniel Flanigan (via e-mail)
        Matt Moriarity (via e-mail)
        Marla Bell (via e-mail)